UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

GUCCI AMERICA, INC., BALENCIAGA AMERICA,  :
INC., BALENCIAGA S.A., BOTTEGA VENETA      :
INTERNATIONAL S.A.R.L., BOTTEGA VENETA,    :
INC., LUXURY GOODS INTERNATIONAL (L.G.I.)  :
S.A. and YVES SAINT LAURENT AMERICA, INC.  :

        Plaintiffs,        :                  10 Civ. _____

     -against-          :

WEIXING LI and LIJUN XU a/k/a JACK LONDON, all  :
doing business as REDTAGPARTY,                  :
MYLUXURYBAGS.COM, XPRESSDESIGNERS.COM,          :
XPRESSDESIGNER.NET, and DESIGNER                :
HANDBAGS; ABC COMPANIES;                        :
and JOHN DOES,                                  :

        Defendants.     :

------------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OFPLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, ASSET RESTRAINING ORDER, EXPEDITED DISCOVERY ORDER, AND ORDER TO SHOW CAUSE FOR <u>PRELIMINARY INJUNCTION</u>

Robert L. Weigel (RW 0163)
Howard S. Hogan (HH 7995)
Jennifer C. Halter (JH 7032)
Anne M. Coyle (AC 3158)
Kimberly Lindsay (KL 5776)
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs Gucci America, Inc.,
Balenciaga S.A., Balenciaga America, Inc.,
Bottega Veneta, Inc., Bottega Veneta International
S.a.r.l., Luxury Goods International (L.G.I.) S.A.,
and Yves Saint Laurent America, Inc.*

New York, New York
June 24, 2010

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

ARGUMENT ........................................................................................................ 10

I.    PLAINTIFFS HAVE MET THE STANDARD FOR A TEMPORARY
      RESTRAINING ORDER AND PRELIMINARY INJUNCTION ..................... 10

      A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR
            TRADEMARK RELATED CLAIMS                                           11

            1.    There Is a Likelihood of Confusion                           11

                  a.    Plaintiffs' Marks Are Strong and Distinctive           12

                  b.    The Infringing Products Are Virtually Identical
                        to Authorized Plaintiffs' Products                     13

                  c.    The Competing Products Overlap and There Is
                        No Gap to Bridge                                       14

                  d.    Defendants' Marks Were Designed in Bad Faith           15

                  e.    The Quality of Defendants' Products, Although
                        Inferior, Is Similar                                   15

      B.    Plaintiffs Are Also Likely to Succeed on Their State Law Claims    16

      C.    Defendants' Activities Clearly Dilute Plaintiffs' Marks            17

      D.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE
            ABSENCE OF AN INJUNCTION                                           18

            1.    Defendants Will Continue to Damage Plaintiffs'
                  Goodwill and Reputations                                     19

            2.    Defendants Will Continue to Interfere With Plaintiffs'
                  Rights to Control the Quality of Goods Bearing
                  Plaintiffs' Marks                                            20

      E.    THE BALANCE OF THE HARDSHIPS FAVORS PLAINTIFFS                      21

      F.    AN ORDER ENJOINING DEFENDANTS' ACTIVITIES WILL
            ALSO SERVE THE PUBLIC INTEREST                                     22

i

**Table of Contents**
**(Continued)**

Page

G.     PLAINTIFFS ALSO SATISFY THE ALTERNATE STANDARD FOR A PRELIMINARY INJUNCTION.     24

II.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS' TRANSFER OF ASSETS ........................... 25

III.     RULE 64 PROVIDES ADDITIONAL SUPPORT FOR AN ASSET FREEZE. 28

IV.     PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY .................... 30

CONCLUSION................................................................................................................ 33

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.,*
No. 94 Civ. 5620 (JFK), 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994) ................................... 31

*Am. Safety Table Co. v. Schreiber,*
287 F.2d 417 (2d Cir. 1961) ................................................................................. 26

*Ayyash v. Bank Al-Madina,*
233 F.R.D. 325 (S.D.N.Y. 2005) ................................................................. 28, 29, 31

*Balenciaga Am., Inc. et al. v. MyPurseWorld.com, et al.,*
No. 2010 Civ. 2912 (LTS) (S.D.N.Y.) ............................................................................. 3

*Balenciaga v. Treasure Enterprises Ltd.,*
WIPO Admin. Panel Decision D2009-0660 (July 18, 2009) ................................... 13

*Biosafe-One, Inc. v. Hawks,*
524 F. Supp. 2d 452 (S.D.N.Y. 2007) ................................................................. 18

*Consolidated Cigar Corp. v. Monte Cristi de Tabacos,*
58 F. Supp. 2d 188 (S.D.N.Y. 1999) ................................................................. 16

*Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC,*
500 F. Supp. 2d 296 (S.D.N.Y. 2007) ................................................................. 17

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ................................................................................. 11

*El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.,*
806 F.2d 392 (2d Cir. 1986) ................................................................................. 21

*Fourth Toro Family L.P. v. PV Bakery, Inc.,*
88 F. Supp. 2d 188 (S.D.N.Y. 2000) ................................................................. 13

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,*
111 F.3d 993 (2d Cir. 1997) ................................................................................. 14

*Gayle Martz, Inc. v. Sherpa Pet Group, LLC,*
651 F. Supp. 2d 72 (S.D.N.Y. 2009) ................................................... 19, 20, 21, 23

*GTFM, Inc. v. Solid Clothing Inc.,*
215 F. Supp. 2d 273 (S.D.N.Y. 2002) ............................................... 14, 15, 16, 18

**Table of Authorities**
**(Continued)**

Page(s)

*Gucci Am. Inc. v. Ashley Reed Trading, Inc.*,
   00 Civ. 6041 (RCC), 2003 WL 22327162 (S.D.N.Y. Oct. 10, 2003) ...................................... 12

*Gucci Am., Inc. v. Action Activewear, Inc.*,
   759 F. Supp. 1060 (S.D.N.Y. 1991) .............................................................. 13, 14, 15, 16, 17

*Gucci Am., Inc. v. Bagsmerchant, LLC et al.*,
   2010 Civ. 2911 (DAB) (JCF) (S.D.N.Y.) ............................................................................ 3

*Gucci Am., Inc. v. Curveal Fashion et al.*,
   09 Civ. 8458 (RJS) (S.D.N.Y.) ........................................................................................ 3

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
   286 F. Supp. 2d 284 (S.D.N.Y. 2003) ............................................................................ 12

*Gucci Am., Inc. v. Frontline Processing Corp., et al.*,
   No. 09 Civ. 6925 (HB) (S.D.N.Y.) ................................................................................. 6

*Gucci Am., Inc. v. Laurette Co., Inc.*,
   08 Civ. 5065 (LAK) (S.D.N.Y.) ...................................................................................... 3

*Gucci Am., Inc. v. MyReplicaHandbag.com*,
   07 Civ. 2438 (JGK) (S.D.N.Y. March 4, 2008) ........................................................... 3, 27

*Gucci America, Inc. v. HGL Enterprises*,
   07 Civ. 5569 (RMB) (S.D.N.Y.) ..................................................................................... 3

*Gucci Shops, Inc. v. Dreyfoos & Assocs., Inc.*,
   Case No. 83-709-CIV-ALH, 1983 WL 425 (S.D. Fla. Nov. 7, 1983) ............................... 13, 17

*Gucci Shops, Inc. v. R.H. Macy & Co., Inc.*,
   446 F. Supp. 838 (S.D.N.Y. 1977) ............................................................................... 13, 17

*Hermes Int'l v. Lederer de Paris Fifth Ave. Inc.*,
   219 F.3d 104 (2d Cir. 2000) ........................................................................................ 22, 23

*Hotel 71 Mezz Lender LLC v. Falor et al.*,
   14 N.Y.3d 303, 900 N.Y.S.2d 698 (2010) ........................................................................ 28

*In re Vuitton Et Fils S.A.*,
   606 F.2d 1 (2d Cir. 1979) ............................................................................................ 12, 27

*Itel Containers Int'l. Corp. v. Companhia de Navegacao Lloyd Brasileiro*,
   No. 90 Civ. 8191 (CES), 1991 WL 12131 (S.D.N.Y. Jan. 25, 1991) ...................................... 29

**Table of Authorities**
**(Continued)**

Page(s)

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
  306 F. Supp. 2d 482 (S.D.N.Y. 2004) ................................................................. 29

*Karam Prasad, LLC v. Cache, Inc.*,
  No. 07 Civ. 5785(PAC), 2007 WL 2438396 (S.D.N.Y. Aug. 27, 2007)................................. 17

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*,
  831 F. Supp. 123 (S.D.N.Y. 1993) ................................................................. 15, 18

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
  51 F.3d 982 (11th Cir. 1995) ................................................................. 25

*Levitt Corp. v. Levitt*,
  593 F.2d 463 (2d Cir. 1979) ................................................................. 26

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
  10 F. Supp. 2d 271 (S.D.N.Y. 1998) ................................................................. 16

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986) ................................................................. 13

*Mason Tenders Dist. Council Pension Fund v. Messera*,
  No. 95 Civ. 9341 (RWS), 1997 WL 223077 (S.D.N.Y. May 7, 1997) ................................. 26

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
  312 F.3d 94 (2d Cir. 2002) ................................................................. 10, 24

*Microsoft Corp. v. Atek 3000 Computer Inc.*,
  No. 06 Civ. 6403 (SLT) (SMG), 2008 WL 2884761 (E.D.N.Y. July 23, 2008) ..................... 20

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
  818 F.2d 254 (2d Cir. 1987) ................................................................. 15

*Moseley v. V Secret Catalogue, Inc.*,
  537 U.S. 418 (2003)................................................................. 14, 17

*Multi-Local Media Corp. v. 800 Yellow Book Inc.*,
  813 F. Supp. 199 (E.D.N.Y. 1993) ................................................................. 19

*N. Face Apparel Corp. v. TC Fashions, Inc.*,
  05 Civ. 9083 (RMB), 2006 WL 838993 (S.D.N.Y. March 30, 2006)................................. 25

*Nabisco, Inc. v. PF Brands, Inc.*,
  191 F.3d 208 (2d Cir. 1999) ................................................................. 14, 18

**Table of Authorities**
**(Continued)**

Page(s)

*NBA Props., Inc. v. YMG, Inc.*,
  No. 93 C 1533, 1993 WL 462836 (N.D. Ill. Nov. 9, 1993)........................................ 15

*Nike, Inc. v. Lydner*,
  No. 6:07-cv-1654, 2008 WL 4426633 (M.D. Fla. Sept. 25, 2008) ........................... 21

*Omega Importing Corp. v. Petri-Kine Camera Co., Inc.*,
  451 F.2d 1190 (2d Cir. 1971) .................................................................................. 19

*Paddington Corp. v. Attiki Importers & Distribs., Inc.*,
  996 F.2d 577 (2d Cir. 1993) ..................................................................................... 14

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) ........................................................... 11, 12, 13, 15, 16

*Polo Fashions, Inc. v. Craftex, Inc.*,
  816 F.2d 145 (4th Cir. 1987) ................................................................................... 12

*Polymer Tech. Corp. v. Mimran*,
  975 F.2d 58 (2d Cir.), amended by, reported at 1992 U.S. App. LEXIS 32204 (2d Cir. 1992),
  aff'd, 37 F.3d 74 (2d Cir. 1994).............................................................................. 16

*Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., LLC*,
  144 F. Supp. 2d 241 (S.D.N.Y. 2001) ..................................................................... 26

*Rado Watch Co., Ltd. v. ABC Co.*,
  No. 92 Civ. 3657 (PKL), 1992 WL 142747 (S.D.N.Y. June 8, 1992) ..................... 14

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*,
  737 F. Supp. 1521 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992) .......... 25, 26

*Republic of the Philippines v. Marcos*,
  862 F.2d 1355 (9th Cir. 1988) ................................................................................. 26

*Reuters Ltd. v. United Press Int'l Inc.*,
  903 F.2d 904 (2d Cir. 1990) ............................................................................... 22, 24

*Salinger v. Colting*,
  No. 09-2878-cv, 2010 WL 1729126 (2d Cir. Apr. 30, 2010)................................... 11

*Savin Corp. v. Savin Group*,
  391 F.3d 439 (2d Cir. 2004) .................................................................................... 17

*SLY Magazine, LLC v. Weider Publ'ns L.L.C.*,
  No. 05-Civ-3940 (CM), 2007 WL 4577389 (S.D.N.Y. Dec. 17, 2007)................... 18

**Table of Authorities**
**(Continued)**

Page(s)

*The N.Y. State Soc'y of Certified Public Accountants v. Eric Louis Assocs., Inc.,*
    79 F. Supp. 2d 331 (S.D.N.Y. 1999) ................................................................ 15

*Thornapple Assocs., Inc. v. Sahagen,*
    No. 06 Civ. 6412, 2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) ............................ 30

*Topps Co., Inc. v. Gerrit J. Verburg Co.,*
    41 U.S.P.Q.2d 1412 (S.D.N.Y. 1996)................................................................... 12

*Tri-Star Pictures, Inc. v. Unger,*
    14 F. Supp. 2d 339 (S.D.N.Y. 1998) .................................................................. 16

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.,*
    749 F. Supp. 473 (S.D.N.Y. 1990) ..................................................................... 31

*United States v. Torkington,*
    812 F.2d 1347 (11th Cir. 1987) ......................................................................... 23

*Virgin Enters., Ltd. v. Nawab,*
    335 F.3d 141 (2d Cir. 2003) ....................................................... 10, 11, 14

*Von Grabe v. Ziff Davis Publ'g Co.,*
    91 Civ. 6275 (DLC), 1994 WL 719697 (S.D.N.Y. Dec. 29, 1994)........................ 10

*Zino Davidoff SA v. CVS Corp.,*
    571 F.3d 238 (2d Cir. 2009) .............................................................................. 21

**Statutes**

15 U.S.C. § 1114................................................................................................. 11

15 U.S.C. § 1117(a) ........................................................................................... 25

15 U.S.C. § 1117(b) ........................................................................................... 25

15 U.S.C. § 1117(c) ........................................................................................... 25

15 U.S.C. § 1125(a) ........................................................................................... 11

15 U.S.C. § 1125(c) ........................................................................................... 18

N.Y.C.P.L.R. 6201.............................................................................................. 29

N.Y.C.P.L.R. 6201(1).......................................................................................... 29

N.Y.C.P.L.R. 6210.............................................................................................. 29

**Table of Authorities**
**(Continued)**

Page(s)

N.Y.C.P.L.R. 6212(a) ................................................................................................ 29

Prioritizing Resources and Organization for Intellectual Property Act of 2008,
    Pub. L. No. 110-403, § 104, 122 Stat. 4256 ......................................................... 25

Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730
    (codified in relevant part at 15 U.S.C. § 1125(c)(1) ............................................ 17

**Other Authorities**

Joint Statement, 130 Cong. Rec. H 12,080 (1984) .................................................... 27

Press Release, Department of Justice Office of Public Affairs,
    Justice Department Announces new Intellectual Property Task Force
    as Part of Broad IP Enforcement Initiative (Feb. 12, 2010) ................................. 24

**Rules**

F.R.C.P. 56(d) ............................................................................................................ 12

Fed. R. Civ. P. 26(d) .................................................................................................. 31

Fed. R. Civ. P. 30(b) .................................................................................................. 31

Fed. R. Civ. P. 34(b) .................................................................................................. 31

Fed. R. Civ. P. 64 ...................................................................................................... 28

**Treatises**

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:47 .......................... 19

Plaintiffs Gucci America, Inc. ("Gucci"), Balenciaga America, Inc. and Balenciaga S.A. (together "Balenciaga"), Bottega Veneta International S.a.r.l. and Bottega Veneta, Inc. (together "Bottega Veneta"), and Luxury Goods International (L.G.I.) S.A. and Yves Saint Laurent America, Inc. (together "Yves Saint Laurent") (collectively, "Plaintiffs"), submit this memorandum of law in support of their application for a temporary restraining order, an order to show cause for preliminary injunction, and an order for expedited discovery against Defendants Weixing Li and Lijun Xu a/k/a Jack London, doing business as Redtagparty,[1] Myluxurybags.com, Xpressdesigners.com, Xpressdesigner.net, and Designer Handbags; and ABC Companies; and John Does (collectively "Defendants").[2]

## PRELIMINARY STATEMENT

Defendants have, without authorization or consent, misappropriated Plaintiffs' world famous trademarks for use in connection with their counterfeiting business. Specifically, Defendants offer for sale, sell, and ship various types of handbags, as well as wallets and other consumer goods employing Plaintiffs' trademarks. In fact, Defendants explicitly label their products as "Gucci," "Balenciaga," "Bottega Veneta" and "Yves Saint Laurent" products, and falsely claim that they are selling authentic merchandise produced by Plaintiffs. Defendants knowingly traffic in these counterfeit products in reckless disregard of trademark laws and Plaintiffs' trademark rights.

---

[1] Redtagparty.com was previously sued by a different luxury brand owner in an unrelated action. Plaintiffs here are not seeking injunctive relief against the website currently available at the domain Redtagparty.com, ownership of which was transferred to the plaintiff brand owner in that action pursuant to a default judgment.

[2] Based on information received to date, Plaintiffs believe that other entities and individuals, whose identities have not yet been discovered, are also liable as joint tortfeasors with Mr. Xu a/k/a Mr. London and Mr. Li. Their identities will be the subject of discovery as this case proceeds.

Defendants are engaged in a practice that courts in this District and elsewhere have uniformly condemned. Their actions have deceived untold numbers of unsuspecting consumers, thereby causing Plaintiffs irreparable harm and an incalculable loss of goodwill and damages. In view of the foregoing, Plaintiffs respectfully request that this Court issue: (i) a temporary restraining order against Defendants enjoining their manufacture, importation, exportation, distribution, offer for sale, and sale of counterfeit products bearing Plaintiffs' trademarks; (ii) an asset restraining order; (iii) an order for expedited discovery allowing Plaintiffs to inspect and copy Defendants' books and records that go to the heart of this dispute; and (iv) an order to show cause why a preliminary injunction should not issue.

## STATEMENT OF FACTS

Plaintiffs are leaders in the design, marketing and distribution of premium, high-quality luxury items offered to the public under the Gucci, Balenciaga, Bottega Veneta and Yves Saint Laurent families of trademarks referenced in the Complaint filed herewith, among others (collectively, the "Plaintiffs' Marks"). *See generally* Declaration of Stacy Feldman, dated June 22, 2010 ("Feldman Decl."). For more than fifty years, Plaintiffs have both developed their respective reputations and distinctive images across an expanding number of products, as well as both domestic and international markets (the "Plaintiffs' Products"). *Id.* Plaintiffs' Marks are famous and widely-recognized brands. Plaintiffs have carefully built their reputations by, among other things, adhering to quality control standards and their respective commitments to customer service. *Id.* As such, the Plaintiffs' Products are manufactured pursuant to specific guidelines. *Id.* In addition, Plaintiffs spend millions of dollars annually to advertise and promote their products and their marks. *Id.*

As a result of Plaintiffs' extensive marketing and promotional efforts, as well as the high quality of the Plaintiffs' Products, the Plaintiffs' Products have achieved an outstanding

reputation among consumers. Concurrently, the Plaintiffs' Marks have become well and favorably known in the industry and to the public as the exclusive source of the Plaintiffs' Products, and have come to symbolize the goodwill of Plaintiffs' Products. Plaintiffs' marketing efforts, combined with their attention to quality and construction, have resulted in billions of dollars in sales of the Plaintiffs' Products.

Through the course of an ongoing investigation into sales of counterfeit versions of Plaintiffs' Products, Plaintiffs became aware that Defendants, among others, had started to offer counterfeit versions of the Plaintiffs' Products for sale to consumers (the "Counterfeit Products"). *See* Declaration of Michael F. Falsone dated June 23, 2010 ("Falsone Decl.") ¶¶ 2-4. Plaintiffs commenced a diligent investigation into these activities and have brought suit against multiple parties. *Id.*; *see also* Feldman Decl., ¶¶ 41, 68; Declaration of Robert L. Weigel, dated June 24, 2010 ("Weigel Decl."), *passim*.[3] In particular, Plaintiffs have confirmed that Defendants were responsible for the marketing and sale of the Counterfeit Products. *See*

---

[3]    Plaintiff Gucci has filed six other actions with this Court against other defendants who similarly sold counterfeit versions of Gucci's Products on their websites. In the first action, Gucci received a judgment and damages award of $4.3 million. Weigel Decl., ¶ 7, Ex. 6 (Judgment dated March 4, 2008 in *Gucci Am., Inc. et al v. MyReplicaHandBag.com*, 07 Civ. 2438 (JGK) (S.D.N.Y. March 4, 2008). In the second action, Gucci obtained a $2 million consent judgment from the defendants. Weigel Decl., ¶ 8, Ex. 7 (Final Order and Consent Judgment dated Nov. 28, 2007 in *Gucci Am., Inc. v. HGL Enterprises*, 07 Civ. 5569 (RMB) (S.D.N.Y.)). In the third action, Gucci obtained a $5.2 million consent judgment from the defendants. Weigel Decl., ¶ 9, Ex. 8 (Final Order and Consent Judgment dated Dec. 15, 2008 in *Gucci Am., Inc. v. Laurette Co., Inc.*, 08 Civ. 5065 (LAK) (S.D.N.Y.)). In the fourth action, Gucci and Balenciaga obtained a $13.7 million default judgment. The two most recent actions filed by Plaintiffs are currently pending. Weigel Decl., ¶ 10, Ex. 9 (Judgment dated Jan. 20, 2010 in *Gucci Am., Inc. v. Curveal Fashion et al.*, 09 Civ. 8458 (RJS) (S.D.N.Y.)); Weigel Decl., ¶ 5, Ex. 4 (Preliminary Injunction dated May 17, 2010 in *Balenciaga Am., Inc. et al. v. MyPurseWorld.com, et al.*, No. 2010 Civ. 2912 (LTS) (S.D.N.Y.)); Weigel Decl., ¶ 5, Ex. 5 (Preliminary Injunction dated May 23, 2010 in *Gucci Am., Inc. v. Bagsmerchant, LLC et al.*, 2010 Civ. 2911 (DAB) (JCF) (S.D.N.Y.)).

*generally* Falsone Decl. Defendants' Counterfeit Products closely resemble Plaintiffs' Products, and display exact copies of the Plaintiffs' Marks and other design elements.

For example, shown below on the left is an image of an authentic Gucci "Jolie" large tote with double straps. Defendants' Counterfeit Products include a nearly identical version of this "Jolie" large tote with double straps, shown on the right. The overall visual impact of Defendants' Counterfeit Product is not only confusingly similar to the authentic Gucci handbag shown on the left, they both bear Gucci's federally registered GUCCI trademark name, non-interlocking "GG" monogram, repeating "GG" design and green-red-green stripe. *See* Feldman Decl., Ex. 1 (U.S. Reg. Nos. 876,292; 1,107,311; 1,122,780, 2,042,805; 3,061,918; 3,072,549).




**AUTHENTIC**                    **COUNTERFEIT**

Similarly, shown below on the left is an image of an authentic Balenciaga First Bag. Defendants' Counterfeit Products include a nearly identical version of this authentic Balenciaga handbag, shown on the right. The overall visual impact of Defendants' Counterfeit Product is not only confusingly similar to the authentic Balenciaga handbag shown on the left, Defendants have used the Balenciaga design and even displayed a fraudulent label that bears the federally registered Balenciaga trademark name. *See id.* Ex. 3 (U.S. Reg. Nos. 3,044,207; 3,344,631).




*AUTHENTIC*                           *COUNTERFEIT*

Similarly, shown below on the left is an image of an authentic Bottega Veneta Woven

Classic Hobo.  Defendants' Counterfeit Products include a nearly identical version of this

authentic Bottega Veneta handbag, shown on the right.  *Id.* ¶ 48.  The overall visual impact of

Defendants' Counterfeit Product is not only confusingly similar to the authentic Bottega Veneta

handbag shown on the left, they both display the trademarked Bottega Veneta name.  *See id.* Ex.

6 (U.S. Reg. Nos. 1,086,395; 3,454,021).




AUTHENTIC                           COUNTERFEIT

Lastly, shown below on the left is an image of an authentic Yves Saint Laurent Large

Muse Top Handle Bag.  Defendants' Counterfeit Products include a nearly identical version of

this authentic Yves Saint Laurent handbag, shown on the right.  The overall visual impact of

5

Defendants' Counterfeit Product is not only confusingly similar to the authentic Yves Saint

Laurent handbag shown on the left, they both display the trademarked Yves Saint Laurent name.

*See id.* Ex. 9 (U.S. Reg. Nos. 1,711, 127; 1,745,483).




AUTHENTIC                          COUNTERFEIT

Defendants' Counterfeit Products all follow this pattern – each displays copies of the

Plaintiffs' Marks and uses the color scheme and design of the Plaintiffs' Products.

Defendants sell many of their Counterfeit Products through the use of an Internet website

that may be located through the Uniform Resource Locator ("URL") designation

<www.Myluxurybags.com> ("Defendants' Website") and possibly others yet unknown to

Plaintiffs.  Defendants offer their Counterfeit Products both directly to consumers through their

website and to be resold to the public through conventional channels on a wholesale basis.

Plaintiffs' investigation has tied Defendants' Website, through archived webpages,

information available through online databases, as well as documents produced in the action

*Gucci Am., Inc. v. Frontline Processing Corp., et al.*, No. 09 Civ. 6925 (HB) (S.D.N.Y.) to

Defendants Lijun Xu a/k/a Jack London and Weixing Li.  Defendants are based in San Diego,

California.  Falsone Decl., ¶¶ 26-27, 32-33, 38-39, 44-45 & Exs. 3-4.

Defendants' Website makes liberal uses of Plaintiffs' Marks.  For example, shown below are true and accurate screen shots of Defendants' Website, repeatedly referring to its Counterfeit Products as "Gucci," "Balenciaga," "Bottega Veneta" and "Yves Saint Laurent" products.









Falsone Decl., ¶¶ 5-6.

As detailed in the accompanying declaration of Michael F. Falsone, Plaintiffs'
investigator contacted Defendants' Website and purchased multiple Counterfeit Products, which
were shipped to Plaintiffs' investigator in New York. *Id.*, *passim.* Plaintiffs examined these
Counterfeit Products and confirmed that they are inferior reproductions of the Plaintiffs'
Products, complete with labels and hangtags bearing counterfeits of the Plaintiffs' Marks.
Among other identifiers, the Products are clearly inauthentic because the workmanship, labeling,
packaging, and general quality of assembly of the samples is poor and does not match the
specifications or quality standards for genuine Plaintiffs' Products. Feldman Decl., ¶¶ 46, 50,
54, 58, 61. The Counterfeit Products do not contain authorized tags or certificates of authenticity
from Plaintiffs. *Id.* at ¶ 61. Plaintiffs did not manufacture, inspect or package the Counterfeit
Products, and did not approve the Counterfeit Products for sale or distribution. *Id.* Plaintiffs did

not authorize Defendants to manufacture, import, export, distribute, advertise, sell, or offer to sell the Counterfeit Products. *Id.* Plaintiffs have not had the opportunity to control the quality and nature of the Counterfeit Products. *Id.*

The purchases made by Plaintiffs' investigator also show that Defendants keep the profits of the sales from Counterfeit Profits at least temporarily with third-party financial institutions. In particular, Plaintiffs' investigator attempted to purchase and paid for Defendants' Counterfeit Products designed to replicate a "Gucci" wallet, a "Balenciaga" bag, a "Bottega Veneta" bag and an "Yves Saint Laurent" bag from www.Myluxurybags.com. Falsone Decl., *passim.* In these instances, agents of Defendants accepted payment through processors of American Express credit cards. *Id.* Plaintiffs have also learned through discovery in a parallel litigation that Defendants process significant volumes of sales through an account with Frontline Processing Corp. Falsone Decl., ¶¶ 50-54 & Ex. 7-9.

## ARGUMENT

## I.   PLAINTIFFS HAVE MET THE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs are entitled to either a temporary restraining order or a preliminary injunction upon a showing of: (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) the existence of serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the plaintiff's favor. *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 145-46 (2d Cir. 2003); *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002); *see also Von Grabe v. Ziff Davis Publ'g Co.*, 91 Civ. 6275 (DLC), 1994 WL 719697, at *1 (S.D.N.Y. Dec. 29, 1994) (the same standard applies for both preliminary injunctions and temporary restraining orders).

Recently, the Second Circuit concluded that the test articulated by the Supreme Court for granting permanent injunctive relief under the Patent Act in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), applies to the grant of a preliminary injunction in a case involving allegations of copyright infringement and unfair competition. The Second Circuit concluded that Plaintiffs seeking a preliminary injunction must show: (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor"; (2) "the court may issue an injunction only if the plaintiff has demonstrated that he is likely to suffer irreparable injury in the absence of an injunction"; (3) "a court must consider the balance of the hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships between the plaintiff and defendant tips in the plaintiff's favor"; and (4) "the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v Colting*, No. 09-2878-cv, 2010 WL 1729126, *9 (2d Cir. Apr. 30, 2010). (alteration in original, quotation marks and citations omitted).  Plaintiffs here easily satisfy either version of this test and are entitled to an order enjoining Defendants' unlawful behavior.

## A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR TRADEMARK RELATED CLAIMS

### 1.    There Is a Likelihood of Confusion

A proper likelihood of confusion analysis, whether conducted under the infringement (15 U.S.C. § 1114) or false designation of origin (15 U.S.C. § 1125(a)) prongs of the Lanham Act, *Virgin Enters.*, 335 F.3d at 146, looks at the factors set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961):  (1) the strength of the plaintiff's trade dress; (2) the similarity between the two dresses; (3) the competitive proximity of the parties' products in the marketplace; (4) the likelihood that the senior user will bridge the gap, if any, between the

products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the

defendant's product; and (8) the sophistication of the relevant consumer group. *Id.* at 495.

In this case, however, the Court need not undertake a factor-by-factor analysis under

*Polaroid* because counterfeits, by their very nature, cause confusion. *See Gucci Am., Inc. v. Duty*

*Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (citing *Topps Co., Inc. v. Gerrit J.*

*Verburg Co.*, 41 U.S.P.Q.2d 1412, 1417 (S.D.N.Y. 1996) ("Where the marks are identical, and

the goods are also identical and directly competitive, the decision can be made directly without a

more formal and complete discussion of all of the Polaroid factors.")). Indeed, confusing the

customer is the whole purpose of creating counterfeit goods. *See In re Vuitton Et Fils S.A.*, 606

F.2d 1, 4 (2d Cir. 1979) (granting writ of mandamus awarding TRO because "the very purpose

of the individual marketing the cheaper [and virtually identical] items is to confuse the buying

public into believing it is buying the true article"); *see also Polo Fashions, Inc. v. Craftex, Inc.*,

816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an

apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is

a presumption of a likelihood of confusion.").

Moreover, in this case, a straightforward application of the *Polaroid* factors also

demonstrates that the likelihood of confusion is extremely high.

### a.    Plaintiffs' Marks Are Strong and Distinctive

It is well established that Plaintiffs' Marks are famous, distinctive, and strong. *See, e.g.,*

*Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, 00 Civ. 6041 (RCC), 2003 WL 22327162, at *9

(S.D.N.Y. Oct. 10, 2003) (determining as established facts under F.R.C.P. 56(d) that "Gucci

owns the trademarks at issue" and "the trademarks are valid");[4] Weigel Decl., Ex. 10

(*Balenciaga v. Treasure Enterprises Ltd.*, WIPO Admin. Panel Decision D2009-0660 (July 18,

2009) (finding for Balenciaga in a domain name dispute where Balenciaga "provided evidence of

its strong and long-established rights in the mark BALENCIAGA" and noting that Balenciaga

"had acquired a considerable reputation throughout the world for the BALENCIAGA mark in

respect of fashion products (clothes, perfumes, shoes, hats, bags, sunglasses)."). Most, if not all,

of the registered Plaintiffs' Marks are arbitrary or fanciful as applied to the goods or services

with which they are used. *See Fourth Toro Family L.P. v. PV Bakery, Inc.*, 88 F. Supp. 2d 188,

195 (S.D.N.Y. 2000) ("H&H" is an arbitrary mark when used to indicate the source of bagels);

*see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986)

("[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost

protection."). To the extent there is any question as to the inherent distinctiveness of Plaintiffs'

Marks, there is no dispute that Plaintiffs' Marks have been prominently used for a long period of

time, achieving widespread recognition and fame and, therefore, have acquired distinctiveness.

Feldman Decl., ¶¶ 8, 21, 29, 38.

### b.   The Infringing Products Are Virtually Identical to Authorized Plaintiffs' Products

Defendants employ identical counterfeits of Plaintiffs' Marks on their Counterfeit

Products; thus, this *Polaroid* factor favors Plaintiffs. *See Rado Watch Co., Ltd. v. ABC Co.*, No.

---

[4]   *See also Gucci Am., Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1063-64 (S.D.N.Y. 1991) (finding that Gucci Marks are not only "clearly fanciful," "strong," and have "secondary meaning," but also that the association with Gucci "overshadows the characteristics of the goods themselves"); *Gucci Shops, Inc. v. Dreyfoos & Assocs., Inc.*, Case No. 83-709-CIV-ALH, 1983 WL 425, at *1-2 (S.D. Fla. Nov. 7, 1983) (because Gucci's "extensive media advertising reaches millions of retail customers throughout the United States," the "Gucci Marks have acquired and now enjoy distinctiveness, goodwill, and secondary meaning"); *Gucci Shops, Inc. v. R.H. Macy & Co., Inc.*, 446 F. Supp. 838, 839 (S.D.N.Y. 1977) (Gucci name and green-red-green stripe "clearly identify the product with the plaintiff").

92 Civ. 3657 (PKL), 1992 WL 142747, at *4 (S.D.N.Y. June 8, 1992) (granting injunction where it is "exceedingly difficult" to distinguish between authentic and infringing goods, "even in a side-by-side comparison").

Furthermore, minor differences do not matter because "the test of confusion is not whether the products can be differentiated" when compared side-by-side. *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997). Instead, the test is "whether they create the same general overall impression such that a consumer who has seen" the senior user's product would, "upon later seeing the [infringing product] alone, be confused." *Id.*; *see also Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir. 1993) (differences in the details of parties' products did not matter because "[e]ach label's lettering style, layout, and coloration, taken together, convey the same impression").

### c.    The Competing Products Overlap and There Is No Gap to Bridge

The closer the defendants' goods are "to those the consumer has seen marketed under" the plaintiffs' brand, "the more likely that the consumer will mistakenly assume a common" source. *Virgin Enters.*, 335 F.3d at 149-50. Here, because both Plaintiffs and Defendants are in "the same segment of commerce," there is "no gap" between them at all. *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 219 (2d Cir. 1999) (overruled in part by *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 436 (2003)); *see also GTFM, Inc. v. Solid Clothing Inc.*, 215 F. Supp. 2d 273, 296 (S.D.N.Y. 2002) (where both plaintiff and defendant sell jerseys, "[b]oth of these factors weigh heavily in favor of" finding a likelihood of confusion); *Gucci Am.,Inc.*, 759 F. Supp. at 1065 ("Where, as here, the parties are selling very closely related, if not identical products, there is no gap to bridge.").

###### d.    Defendants' Marks Were Designed in Bad Faith

If there is a showing that Defendants intended to copy Plaintiffs' Marks, "likelihood of confusion will be presumed as a matter of law." *The N.Y. State Soc'y of Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)). Here, the similarities are overwhelming. Not content with simply copying the Plaintiffs' Marks and product designs themselves, Defendants also market their Counterfeit Products with an ersatz version of the Plaintiffs' names and labels and state on the website that the products are authentic. These facts make "the conclusion that [Defendants] wanted the public to identify its merchandise with [the Plaintiffs'] trademarks . . . inescapable." *NBA Props., Inc. v. YMG, Inc.*, No. 93 C 1533, 1993 WL 462836, at *3 (N.D. Ill. Nov. 9, 1993). This showing of bad faith entitles Plaintiffs to a presumption of confusion in the marketplace. *See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 132 (S.D.N.Y. 1993) (courts may infer intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired a secondary meaning"); *GTFM, Inc.*, 215 F. Supp. 2d at 297 (where similarities "are so strong that they could only have occurred through deliberate copying . . . a presumption arises that the copier has succeeded in causing confusion").[5]

###### e.    The Quality of Defendants' Products, Although Inferior, Is Similar

If Defendants' Counterfeit Products are inferior, this *Polaroid* factor weighs in favor of Plaintiffs. *See Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp. 2d 188, 199

---

[5] *See also Gucci Am., Inc.*, 759 F. Supp. at 1065 ("Where the evidence 'show[s] or require[s] the inference that another's name was adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up, then the inference of likelihood of confusion is readily drawn, for the very act of the adopter has indicated that he expects confusion and resultant profit.'") (citation omitted).

(S.D.N.Y. 1999); *Gucci Am., Inc.*, 759 F. Supp. at 1066 ("the existence of inferior infringing goods strengthens a plaintiff's 'interest in protecting its reputation from debasement'") (citation omitted). The renown of Plaintiffs' Marks is due largely to Plaintiffs' rigorous quality control standards. *See, e.g.,* Feldman Decl., ¶ 10. Plaintiffs' initial inspection of Defendants' Counterfeit Products revealed, among other things, poor construction, missing care, and incorrect buttons and hangtags. *See id.* at ¶¶ 46, 50, 54, 58. More importantly, however, the "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir.), *amended by*, *reported at* 1992 U.S. App. LEXIS 32204 (2d Cir. 1992), *aff'd*, 37 F.3d 74 (2d Cir. 1994). Because Plaintiffs have no control over the quality of Defendants' Counterfeit Products, this factor further supports a finding of likelihood of confusion.

**B.    Plaintiffs Are Also Likely to Succeed on Their State Law Claims**

Because so many of the *Polaroid* factors favor a finding of confusion, an award of preliminary relief is appropriate. *See, e.g.*, *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 288-89 (S.D.N.Y. 1998) (issuing preliminary injunction where only five of the *Polaroid* factors favor a likelihood of confusion). For the same reason, Plaintiffs also have shown a likelihood of success on their trademark infringement, unfair competition, and deceptive trade practices claims under New York State law. *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 359 n.18 (S.D.N.Y. 1998) (because "the standards for trademark infringement are essentially the same under the Lanham Act, New York law and the common law . . . Defendants have similarly infringed upon Plaintiffs' marks under New York law and the common law"); *GTFM, Inc.*, 215 F. Supp. 2d at 300-02 (likelihood of success on federal infringement claims supports likelihood of success on New York infringement, unfair competition, dilution, and deceptive business practices claims).

16

### C.    Defendants' Activities Clearly Dilute Plaintiffs' Marks

Plaintiffs also meet the standard for trademark dilution established in this Circuit: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Savin Corp. v. Savin Group*, 391 F.3d 439, 448-49 (2d Cir. 2004).

Here, the first four factors are beyond dispute. Plaintiffs' Marks are undeniably famous and distinctive, and Defendants began using infringing versions of Plaintiffs' Marks in commerce long after the Plaintiffs first made them famous. Feldman Decl., *passim*; *see also Gucci Am., Inc.*, 759 F. Supp. at 1063-64.[6]

With respect to the fifth factor, in light of the Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730 (codified in relevant part at 15 U.S.C. § 1125(c)(1)), Plaintiffs need only establish a "likelihood of dilution" rather than "actual dilution." *See Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 & n.87 (S.D.N.Y. 2007) (explaining that the Trademark Dilution Revision Act of 2006 established a "likelihood of dilution" standard in place of an "actual dilution" standard); *accord Karam Prasad, LLC v. Cache, Inc.*, No. 07 Civ. 5785 (PAC), 2007 WL 2438396, *3 (S.D.N.Y. Aug. 27, 2007) (New York State dilution law requires mere "likelihood of dilution"). Plaintiffs, however, can meet their burden under either standard. Where, as here, "the junior and senior marks are identical . . . actual dilution can reliably be proven through circumstantial evidence." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003). In fact, "the closer the products are to one another, the greater the likelihood of both confusion and dilution." *Nabisco, Inc.*, 191 F.3d at

---

6    *See also Gucci Shops, Inc. v. Dreyfoos & Assocs., Inc.*, Case No. 83-709-CIV-ALH, 1983 WL 425, at
    *1-2; *Gucci Shops, Inc. v. R.H. Macy & Co., Inc.*, 446 F. Supp. at 839.

222.  Defendants sell their merchandise for the obvious purpose of offering a cheaper and inferior version of Plaintiffs' Products.  It is hard to imagine circumstantial evidence that would show more clearly a reduction in Plaintiffs' Marks' capacity to identify and distinguish officially licensed goods and services.  *See, e.g., Kraft Gen. Foods, Inc.*, 831 F. Supp. at 134-35 (it is "abundantly clear" that dilution, in addition to infringement, occurs when defendant uses plaintiff's marks "in the same markets and the names are similar enough to cause confusion among the purchasing public").

Moreover, 15 U.S.C. § 1125(c) and New York State dilution law recognize two types of dilution:  (1) "blurring, which is the diminished ability of the mark to serve as a unique identifier of the plaintiffs' goods and services," and (2) "tarnishment, which is the disparagement of the mark's reputation."  *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 466 (S.D.N.Y. 2007); *see also SLY Magazine, LLC v. Weider Publ'ns L.L.C.*, No. 05-Civ-3940 (CM), 2007 WL 4577389, at *14 (S.D.N.Y. Dec. 17, 2007).  Defendants' use of Plaintiffs' Marks to identify Defendants' goods runs the risk that Plaintiffs' Marks "will lose [their] ability to serve as a unique identifier of the [Plaintiffs'] product[s]."  *See GTFM, Inc.*, 215 F. Supp. 2d at 301 (New York State dilution claim established by defendant's use of plaintiff's "05" trademark on competing jerseys) (citation and internal quotation marks omitted).  Accordingly, Defendants are engaging in blurring of Plaintiffs' Marks.  Similarly, Defendants are tarnishing Plaintiffs' Marks by using them on goods of lesser quality.  *Id.*; Feldman Decl., *passim*.

### D.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

If this Court does not issue an injunction, Plaintiffs will suffer very real harm in the form of unquantifiable lost sales and market share.  "Federal courts have long recognized the need for immediate injunctive relief in trademark infringement cases due to the amorphous nature of the

damage to the trademark and the resulting difficulty in proving monetary damages." *See Multi-Local Media Corp. v. 800 Yellow Book Inc.*, 813 F. Supp. 199, 202 (E.D.N.Y. 1993)); *see also* 5 McCarthy on Trademarks and Unfair Competition § 30:47 ("Confused purchasers will think that defendant's goods or services are sponsored or approved by plaintiff. If defendant's goods are (or may be in the future) of poor quality, this will reflect adversely upon plaintiff's business goodwill and reputation. Such an injury is real but difficult to measure in dollars and cents."). As the Second Circuit has stated, irreparable injury "almost inevitably follows" because of the consumer confusion caused by counterfeiting.

> Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult. . . . Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting, but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Omega Importing Corp. v. Petri-Kine Camera Co., Inc.*, 451 F.2d 1190, 1196 (2d Cir. 1971). Here, both the evidence before the Court and the undisputed allegations of the Complaint support this time-tested principle.

### 1.    Defendants Will Continue to Damage Plaintiffs' Goodwill and Reputations

The Defendants in this action are counterfeiters who illegally apply exact copies of Plaintiffs' trademarks to inferior products and then sell these superficially similar products to the public as "authentic designer handbags" produced by Plaintiffs. Compl. ¶ 35; Falsone Decl., ¶¶ 28, 34, 40, 46. Without an injunction to bar Defendants from continuing this practice, the goodwill and reputations that Plaintiffs have built over the last century essentially rests in the hands of these counterfeiters.

Courts in this Circuit have recognized that this harm more than justifies the issuance of injunctive relief. For example, in *Gayle Martz, Inc. v. Sherpa Pet Group, LLC*, 651 F. Supp. 2d

72 (S.D.N.Y. 2009), the Court recognized the irreparable injury caused to a trademark owner by the unauthorized use of its mark finding that "[t]he unauthorized use of a mark . . . invariably threatens injury to the economic value of the goodwill and reputation associated with . . . a mark." *Id.* at 85. In granting the plaintiff's request for a permanent injunction, the Court found that plaintiff had demonstrated the possible damage to its reputation and the absence of an adequate remedy at law "since 'there is no assurance in the record against defendant[s] continued violation of plaintiff's . . . trademarks.'" *Id.* (quoting *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 Civ. 6403 (SLT) (SMG), 2008 WL 2884761, at *5 (E.D.N.Y. July 23, 2008)).

As in *Gayle*, the evidence indicates that Defendants will continue to infringe on Plaintiffs' Marks during the pendency of this litigation if they are not enjoined. Indeed, in September 2007, Defendant Weixing Li was adjudicated to have infringed other brand owners' marks through the sale of counterfeit goods through numerous websites, *see* Falsone Decl., ¶ 56 & Ex. 11, and yet he continued to engage in the same infringement and dilution of Plaintiffs' rights. The processing history for Lijun Xu's merchant account, moreover, indicates that account was used to process sales of the Counterfeit Products at least since December 2007. Falsone Decl., ¶ 54 & Ex. 9.

### 2.    Defendants Will Continue to Interfere With Plaintiffs' Rights to Control the Quality of Goods Bearing Plaintiffs' Marks

An injunction here is also justified because, without court intervention, Plaintiffs have no ability to control the quality of products to which Defendants are illegally applying Plaintiffs' Marks. The products offered for sale by Defendants bear duplicates of Plaintiffs' Marks, indicating for all the world that these products are consistent with the high quality associated with authorized products bearing Plaintiffs' Marks. But Defendants Counterfeit Products "did not come from Plaintiffs nor were they produced by any party that is authorized by Plaintiffs to

manufacture, license or distribute Plaintiffs' Products." Feldman Decl., ¶ 60.  Moreover,

Plaintiffs "did not have the opportunity to control the[] quality and nature" of the products

offered for sale by Defendants.  *Id.*

As the Second Circuit has noted, "[o]ne of the most valuable and important protections

afforded by the Lanham Act is the right to control the quality of the goods manufactured and

sold under the holder's trademark."  *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d

Cir. 2009) (internal quotation marks omitted) (affirming district court's grant of preliminary

injunction) (quoting *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 395

(2d Cir. 1986)).  By their actions, Defendants have taken this right away from Plaintiffs.  In

*Davidoff*, the Second Circuit recognized the irreparable harm caused to a trademark owner who

cannot control the quality of their products because "a higher incidence of substantial sales of

counterfeit goods, which are invariably non-conforming and inferior" would "harm [Plaintiffs']

reputation and diminish the value of its trademark."  *Id.* at 244.  Given the possibility of

irreparable and non-quantifiable harm to Plaintiffs, this factor weighs in favor of issuing a

temporary restraining order now.

**E.    THE BALANCE OF THE HARDSHIPS FAVORS PLAINTIFFS**

The remaining issue, the balance of hardships, tilts decidedly in Plaintiffs' favor.  As the

Court correctly observed in *Gayle Martz*, "the only hardship that will befall Defendants in this

case is the imposition of an obligation to comply with the law, while [plaintiff] faces continued

loss of goodwill and ability to exploit the trademarks that [plaintiff] itself owns if an injunction

does not issue."  651 F. Supp. 2d at 85; *see also Nike, Inc. v. Lydner*, No. 6:07-cv-1654, 2008

WL 4426633, at *6 (M.D. Fla. Sept. 25, 2008) (granting plaintiff's motion for permanent

injunction against operators of websites selling counterfeit products) ("The only harm to

Defendants as a result of the injunction is that they will be precluded from selling merchandise

that infringes Nike's marks.  As such, the balance of the hardships favors issuance of the injunction.").

On the other hand, if no injunction is issued, Plaintiffs will suffer significant, irreparable hardship because they will have lost control over the very indicia that communicate "Gucci," "Balenciaga," "Bottega Veneta" and "Yves Saint Laurent" to millions of consumers; namely, Plaintiffs' Marks.  Moreover, countless consumers will continue to be misled by Defendants' conduct and no later action by this Court could retrieve that lost goodwill.  *See, e.g., Reuters Ltd. v. United Press Int'l Inc.*, 903 F.2d 904, 909 (2d Cir. 1990) ("irreparable harm discussed earlier" meets plaintiff's burden under the balance of hardships).

### F.    AN ORDER ENJOINING DEFENDANTS' ACTIVITIES WILL ALSO SERVE THE PUBLIC INTEREST

Further, issuing an injunction in this case would protect not only Plaintiffs, but also the public.  As the Second Circuit has observed, "[t]rademark laws exist to protect the public from confusion."  *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d Cir. 2000).  In offering the Counterfeit Products as "authentic designer handbags," there is no doubt that Defendants have endeavored to create the very public confusion that the Lanham Act was designed to avoid.  *See id.* at 107 ("[B]y explicitly informing their customers that the style and workmanship of the knock-offs were such that no third-party observer would be able to tell that they were not genuine Hermes bags, [defendants] . . . encourage[d] consumer confusion in the post-sale context.").  Indeed, it is evident from the communications received by Plaintiff Gucci from numerous consumers that such confusion has already occurred and will continue to occur due to the actions of counterfeiters like the Defendants.  *See* Feldman Decl., ¶ 65 & Ex. 10. Potential customers also made queries on various websites as to whether the Defendants' website Myluxurybags.com was offering authentic goods, and, in at least one case, stated that the site

"advertises authentic goods but sells fake knock offs." *Id.* Ex. 10. Without an injunction, it is impossible to know how many of Plaintiffs' potential customers will buy Counterfeit Products from the Myluxurybags.com site and be deceived. *See id.* ¶ 66.

The Myluxurybags.com website advertises Defendants' counterfeit goods as genuine. Even if the website disclosed that Defendants were selling counterfeits, however, post-sale confusion will occur as a result of the sale of such Counterfeit Products: members of the public will see the inferior products and think they were made by Plaintiffs. This harms the general public, and an injunction against infringing sales serves to protect the public interest. *See Gayle Martz*, 651 F. Supp. 2d at 85 ("[T]he public interest lies in the enforcement of the Acts of Congress, especially the prevention of consumer confusion as espoused by the Lanham Act.") (quotation marks omitted). In *Hermes*, the Second Circuit cited with approval the Eleventh Circuit's summary of the theory behind protecting the public interest in trademark cases:

> It . . . is important to recognize that the enforcement of trademark laws benefits consumers even in cases where there is no possibility that consumers will be defrauded. For, to the extent that trademarks provide a means for the public to distinguish between manufacturers, they also provide incentives for manufacturers to provide quality goods. Traffickers of these counterfeit goods, however, attract some customers who would otherwise purchase the authentic goods. Trademark holders' return to their investments in quality are thereby reduced. This reduction in profits may cause trademark holders to decrease their investments in quality below what they would spend if there were no counterfeit goods. This in turn harms those consumers who wish to purchase higher quality goods.'

219 F.3d at 108 (quoting *United States v. Torkington*, 812 F.2d 1347, 1353 n.6 (11th Cir. 1987) (citation omitted)).

Importantly, the public harm caused by counterfeiting has been recognized by lawmakers of both parties and successive administrations. In 2006, when signing the bipartisan Stop Counterfeiting in Manufactured Goods Act, former President George Bush stated that: "Counterfeiting costs our country hundreds of billions of dollars a year. . . . Counterfeiting hurts

businesses. They lose the right to profit from their innovation. Counterfeiting hurts workers, because counterfeiting undercuts honest competition, rewards illegal competitors. . . . Counterfeiting hurts the government. We lose out on tax revenue. . . . Counterfeiting hurts national security, as terrorist networks use counterfeit sales to sometimes finance their operations." *See* Weigel Decl., Ex. 11. In a recent press release announcing the Department of Justice's new Intellectual Property Task Force, Attorney General Eric Holder similarly noted that "[t]he rise in intellectual property crime in the United States and abroad threatens not only our public safety but also our economic wellbeing." *See* Press Release, Department of Justice Office of Public Affairs, Justice Department Announces new Intellectual Property Task Force as Part of Broad IP Enforcement Initiative (Feb. 12, 2010). Vice President Joe Biden echoed these sentiments in commenting that the "[t]heft of intellectual property does significant harm to our economy and endangers the health and safety of our citizens." *Id.*

In contrast, the issuance of a preliminary injunction enforcing the trademark laws of the United States would not harm the public. As a result, this factor similarly weighs in favor of granting the injunctive relief sought by Plaintiffs.

### G.    PLAINTIFFS ALSO SATISFY THE ALTERNATE STANDARD FOR A PRELIMINARY INJUNCTION.

Plaintiffs also are entitled to a preliminary injunction under the alternate standard because they have shown that (1) serious questions exist, going to the merits of the case, and that these questions are fair ground for litigation, and (2) the balance of hardships tips in their favor. *Merkos L'Inyonei Chinuch, Inc.*, 312 F.3d at 96.

As long as there is at least one issue of sufficient importance "going to the merits to create a firm ground for litigation," Plaintiffs have met their burden under the first prong of this standard. *Reuters Ltd.*, 903 F.2d at 909. Because they have shown a convincing likelihood of

success on the merits, Plaintiffs, by definition, also have raised very substantial objections and questions that are fair game for litigation.

As explained above, the balance of hardships also tilts decidedly in favor of Plaintiffs.

## II.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION RESTRAINING DEFENDANTS' TRANSFER OF ASSETS

The damages provisions of the Lanham Act provide that if Plaintiffs succeed on the merits, they "shall be entitled . . . to recover [among other things] defendant's profits," 15 U.S.C. § 1117(a), treble their actual damages and prejudgment interest because this is a counterfeiting case, *id.* § 1117(b), or statutory damages up to a maximum of $2 million "per counterfeit mark per type of goods . . . sold, offered for sale, or distributed," *id.* § 1117(c).[7]   Courts in this and other circuits have made clear that district courts "have the 'authority to freeze those assets which could [be] used to satisfy an equitable award of profits.'" *N. Face Apparel Corp. v. TC Fashions, Inc.,* 05 Civ. 9083 (RMB), 2006 WL 838993, at *3 (S.D.N.Y. March 30, 2006) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 986-87 (11th Cir. 1995)); *see also Reebok Int'l Ltd. v. Marnatech Enters., Inc.,* 737 F. Supp. 1521, 1525 (S.D. Cal. 1989), *aff'd,* 970 F.2d 552 (9th Cir. 1992) ("Under the provisions of the Lanham Act, plaintiffs will be entitled to an equitable accounting of defendants' profits from the sale of such counterfeit merchandise" and therefore "an order freezing a defendant's assets is appropriate in order to preserve the status quo, so that assets can be preserved to satisfy an equitable decree."). This is consistent with long-standing practices in the Second Circuit, which provide that "[t]he framing

---

[7]   In 2008, Congress amended 15 U.S.C. § 1117(c) to enhance the remedies available for trademark infringement by increasing the minimum amount of statutory damages from $500 to $1000 and increasing the maximum amount of statutory damages from $1 million to $2 million. *See Prioritizing Resources and Organization for Intellectual Property Act of 2008,* Pub. L. No. 110-403, § 104, 122 Stat. 4256, 4259 (codified as amended at 15 U.S.C. § 1117(c)).

of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit is ordinarily within the domain of the trial court," and that "[e]very reasonable means of preventing a continuance of deceptive practices is proper." *Levitt Corp. v. Levitt*, 593 F.2d 463, 469 n.10 (2d Cir. 1979) (citations omitted); *Am. Safety Table Co. v. Schreiber*, 287 F.2d 417, 419-20 (2d Cir. 1961).[8]

In *Reebok Int'l Ltd.*, the district court concluded that an asset restraint was appropriate based on plaintiff's showing of: (1) a "reasonable likelihood" that "defendants engaged in a substantial business of counterfeit goods"; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen. 737 F. Supp. at 1527. The Ninth Circuit, in affirming this decision, implied that it might be an abuse of discretion for a court to fail to award equitable relief such as an asset freeze "if such an action were necessary to protect a plaintiff's right to recovery of [Section] 1117 profits and damages and to ensure that a defendant may not benefit by willfully engaging in illegal trademark activity." *Reebok Int'l Ltd.,* 970 F.2d at 558-59.[9]

As set forth above, Plaintiffs have established a reasonable likelihood that defendants engaged in a substantial business of selling counterfeit goods and the immediate and irreparable

---

[8] *See also Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Servs. of Va., LLC,* 144 F. Supp. 2d 241, 250 n.9 (S.D.N.Y. 2001) ("[W]here plaintiffs seek both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to freeze assets.") (emphasis in original).

[9] *See also Mason Tenders Dist. Council Pension Fund v. Messera,* No. 95 Civ. 9341 (RWS), 1997 WL 223077, at *7 (S.D.N.Y. May 7, 1997) (acknowledging that "[a]lmost all the Circuit Courts [including the Second Circuit] have held that Rule 65 is available to freeze assets *pendente lite* under some set of circumstances") (emphasis added); *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir. 1988) (*en banc*) ("A court has the power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies.").

harm to Plaintiffs as a result of Defendants' illegal activities.  The irreparable harm to Plaintiffs resulting from trademark dilution, customer confusion and lost goodwill would be further compounded by Plaintiffs inability to obtain an equitable accounting from Defendants and to recover their lost profits as they are entitled to do under the Lanham Act.  An asset freeze is crucial to preserve the funds in Defendants' accounts until Plaintiffs obtain a judgment in this action.  Indeed, Plaintiffs have obtained judgments against counterfeiters in numerous cases in the past, and have recovered significantly greater amounts of the damages to which they were equitably entitled where the court ordered a prejudgment asset freeze.  *See* Feldman Decl., ¶ 69.  For example, in the action *Gucci America, Inc. et al. v. Myreplicahandbag.com*, et al., No. 07 Civ. 2438, in which Judge Koeltl entered a preliminary injunction freezing defendants' assets, Gucci recovered nearly $200,000 from the counterfeiters' accounts, which by far exceeds the amount recovered in cases in which there was no freeze.  *Id.*

The  Defendants in this case, moreover, are also likely to hide their assets.  These Defendants trade in counterfeit goods; thus, unlike a legitimate business that may be subject to accounting and tax requirements and that has readily identifiable assets that may be used to satisfy judgments against it, there is no reason to conclude that Defendants will make their assets available for recovery or will adhere to the authority of this Court any more than they have adhered to federal and state trademark law.  *See* Falsone Decl., ¶¶ 57-58; Joint Statement, 130 Cong. Rec. H 12,080 (1984) ("[M]any of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon.").  The most reasonable inference is that Defendants will move quickly to remove monies subject to an equitable accounting to locations and accounts which neither Plaintiffs nor this Court will ever discover.  *See, e.g., In re Vuitton Et Fils S.A.*, 606 F.2d at 5 (directing district court to issue an *ex*

*parte* temporary restraining order in a trademark infringement case where notice would enable defendant to dispose of evidence and would "render fruitless further prosecution of the action").

Defendants, moreover, are not domiciled in New York and are doing business internationally, giving them the incentive and ability to hide their assets. *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (granting plaintiff's motion for prejudgment attachment where defendants are "foreign individuals and corporations who have both incentive and capacity to hide their assets"); *see also* Falsone Decl., ¶ 57 ("most sellers of counterfeit trademark goods such as those of Defendants establish multiple accounts with financial institutions in multiple names with the express intent of making it difficult to find and recover the profits of their counterfeiting activities."). In the absence of a preliminary injunction freezing these accounts, there will be nothing to stop Defendants from draining the accounts, thereby depriving Plaintiffs of their equitable rights under the Lanham Act.

## III.    RULE 64 PROVIDES ADDITIONAL SUPPORT FOR AN ASSET FREEZE

Rule 64 of the Federal Rules of Civil Procedure provides that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." F. R. Civ. Pro. 64. Under New York law, Plaintiffs are entitled to a prejudgment attachment, by which "a creditor effects the prejudgment seizure of a debtor's property, to be held by the sheriff, [actually or constructively], so as to apply the property to the creditor's judgment if the creditor should prevail in court." *See Hotel 71 Mezz Lender LLC v. Falor et al.*, 14 N.Y.3d 303, 311, 900 N.Y.S.2d 698, 703 (2010) (quotation and citation omitted, alteration in original). "[A] court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York." *Id.* Section 6210 of the CPLR provides that a court may grant a

temporary restraining order prohibiting transfer of assets by a garnishee upon a motion on notice

for an order of attachment.  *See* N.Y. C.P.L.R. 6210.  Accordingly, because this Court has

jurisdiction over Defendants pursuant to the New York long-arm statute and because Plaintiffs

meet the requirements for prejudgment attachment as set forth below, Plaintiffs are entitled to

attach Defendants' assets wherever they may be found and entry of a temporary restraining order

to freeze such assets is appropriate.

      Pursuant to Section 6212(a) of the CPLR, a plaintiff is entitled to prejudgment attachment

if it can show "that there is a cause of action, that it is probable that the plaintiff will succeed on

the merits, that one or more grounds for attachment provided in Section 6201 exist, and that the

amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  N.Y.

C.P.L.R. 6212(a) ; *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade

Servs., Inc.*, 306 F. Supp. 2d 482, 484-85 (S.D.N.Y. 2004).  Plaintiffs have satisfied all of these

requirements and are therefore entitled to a temporary restraining order and an order of

attachment against Defendant's assets.

      Section 6201(1) of the CPLR provides grounds for an attachment where "the defendant is

a nondomiciliary residing without the state, or is a foreign corporation not qualified to do

business in the state."  N.Y. C.P.L.R 6201(1) .  Defendants known to Plaintiffs at this time are

individuals found in California.  Compl. ¶¶ 10-11.  Accordingly, an attachment is proper under

Section 6201(1).  *See Itel Containers Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*,

No. 90 Civ. 8191 (CES), 1991 WL 12131, at *3 (S.D.N.Y. Jan. 25, 1991).

      Additionally, the fact that Defendants are foreign individuals and entities operating a

counterfeiting business weighs in favor of granting an attachment.  *See, e.g., Ayyash*, 233 F.R.D.

at 327 (granting plaintiff's motion for attachment under CPLR 6201 where defendants are

"foreign individuals and corporations who have both incentive and capacity to hide their assets"). Given their blatant disregard of state and federal law, there is no reason to believe these Defendants would voluntarily satisfy any judgment obtained by Plaintiffs in this action.

Having shown a basis for a prejudgment attachment pursuant to Section 6201 of the CPLR, Plaintiffs need only show that they have a cause of action, a probability of success on the merits, and that the amount demanded from Defendants exceeds all known counterclaims.  With respect to the cause of action requirement, the "standard for determining whether a cause of action exists for purposes of attachment under New York law is a liberal one.  Unless the plaintiff's papers clearly establish that the plaintiff must ultimately be defeated, a cause of action exists." *Thornapple Assocs., Inc. v. Sahagen*, No. 06 Civ. 6412 (JFK), 2007 WL 747861, at *3 (S.D.N.Y. Mar. 12, 2007) (internal quotation marks omitted).  *See also Considar, Inc. v. Redi Corp., Establishment*, 238 A.D.2d 111, 111, 655 N.Y.S.2d 40, 40 (N.Y. App. Div. 1997) ("[P]laintiff must be given the benefit of all legitimate inferences and deductions that can be made from the facts stated.") (citation omitted).

Finally, as stated in its prayer for relief, Plaintiffs are seeking up to $174,000,000 in statutory damages.  As Defendants have no known counterclaims against Plaintiffs (Feldman Decl., ¶ 71), the requirement that the amount demanded exceeds all known counterclaims is also met.  As all the elements of a pre-judgment attachment are met, New York law provides additional support for the entry of a temporary restraining order and preliminary injunction freezing Defendants' assets.

## IV.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY

Finally, given the harm caused by Defendants' marketing of the Counterfeit Products, Plaintiffs have a pressing need to ascertain the scope of Defendants' activities, Defendants' sources of the Counterfeit Products, any pending advertisements, offerings, sales, or shipments

of Counterfeit Products, other unauthorized use of Plaintiffs' Marks, and the location of Defendants' ill-gotten profits without delay. Plaintiffs therefore respectfully request that this Court issue an order allowing expedited discovery from Defendants as well as third-party banks, credit card companies, and other financial institutions with evidence of Defendants' activities.

District courts have broad power to permit expedited discovery and require early document production in appropriate cases. *See* FED. R. CIV. P. 30(b), 34(b). Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited relief is granted. *See Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*, No. 94 Civ. 5620 (JFK), 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994); *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

Further, Rule 26(d) of the Federal Rules of Civil Procedure permits the district court, in its discretion, to order expedited discovery from third parties to a civil action. *See* FED. R. CIV. P. 26(d). The court evaluates a motion for expedited discovery "under the flexible standard of reasonableness and good cause," and examines "the entirety of the record to date and the reasonableness of the request in light of all the surrounding circumstances." *Ayyash*, 233 F.R.D. at 327 (internal citations omitted). Where the moving party has established the substantiality of its claims and shown "good cause" for the motion, expedited discovery is appropriate. *See id.* (granting Plaintiff's motion for expedited third-party discovery where defendants are "foreign individuals and corporations who have both incentive and capacity to hide their assets," giving Plaintiff "considerable urgency... to seek information about the location of defendants' possible

assets within the United States."); *see also* Weigel Decl., Ex. 4; Weigel Decl., Ex. 5. Where the moving party has established the substantiality of its claims and shown "good cause" for the motion, expedited discovery is appropriate.

As stated in the supporting declarations and *supra*, Defendants have engaged in numerous deceptive practices that indicate Plaintiffs may lose the opportunity for meaningful discovery about the requested relief. The discovery requested on an expedited basis in Plaintiff's proposed temporary restraining order has been precisely defined and carefully limited to include only what is essential for the preliminary injunction. Plaintiffs are unaware of any reason that Defendants, or their banks, credit card processors, or other financial institutions, would not be able to comply with these requests without undue burden.

Accordingly, good cause exists for prompt discovery of the extent of Defendants' counterfeit operations and the amount of profits they have derived. Only armed with that information can Plaintiffs gain a full and accurate picture of Defendants' infringing activities and ensure the complete cessation of the counterfeiting of Plaintiffs' Marks and Plaintiffs' Products by Defendants and Defendants' associates. In light of the breadth of Defendant's infringement, expedited discovery is both reasonable and necessary to provide Plaintiffs adequate redress.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant an order temporarily restraining Defendants from selling their Counterfeit Products or making any unauthorized use of Plaintiffs' Marks, an order to show cause for preliminary injunction, and an order for expedited discovery.

Dated: New York, New York
       June 24, 2010

                                        Respectfully submitted,

                                        GIBSON, DUNN & CRUTCHER, LLP

                                        By:    _____
                                               Robert Weigel (RW 0163)
                                               Howard S. Hogan (HH 7995)
                                               Jennifer C. Halter (JH 7032)
                                               Anne M. Coyle (AC 3158)
                                               Kimberly Lindsay (KL 5776)
                                               200 Park Avenue
                                               New York, New York 10166
                                               (212) 351-4000

                                        *Attorneys for Plaintiffs Gucci America, Inc.,*
                                        *Balenciaga S.A., Balenciaga America, Inc.,*
                                        *Bottega Veneta, Inc., Bottega Veneta International*
                                        *S.a.r.l., Luxury Goods International (L.G.I.) S.A.,*
                                        *and Yves Saint Laurent America, Inc.*