UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                            :

GUCCI AMERICA, INC., BALENCIAGA      :
AMERICA, INC., BALENCIAGA S.A., BOTTEGA  :
VENETA INTERNATIONAL S.A.R.L.,      :
BOTTEGA VENETA INC., LUXURY GOODS   :
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT  :
LAURENT AMERICA, INC.          :         2010 Civ. 4974 (RJS)
                            :

        Plaintiffs,        :

   -against-         :

WEIXING LI, LIJUN XU and TING XU a/k/a JACK :
LONDON, all doing business as REDTAGPARTY,  :
MYLUXURYBAGS.COM, KUELALA.COM,    :
XPRESSDESIGNERS.COM,        :
XPRESSDESIGNER.NET, and DESIGNER    :
HANDBAGS; ABC COMPANIES;      :
and JOHN DOES,          :

        Defendants.      :
                            :
--------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF  PLAINTIFFS' MOTION TO COMPEL THIRD PARTY BANK OF CHINA TO COMPLY WITH THIS COURT'S ORDERS AND PLAINTIFFS' SUBPOENA

Robert Weigel (RW 0163)
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue, 47th floor
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs Gucci America, Inc.,*
*Balenciaga America, Inc., Balenciaga S.A.,*
*Bottega Veneta International S.A.R.L., Bottega*
*Veneta Inc., Luxury Goods International S.A. and*
*Yves Saint Laurent America, Inc.*

New York, New York
December 6, 2010

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

FACTS ............................................................................................................... 5

ARGUMENT ...................................................................................................... 9

I.     BANK OF CHINA HAS NO LEGITIMATE BASIS TO REFUSE DISCLOSING
WHETHER IT HAS COMPLIED WITH THIS COURT'S ORDERS ........................... 9

        1.     The Court Has Authority to Order the Bank to Freeze Property Under Its
Control, Even Where the Property Is Overseas ........................................ 9

        2.     Bank of China Failed to Move the Court to Modify the Order ............... 11

        3.     Bank of China has Availed Itself of the Benefits of Doing Business in
New York, and Therefore Must Comply with United States Law. ......... 12

        4.     Chinese Law Is No Impediment to Bank of China's Compliance with the
Court's Order ........................................................................................ 13

II.    BANK OF CHINA HAS NO LEGITIMATE BASIS FOR REFUSING TO COMPLY
WITH THE SUBPOENA AND SHOULD BE COMPELLED TO PRODUCE ALL
RESPONSIVE DOCUMENTS ................................................................................ 14

        1.     Bank of China is Withholding Documents that are Critical to the
Enforcement of Plaintiffs' Trademark Rights and Any Judgment Entered
by this Court ......................................................................................... 15

        2.     Bank of China Controls the Documents Responsive to Plaintiffs'
Subpoena and Must Therefore Produce Them ......................................... 17

        3.     Chinese Law Does Not Prevent Bank of China from Producing
Documents Responsive to Plaintiffs' Subpoena .................................... 20

III.   PLAINTIFFS ARE ENTITLED TO FEES AND COSTS INCURRED IN BRINGING
THIS MOTION .................................................................................................... 22

CONCLUSION .................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aurelius Capital Partners, LP v. Republic of Argentina*,
No. 07 Civ. 2715, 2009 WL 910783 (S.D.N.Y. April 3, 2009)................................................ 21

*Balenciaga America, Inc. v. Dollinger*,
No.10 Civ. 2912, 2010 WL 3952850 (S.D.N.Y. Oct. 8, 2010) ............................................. 11

*Bank of China v. Chase Manhattan Bank*,
98 Civ. 4787 (S.D.N.Y.) ...................................................................................................... 13

*Bank of China v. Good Fortune*,
97 Civ. 7664 (S.D.N.Y.) ...................................................................................................... 13

*Bank of China v. L.J. Global, Inc.*,
95 Civ. 300 (S.D.N.Y.) ........................................................................................................ 13

*Bank of China v. St. Paul Mercury Ins. Co.*,
03 Civ. 09797, 2005 WL 580502 (S.D.N.Y. March 10, 2005)............................................... 13

*Bank of China v. Sub-Zero, Inc.*,
2005 WL 1149780 (S.D.N.Y. May 16, 2005) ....................................................................... 13

*Bank of China v. Wang*,
97 Civ. 5208 (S.D.N.Y.) ...................................................................................................... 13

*Bank of Montreal v. Mitsui Mfrs. Bank*,
No. 85 Civ. 1519, 1990 WL 134899 (S.D.N.Y. Sept. 11, 1990)..................................... 10, 17

*Bank of Tokyo-Mitsubishi, Ltd., New York Branch v. Kvaerner*,
671 N.Y.S.2d 902 (Sup. Ct. N.Y. County 1998) ................................................................... 17

*Barcia v. Sitkin*,
1997 WL 66785 (S.D.N.Y. Feb. 14, 1997)...................................................................... 15, 19

*Bodner v. Banque Paribas*,
202 F.R.D. 370 (S.D.N.Y. 2000) .......................................................................................... 21

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*,
90 Civ. 2370, 2000 WL 713057 (S.D.N.Y. June 2, 2000)...................................................... 15

*Cooper Indus. Inc. v. British Aerospace, Inc.*,
102 F.R.D. 918 (S.D.N.Y. Aug. 28, 1984) ........................................................................... 19

*Dietrich v. Bauer*,
2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000)........................................................... 10, 17, 18

*First Nat'l City Bank of New York v. IRS*,
  271 F.2d 616 (2d Cir. 1959)............................................................................... 12

*First Nat'l City Bank*,
  379 U.S. 378 (S. Ct 1965)........................................................................... 11, 21

*Gucci America, Inc. et al. v. Curveal Fashion et al.*,
  No. 09 Civ. 8458, 2010 WL 808639 (S.D.N.Y. March 8, 2010)........................... 15, 16, 18, 21

*Gucci America, Inc., et al. v. MyReplicaHandbag.com et al.*,
  No. 07 Civ. 2438, 2008 WL 512789 (S.D.N.Y. Feb. 26, 2008) .................................. 1, 14, 19

*Hunter Douglas, Inc. v. Comfortex Corp.*,
  No. M8-85, 1999 WL 14007 (S.D.N.Y. Jan. 11, 1999)....................................... 18, 19

*In re Grand Jury Proceedings Bank of Nova Scotia*,
  740 F.2d 817 (11th Cir. 1984) .......................................................................... 12

*In re One Grand Jury Subpoena*,
  1989 WL 49165, at *3 (D. Conn. Mar. 22, 1989)................................................ 13

*In re Ramaekers*,
  33 F. Supp. 2d 312 (S.D.N.Y. 1999).................................................................. 15

*Koehler v. Bank of Bermuda Ltd.*,
  12 N.Y.3d 533 (2009) ......................................................................................... 11

*La Grande v. Adecco*,
  2006 WL 2806402 (N.D.N.Y. Sept. 28, 2006) .................................................. 12

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
  51 F.3d 982 (11th Cir. 1995) ............................................................................. 10

*Maness v. Meyers*,
  419 U.S. 449 (1975).......................................................................................... 11

*Marc Rich & Co., A.G. v. United States*,
  707 F.2d 663 (2d Cir. 1983)....................................................................... 18, 20

*N. Face Apparel Corp. v. TC Fashions, Inc.*,
  05 Civ. 9083 (RMB), 2006 WL 838993 (S.D.N.Y. March 30, 2006) ................... 10

*Orbit One Comm'cns., Inc. v. Numerex Corp.*,
  255 F.R.D. 98 (S.D.N.Y. 2008) ........................................................................ 14

*Quantum Corp. Funding Ltd. v. Assist You Home Health Care Svcs. Of Va., LLC*,
  144 F. Supp. 2d 241 (S.D.N.Y. 2001)................................................................ 10

*Richmark Corp. v. Timber Falling Consultants*
    959 F.2d 1468 (9th Cir. 1992)………………………………………..……………………13

*Ssangyon Corp. v. Vida Shoes Int'l, Inc.*,
    2004 U.S. Dist. LEXIS 9101 (S.D.N.Y. May 20, 2004) ........................................................ 21

*United States v. Bank of Nova Scotia*,
    740 F.2d 817 (11th Cir. 1984) ........................................................................................ 22

*United States v. Chase Manhattan Bank*,
    590 F. Supp. 1160 (S.D.N.Y. 1984).................................................................................. 21

*United States v. Vetco Inc.*,
    691 F.2d 1281 (9th Cir. 1981) ......................................................................................... 20

## Statutes

15 U.S.C. § 1051 (2010) ............................................................................................................. 5

## Rules

Fed. R. Civ. P. 37(a)(5).......................................................................................................... 5, 22

Fed. R. Civ. P. 45(c)(2)(B)(i)..................................................................................................... 14

**PRELIMINARY STATEMENT**

Plaintiffs Gucci America, Inc., Balenciaga America, Inc., Balenciaga S.A., Bottega Veneta International S.A.R.L., Bottega Veneta Inc., Luxury Goods International (L.G.I.) S.A. and Yves Saint Laurent America, Inc. (collectively, "Plaintiffs") submit this memorandum of law in support of their motion to compel third party Bank of China, a bank doing business in New York with branches located at 410 Madison Avenue and 42 East Broadway in Manhattan, to confirm compliance with the preliminary injunction entered by the Court in this action and to produce all documents responsive to Plaintiffs' valid subpoena (the "Subpoena").

Defendants have used at least two Bank of China accounts to conduct their international counterfeiting enterprise—a business that brought in more than $1 million a year and did incalculable harm to Plaintiffs' brands.  Plaintiffs know that Defendants used these accounts because counsel for Defendant Lijun Xu informed Plaintiffs that these are the accounts into which his client wired the proceeds from the sale of counterfeit goods described in detail in Plaintiffs' Complaint.  This Court specifically referenced the accounts in its preliminary injunction ( the "Preliminary Injunction") and Plaintiffs specifically pointed out the account numbers when it served the TRO, the Preliminary Injunction, and the Subpoena on the Bank of China.  Yet, in violation of established case law and this Court's orders, Bank of China refuses to confirm that it has frozen Defendants' accounts, and further refuses to produce documents within its possession and control that are responsive to Plaintiffs' valid Subpoena.

This is the second lawsuit involving Gucci in which the Bank of China has taken the position that Chinese law prohibited it from producing records of the activity in a counterfeiter's bank account.  *See Gucci America, Inc., et al. v. MyReplicaHandbag.com et al.*, No. 07 Civ. 2438, 2008 WL 512789 (S.D.N.Y. Feb. 26, 2008).  In 2008 and 2009, Gucci was forced to make

1

two separate motions for contempt in front of Judge Koeltl.  While the second motion for

contempt was pending, the Bank of China wrote the Court asking that the Court refrain from

deciding the then pending motion because:  "[t]he Bank is therefore committing to produce to

Gucci on, or before, Friday September 4, 2009, transaction activity documents maintained by the

Bank's Guangdong Branch which relate to the deposits and withdrawals from [defendant's]

accounts, as well as documents related to the opening and closing of the accounts."  Declaration

of Robert L. Weigel, dated Dec. 6, 2010 ("Weigel Decl."), Ex. 16. (Bank of China Status Report,

dated Aug. 21, 2009).  Having produced bank records from one counterfeiter's account at its

Guangdong Branch in 2009—after making the exact same illegality argument it is making

here—the Bank of China has no basis for arguing that it is prohibited from producing the same

sort of account records in this lawsuit.  To the best of Plaintiffs' knowledge no harm came to the

Bank of China as a result of its production in 2009.

On June 25, 2010, the Court granted Plaintiffs' request for a temporary restraining order

against Defendants (the "TRO"), and Bank of China was served with a copy of the TRO at its

office on Madison Avenue.  On July 12, 2010, this Court issued the Preliminary Injunction

which, *inter alia*, required Bank of China to freeze "any and all Bank of China accounts

associated with or utilized by" any of the Defendants upon receipt of actual notice of the order.

The Preliminary Injunction also provided for expedited discovery, requiring that any third parties

served with a subpoena in this matter produce responsive documents within ten days.

Plaintiffs served a copy of the Preliminary Injunction on Bank of China on July 13, 2010.

Plaintiffs also served Bank of China with the Subpoena for documents relating to any accounts

held by Defendants at Bank of China, including the two Bank of China accounts specifically

referenced in the Preliminary Injunction.  The Bank of China did not seek any relief from either

the Preliminary Injunction or the Subpoena.  Instead, it simply refused to comply.  In its objections and responses to the Subpoena, Bank of China states that "BOC-NY does not have possession, custody, or control over information located in any other branch or office of the Bank of China, including branches or offices located outside the United States."  The Bank of China limited its response "to information in the possession, custody, or control of BOC-NY," and produced only those responsive documents maintained by its New York branch—even though there is no separate corporate entity called "BOC-NY" and the same corporate entity that operates in New York maintains the relevant accounts in China.  Bank of China did not produce *any* documents relating to the two accounts into which the proceeds from the sales of counterfeit goods were transferred, despite the fact that each account is specifically described in both the Preliminary Injunction and the Subpoena.

To date, there is no indication that the bank has frozen Defendants' accounts.  Plaintiffs are entitled to confirmation that Defendants' accounts, which have been used in furtherance of their counterfeiting operations, have been frozen as ordered by this Court.  Plaintiffs are also entitled to discovery of information concerning those accounts, information that is not only relevant, but critical to this action, and that is squarely within Bank of China's control.

The only excuses that Bank of China offers for its disobedience of the Court's order are that the Bank of China does not control accounts that it maintains outside of New York and that, under Chinese law, it is not permitted to comply with this Court's orders.  Bank of China is wrong.  There is no question that the bank is doing business in New York and therefore subject to the Court's jurisdiction.  The very same Bank of China corporate entity that operates in New York also operates overseas and controls Defendants' accounts and account information.  The bank's argument that Chinese law prohibits compliance is contrary to the case law, and belied by

the fact that the bank produced documents from China in a similar case in this district with no ill effect.  Moreover, the bank simply cannot prove that Chinese law actually *prohibits* it from complying with the Preliminary Injunction issued by this Court or from producing documents responsive to Plaintiffs' Subpoena.  At most, Chinese law permits the bank to refuse to provide certain information, but does not impose an obligation to keep such information secret—and in any case does not excuse the bank's disobedience of valid orders of a U.S. court.  Chinese law cannot excuse Bank of China's failure to make a timely motion for relief from the Preliminary Injunction.

The bank's failure to comply with this Court's orders aids the counterfeiters in concealing their operations and assets.  Bank of China voluntarily chose to do business with Defendants and either knew that Defendants were engaged in counterfeiting or did not care enough to find out.  Because Bank of China refuses to produce documents, Plaintiffs and this Court cannot determine if Bank of China was a willing accomplice or simply turned a blind eye to Defendants' operations.

Plaintiffs have devoted significant time and resources to understanding how Defendants ran their counterfeiting business, which had sales of over $1 million per year, and where the proceeds from this illegal operation were sent.  The money trail ends with Bank of China and, unless the bank is required to comply with the Subpoena, it is likely that any judgment entered by this Court will be ignored and the counterfeiters will continue to operate with impunity.  Bank of China is protecting the counterfeiters at the expense of this Court's ability to enforce its orders and, ultimately, its judgment.

For these reasons, and as set forth below, Plaintiffs respectfully request that this Court compel Bank of China to produce all documents called for by the Subpoena and confirm that it

has frozen all of Defendants' accounts, regardless of location, in compliance with the Court's

TRO and Preliminary Injunction.  Plaintiffs further request that, if Bank of China has not frozen

the relevant bank accounts, this Court grant Plaintiffs permission to file a motion for contempt

against the bank.  Finally, Plaintiff respectfully requests that the Court award Plaintiffs attorneys'

fees and costs incurred in connection with this dispute pursuant to Federal Rule of Civil

Procedure 37(a)(5).

## FACTS

Plaintiffs commenced this action against Weixing Li, Lijun Xu and Ting Xu, a/k/a Jack

London, all doing business as Redtagparty, Myluxurybags.com, Kuelala.com,

Xpressdesigners.com, Xpressdesigner.net, and Designer Handbags; ABC Companies; and John

Does (collectively, "Defendants") pursuant to the Lanham Act, 15 U.S.C. § 1051 (2010), *et seq.*,

and related state law causes of action to prevent Defendants from engaging in blatant trademark

counterfeiting.  Plaintiffs have since entered into a settlement with Defendant Lijun Xu and

moved for entry of a default judgment against the remaining Defendants.  Briefly stated,

Defendants came to Plaintiffs' attention in the course of investigating reports that counterfeit

versions of Plaintiffs' products were being offered for sale on the internet.  Defendants and their

corporate affiliates openly sold hundreds of different consumer goods employing Plaintiffs'

trademarks.  In fact, Defendants explicitly labeled their counterfeit goods as "Gucci,"

"Balenciaga," "Bottega Veneta," and "YSL" products in reckless disregard of trademark laws

and Plaintiffs' trademark rights.  Worse still, Defendants claimed that their products were

authentic, deceiving consumers into purchasing these products or believing that the products

were associated with Plaintiffs.  Defendants sold their counterfeit products within the Southern

District of New York and transferred money from such sales into the Bank of China accounts.

On June 25, 2010, the Court entered a TRO freezing the Defendants' assets and enjoining Defendants from, *inter alia*, manufacturing, distributing, marketing or offering for sale counterfeit goods.  *See* Docket No. 3 (the TRO).  On July 12, 2010, this Court entered an order converting the TRO into the Preliminary Injunction.  *See* Docket No. 12 (the Preliminary Injunction).

The Preliminary Injunction clearly and unambiguously ordered as follows:

> [A]ny banks . . . who receive actual notice of this order by personal service or otherwise, are, without prior approval of the Court, restrained and enjoined from transferring, disposing of, or secreting any money, stocks, bonds, real or personal property, or other assets of Defendants or otherwise paying or transferring any money, stocks, bonds, real or personal property, or other assets to any of the Defendants, or into or out of any accounts associated with or utilized by any of the Defendants.  This includes but is not limited to . . . any and all Bank of China accounts associated with or utilized by Weixing Li, Lijun Xu, Redtagparty, Myluxurybags.com and/or any of the other Defendants, including but not limited to the accounts ending in the last four digits 2443 and 1235, as identified in correspondence between Plaintiffs and Defendant Lijun Xu's counsel.

Docket No. 12 at 6-7.  The two Bank of China accounts referenced in the Preliminary Injunction are those identified by counsel to Defendant Lijun Xu as the accounts into which his client wired the bulk of the proceeds from Defendants' counterfeit sales operation.  *See* Weigel Decl., Ex. 1 (Email from Defendant Xu's Counsel to Counsel for Plaintiffs, dated July 9, 2010) ("here are two account numbers at Bank of China to which wire transfers were made").  Additionally, account records provided by JPMorgan Chase show that Defendant Ting Xu wired at least $80,000 from her account in the United States to these two Bank of China accounts.[1]  *See id*; Ex.

---

[1] This type of arrangement is typical of the way counterfeiters operate to avoid United States trademark laws.  The counterfeiters manufacture their illicit goods in China and sell them to residents in the United States via websites that "drop ship" the counterfeit goods individually into the United States using EMS, China's postal service.  In this case, Defendants' credit card sales of counterfeit goods were processed in the United States by Frontline Processing

[Footnote continued on next page]

2 (JP Morgan Chase Bank Statements for Defendant Ting). The account numbers were plainly

identified to Bank of China in the Preliminary Injunction itself as well as the accompanying

cover letter and in the Subpoena that was served upon the bank.

Bank of China was served with a copy of the TRO on July 9, 2010 at its office located at

410 Madison Avenue, New York, New York 10017, and was subsequently served at the same

location with a copy of the Preliminary Injunction on July 13, 2010, and the Subpoena on July

16, 2010.  *See* Weigel Decl., Ex. 3 (Service of TRO on Bank of China); Ex. 8 (Letter Enclosing

Preliminary Injunction to Bank of China); Ex. 9 (Affidavit of Service for Subpoena, dated July

21, 2010).  Pursuant to the terms of the Preliminary Injunction, which provided for expedited

discovery as to third parties, the bank was required to "produce documents responsive to such

requests within ten (10) days of service of such subpoena."  *See* Docket No. 12 at 9.  The

Subpoena specifically requested documents relating to any accounts held by Defendants at Bank

of China.  *See* Weigel Decl., Ex. 8 (requesting, for example, "all documents and internal or

external communications concerning Defendants or Defendants' accounts").

On July 26, 2010, Bank of China served its objections and responses to the Subpoena and

refused to produce any documents not located in New York, despite the plain language of the

Subpoena.  *See* Weigel Decl., Ex. 12 (Bank of China Objections and Responses to Subpoena,

General Objection No. 2).  On September 16, 2010, Bank of China finally produced some

documents in response to the Subpoena.  The production contained only those documents in

Bank of China's possession "that were located in New York."  *Id.*; Ex. 13 (Bank of China

Production, dated September 16, 2010); Ex. 12 at 1.  Significantly, the production did not include

---

[Footnote continued from previous page]
 Corporation, which then sent the proceeds from these sales to the Defendants, who then
 forwarded these funds to accounts at Bank of China.

*any* documents relating to the two accounts into which the proceeds from the sales of counterfeit goods were deposited, despite the fact that the subpoena specifically requested "all documents and internal or external communications concerning Defendants or Defendants' accounts."

In addition to asking the Bank of China to comply with the Subpoena, Plaintiffs repeatedly requested confirmation that the bank had frozen all accounts held by defendants, whether located in the United States or abroad, pursuant to the Preliminary Injunction.  However, the bank refused to provide such confirmation and instead stated by letter on July 21, 2010 that it was "not aware of authority that, under the circumstances of this matter, would permit the TRO or PI to reach accounts or assets, if any, that might be located outside the United States."  Weigel Decl., Ex. 7 (Bank of China July 21, 2010 Letter).

On November 15, 2010, Plaintiffs wrote to Bank of China regarding its failure to fully comply with the Subpoena and refusal to provide confirmation that it had frozen all of Defendants' accounts.  *Id.*; Ex. 11 (Plaintiffs' November 15 Letter).  In response, Bank of China stated that it continues to "disagree with [Plaintiffs'] assertion that the Court's orders require that the Bank of China freeze accounts located in China."  *Id.*; Ex. 12 at 2.  The Bank further claimed that "Chinese law plainly prohibits disclosure in response to an order of a United States court" and "the freezing of accounts in China would violate Chinese law and subject Bank of China to liability."  *Id.* at 3.  To date, Bank of China has not confirmed compliance with the Court's order, nor has it produced the documents responsive to Plaintiffs' Subpoena that are within its control.

Notably, the Preliminary Injunction permitted Bank of China the option "upon two (2) days written notice to the Court and Plaintiffs' counsel" to "appear and move for dissolution or modification of any provisions of this Order that impact upon it."  Docket No. 12 at 9.  Yet, Bank of China never requested any such relief from the Court.

## ARGUMENT

### I.   BANK OF CHINA HAS NO LEGITIMATE BASIS TO REFUSE DISCLOSING WHETHER IT HAS COMPLIED WITH THIS COURT'S ORDERS

Under the clear and unambiguous terms of the Preliminary Injunction, banks receiving notice of the order "are, without prior approval of the Court, restrained and enjoined from transferring, disposing of, or secreting any money, stocks, bonds, real or personal property, or other assets of Defendants or otherwise paying or transferring any money, stocks, bonds, real or personal property, or other assets to any of the Defendants, or into or out of any accounts associated with or utilized by any of the Defendants." Docket No. 12 at 6-7. The order explicitly included "any and all Bank of China accounts associated with or utilized by Weixing Li, Lijun Xu, Redtagparty, Myluxurybags.com and/or any of the other Defendants" and specifically references "the accounts ending in the last four digits 2443 and 1235, as identified in correspondence between Plaintiffs and Defendant Lijun Xu's counsel." *Id.* Plaintiffs served the Preliminary Injunction on Bank of China on July 13, 2010 in New York.

Since then, Plaintiffs have repeatedly requested confirmation that the bank has frozen all accounts held by Defendants, whether located in the United States or abroad, as required under the Preliminary Injunction, but to no avail. Bank of China claims that it is not required to freeze assets located outside the United States. Weigel Decl., Ex. 7; Ex 12 at 2-3. The bank simply refuses to confirm that it has complied with the Court's orders, and indeed, its responses suggest that it has *not* complied with the orders.

### 1.   The Court Has Authority to Order the Bank to Freeze Property Under Its Control, Even Where the Property Is Overseas

The Preliminary Injunction issued by this Court contained an asset restraint provision requiring Bank of China to freeze "any and all Bank of China accounts associated with or

utilized by Weixing Li, Lijun Xu, Redtagparty, Myluxurybags.com and/or any of the other

Defendants, including but not limited to the accounts ending in the last four digits 2443 and

1235."  Docket No. 12 at 7.  Courts in this and other circuits have made clear that district courts

"have the 'authority to freeze those assets which could [be] used to satisfy an equitable award of

profits."  *N. Face Apparel Corp. v. TC Fashions, Inc.*, 05 Civ. 9083 (RMB), 2006 WL 838993, at

*3 (S.D.N.Y. March 30, 2006) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d

982, 986-87 (11th Cir. 1995)); *see also Quantum Corp. Funding Ltd. v. Assist You Home Health

Care Svcs. Of Va., LLC*, 144 F. Supp. 2d 241, 250 n.9 (S.D.N.Y. 2001) ("[W]here plaintiffs seek

both equitable and legal relief in relation to *specific* funds, a court retains its equitable power to

freeze assets.") (emphasis in original).  Thus, there is no question that the Court had the authority

to issue an  order restraining Defendants' assets.

Similarly, there can be no dispute that this Court has jurisdiction over Bank of China,

which is present in New York through its New York branch.  *See Dietrich v. Bauer*, 2000 WL

1171132, at *4 (S.D.N.Y. Aug. 16, 2000) ("This Court has jurisdiction over a foreign

corporation doing business in New York.  This rule applies to a bank that maintains and operates

a branch here."); *Bank of Montreal v. Mitsui Mfrs. Bank*, No. 85 Civ. 1519, 1990 WL 134899, at

*7 (S.D.N.Y. Sept. 11, 1990) (foreign bank is subject to personal jurisdiction because it

"unquestionably does business [in New York] through its New York branch" and "only one

commonly-owned enterprise exists which relies on the joint endeavors of each").  The Bank of

China that controls operations in China is the very same corporate entity doing business in New

York.

It is well-established that United States courts have the authority to freeze property under

the control of one over whom the court has personal jurisdiction.  *See First Nat'l City Bank,* 379

U.S. 378, 384 (S. Ct. 1965). ("Once personal jurisdiction of a party is obtained, the District

Court has authority to order it to freeze property under its control, whether the property be within

or without the United States."). As the New York Court of Appeals recently made clear, a bank

subject to personal jurisdiction in New York can be compelled to bring assets into New York.

The Court of Appeals held that "a court sitting in New York that has personal jurisdiction over a

garnishee bank can order the bank to produce stock certificates located outside New York,

pursuant to CPLR 5225(b)." *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 541 (2009).

Indeed, in a similar trademark infringement action, the court denied defendants' request to

modify the asset freeze provisions of a preliminary injunction order to exclude assets located

outside of the United States. *See Balenciaga America, Inc. v. Dollinger,* No.10 Civ. 2912, 2010

WL 3952850 (S.D.N.Y. Oct. 8, 2010). In so holding, the court cited to the Supreme Court's

decision in *First Nat'l City Bank* and confirmed the court's "authority to freeze [defendants']

assets 'within or without the United States.'" *Id.*, quoting *First Nat'l City Bank,* 379 U.S. 378 at

384.

### 2.      Bank of China Failed to Move the Court to Modify the Order

Even if Bank of China believed that this Court's orders did not reach the specific

accounts listed in the Preliminary Injunction, Bank of China cannot simply disregard the Court's

orders. Had Bank of China wished to challenge the Preliminary Injunction, the proper recourse

would have been to move the Court for modification of the order. *See Maness v. Meyers,* 419

U.S. 449, 458 (1975) ("If a person to whom a court directs an order believes that order to be

incorrect, the remedy is to appeal, but, *absent a stay, he must comply promptly with the order

pending appeal*.") (emphasis added). The Preliminary Injunction explicitly permitted Bank of

China to "appear and move for dissolution or modification of any provisions of this Order that

impact upon it" upon two days' written notice.  Docket No. 12 at 9.  However, Bank of China

did not seek such relief from the Court.  Instead, it appears that Bank of China may have

unilaterally chosen to ignore the Preliminary Injunction.  Again, since Bank of China refuses to

confirm or deny its compliance with the Court's orders, Plaintiffs have no way to know whether

Defendants' accounts have been restrained.  If Bank of China has failed to freeze the accounts, it

has no excuse for violating this Court's order.  *See La Grande v. Adecco*, 2006 WL 2806402, at

*9 (N.D.N.Y. Sept. 28, 2006) (noting that "[o]rders issued by a court must be obeyed, even if it

is later shown to be erroneous").  Because Bank of China failed to move the Court to modify the

Preliminary Injunction, any objections to the order that it may now attempt to raise—nearly five

months after it was first served with the order requiring it to freeze Defendants' accounts—

should be deemed waived.

### 3.      Bank of China has Availed Itself of the Benefits of Doing Business in New York, and Therefore Must Comply with United States Law.

Having availed itself of the benefits of doing business in New York, Bank of China

should not be permitted to evade its obligations under U.S. law.  *See Bank of Nova Scotia*, 740

F.2d 817, 828-29 (11th Cir. 1984) (where corporation "voluntarily elected to do business in

numerous foreign host countries," it "accepted the incidental risk of occasional inconsistent

governmental actions [and] cannot expect to avail itself of the benefits of doing business here

without accepting the concomitant obligations").  As the Second Circuit has stated, "If the Bank

cannot, as it were, serve two masters and comply with the lawful requirements both of the United

States and [a foreign country], perhaps it should surrender to one sovereign or the other the

privileges received therefrom."  *First Nat'l City Bank of New York v. IRS*, 271 F.2d 616, 620 (2d

Cir. 1959).  "Just as United States companies doing business in [China] must expect to abide by

[Chinese] law, when Beijing availed itself of business opportunities in this country, it undertook

an obligation to comply with the lawful orders of United States courts." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1479 (9th Cir. 1992); *see also In re One Grand Jury Subpoena*, 1989 WL 49165, at *3 (D. Conn. Mar. 22, 1989) ("Although the Court is cognizant of the potential liability under Cayman law for the improper disclosure of confidential information, . . . [a]s several courts have noted, banks involved in international commerce must often face the risk of inconsistent government actions.  That risk is an incident of international banking, and with the decision to enter that field of commerce comes such a risk.").

Tellingly, Bank of China uses this Court, when convenient, to enforce its own legal rights.  *See, e.g., Bank of China v. Sub-Zero, Inc.*, 2005 WL 1149780 (S.D.N.Y. May 16, 2005); *Bank of China v. St. Paul Mercury Ins. Co.*, 03 Civ. 09797, 2005 WL 580502 (S.D.N.Y. March 10, 2005); *Bank of China v. Chase Manhattan Bank*, 98 Civ. 4787 (S.D.N.Y.); *Bank of China v. Good Fortune*, 97 Civ. 7664 (S.D.N.Y.); *Bank of China v. Wang*, 97 Civ. 5208 (S.D.N.Y.); *Bank of China v. L.J. Global, Inc.*, 95 Civ. 300 (S.D.N.Y.).  The bank cannot ignore this Court's orders while simultaneously taking advantage of this Court's process as a plaintiff.

### 4.    Chinese Law Is No Impediment to Bank of China's Compliance with the Court's Order

Contrary to Bank of China's assertions, Chinese law does not prohibit the bank from complying with this Court's orders.  In fact, Chinese law merely *permits* the bank to withhold information ordered disclosed by United States courts.  Therefore, Chinese legal obligations are not sufficient to relieve Bank of China of its obligation to comply with this Court's orders.

In support of the claim that "the freezing of accounts in China would violate Chinese law and subject Bank of China to liability," the bank cites an opinion from the Chinese Ministry of Justice that supposedly advises that the bank is not permitted to produce documents from its Chinese branches or offices in response to a United States court order.  Weigel Decl., Ex. 12 at 3.

13

This is the second litigation in which Bank of China has tried to offer this affidavit as a shield for its clients' international counterfeiting operations.  *See Gucci America, Inc., et al. v. MyReplicaHandbag.com et al.*, No. 07 Civ. 2438, 2008 WL 512789 (S.D.N.Y. Feb. 26, 2008). The Ministry of Justice letter did not support Bank of China's position in the *MyReplicaHandbag.com* case, just as it does not support the bank's position here.  Nor does the affidavit of Zhipan Wu, to which the bank also refers, support its arguments.  As the plaintiffs' expert on Chinese law explained in the *MyReplicaHandbag.com* case, China "provides a bank with the right to refuse certain requests under certain circumstances," but "does not impose a *duty* to refuse."  *See* Weigel Decl., Ex. 15 (Declaration of Donald Clark in MyReplicahandbag.com) ¶ 34 (emphasis in original).  Thus, Bank of China is obligated to freeze Defendants' accounts in compliance with the Court's orders, and should forthwith confirm that the accounts have been frozen.

## II.    BANK OF CHINA HAS NO LEGITIMATE BASIS FOR REFUSING TO COMPLY WITH THE SUBPOENA AND SHOULD BE COMPELLED TO PRODUCE ALL RESPONSIVE DOCUMENTS

Plaintiffs served a valid subpoena upon Bank of China on July 13, 2010.  Despite Plaintiffs' repeated requests, Bank of China has refused to produce all documents responsive to the Subpoena; namely, documents located outside of the United States, including documents relating to the two Bank of China accounts into which Defendants wired the proceeds of their counterfeiting business.  Bank of China can be compelled to produce documents responsive to Plaintiffs' Subpoena pursuant to Federal Rule of Civil Procedure 45.  *See* Fed. R. Civ. P. 45(c)(2)(B)(i).  "Unless it offers an adequate excuse, a party or non-party must obey a valid subpoena."  *Orbit One Comm'cns., Inc. v. Numerex Corp.*, 255 F.R.D. 98, 105 (S.D.N.Y. 2008). It is not sufficient for Bank of China merely to claim that compliance with the Subpoena and the

Court's orders is difficult.  Instead, in this Circuit, "compliance must be beyond the realm of possibility, not just difficult to achieve, before a party will be exonerated in a contempt proceeding."  *Barcia v. Sitkin*, 1997 WL 66785, at *2 (S.D.N.Y. Feb. 14, 1997).  The burden of demonstrating that compliance is impossible rests with Bank of China.  *See In re Ramaekers*, 33 F. Supp. 2d 312, 314 (S.D.N.Y. 1999).  Bank of China cannot meet this high burden.

1.    **Bank of China is Withholding Documents that are Critical to the Enforcement of Plaintiffs' Trademark Rights and Any Judgment Entered by this Court**

Plaintiffs duly served Bank of China with a valid subpoena specifically requesting documents relating to any accounts held by Defendants.  Plaintiffs' Subpoena was not limited to those accounts or documents maintained by the bank's New York branch, and its requests specifically extended to documents located abroad.  *See Gucci America, Inc. et al. v. Curveal Fashion et al.*, No. 09 Civ. 8458, 2010 WL 808639, at *8 (S.D.N.Y. March 8, 2010) (concluding that request for all documents responsive to subpoena "includes all documents located abroad, including but not limited to documents maintained by [foreign branch of bank]").  Indeed, the Subpoena specifically requested documents relating to the two Bank of China accounts into which the proceeds from Defendants' counterfeiting business were deposited.  The documents sought are highly relevant, indeed critical, to this action.  *See British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 90 Civ. 2370, 2000 WL 713057, at *5 (S.D.N.Y. June 2, 2000) (noting that "there is arguably no information concerning [a judgment debtor's] financial situation which is of greater potential relevance . . . than the identity and location of the debtor's assets").

There can be no question that Bank of China has responsive documents within its control that are directly relevant to the claims in this litigation and has failed to produce them.  Bank of China does not contend that it has no documents responsive to the subpoena.  It just refuses to

produce them.  The fact that Defendant Ting Xu wired at least $80,000 to the two Bank of China accounts referenced in the Subpoena demonstrates that the relevant records are likely to exist within Bank of China's control.  *See* Weigel Decl., Ex. 1; Ex. 2.  Indeed, China's anti-money laundering laws require Bank of China to maintain customer "[a]ccount records" and "transaction records" for at least five years, so there is no question that the documents sought exist.  *See* Weigel Decl., Ex. 17 ("Circular of the People's Bank of China for Financial Institutions to Strictly Carry out Anti-money Laundering Provisions for the Prevention of Money Laundering Risks," dated Jan. 1, 2005).  By law, the transaction records must include information regarding "the sources and uses of the funds" in customers' accounts—information directly relevant to Plaintiffs' claims and recovery of any judgment against Defendants.  *Id.*; *see also* Weigel Decl., Ex. 18 (The Rules for Anti-Money Laundering by Financial Institutions," effective Jan. 1, 2007, Articles 9-10) (noting that financial institutions must be able to "effectively identify beneficiaries" of customer transactions and "shall properly keep customers' identity records and transaction information").  In short, relevant documents exist and Bank of China has them.

If Plaintiffs cannot secure documents concerning the accounts that Defendants used in their counterfeiting scheme, our ability to further investigate the operation and ultimately to collect on any judgment will be jeopardized.  In a similar action, Magistrate Judge Katz compelled production of documents held by United Overseas Bank's subsidiary in Malaysia, finding that "the United States interest in fully and fairly adjudicating matters before its courts, including enforcement of its judgments, outweighs [the foreign country's] interest in protecting the confidentiality of its banking customers' records."  *Curveal Fashion*, 2010 WL 808639, at *7 (compelling production of all documents and information, including that related to overseas bank

accounts, responsive to a Subpoena in case involving counterfeiting operations). Unless Bank of China is forced to comply with the terms of the Subpoena, the money trail of this counterfeiting operation will abruptly end, any judgment issued by this Court will be nearly impossible to enforce, and the counterfeiters will continue to operate with impunity.

The only production Bank of China has made in this action to date contained solely those documents "that were located in New York and otherwise responsive to the subpoena." Weigel Decl., Ex. 12 at 1. The production did not include *any* documents relating to two Bank of China accounts into which proceeds from the sales of counterfeit goods were deposited, despite the fact that both accounts were specifically referenced in the Subpoena. Bank of China does not deny that it maintains accounts in the name of Defendants, nor has it denied the existence of related documents. Rather, the bank contends that it cannot produce the documents that are located in China, because this supposedly renders them outside of the control of the bank's New York employees and subjects them to Chinese law, which allegedly prohibits such disclosure. Both arguments are without merit.

### 2. Bank of China Controls the Documents Responsive to Plaintiffs' Subpoena and Must Therefore Produce Them

The Bank of China that controls operations in China is the very same corporate entity doing business in New York. The bank therefore controls the requested documents as a matter of law, and is required to produce them pursuant to the Subpoena and the Court's order.

Bank of China is present in New York. It maintains two offices in Manhattan—one on East Broadway and one on Madison Avenue where the bank was served with the orders and Subpoena. Accordingly, this Court has jurisdiction over the bank. *See Dietrich*, 2000 WL 1171132, at *4; *Bank of Montreal*, 1990 WL 134899, at *7; *see also Bank of Tokyo-Mitsubishi, Ltd., New York Branch v. Kvaerner*, 671 N.Y.S.2d 902, 904-05 (Sup. Ct. N.Y. County 1998)

(holding that "if a party subject to the court's in personam jurisdiction controls a foreign corporate entity, the party, by virtue of its control, should be obligated to produce any and all appropriate discovery under its aegis, . . .*wherever the [discovery] may be located*") (emphasis added). Even where the corporate entities challenging application of the subpoena are related, but not identical, New York courts routinely require production from overseas entities. *See Curveal Fashion*, 2010 WL 808639, at *7 ("a parent company doing business in New York is required to produce documents held by its subsidiary, even if located overseas"); *Dietrich v. Bauer*, 2000 WL 1171132, at *4 (holding that bank doing business in New York was required to produce documents held abroad by its subsidiary). There can be no question, then, that in the present situation, where Bank of China in both New York and China is the same entity, the Bank of China must produce documents held by its overseas branches.

The fact that documents responsive to the Subpoena may not be located in "BOC-NY" does not relieve Bank of China from its obligation to produce documents responsive to the Subpoena. The "test for production of documents is control, not location." *Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983). "The test to determine whether a corporation has custody and control over documents located with an overseas affiliate is not limited to whether the corporation has a legal right to those documents. Rather, the test focuses on whether the corporation has access to the documents and ability to obtain the documents." *Hunter Douglas, Inc. v. Comfortex Corp.*, No. M8-85, 1999 WL 14007, *3 (S.D.N.Y. Jan. 11, 1999). Because Bank of China controls its overseas accounts, it should be compelled to produce documents responsive to Plaintiffs' Subpoena, regardless of location. *See id.* (compelling production of documents in corporation's custody or control and noting that "the mere fact that the subpoenaed documents are in Canada does not exempt them from discovery.") (citation

omitted); *see also Cooper Indus. Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 n.2 (S.D.N.Y. Aug. 28, 1984) ("The documents and records that a corporation requires in the normal course of its business are presumed to be in its control unless the corporation proves otherwise. Any other rule would allow corporations to improperly evade discovery.")  Moreover, because "much of the plaintiff's underlying cause[s] of action stem from revenues derived from [the bank's] business dealings in the United States," which involved the transfer of the proceeds of Defendants' counterfeiting operations conducted within the United States into Bank of China accounts, Plaintiffs' entitlement to documents relating to those accounts is all the more clear. *See id.*

Moreover, the records produced by Bank of China's New York branch demonstrate that the bank's computer system maintains ordinary-course business records, and there is no reason to believe that the bank does not maintain similar records worldwide.  In fact, Bank of China produced records from a Chinese branch office in a similar litigation before in this District.  *See MyReplicaHandbag.com et al.*, 2008 WL 512789.  In that case, as here, Bank of China initially claimed that it had no control over documents located overseas.  After Plaintiffs twice moved for contempt, in an effort to forestall an adverse ruling by Judge Koeltl, Bank of China represented to the Court that "[t]he Bank is therefore committing to produce to Gucci . . . transaction activity reports maintained by the Bank's Guangdong Branch which relate to the deposits from [defendant's] accounts, as well as documents related to the opening and closing of the accounts." *See* Weigel Decl., Ex. 16.  Bank of China's production of a customer's account records in the *MyReplicaHandbag.com* case demonstrates that compliance with Plaintiffs' Subpoena is not impossible, and therefore should be compelled.  *See Barcia*, 1997 WL 66785, at *2 (noting that

"compliance must be beyond the realm of possibility, not just difficult to achieve"); *Marc Rich & Co., A.G. v. U.S.*, 736 F.2d at 866-67.

### 3.   Chinese Law Does Not Prevent Bank of China from Producing Documents Responsive to Plaintiffs' Subpoena

"'[T]he party relying on foreign law has the burden of showing that such law actually bars [the] production'" at issue. *British Int'l Ins. Co. Ltd.*, 2000 WL 713057, at *8 (quoting *United States v. Vetco Inc.*, 691 F.2d 1281, 1289 (9th Cir. 1981)).  Bank of China cannot meet this burden to show that Chinese law prevents the bank from complying with the Subpoena. Additionally, Bank of China's production of similar documents in the *MyReplicaHandbag.com* litigation undercuts any suggestion that it is prohibited from complying with the Subpoena or that compliance would result in any serious consequences for the bank.

### a.   Bank of China Cannot Prove that Chinese Law Prohibits It from Complying with Plaintiffs' Subpoena and the Court's Order.

Bank of China relies upon an opinion from the Chinese Ministry of Justice as support for its refusal to comply with Plaintiffs' Subpoena.  Bank of China's reliance is misplaced.  As Plaintiffs' expert in the *MyReplicaHandbag* case explained, Chinese law "provides a bank with the right to refuse certain requests under certain circumstances," but "does not impose a *duty* to refuse."  *See* Weigel Decl., Ex. 15 (Declaration of Donald Clark in No. 07 Civ. 2438, Docket No. 40) ¶ 34 (emphasis in original).  As noted above, after plaintiffs were forced to file two contempt motions against Bank of China in the *MyReplicaHandbag.com* case, the bank finally produced all of its records relating to the accounts of the defendant counterfeiter, including records that were maintained in China.  *See* Weigel Decl., Ex. 16.  To Plaintiffs' knowledge, Bank of China has not been subjected to any fines, penalties imprisonment or other punishment by the Chinese government as a consequence of producing these documents.  Further, opinions from a foreign

country's Ministry of Justice do not constitute a sufficient basis to refuse compliance with a United States court order absent "evidence that the confidentiality asserted . . . [by the foreign country] is enforced by active prosecution."  *Bodner v. Banque Paribas*, 202 F.R.D. 370, 376 (S.D.N.Y. 2000).  The apparent lack of any harm to Bank of China as a result of its production in the *MyReplicaHandbag* case suggests that the Chinese bank secrecy laws will not be enforced by "active prosecution," and the Chinese Ministry of Justice letter therefore does not excuse disobedience of this Court's order.  For the same reasons, the Wu Affidavit that Bank of China cites in its November 17 letter is also unconvincing.

### b.  The Court Can Properly Order Bank of China to Produce Documents Responsive to Plaintiffs' Subpoena

It is clear that banks doing business in the United States are under an obligation to disclose foreign documents regarding foreign accounts and assets when ordered to do so by a U.S. court.  Therefore, even if Chinese law did prohibit disclosure of the documents requested in Plaintiffs' Subpoena, this Court could still compel their production from Bank of China.  *See Curveal Fashion*, 2010 WL 808639, at *7; *see also Ssangyon Corp. v. Vida Shoes Int'l, Inc.*, 2004 WL 1125659 (S.D.N.Y. May 20, 2004) (rejecting bank's assertion that it was prohibited from producing documents under Hong Kong law); *United States v. Chase Manhattan Bank*, 590 F. Supp. 1160 (S.D.N.Y. 1984) (same); *Aurelius Capital Partners, LP v. Republic of Argentina*, No. 07 Civ. 2715, 2009 WL 910783, at *4 (S.D.N.Y. April 3, 2009) (denying motion to quash subpoenas served on financial institutions that potentially held defendants' assets outside of the United States and holding that "[t]he institutions, *all of which are located in New York*, must produce such information to the extent that it is within their control, *regardless of where the information is physically located*.") (citing *First Nat'l City Bank*, 379 U.S. 378 (emphases added)).

In *Curveal Fashion*, Magistrate Judge Katz required the non-party bank to produce documents from its overseas subsidiary despite the bank's assertion that Malaysian bank secrecy law prohibited such production and subjected the bank to civil and criminal liability. *Id.* Instead, the court found that "the United States interest in fully and fairly adjudicating matters before its courts, including the enforcement of judgments, outweighs [a foreign country's] interest in protecting the confidentiality of its banking customers' records"). Similarly, in *United States v. Bank of Nova Scotia*, the Eleventh Circuit rejected the bank's argument that foreign law prohibited it from complying with the Court's order to produce documents that were located in the Bahamas and Cayman Islands. *See* 740 F.2d 817 (11th Cir. 1984). In that case, although the non-complying bank submitted a statement from the foreign government explaining its interest in upholding its bank secrecy laws, the Court issued a $25,000 per day fine to coerce production of the documents by the bank. *Id.* Similarly, Bank of China is not immune from U.S. law. *See id.* This Court therefore can, and should, compel Bank of China to produce all documents responsive to Plaintiffs' Subpoena, regardless of where they are located.

### III.   PLAINTIFFS ARE ENTITLED TO FEES AND COSTS INCURRED IN BRINGING THIS MOTION

Plaintiffs are entitled to recover costs and attorneys' fees associated with bringing this motion pursuant to Federal Rule of Civil Procedure 37(a)(5). *See* Fed. R. Civ. P. 37(a)(5) ("If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees.").

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request an order: (i) compelling Bank of China to timely produce all documents called for by Plaintiffs' Subpoena, regardless of location of said documents; (ii) compelling Bank of China to confirm that it has frozen all of Defendants' accounts, regardless of location, in compliance with the Court's orders dated June 25, 2010 and July 12, 2010; (iii) permitting Plaintiffs to file a motion for contempt against Bank of China if the bank has not frozen all of Defendants' accounts at the bank, regardless of location, as required under the Court's orders (iv) awarding Plaintiffs attorneys' fees and costs incurred in bringing the instant motion; and (v) awarding such other relief as the Court may deem just and proper.

Dated:  New York, New York
        December 6, 2010

Respectfully submitted,

GIBSON, DUNN & CRUTCHER, LLP

By:  ____/s/ Robert L. Weigel____
     Robert L. Weigel (RW 0163)
     Howard S. Hogan (HH 7995)
     Jennifer C. Halter (JH 7032)
     Anne M. Coyle (AC 3158)
     200 Park Avenue
     New York, New York 10166
     (212) 351-4000

*Attorneys for Plaintiffs Gucci America, Inc.,*
*Balenciaga America, Inc., Balenciaga S.A.*
*Bottega Veneta International S.A.R.L.,*
*Bottega Veneta Inc., Luxury Goods International*
*S.A. and Yves Saint Laurent America, Inc.*