UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                           :

GUCCI AMERICA, INC., BALENCIAGA        :
AMERICA, INC., BALENCIAGA S.A., BOTTEGA  :
VENETA INTERNATIONAL S.A.R.L.,      :
BOTTEGA VENETA INC., LUXURY GOODS   :
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT  :
LAURENT AMERICA, INC.          :        2010 Civ. 4974 (RJS)
                           :

        Plaintiffs,         :

   -against-           :

WEIXING LI, LIJUN XU and TING XU a/k/a JACK :
LONDON, all doing business as REDTAGPARTY,  :
MYLUXURYBAGS.COM, KUELALA.COM,    :
XPRESSDESIGNERS.COM,        :
XPRESSDESIGNER.NET, and DESIGNER    :
HANDBAGS; ABC COMPANIES;       :
and JOHN DOES,            :

        Defendants.      :
----------------------------------------------------------------x


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THIRD PARTY BANK OF CHINA'S ALTERNATIVE CROSS-MOTION TO MODIFY THE COURT'S ORDERS


                     GIBSON, DUNN & CRUTCHER, LLP
                     200 Park Avenue, 47th floor
                     New York, New York 10166
                     (212) 351-4000
                     *Attorneys for Plaintiffs Gucci America, Inc.,*
                     *Balenciaga America, Inc., Balenciaga S.A.,*
                     *Bottega Veneta International S.A.R.L., Bottega*
                     *Veneta Inc., Luxury Goods International S.A. and*
                     *Yves Saint Laurent America, Inc.*

New York, New York
January 3, 2011

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................3

ARGUMENT ........................................................................................................7

I.    THIS COURT HAS THE AUTHORITY TO ORDER BOC TO RESTRAIN
      DEFENDANTS' OVERSEAS ACCOUNTS ..................................................8

      A.    *Grupo Mexicano* Did Not Affect the Court's Authority to
            Preliminarily Restrain Assets in Cases Seeking Equitable Relief. ..........8

      B.    Courts Routinely Grant Asset Restraints in Cases Arising Under
            the Lanham Act..................................................................................9

      C.    The Extraterritorial Reach of the Lanham Act is Well-Established. ......11

      D.    New York's "Separate Entity" Rule Does Not Release BOC from
            Its Obligation to Comply with this Court's Orders...............................13

      E.    BOC Is Subject to the Jurisdiction of this Court and Must Comply
            with Its Orders................................................................................14

II.   THIS COURT HAS THE AUTHORITY TO ORDER BOC TO PRODUCE
      DOCUMENTS FROM CHINA ...................................................................16

      A.    The Importance of the Documents to the Litigation...............................17

      B.    The Degree of Specificity of the Request.............................................17

      C.    Whether the Information Originated Outside the United States............18

      D.    Availability of Alternative Means of Retrieving the Information. .........20

      E.    Competing Interests. .........................................................................21

      F.    Hardship of Compliance on BOC........................................................22

      G.    Good Faith of Party Resisting Discovery. ...........................................24

CONCLUSION....................................................................................................24

## TABLE OF AUTHORITY

**Page**

### Cases

*A.T. Cross Co. v. Sunil Trading Corp.*,
  467 F. Supp. 47 (S.D.N.Y. 1979) ................................................. 12

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
  126 F. Supp. 2d 328 (S.D.N.Y. 2001) ............................................. 11, 12

*Adelphia Commc'ns Corp. v. Rigas*,
  No. 02 Civ. 8495 (GBD), 2003 WL 21297258 (S.D.N.Y. June 4, 2003)................................. 9

*Animale Grp. Inc. v. Sunny's Perfume Inc.*,
  256 Fed. Appx. 707, 709, 2007 WL 4259200 (5th Cir. Dec. 5, 2007) .................................... 10

*Balenciaga v. Dollinger*,
  No. 10 Civ. 2912 (LTS), 2010 WL 3952850 (S.D.N.Y. Oct. 8, 2010) ................................... 15

*Bank of Tokyo-Mitsubishi, LTD, N.Y. Branch v. Kvaerner*,
  671 N.Y.S.2d 902 (Sup. Ct. N.Y. County 1998) ...................................................... 19

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*,
  No. 90Civ.2370 (JFK) (FM), 2000 WL 713057 (S.D.N.Y. June 2, 2000)....................... 4, 16

*Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*,
  714 F. Supp. 78 (S.D.N.Y. 1989) .................................................. 12, 13

*Deckert v. Indep. Shares Corp.*,
  311 U.S. 282 (1940)......................................................................... 8, 9

*Dietrich v. Bauer*,
  No. 95 Civ. 7051 (RWS), 2000 Dist. LEXIS 11729 (S.D.N.Y. Aug. 16, 2000) ..................... 15

*ESPN, Inc. v. Office of the Comm'r of Baseball*,
  76 F. Supp. 2d 383 (S.D.N.Y. 1999) ............................................................... 4

*Fid. Partners, Inc. v. Philippine Exp. & Foreign Loan Guarantee Corp.*,
  921 F. Supp. 1113 (S.D.N.Y. 1996) ............................................................... 19

*First Am. Corp. v. Price Waterhouse LLP*,
  154 F.3d 16 (2d Cir. 1998) ..................................................................... 20

*First Nat'l City Bank of N.Y. v. IRS*,
  271 F.2d 616 (2d Cir. 1959) .................................................................... 16

*Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*,
  651 F. Supp. 2d 72 (S.D.N.Y. 2009) ............................................................ 11

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ...................................................................... passim

*Gucci America, Inc. v. Curveal Fashion*,
  No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) .................. passim

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*,
  219 F.3d 104 (2d Cir. 2000) ................................................................... 11

# TABLE OF AUTHORITY
### *Continued*

Page

*Hotel 71 Mezz Lender LLC v. Falor et al.*,
   14 N.Y.3d 303 (N.Y. 2010) ................................................................................ 14

*In re Grand Jury Proceedings Bank of Nova Scotia*,
   740 F.2d 817 (11th Cir. 1984) ........................................................................... 15

*Ings v. Ferguson*,
   282 F.2d 149 (2d Cir. 1960) ............................................................................... 19

*Koehler v. Bank of Bermuda, Ltd.*,
   12 N.Y.3d 533 (N.Y. 2009) ........................................................................... 13, 14

*Lorillard Tobacco Co. v. Montrose Wholesale Candies*,
   Nos. 03 C 4844, 03 C 5311, 2005 WL 3115892 (N.D. Ill. Nov. 8, 2005) ............... 10

*Marc Rich & Co., A.G. v. United States*,
   707 F.2d 663 (2d Cir. 1983) ............................................................................... 19

*Minpeco S.A. v. Conticommodity Servs. Inc.*,
   116 F.R.D. 517 (S.D.N.Y. 1987) ........................................................................ 16

*Morrison v. Nat'l Australia Bank, Ltd.*,
   130 S. Ct. 2869 (2010) ....................................................................................... 12

*Motorola, Inc. v. Abeckaser*,
   No. 07-CV-3963 (CPS) (SMG), 2009 WL 1362833 (E.D.N.Y. May 14, 2009) ......... 10

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
   No. 07-4553-cv, 2010 WL 4968691 (2d Cir. Dec. 8, 2010) .................................. 12

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n*,
   520 F.3d 109 (2d Cir. 2008) ................................................................................. 4

*Reino De Espana v. Am. Bureau of Shipping*,
   No. 03CIV3573 (LTS) (RLE), 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005) ............ 17

*SEC v. Banca Della Svizzera Italiana*,
   92 F.R.D. 111 (S.D.N.Y. 1981) ...................................................................... 11, 21

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist of Iowa.*,
   482 U.S. 522 (1987) ............................................................................................ 20

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999) ................................................................................. 4

*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952) ............................................................................................ 11

*Strauss v. Credit Lyonnais, S.A.*,
   249 F.R.D. 429 (E.D.N.Y. 2008) ........................................................................ 24

*United States v. First City Nat'l Bank*,
   396 F.2d 897 (2d Cir.1968) ................................................................................ 21

*United States v. First Nat'l City Bank*,
   379 U.S. 378 (1965) ..................................................................................... passim

*United States v. Kyle*,
   21 F.R.D. 163 (E.D.N.Y. 1957) .......................................................................... 19

**TABLE OF AUTHORITY**
*Continued*

Page

*Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.,*
　No. 00 Civ. 8051 (JSM), 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) ................................... 9

**Statutes**

15 U.S.C. § 1116 ....................................................................................................... 10

15 U.S.C. § 1117 ....................................................................................................... 10

N.Y.C.P.L.R. § 302 .................................................................................................... 14

N.Y.C.P.L.R. § 6202 .................................................................................................. 14

**Rules**

Fed. R. Civ. P. 44.1 ..................................................................................................... 4

Fed. R. Evid. 408 ........................................................................................................ 4

Plaintiffs Gucci America, Inc., Balenciaga America, Inc., Balenciaga S.A., Bottega Veneta International S.A.R.L., Bottega Veneta Inc., Luxury Goods International (L.G.I.) S.A. and Yves Saint Laurent America, Inc. (collectively, "Plaintiffs") submit this memorandum of law in opposition to the cross-motion filed by third party Bank of China ("BOC" or the "Bank") to modify the temporary restraining order and preliminary injunction entered by this Court (collectively, the "Orders").

## PRELIMINARY STATEMENT

BOC's cross-motion is based upon the notion that this Court is powerless to compel the Bank to freeze the proceeds from Defendants' unlawful counterfeiting operation simply because the Defendants have succeeded in wiring their illegal proceeds—denominated in U.S. Dollars— to accounts that the Defendants maintain in China.  The Bank is wrong.

Plaintiffs here are not attempting to apply the law of the United States extraterritorially to activities that are internal to China.  As set forth in the papers filed by Plaintiffs in support of the temporary restraining order, Defendants' counterfeiting operation was largely based in the United States.  The counterfeit goods sold by Defendants to Plaintiffs' investigator were shipped to New York from San Diego, California—where the three individual Defendants appear to reside—and the sales were processed in U.S. Dollars by Frontline Processing Corporation ("Frontline") in Montana.  Frontline forwarded the proceeds from the sales of counterfeit goods to Defendants' accounts here in the United States, and Defendants then wired these funds to accounts at BOC.  Defendants cannot shield the proceeds generated from their illegal counterfeiting operation simply by orchestrating an arrangement to wire these U.S. Dollars into accounts in China.  Indeed, it is well-settled in this and other Circuits that moving assets offshore

does not immunize them from seizure.  Similarly, Defendants cannot shield their account records from discovery merely because those records are located in China.

There is no impediment to this Court requiring BOC, an entity undoubtedly subject to the jurisdiction of this Court, to freeze Defendants' accounts and produce records relating to those accounts.  BOC's reliance upon the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), is misplaced.  BOC inexplicably ignores numerous decisions in this and other Circuits where the courts distinguished *Grupo Mexicano* from claims arising under the Lanham Act and granted exactly the type of preliminary asset restraint found in this Court's Orders.

Similarly, there is nothing to prevent this Court from holding BOC in contempt if it refuses to abide by this Court's Orders.  There is no question that BOC is present in New York and actively doing business here—not through the fictitious entity referred to in the Bank's supporting papers as "BOC-NY," but through the same corporate entity that operates in China. As a result, the Bank is subject to personal jurisdiction in New York and is required to obey the orders of this Court, including the Orders that clearly and unambiguously required it to freeze Defendants' accounts.  It is no excuse that BOC's compliance with the Court's Orders may conflict with its obligations under Chinese law.  BOC has chosen to avail itself of the privilege of doing business in New York and must comply with the Orders issued by this Court.  Moreover, the Bank, whose indirect majority owner is the Chinese government, does not deny that it suffered no backlash from the Chinese government by restraining the defendant's account or producing documents maintained in China in connection with a prior litigation in the Southern District of New York captioned *Gucci America, Inc. v. MyReplicaHandbag.com*, 07 Civ. 2438

(JGK) ("*MyReplicaHandbag.com*").  The Bank offers no plausible reason why it would be subject to any penalties if it complies with the Orders entered in this case.

Even if BOC legitimately believed that compliance with the Orders was impossible or that the Orders did not reach assets located in China, there is no excuse for the Bank waiting six months to seek relief from this Court's Orders.  No later than July 13, 2010, BOC had notice that this Court had restrained Defendants' BOC accounts, including the two accounts specifically referenced in the preliminary injunction by their last four digits.  If the Bank believed it could not freeze these accounts, it should have sought relief from this Court as soon as it came to that realization—not six months later and only in response to Plaintiffs' motion to compel.

## STATEMENT OF FACTS

For the sake of brevity, Plaintiffs will not repeat the procedural history of this litigation or the circumstances that led to the filing of their motion against BOC, all of which is discussed in full in the Memorandum of Law in Support of Plaintiffs' Motion to Compel Third Party Bank of China to Comply with this Court's Orders and Plaintiffs' Subpoena, dated December 6, 2010 ("Pls. Br.").  *See* Pls. Br. at 5-8. [1]  However, Plaintiffs have no alternative but to correct the record with respect to important factual errors contained in BOC's description of its actions in the *MyReplicaHandbag.com* litigation and the reliance it now places upon the "customer consent" provided in that case.[2]

---

[1]  References to the Memorandum of Law of Non Party Bank of China in Opposition to Plaintiffs' Motion to Compel and In Support of Its Alternative Cross Motion to Modify the Court's Orders, dated December 22, 2010, appear herein as "BOC Br."

[2]  The facts relating to BOC's course of conduct in the *MyReplicaHandbag.com* case are particularly relevant here because they highlight the inconsistencies in the position that the Bank takes here.  BOC asserts that this information, which is available in *publicly filed*

[Footnote continued on next page]

**BOC Maintained Throughout the *MyReplicaHandbag.com* Litigation
That Its Client Had *Not* Consented to an Asset Freeze/Disclosure Order.**

In March 2007, the plaintiffs in the *MyReplicaHandbag.com* case, which included Gucci America, Inc., one of the Plaintiffs in this action, notified BOC of a temporary restraining order entered against the defendants, including an individual named Kelvin Cho.  BOC's response was that its Chinese branches could not comply with the restraining order, which the Bank's legal department viewed as being inconsistent with Chinese law.  *See* Declaration of Jennifer C. Halter, dated January 3, 2011 ("Halter Decl."), Ex. A (April 3, 2007 letter from BOC counsel).

On April 19, 2007, the Court entered a Stipulation and Order in which the defendants agreed that the "Bank of China account identified in the March 26 Order shall be treated in accordance with the terms and spirit of the March 26 Order, including but not limited to the asset restraint and disclosure requirements."  *Id.* Ex. B (Stipulation and Order, dated April 19, 2007).  The plaintiffs immediately notified BOC of the Stipulation and Order and, in particular, the

---

[Footnote continued from previous page]

*documents*, is somehow inadmissible under Federal Rule of Evidence ("FRE") 408. *See* BOC Br. at 11-12.  Even assuming FRE 408 were applicable under these circumstances, BOC's interpretation is entirely inconsistent with the text of FRE 408 and well-established case law. *See* FRE 408 ("This rule does not require exclusion if the evidence is offered for . . . permissible purposes"); *see also PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, 520 F.3d 109, 116 (2d Cir. 2008) ("The exception says only that '[t]his rule . . . *does not require exclusion* when the evidence is offered for another purpose,' leaving the court wide discretion whether to admit or exclude.") (emphasis in original) (quoting Fed. R. Evid. 408 (2005)); *ESPN, Inc. v. Office of the Comm'r of Baseball*, 76 F. Supp. 2d 383, 412 (S.D.N.Y. 1999) ("the trial court 'has broad discretion as to whether to admit evidence of settlement . . . offered for 'another purpose''') (quoting *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir. 1999)).  Further, "[u]nder Fed. R. Civ. P. 44.1, the determination of the effect of a foreign law presents a question of law for the Court which may 'consider any relevant material or source' without regard to its admissibility under the Federal Rules of Evidence." *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, No. 90Civ.2370 (JFK) (FM), 2000 WL 713057, at *7 (S.D.N.Y. June 2, 2000) (quoting Fed. R. Civ. P. 44.1).  Because BOC relies almost exclusively upon Chinese law, it is entirely appropriate for this Court to consider information regarding whether the prohibitions cited by BOC are actually enforced.

provisions regarding the restraint and disclosure relating to the defendants' accounts. *Id.* Ex. C (April 19, 2007 letter to BOC). BOC maintained that "despite the Stipulation, the customer's consent, in the form of a written authorization, was necessary before BOC could freeze the account and furnish account-related documents." *Id.* Ex. G (June 21, 2007 letter from BOC to Judge Koeltl).[3] BOC nevertheless froze the defendants' account.[4]

### BOC Produced Customer Account Documents to Plaintiffs that were Maintained in China.

While the *MyReplicaHandbag.com* action was still pending, and without notifying the Court or plaintiffs, BOC released its freeze on the defendants' accounts. *Id.* Ex. J (March 25, 2008 letter from BOC counsel). The plaintiffs only learned of this development when they served BOC with a copy of the judgment entered against defendants that required the Bank to liquidate defendants' holdings. *See id.* Ex. I (March 5, 2008 letter to BOC); Ex. J. Shockingly, despite written correspondence with plaintiffs and its counsel's statements in open court to the contrary, the Bank also claimed that it had never "confirmed the freezing of the account." *Id.* Ex. J. BOC also refused to produce any documents relating to the account, including those that would confirm the balance in the account before the Bank allowed it to be drained. As a result,

---

[3] Plaintiffs had also provided BOC with a signed statement from Kelvin Cho, the individual defendant, stating that he was, indeed, represented by the attorney who executed the Stipulation and Order on his behalf. *See id.* Ex. E (May 15, 2007 email exchange between counsel for plaintiffs and BOC). The Bank still claimed that the consent provided was not sufficient under Chinese law. *Id.*

[4] Although BOC never received the written authorization it claimed to require under Chinese law, the Bank represented to the Court and plaintiffs that it had placed and "internal restraint" on the account and was "monitoring it closely." *Id.* Ex. G; Ex. H (June 22, 2007 Hr'g Tr.) at 42:3-4.

in July 2008, plaintiffs sought to hold BOC in contempt.  *See MyReplicaHandbag.com*, 07 Civ. 2438 (JGK), Docket No. 37 (Memorandum of Law).

In exchange for the plaintiffs withdrawing the contempt motion, the Bank agreed, *inter alia*, to produce the "complete account records" for defendants' accounts.[5]  This agreement was memorialized in a side agreement, which provided that the terms of the agreement could be disclosed for purposes of enforcing or defending the parties' rights.  The terms of the agreement were incorporated by reference into a formal Order that was entered by the Court on December 29, 2008.  Halter Decl. Ex. K (Stipulation and Order, dated Dec. 29, 2008).

Upon inspection of the documents provided by BOC from its branch in Guangzhou, China, plaintiffs realized that basic information, such as the account opening documents, were missing from the production.  Also absent were any records of wire transfers, even though plaintiffs knew that such information existed.  BOC contended that information relating to wire transfers would be considered "transaction data," which its Guangzhou branch did not consider to be encompassed by the term "complete account records."  As a result of BOC's failure to adhere to the terms of the settlement, in May 2009, the plaintiffs filed a motion to compel the Bank's compliance with the settlement agreement or hold the Bank in contempt for violating the Stipulation and Order.  *See MyReplicaHandbag.com*, 07 Civ. 2438 (JGK) , Docket No. 47 (Memorandum of Law).

At a hearing on the motion, Judge Koeltl suggested that the parties' disagreement regarding the definition of "complete account records" could be alleviated if plaintiffs served a subpoena on BOC requesting it to produce the missing documents.  BOC then moved to quash

---

[5]   Although BOC had consistently referred to the defendants having an "account" (singular), the plaintiffs later learned that the defendants maintained multiple accounts at the Bank.

the subpoena that plaintiffs served.  *See id.* Docket No. 53 (Motion to Quash).  Ultimately, BOC

agreed to provide the missing documents to plaintiffs, as stated in the Bank's publicly filed status

report to Judge Koeltl:  "The Bank is committed to produce to Gucci . . . transaction activity

documents maintained by the Bank's Guangdong Branch, which relate to the deposits and

withdrawals from Mr. Cho's accounts, as well as documents related to the opening and closing

of the accounts."  *See* Declaration of Robert L. Weigel, dated December 6, 2010 ("Weigel

Decl."), Ex. 16 (Docket No. 28).  The parties subsequently entered into a Stipulation and Order

of Settlement, dated January 8, 2010, and the motions were withdrawn.  Halter Decl. Ex. L

(Stipulation and Order, dated Jan. 8, 2010).  BOC does not appear to challenge Plaintiffs'

statement that the Bank has not been subjected to any punishment by the Chinese government as

a result of its production of documents or the initial restraint it placed on the defendants'

account.

## ARGUMENT

BOC seeks an order from this Court that it should not be required *in this case* to produce

documents from China and has no duty to freeze Defendants' accounts.  For nearly six months,

BOC has stonewalled Plaintiffs' efforts to enforce this Court's Orders.  The Bank refuses to

produce documents called for by the Plaintiffs' subpoena (the "Subpoena") and, even more

egregiously, refuses to state whether or not it has frozen Defendants' accounts.  Indeed, BOC has

failed to respond to Plaintiffs' direct and pointed inquiries as to whether the bank has frozen

Defendants' accounts.  BOC does not even take the opportunity in its papers to inform the Court

whether it had frozen Defendants' accounts, instead characterizing Plaintiffs' inquiry as a "back

door attempt at discovery."  As set forth below, though, the Bank's position is not supported in

fact or in law.

Plaintiffs have no interest in wasting this Court's time with a contempt motion if BOC has, in fact, complied with the Court's Orders.  Unfortunately, BOC refuses to confirm or deny its compliance, thus necessitating the intervention of this Court.  Accordingly, Plaintiffs respectfully request that the Court deny the Bank's motion to amend the Court's past orders and grant the relief previously requested by Plaintiffs.

## I.   THIS COURT HAS THE AUTHORITY TO ORDER BOC TO RESTRAIN DEFENDANTS' OVERSEAS ACCOUNTS

BOC mistakenly asserts that the Supreme Court's decision in *Grupo Mexicano* stands for the proposition that this Court lacks the authority to issue a pre-judgment asset restraint in this case.  BOC also contends that this Court lacks authority to freeze Defendants' overseas assets. On both points, BOC is simply incorrect as a matter of law.

### A.   *Grupo Mexicano* Did Not Affect the Court's Authority to Preliminarily Restrain Assets in Cases Seeking Equitable Relief.

In *Grupo Mexicano*, the Supreme Court addressed the narrow question of "whether, *in an action for money damages*, a United States District Court has the power to issue a preliminary injunction preventing the defendants from transferring assets *in which no* lien or *equitable interest is claimed*."  527 U.S. at 310 (emphasis added).   In finding that the district court lacked authority to grant an asset freeze in that limited circumstance, the Supreme Court explicitly distinguished two earlier decisions authorizing pre-judgment asset restraints, *Deckert v. Indep. Shares Corp.*, 311 U.S. 282 (1940), and *United States v. First Nat'l City Bank*, 379 U.S. 378 (1965).  *See Grupo Mexicano*, 527 U.S. at 324-26.  The Court distinguished *Deckert* on the grounds that the plaintiff stated a claim for equitable relief, just as Plaintiffs have stated in this case.  *See id.* at 325 ("*Deckert* is not on point here because, as the Court took pains to explain, 'the bill state[d] a cause [of action] for equitable relief.'") (quoting *Deckert*, 311 U.S. at 288). The Court went on to distinguish *First National* on the grounds that the Court there derived its

8

power to act from a federal statute—the federal tax code—and not from the Court's general equitable powers.  *See id.* at 326.[6]

Here, Plaintiffs seek equitable relief—an accounting—and the preliminary injunction that restrained Defendants' assets is authorized by a specific federal statute, the Lanham Act. Although BOC takes great pains to cast the relief requested by Plaintiffs as one for money damages so that it will fit within the *Grupo Mexicano* analysis, the consistent holdings of multiple courts within this District is that where, as here, "plaintiffs seek both legal and equitable relief in relation to specific funds, a court retains its equitable power to freeze assets." *Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.*, No. 00 Civ. 8051 (JSM), 2000 WL 1610790, at *1 (S.D.N.Y. Oct. 27, 2000) (discussing holdings of "courts since *Grupo Mexicano*"); *see also Adelphia Commc'ns Corp. v. Rigas*, No. 02 Civ. 8495 (GBD), 2003 WL 21297258, at *5 (S.D.N.Y. June 4, 2003) ("plaintiff here seeks not only money damages, but also equitable relief").  This Court's Orders preserve Plaintiffs' equitable right to an accounting of the profits made by Defendants through their counterfeiting operations.  *See* Docket Nos. 1 (Compl. at 33), 18 (Am. Compl. at 38).

## B.     Courts Routinely Grant Asset Restraints in Cases Arising Under the Lanham Act.

BOC is incorrect that there is no authority to freeze assets under the Lanham Act. Section 1116 of the Lanham Act provides district courts with broad authority "to grant injunctions, according to the principles of equity and upon such terms as the court may deem

---

[6]   In *Deckert*, the Supreme Court held that a district court had sufficient equitable powers to freeze a defendant's assets in suits sounding in equity.  *See Grupo Mexicano*, 527 U.S. at 325.  In *First National*, the Supreme Court "concluded that the temporary injunction was appropriate to prevent further dissipation of assets."  *Id.* (quotation marks and citation omitted).

reasonable, to prevent the violation of any right of the registrant of a mark." *See* 15 U.S.C. § 1116(a).  Before and after *Grupo Mexicano*, courts in this and other Circuits have consistently found that this broad grant of authority includes the power to freeze a defendant's assets.  *See, e.g.*, *Motorola, Inc. v. Abeckaser*, No. 07-CV-3963 (CPS) (SMG), 2009 WL 1362833, at *4 n.4 (E.D.N.Y. May 14, 2009) (noting that "numerous courts have held that the injunctive relief freezing assets in order to ensure availability of final relief is permissible under the Lanham Act" and finding *Grupo Mexicano* "distinguishable" from "an action to recover damages for willful violations of the trademark provisions of the Lanham act"); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 Fed. Appx. 707, 709, 2007 WL 4259200, at *2 (5th Cir. Dec. 5, 2007) (finding that the district court was authorized to enter an asset freeze where "Plaintiffs seek an accounting of lost profits under the Lanham Act, which is 'subject to the principles of equity'") (quoting 15 U.S.C. § 1117); *Lorillard Tobacco Co. v. Montrose Wholesale Candies*, Nos. 03 C 4844, 03 C 5311, 2005 WL 3115892, at *13 (N.D. Ill. Nov. 8, 2005) ("Because [plaintiff] seeks to recover the [] defendants' profits, then, an order freezing the [] defendants' assets is within the court's authority.").

Moreover, the distinctions drawn by the Supreme Court between *Grupo Mexicano* and *First National* further confirm that *Grupo Mexicano* was not intended to apply to preliminary injunctions requested in connection with Lanham Act cases.  First, the Court noted that *First National* "involved not the Court's general equitable powers under the Judiciary Act of 1789 [as *Grupo Mexicano* did], but its powers under the statute authorizing issuance of tax injunctions." 527 U.S. at 326.  Similarly, here, the Court's Orders were issued pursuant to authority granted by the Lanham Act.  Second, the Court observed that the holding in *First National* "relied in part on the doctrine that courts of equity 'will go much farther both to give and withhold relief in

10

furtherance of the public interest that they are accustomed to go when only private interests are involved.'"  *Id.* at 326 (quoting *First Nat'l*, 379 U.S. at 383).  The Lanham Act's trademark provisions were enacted to protect not only the private interests of the intellectual property holders, but also the consuming public, thus supporting the broad discretion granted to the Court in fashioning relief in these cases.  *See Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107-08 (2d Cir. 2000) ("Trademark laws exist to protect the public from confusion."); *Gayle Martz, Inc. v. Sherpa Pet Grp., LLC*, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009) ("[T]he public interest lies in the enforcement of the Acts of Congress, especially the prevention of consumer confusion as espoused by the Lanham Act.") (internal quotation marks omitted).[7]

## C.    The Extraterritorial Reach of the Lanham Act is Well-Established.

Similarly, BOC's argument that the "Lanham Act [d]oes [n]ot [a]pply [e]xtraterritorially," BOC Br. at 16, is both incorrect as a matter of well-settled law and beside the point.  Indeed, "[i]t is well-established that United States courts have jurisdiction to apply the Lanham Act to allegedly infringing conduct occurring outside the United States when necessary to prevent harm to United States commerce."  *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F. Supp. 2d 328, 336 (S.D.N.Y. 2001) (citing *Steele v. Bulova Watch Co.*, 344 U.S.

---

[7]    BOC's attempts to distinguish *First National* fail.  First*, contrary to BOC's suggestion, the holding in *First National* is not limited to actions involving the tax code.  *See, e.g., SEC v. Banca Della Svizzera Italiana*, 92 F.R.D. 111, 116 (S.D.N.Y. 1981) (the court followed *First National* in an action alleging insider trading allegations and stated, "[c]learly . . . the Second Circuit has moved away from the position that a foreign law's prohibition of discovery is an absolute bar to compelling disclosure").  Second, courts have enforced equitable restraints on non-party banks.  *See, e.g., Gucci America, Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639, at *7 (S.D.N.Y. Mar. 8, 2010).  Third, as explained above, although the instant action is a private dispute, rather than an action brought by the government, at stake are issues of vital interest to the United States, including consumer protection and licensee protections.

280 (1952) (holding that "the broad jurisdictional grant in the Lanham Act . . . encompass[ed] petitioner's activities" in Mexico because "[h]is operations and their effects were not confined within the territorial limits of a foreign nation").[8]

As detailed in the Declaration of Michael Falsone that accompanied Plaintiffs' request for a temporary restraining order (Docket No. 9), Defendants operated a large portion of their business from San Diego, California and have transacted business in the United States through website sales and shipment of counterfeit goods to American consumers.  Accordingly, even if Defendants are citizens of China, they are subject to United States trademark law.  *See A.V. by Versace*, 126 F. Supp. 2d at 337 (defendant's Italian citizenship "cannot serve as a shield against the application of the Lanham Act") (citations omitted); *Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*, 714 F. Supp. 78, 80 (S.D.N.Y. 1989) ("Although defendant Langford is not a United States citizen, . . . [he] may be treated as United States citizens for the purpose of" liability under United States trademark law) (citing *A.T. Cross Co. v. Sunil Trading Corp.*, 467 F. Supp. 47, 50 n.5 (S.D.N.Y. 1979)).[9]

---

[8]   The cases that BOC relies upon in claiming that the Lanham Act lacks extraterritorial reach are inapposite.  *See* BOC Br. at 4, 13 (citing *Morrison v. Nat'l Australia Bank, Ltd.*, 130 S. Ct. 2869 (2010); *Norex Petroleum Ltd. v. Access Indus., Inc.*, No. 07-4553-cv, 2010 WL 4968691 (2d Cir. Dec. 8, 2010)).  In *Morrison*, the Supreme Court addressed whether the Securities Exchange Act allowed foreign plaintiffs to bring suit in the United States for misconduct relating to securities traded on foreign exchanges.  In *Norex*, the Second Circuit addressed whether the RICO statute applied to an alleged conspiracy to take over a Russian oil company.  Neither of these cases are analogous to the facts here, where Defendants conducted much of their illegal operations in the United States.

[9]   BOC's position is no different.  The Bank has two branches in New York through which it conducts business and is therefore a "citizen" of the United States for the purposes of the Lanham Act analysis.  Moreover, Defendants' illicit proceeds were transferred from the United States into at least two BOC accounts denominated in U.S. Dollars.  Because "any sale of the [counterfeit goods] will irreparably damage [a trademark holder] directly, by

[Footnote continued on next page]

**D.    New York's "Separate Entity" Rule Does Not Release BOC from Its Obligation to Comply with this Court's Orders.**

BOC claims that this Court is prohibited from freezing Defendants' overseas accounts and invokes as support for this proposition the "separate entity rule," an outdated New York State law concept that does not limit this Court's ability to freeze assets under the Lanham Act and that was ignored by the Court of Appeals in *Koehler v. Bank of Bermuda, Ltd.*, 12 N.Y.3d 533 (N.Y. 2009).

In *Koehler*, on a certified question from the Second Circuit, the New York Court of Appeals held that New York law allowed the court to require a bank in Bermuda (that was served at its New York branch and ultimately consented to personal jurisdiction) to bring stock certificates or their cash equivalent into New York from Bermuda to satisfy a judgment. *Id.* at 535. The Court of Appeals noted that "CPLR article 52 contains no express territorial limitations," *id.* at 539, and the decision is completely consistent with the United States Supreme Court's decision in *First National*.[10]   Under *Koehler*, "the separate entity rule appears to be irrelevant where a creditor serves process on a foreign bank and can argue that the bank is 'present' in New York for jurisdictional purposes." *See* Halter Decl. Ex. M (Daniel L. Brown and Elizabeth M. Rotenberg-Schwartz, *Judgment Secured: Now What?*, New York Law Journal, July 20, 2009).

---

[Footnote continued from previous page]
undermining [the trademark owner's] good will and reputation for quality manufacture, or indirectly, by depriving [a trademark owner's] licensees of their exclusive rights. . . [s]uch injuries would have a substantial effect on United States commerce," thus supporting the application of the Lanham Act to overseas conduct.  *See Calvin Klein*, 714 F. Supp. at 80.

[10] *Koehler* is consistent with the Supreme Court's holding in *First National*, as the holding in *Koehler* was premised upon personal jurisdiction over the person owning or holding the property, not jurisdiction over the property itself.

BOC unsuccessfully tries to distinguish *Koehler* by stating that it involved the collection of a judgment.  BOC argues that this Court's ability to freeze assets is more limited in the pre-judgment context.  In a decision issued last February, however, the Court of Appeals made it abundantly clear that the Court's pre-judgment power to attach assets is *not* limited to assets located within New York State—so long as the attachment is not the basis for personal jurisdiction.  *See Hotel 71 Mezz Lender LLC v. Falor et al.*, 14 N.Y.3d 303, 312 (N.Y. 2010) ("[A] court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York.") (citing *Koehler*, 12 N.Y.3d at 539).  The Defendants in this action are subject to this Court's personal jurisdiction because of New York's long-arm statute.  *See* N.Y.C.P.L.R. § 302(a).  Accordingly, the distinction BOC attempts to draw between pre- and post-judgment remedies simply does not exist under New York law.  *See Hotel 71*, 14 N.Y.3d at 312 ("'Any debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment.'") (quoting N.Y.C.P.L.R. § 6202).  The rule in New York is simple:  where, as here, the defendant is subject to the Court's personal jurisdiction, the defendant's property outside of New York may be attached.  *Id.*; *see also* Halter Decl. Ex. N (New York State Law Digest No. 603, March 2010) ("With personal jurisdiction of [defendant], the court can reach the intangible assets of [defendant] no matter where situated, holds *Hotel 71*.").

**E.  BOC Is Subject to the Jurisdiction of this Court and Must Comply with Its Orders.**

Under federal law, the separate entity rule has no application because "[o]nce personal jurisdiction of a party is obtained, the District Court has authority to order it to freeze property under its control, whether the property be within or without the United States."  *First Nat'l*, 379

U.S. at 384; *see also Balenciaga v. Dollinger*, No. 10 Civ. 2912 (LTS), 2010 WL 3952850, at *8
(S.D.N.Y. Oct. 8, 2010).  BOC maintains two branches in Manhattan—one on Madison Avenue
in midtown and the other on East Broadway in Chinatown, which BOC advertises on its website
as a "full service branch."  *See* Halter Decl. Ex. O (printout of BOC website).  BOC does not
dispute that it maintains two branch offices in New York.  Nor does the Bank dispute that the
New York branch of BOC is the same corporate entity doing business in China as "Bank of
China."  *See* Declaration of Donald Clarke, dated Jan. 3, 2011 ("Clarke Decl."), ¶ 16.
Accordingly, as "a bank that maintains and operates a branch here" in New York, there is no
question that BOC is subject to the jurisdiction of this Court.  *See Dietrich v. Bauer*, No. 95 Civ.
7051 (RWS), 2000 Dist. LEXIS 11729, at *11 (S.D.N.Y. Aug. 16, 2000) ("This Court has
jurisdiction over a foreign corporation doing business in New York.").

     BOC's contention that it would run afoul of Chinese law by restraining Defendants'
accounts does not alleviate the Bank from its obligations under United States law.  According to
its website, there are "581 overseas branches of Bank of China in over 26 countries and regions."
*See* Halter Decl. Ex. P (printout from BOC's website).  Having "voluntarily elected to do
business in numerous foreign host countries," BOC has "accepted the incidental risk of
occasional inconsistent governmental actions [and] cannot expect to avail itself of the benefits of
doing business here without accepting the concomitant obligations."  *See In re Grand Jury
Proceedings Bank of Nova Scotia*, 740 F.2d 817, 828-29 (11th Cir. 1984).  The Second Circuit
has explicitly stated that "[i]f the Bank cannot, as it were, serve two masters and comply with the
lawful requirements [of] both . . . it should surrender to one sovereign or the other the privileges
received therefrom."  *First Nat'l City Bank of N.Y. v. IRS*, 271 F.2d 616, 620 (2d Cir. 1959).  As
a result, BOC must either comply with this Court's Orders or risk the possibility of contempt.

**II.   THIS COURT HAS THE AUTHORITY TO ORDER BOC TO PRODUCE DOCUMENTS FROM CHINA**

Even if BOC is correct that Chinese law prohibits disclosure, that is not sufficient to overcome BOC's duty to comply with the Court's Orders or Plaintiffs' Subpoena.  *See Curveal Fashion*, 2010 WL 808639, at *5 ("American courts are not required to adhere blindly to the directives of a foreign blocking statute.") (citation omitted); *see also British Int'l Ins. Co. Ltd.*, 2000 WL 713057, at *8 ("[E]ven if this Court were to conclude that [disclosure] would violate Mexican law . . . the blanket denial of [plaintiff]'s motion to compel would not necessarily be the result.").

In determining whether to order discovery of documents and information, courts in this Circuit follow the approach set forth in the Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c) and consider the following factors:  "(1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of retrieving the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located."  *Curveal Fashion*, 2010 WL 808639, at *2.  In addition to these five factors, "courts in the Second Circuit may also consider 'the hardship of compliance on the party or witness from whom discovery is sought [and] the good faith of the party resisting discovery.'"  *Id*. (quoting *Minpeco S.A. v. Conticommodity Servs. Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987) (alterations in the original). Here, the relevant factors strongly favor Plaintiffs.

### A.      The Importance of the Documents to the Litigation.

The documents Plaintiffs seek are critical to their ability to investigate Defendants'

counterfeiting operations and hold Defendants accountable for their counterfeiting operations.

BOC's assertion that "Plaintiffs have no need for the information sought in order to adjudicate

the merits" is specious.  Without the information requested from BOC, it will be impossible for

Plaintiffs to track the millions of dollars generated from Defendants' illegal counterfeiting

operation and recover the money that is owed to them in law and equity.  Defendants' credit card

sales of counterfeit goods were processed in the United States by Frontline, a Montana-based

company, which then sent the proceeds from these sales to the Defendants' bank accounts here in

the United States, and Defendants then forwarded these funds to accounts at BOC.  Plaintiffs

must be permitted to track the ill-gotten funds that flowed into BOC as this information is "both

relevant and vital to the litigation."  *Curveal Fashion*, 2010 WL 808639, at *3.

### B.      The Degree of Specificity of the Request.

BOC provides no support for its conclusory statement that "[t]he requests are neither

specific nor tailored and seek a broad range of information."  To the contrary, Plaintiffs seek "a

specific, discrete source of information."  *Reino De Espana v. Am. Bureau of Shipping*, No.

03CIV3573 (LTS) (RLE), 2005 WL 1813017, at *9 (S.D.N.Y. Aug. 1, 2005).  Plaintiffs

"narrowly tailored the requests to target Defendants' accounts at [BOC], which Plaintiffs have

shown to be a repository for . . . funds received by Defendants as a result of their infringing

activities."  *Curveal Fashion*, 2010 WL 808639, at *3.  In *Curveal Fashion*, in ordering

production by United Overseas Bank of documents located in Malaysia, Magistrate Judge Katz

relied on the fact that that the asset freeze and discovery order was directed "towards a specific

[bank] account number, belonging to an account believed to be owned by Defendant Curveal

17

Fashion." *Id.*  Here, too, the Court's Preliminary Injunction was directed towards specific

account numbers at BOC.  *See* Docket No. 12, at 7.[11]

      **C.**      **Whether the Information Originated Outside the United States.**

      BOC mistakenly claims that the information Plaintiffs seek "undoubtedly originated in

China."  The information Plaintiffs seek concerns proceeds of Defendants' counterfeiting

operations, which originated not in China, but in the United States.  Defendants' credit card sales

of counterfeit goods were processed in the United States by Frontline Processing Corporation,

which then sent the proceeds in U.S. Dollars to the Defendants, who then forwarded these funds

to accounts at BOC.  BOC cannot shield these funds, which arose from illicit activities in the

United States, from the reach of this Court.

      BOC's assertion that its "New York Branch does not have access or control over account

information in China," is belied by the fact that BOC's New York branch routinely transfers

money between accounts located at BOC's New York branch and its branches in China.  *See*

Halter Decl. Ex. Q (printout from BOC's website regarding its wire transfer services between

customer accounts in the United States and China).[12]  Moreover, BOC's production of

---

[11]  Moreover, Plaintiffs' Subpoena was not limited to documents maintained domestically, nor was it limited to BOC's New York branch; it expressly included all affiliates of BOC.  The Subpoena was specifically directed to "Bank of China," which was defined as "Bank of China and any of its affiliates, subsidiaries, managers, employees, agents, representatives, consultants, attorneys, or any other person or entity acting for, or at the direction of, Bank of China."  *See* Weigel Decl. Ex. 5.  As such, BOC cannot seriously contest that Plaintiffs' Subpoena was not sufficiently specific.

[12]  Indeed, this section of BOC's United States website, titled "Bank of China RMB [Chinese Yuan Renminbi] Business Q&A," touts the wire transfer services it offers to "Personal Customers" "who want to transfer RMB between their own RMB accounts at our branches and in China."  *Id.*  The Bank also notes that a customer's "relatives in China" can "wire RMB into [the customer's account] at [our] branch."  *Id.*

documents in the *MyReplicaHandbag.com* case that were located in its Guangzhou branch shows that the Bank has the practical ability to obtain customer account information from its overseas branches.  *See* Weigel Decl. Ex. 16.  BOC's production of customer account records in that case demonstrates that the Bank can—and should—comply with Plaintiffs' Subpoena in this case.

Notably, BOC does not deny that it possesses and controls responsive documents overseas.  Indeed, the New York branch of BOC and the overseas branches in China are all the same corporate entity—a fact not disputed by BOC.  *See* Clark Decl. ¶ 16.   The Bank therefore controls the requested documents as a matter of law, and is required to produce them pursuant to the Subpoena and the Court's Orders.  *See, e.g.*, *Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983) (the "test for the production of documents is control, not location"). The fact that documents responsive to the Subpoena may not be located in "BOC-NY" does not relieve the Bank from its obligation to produce documents responsive to the Subpoena.  *See Curveal Fashion*, 2010 WL 808639, at *8 ("Although . . . the documents are located abroad, this is insufficient to overcome those factors weighing in favor of disclosure."); *see also Bank of Tokyo-Mitsubishi, LTD, N.Y. Branch v. Kvaerner*, 671 N.Y.S.2d 902, 904-05 (Sup. Ct. N.Y. County 1998) (holding that "if a party subject to the court's *in personam* jurisdiction controls a foreign corporate entity the party, by virtue of its control, should be obligated to produce any and all appropriate discovery under its aegis, . . .*wherever the [discovery] may be located*") (emphasis added).[13]

_____

[13] The cases BOC cites in support of its position, *Ings v. Ferguson*, 282 F.2d 149 (2d Cir. 1960), *Fid. Partners, Inc. v. Philippine Exp. & Foreign Loan Guarantee Corp.*, 921 F. Supp. 1113 (S.D.N.Y. 1996), and *United States v. Kyle*, 21 F.R.D. 163 (E.D.N.Y. 1957), have all been superseded by *Koehler*, 12 N.Y.3d at 541.

D.      **Availability of Alternative Means of Retrieving the Information.**

The information sought by Plaintiffs "cannot be easily obtained through alternative means." *See Curveal Fashion*, 2010 WL 808639, at *3.  Contrary to BOC's suggestion, resorting to the Hague Convention is not a reliable alternative for Plaintiffs.  Even the U.S State Department has observed that "[w]hile it is possible to request compulsion of evidence in China . . . such requests have not been particularly successful in the past.  Requests may take more than a year to execute.  It is not unusual for no reply to be received . . . ."  Halter Decl. Ex. R (printout from U.S. State Department website, China Judicial Assistance, "Compulsion of Testimony or Documentary Evidence"); s*ee also* Clark Decl. ¶ 21 ("It is well known among transnational litigators that it is in fact very difficult to obtain evidence from China in this way.").  Consequently, "a Hague convention request by a United States court is not a realistic or meaningful option for Plaintiffs in this case to obtain the information they seek or to effectively freeze the defendants' assets."  Clark Decl. ¶ 22.

Further, there is no "rule of law that would require first resort to Convention procedures whenever discovery is sought from a foreign litigant." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist of Iowa.*, 482 U.S. 522, 542 (1987); *see also First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) ("We decline PW-UK's invitation to adopt a rule mandating primary resort to the Hague Convention as the means of obtaining discovery from a foreign non-party witness.").  As the Supreme Court recognized, "[i]n many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules." *Societe Nationale*, 482 U.S. at 542.  On the other hand, complying with this Court's processes should not be difficult for BOC, which avails itself of the

20

benefits of transacting business in New York, and frequently utilizes New York state and federal

courts to prosecute its own claims.  *See* Pls. Br. at 13.

### E.     Competing Interests.

The Court's decision in *Curveal Fashion* was predicated on a recognition of the black-

letter principle that the United States has a strong interest in enforcing its trademark laws.  2010

WL 808639, at *5 ("[B]oth federal and state trademark laws are designed to protect the public

from consumer confusion and deceptive trade practices.").  Even BOC recognizes that "the

United States . . . has a significant interest in upholding its trademark laws."  BOC Br. at 10.  In

addition, the United States has "a substantial interest in fully and fairly adjudicating matters

before its courts.  Achieving that goal is only possible with complete discovery."  *Curveal*

*Fashion*, 2010 WL 808639, at *5 (quotation and citations omitted).  As a result, noncompliance

with the Subpoena and the Court's Orders would severely undermine important United States

interests.  In contrast, no significant Chinese interests would be undermined by requiring BOC to

freeze and divulge the whereabouts of the proceeds from Defendants' unlawful counterfeiting

operation.

Indeed, China's interest in upholding its banking and bank secrecy laws is not strong, as

evidenced by the fact that the protections of these laws may be waived by a private party, the

holder of the account.  *See* BOC Br. at 12; Declaration of Zhipan Wu, dated Dec. 22, 2010 ("Wu

Decl.") ¶ 29.  *See also Curveal Fashion*, 2010 WL 808639, at *6 ("[The foreign country's law]

provides for an absolute waiver of its protections by the customer, which the Second Circuit has

found to be 'of considerable significance,' in undermining the importance of the interest.")

(citing *United States v. First City Nat'l Bank*, 396 F.2d 897, 902 (2d Cir.1968)); *SEC v. Banca*

*Della Svizzera Italiana*, 92 F.R.D. 111, 118 (S.D.N.Y. 1981) ("It is also of significance that the

secrecy privilege . . . is one belonging to the bank customers and may be waived by them.  It is

not something required to protect the Swiss government itself or some other public interest."").

Additionally, Professor Wu lists no less than a dozen entities that Chinese law has designated as

"competent organs"—ranging from the "People's Court" to the "Smuggling and Investigation

Organ"—that have the authority to inquire about and/or freeze a customer's bank account.  Wu

Decl. ¶ 16, Ex. B-4.  China, for example, permits disclosure of bank records to enforce its own

customs laws.  *Id.*  (listing "customs house" among "competent organs").  These exceptions to

China's bank secrecy laws show that bank customers are not promised absolute confidentiality

and strongly undermines China's "interest in protecting the confidentiality of its banking

customers' records" when it is the United States' trademark laws that are being violated.  *See*

*Curveal Fashion*, 2010 WL 808639, at *7; *see also* Clarke Decl. ¶¶ 13-14.

F.   **Hardship of Compliance on BOC.**

BOC has utterly failed to show that it would suffer any adverse consequences if it were to

comply with this Court's Orders.  As the Court held previously, where a non-party provides "no

information that would assist the Court in determining the likelihood that it would be prosecuted

for disclosing the requested information, let alone any indication that the maximum penalty

would be imposed," it can be compelled to comply with the Court's orders.  *See Curveal*

*Fashion*, 2010 WL 808639, at *7 (noting that "Court cannot conclude that the prospect of

significant hardship is anything more than mere speculation").

Here, BOC does not dispute that it previously produced customer account records located

in China without suffering any adverse effects.  At most, it argues that this clear past precedent

should not be considered because the banking customer in that case had "had consented to

disclosure and freezing."  BOC Br. at 2.  But this position is completely belied by BOC's *own*

*prior statements* in the *MyReplicaHandbag.com* litigation.  Indeed, BOC consistently maintained

that the defendant in that case *had not consented* to the asset freeze or disclosure orders under Chinese law.  Importantly:

- In a May 3, 2007 letter from BOC's counsel, BOC claimed that a stipulation entered into by its customer's attorney did not constitute sufficient "consent" for the Bank's purposes.  Halter Decl., Ex. D;

- In a May 15, 2007 email, BOC's counsel stated that the Bank required additional "explicit authorization" from its customer before freezing and disclosing the customer's assets.  *Id.* Ex. E;

- In a June 21, 2007 letter *to the Court*, BOC represented that "the customer's consent, in the form of a written authorization, was necessary before BOC could freeze the account and furnish account-related documents" and that "[t]he authorization was not produced . . . ."  *Id.* Ex. G.

It is therefore inexplicable that BOC now claims that it was able to freeze the defendants' accounts and provide plaintiffs with account records because the customer consented to the Bank doing so.  *See* BOC Br. at 12; *see also* Wu Decl. ¶ 29 (basing his opinion on the same incorrect "fact").  BOC also fails to explain why—if it actually believed the consent provided in *MyReplicaHandbag.com* was sufficient—it released a court-ordered restraint on the defendants' accounts and refused to produce documents from China until plaintiffs were forced to file a contempt motion against the Bank.  However, BOC's actions in the *MyReplicaHandbag.com* litigation make one thing clear:  BOC can, when it chooses, act in a manner that it claims is contrary to Chinese law in response to a United States Court order and has not suffered any consequences from doing so.  Indeed, it is not surprising that the Chinese government took no action against BOC as the Chinese government indirectly owns over 70 percent of BOC.  *See* Clark Decl. ¶ 19.

There is thus no impediment to the Bank freezing a customer's accounts, even when the Bank admits that such actions are "not consistent with Chinese law."  *See* Halter Decl. Ex. F (May 16, 2007 email from BOC counsel).  Likewise, there is nothing precluding BOC from

producing customer account records, as it did in the *MyReplicaHandbag.com* litigation.  As a result, "the likelihood that the [BOC] will be prosecuted and convicted is 'slight and speculative,'" and this Court "may order disclosure."  *Curveal Fashion*, 2010 WL 808639, at *7 (citing *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 454 (E.D.N.Y. 2008) (citing *First Nat'l*, 396 F.2d at 905)).

**G.    Good Faith of Party Resisting Discovery.**

Although the Court need not reach the issue of BOC's good faith or lack thereof, there is ample evidence that the Bank has not acted in good faith in failing to comply with the Court's Orders and Plaintiffs' Subpoena.  *See supra* at 5-8 (detailing BOC's shifting positions).  Despite having demonstrated in publicly filed documents that it has the power to produce documents from a Chinese branch in litigation before this Court (*see* Weigel Decl., Ex. 16), BOC continues to insist that it does not have control over documents located in its own offices overseas.  This is untenable.  Just as it produced documents in the *MyReplicaHandbag.com* case, BOC can—and should—produce documents responsive to Plaintiffs' Subpoena in the present action.  BOC's claim that it had the "customer consent" under Chinese law to produce these documents is demonstrably false and BOC's inconsistent position is evidence of bad faith.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests an order: (i) denying BOC's untimely motion to modify the Court's orders; (ii) granting the relief requested in Plaintiffs' original motion; and (iii) awarding such other relief as the Court may deem just and proper.

Dated: New York, New York
       January 3, 2011

                          Respectfully submitted,

                          GIBSON, DUNN & CRUTCHER, LLP


                          By:      /s/ Robert L. Weigel
                                 Robert L. Weigel (RW 0163)
                                 Howard S. Hogan (HH 7995)
                                 Jennifer C. Halter (JH 7032)
                                 Anne M. Coyle (AC 3158)
                                 200 Park Avenue
                                 New York, New York 10166
                                 (212) 351-4000

                          *Attorneys for Plaintiffs Gucci America, Inc.,*
                          *Balenciaga America, Inc., Balenciaga S.A.*
                          *Bottega Veneta International S.A.R.L.,*
                          *Bottega Veneta Inc., Luxury Goods International*
                          *S.A. and Yves Saint Laurent America, Inc.*