UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

GUCCI AMERICA, INC., BALENCIAGA )
AMERICA, INC., BALENCIAGA S.A., )
BOTTEGA VENETA INTERNATIONAL )
S.A.R.L., BOTTEGA VENETA, INC., LUXURY )
GOODS INTERNATIONAL (L.G.I.) S.A. and )          10 Civ. 4974
YVES SAINT LAURENT AMERICA, INC., )
                                    )
                  Plaintiffs, )
                                    )
         v.                         )
                                    )
WEIXING LI and LIJUN XU a/k/a JACK )
LONDON, all doing business as REDTAGPARTY, )
MYLUXURYBAGS.COM, )
XPRESSDESIGNERS.COM, )
XPRESSDESIGNER.NET, and DESIGNER )
HANDBAGS; ABC COMPANIES; and JOHN )
DOES, )
                                    )
                  Defendants. )
_____ )

**SUPPLEMENTAL MEMORANDUM OF LAW OF NONPARTY BANK OF
CHINA CONCERNING THE APPROPRIATENESS OF A POST JUDGMENT
TURNOVER ORDER**

Dwight A. Healy
Marika Maris (of counsel)
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Tel:  (212) 819-8200

## Table of Contents

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

    The Complaint ....................................................................................................................3

    The Proposed Judgment.....................................................................................................3

ARGUMENT ...........................................................................................................................4

    I.        ARTICLE 52 DOES NOT AUTHORIZE TURNOVER IN THIS ACTION .............4

        A.    Under the Separate Entity Rule, the Reach of the Petition Should Be Limited to New York.................................................................................................................4

        B.    The Koehler Decision Did Not Disturb the Separate Entity Rule ...............................9

        C.    In Light of Significant Policy Considerations, Koehler Should Not Be Given an Expansive Record ..........................................................................................12

        D.    The Separate Entity Rule Reflects the Reality that a Depositor at a Branch of BOC in China Cannot Withdraw Its Deposit at the New York Branch...............................13

    II.      THE COURT SHOULD DECLINE TO GRANT THE RELIEF GUCCI SEEKS, WHICH WOULD SUBJECT BANK OF CHINA TO SANCTIONS AND CIVIL LIABILITY IN CHINA.................................................................................................14

        A.    Because Granting Gucci the Relief Sought Would Subject BOC to Double Liability, It Would Violate Due Process...................................................................15

        B.    Under C.P.L.R. § 5240 the Court Should Deny the Relief Sought in the Circumstances Present Here or, at a Minimum, Require Gucci to Indemnify Bank of China for any Exposure It May Have..................................................................16

        C.    Under Principles of Comity the Court Should Deny the Relief Sought by Gucci .....18

    III.     NONE OF THE GROUNDS CITED IN THE PROPOSED JUDGMENT SUPPORT THE RELIEF REQUESTED .......................................................................19

    IV.     PETITIONER'S EFFORT TO REACH THE DEFENDANTS' PROPERTY AT BRANCHES OF BANK OF CHINA LOCATED OUTSIDE NEW YORK, WHICH RESTS ON STATE LAW, IS PREEMPTED BY FEDERAL LAW........................................21

    CONCLUSION.....................................................................................................................25

## Table of Authorities

## CASES

ABC Charters, Inc. v. Bronson, 591 F.Supp.2d 1272 (S.D. Fla. 2008)...........................................23

Allied Maritime, Inc. v. Descatrade SA, 620 F.3d 70 (2d Cir. 2010)..........................................6, 12

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003) ...............................................22

Anderson Nat'l Bank v. Luckett, 321 U.S. 233 (1944) ...............................................16

Bass v. Bass, 140 A.D.2d 251, 528 N.Y.S.2d 558 (1st Dep't 1988)..................................14

Bd. of Tr. v. United States, 289 U.S. 48 (1933)..................................................24

Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311 (1981) ...........................23

Citibank, N.A. v. Wells Fargo Asia Ltd., No. 88-1260, 1989 WL 1126987, at *14 (U.S. 1989) ...................................................................8

Coleman v. New York State Dept. of Correctional Services, 19 Misc.3d 1104(A), 2008 WL 711730 (N.Y. Sup. Ct. 2008) ...........................................................9

Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977) ...........................................24

Cronan v. Schilling, 100 N.Y.S.2d 474 (N.Y. Sup. Ct. 1950), aff'd, 282 A.D. 940, 126 N.Y.S.2d 192 (1st Dept. 1953) .........................................................5, 7, 12

Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000).........................................21

D/S A/S Flint v. Sabre Shipping Corp., 228 F.Supp. 384 (E.D.N.Y. 1964)...................................14

Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50 (2d Cir. 1965) ...............9

Eitzen Bulk v. State Bank of India, No. 09 Civ. 10118 (S.D.N.Y. August 3, 2010)................11, 15

EM Ltd. v. Republic of Argentina, No. 03 CIV. 2507 (TPG), 03 CIV. 8845 (TPG), 05 CIV. 2434 (TPG), 06 CIV. 6466 (TPG), 07 CIV. 1910 (TPG), 2009 WL 2568433, *3 (S.D.N.Y. Aug 18, 2009). ......................................................19

F. Hoffmann-LaRoche Ltd. v. Empagran S.A., 542 U.S. 155 (2004) ...........................................19

Fid. Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp., 921 F.Supp. 1113 (S.D.N.Y. 1996)....................................................4, 5, 7

Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co., 58 A.D.2d 397, 397 N.Y.S.2d 66 (2d Dep't 1977) ......................................................................9

NEWYORK 7981400 v6 (2K)

Gryphon Domestic VI, LLC v. APP International Finance Co., B.V., 41 A.D.3d 25 (1st Dep't 2007) ............................................................................................................................15

Hilton v. Guyot, 159 U.S. 113 (1895)............................................................................................18

Hines v. Davidowitz, 312 U.S. 52 (1941)......................................................................................21

Hohenstein Shipping Co. v. Feliz Compania Naviera S. A., 236 F.Supp. 216 (E.D.N.Y. 1964)....13

Hotel 71 Mezz Lender LLC v. Falor et al., 14 N.Y.3d 303 (2010) ................................................12

In re Assicurazioni Generali S.p.a. Holocaust Ins. Litigation, 340 F.Supp.2d 494 (S.D.N.Y. 2004) ................................................................................................................................22

In re Maxwell Commc'n Corp., 93 F.3d 1036 (2d Cir. 1996) ........................................................18

In re Payment Card Interchange Fee and Merch. Discount Antitrust Litig., No. 05-MD-1720 (JG)(JO), 2010 WL 3420517 (E.D.N.Y. Aug. 27, 2010) ..........................................18

Intercont'l Credit Corp. v. Roth, 578 N.Y.S.2d 955 (N.Y. Sup. Ct. 1990), vacated on other grounds, 595 N.Y.S.2d. 602 (N.Y. Sup. Ct. 1991) ....................................................7

Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434 (1979)............................................23, 24

John Wiley & Sons, Inc. v. Kirtsaeng, No. 08 Civ. 7834 (GEL) (DCP), 2009 WL 3003242 (S.D.N.Y. Sept. 15, 2009).........................................................................................11

JPMorgan Chase Bank, N.A. v. Motorola, Inc., 47 A.D.3d 293, 846 N.Y.S.2d 171 (1st Dep't 2007) ..........................................................................................................................17, 18

Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70 (2d Cir. 2002)........................................................................................................14

Koehler v. Bank of Bermuda Ltd., 12 N.Y.3d 533 (2009) ..................................................... passim

Koehler v. Bank of Bermuda Ltd., No. 2009-0082, 2008 WL 6191439 (N.Y. Dec. 12, 2008), 2009 WL 1615260 (N.Y. Feb. 4, 2009)...................................................................11

Koehler v. Bank of Bermuda Ltd., No. 2009-0082, 2009 WL 1615263, at *29-30 (N.Y. Apr. 16, 2009) ....................................................................................................................11

Koehler v. Bank of Bermuda Ltd., No. M18-302, 2005 WL 551115 (S.D.N.Y. March 9, 2005) ........................................................................................................................10

Kosmond v. Kosmond, 830 N.E.2d 596 (Ill. App. Ct. 2005) .........................................................19

Lok Prakashan Ltd. v. India Abroad Publ'n, Inc., No. 00 Civ 5862 (LAP), 2002 WL 1585820 (S.D.N.Y. July 16, 2002) ..................................................................... passim

NEWYORK 7981400 v6 (2K)

<u>Louisiana Public Service Comm'n</u> v. <u>F.C.C.</u>, 476 U.S. 355 (1986)................................................22

<u>Mayor and City Council of Baltimore</u> v. <u>Baltimore Football Club Inc.</u>, 624 F.Supp. 278 (D. Md. 1985)................................................................................................................................15

<u>Morrison</u> v. <u>Nat'l Austl. Bank, Ltd.</u>, 130 S.Ct. 2869 (U.S. 2010)..........................................20, 21

<u>Motorola Credit Corp.</u> v. <u>Uzan</u>, 288 F.Supp.2d 558 (S.D.N.Y. 2003) .................................... passim

<u>N.L.R.B.</u> v. <u>Jones & Laughlin Steel Corp.</u>, 301 U.S. 1 (1937)........................................................25

<u>Nat'l Foreign Trade Council</u> v. <u>Natsios</u>, 181 F.3d 38 (1st Cir. 1999), aff'd, 530 U.S. 363 (2000)............................................................................................................................24

<u>Nat'l Union Fire Ins. Co.</u> v. <u>Advanced Emp't Concepts, Inc.</u>, 269 A.D.2d 101, 703 N.Y.S.2d 3 (1st Dep't 2000) ........................................................................................4, 5, 6, 8, 9

<u>New York Lumber Trade Ass'n</u> v. <u>Lacey</u>, 281 N.Y.S. 647 (2d Dep't 1935), <u>aff'd</u>, 199 N.E. 688 (N.Y. 1935) ....................................................................................................................23

<u>Newtown Jackson Co.</u> v. <u>Animashuan</u>, 148 N.Y.S.2d 66 (N.Y. Sup. Ct. 1955)..............................5

<u>Oppenheimer</u> v. <u>Dresdner Bank A.G.</u>, 50 A.D.2d 434, 377 N.Y.S.2d 625 (2d Dep't 1975) ..........17

<u>Paz</u> v. <u>Long Island R.R.</u>, 241 A.D.2d 486, 661 N.Y.S.2d 20 (2d Dep't 1997)...............................17

<u>People</u> v. <u>Bailey</u>, 237 N.E.2d 205 (N.Y. 1968) ............................................................................25

<u>People</u> v. <u>Lally</u>, 224 N.E.2d 87 (N.Y. 1966) ................................................................................25

<u>Petersen</u> v. <u>Chem. Bank</u>, 29 How. Pr. 240 (N.Y. 1865) ...............................................................18

<u>Rice</u> v. <u>Santa Fe Elevator Corp.</u>, 331 U.S. 218 (1947), <u>rev'd</u>, 331 U.S. 247 (1947)......................21

<u>Scanscot Shipping Services</u> v. <u>Metales Tracomex LTDA</u>, 617 F.3d 679 (2d Cir. 2010).................5

<u>Sec. Savings Bank</u> v. <u>California</u>, 263 U.S. 282 (1923)...................................................................16

<u>Singer Sewing Mach. Co.</u> v. <u>Brickell</u>, 233 U.S. 304 (1914)...........................................................25

<u>Square D Co.</u> v. <u>Niagara Frontier Tariff Bureau, Inc.</u>, 760 F.2d 1347 (2d Cir. 1985) ....................9

<u>U.S.</u> v. <u>First Nat'l City Bank</u>, 321 F.2d 14 (2d Cir. 1963).............................................................14

<u>United States</u> v. <u>Ross</u>, 302 F.2d 831 (2d Cir. 1962) ....................................................................19

<u>W. Union Tel. Co.</u> v. <u>Pennsylvania</u>, 368 U.S. 71 (1961)..........................................................15, 16

<u>Zschernig</u> v. <u>Miller</u>, 389 U.S. 429 (1968)....................................................................................22

NEWYORK 7981400 v6 (2K)

## STATUTES AND RULES

12 U.S.C. § 84 ...................................................................................................................8

12 U.S.C. § 3102 ...............................................................................................................8

12 U.S.C. § 3105 .................................................................................................2, 22, 23

15 U.S.C. § 1116 .........................................................................................................4, 20

N.Y. BANKING LAW § 103 .............................................................................................8

N.Y. BANKING LAW § 202-f ..........................................................................................8

N.Y. C.P.L.R. 5209 ........................................................................................................17

N.Y. C.P.L.R. 5225 ..........................................................................................................4

N.Y. C.P.L.R. 5240 .............................................................................................2, 16, 17

N.Y. U.C.C. § 4A-502(a) ..............................................................................................5, 6

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 441 ...........................19

## MISCELLANEOUS

11 Weinstein-Korn-Miller, N.Y. Civ Prac ¶ 5240.00 ...................................................17

12 C.F.R. § 211.24 .............................................................................................2, 22, 23

Federal Rule of Civil Procedure 54 ................................................................................3

Federal Rule of Civil Procedure 69 ....................................................................4, 20, 21

Federal Rule of Civil Procedure 64 ......................................................................... 4, 19

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 195 ......................................14

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 214 ........................................7

U.S. Constitution, Article VI .........................................................................................21

NEWYORK 7981400 v6 (2K)

Nonparty Bank of China ("BOC") respectfully submits this memorandum of law in opposition to Gucci's request that its proposed default judgment direct BOC to turn over any property of the Defendants that it may hold ("Proposed Judgment").[1]

## PRELIMINARY STATEMENT

Gucci has requested the Court to enter a judgment that includes what is in substance a turnover order (i.e., a judgment enforcement remedy) that calls for third party banks to turn over to Gucci any assets of the Defendants, located in any jurisdiction.  That relief should be denied insofar as it seeks to compel BOC to deliver to Gucci any deposits or other assets of the Defendants at its head offices or branches in China.

The separate entity rule, repeatedly applied in judgment enforcement proceedings by courts in this district, bars such relief.  Koehler v. Bank of Bermuda Ltd., 12 N.Y.3d 533 (2009), does not mention the separate entity rule, and should not be read to sub silentio overturn that longstanding common law rule.  The Koehler court's statement that post judgment enforcement proceedings are in personam does not call for any different conclusion.  Under the separate entity rule, non-U.S. branches of a foreign bank are not considered present before the court for judgment enforcement purposes by reason of the existence of a New York branch.  Moreover, the separate entity rule reflects the reality that a depositor at a branch of BOC in China has no

---

[1]      In addition to the definitions used in the Memorandum of Law of Nonparty Bank of China in Opposition to the Plaintiffs' Motion to Compel and in Support of its Alternative Cross Motion to Modify the Court's Orders, dated December 22, 2010 ("BOC Mem."), the following definitions are used herein: Plaintiffs' Memorandum of Law in Opposition to Third Party Bank of China's Alternative Cross-Motion to Modify the Court's Orders, dated January 3, 2011 ("Pl. Opp."); Supplemental Declaration of Dwight A. Healy, dated January 19, 2011 ("Healy Suppl. Decl."); Amicus Brief of New York Federal Reserve, dated November 16, 2010, submitted in Samsun Logix Corp. v. Bank of China, et al., Index No. 105262/2010 (Healy Suppl. Decl. Ex. A) ("FRBNY Br."); Amicus Brief of the Clearing House Association, L.L.C. and the Institute of International Bankers, dated November 16, 2010, submitted in Samsun Logix Corp. v. Bank of China, et al., Index No. 105262/2010 (Healy Suppl. Decl. Ex. B) ("Clearing House Br."); Declaration of Donald Clarke, dated January 3, 2011 ("Clarke Dec. II"); and Declaration of Jennifer C. Halter, dated January 3, 2011 ("Halter Decl.").

right to withdraw its deposit at the New York branch.  Gucci as a garnishor should have no greater right.

As reflected in prior statements of the United States and a recent amicus brief of the Federal Reserve Bank of New York ("FRBNY") in another case concerning <u>Koehler</u>, there are significant policy reasons for not extending <u>Koehler</u> to authorize post judgment enforcement against assets located at the foreign head offices and branches of a foreign bank merely based on the presence of a New York branch.  These policy concerns are equally shared by a diverse group of cross-border stakeholders as reflected in an amicus brief of the Institute of International Bankers and the Clearing House Association.  <u>See</u> Clearing House Br. at 22-28.  The expansive reading of <u>Koehler</u> sought by Gucci would subject international banks to conflicting rules and orders concerning foreign accounts, and risk causing a backlash in foreign jurisdictions resulting in the adoption of reciprocal laws applied to U.S. banks which ultimately would "threaten[ ] the balance of international banking law."  FRBNY Br. at 7.

Even if the separate entity rule did not apply, Gucci is not entitled to the relief sought.  Ordering turnover of deposits in China would depart from well settled law of international comity, would cause BOC to violate Chinese banking laws and would subject BOC to sanctions and the risk of double liability (facts not present in <u>Koehler</u>).[2]  As a result, it would contravene due process.  Gucci should not be allowed to impose on the BOC the burden of paying Gucci's damages award.   This Court clearly has the authority to deny such relief under the protective order provision set forth in Section 5240 of the New York Civil Practice Law and Rules.  At a minimum, the Court should condition any turnover order on a full indemnity from Gucci.  In

---

[2]        Indeed, Gucci's request to require BOC to act in contravention of the regulatory law of China is inconsistent with the Federal Reserve statutes and regulations under which the New York branch operates, which, in substance, require the bank to confirm, in order to be licensed, that it operates in accordance with the regulatory laws of its home jurisdiction.  <u>See</u> 12 U.S.C. § 3105(d)(2)(A) (2006); 12 C.F.R. § 211.24(c)(1)(i)(A) (2010).

short, the Court should either require Gucci to pursue its remedies elsewhere (for example in China, where Gucci itself is present and conducts substantial operations) in a manner that does not conflict with Chinese law, or assure that its enforcement efforts here do not result in unfairly saddling BOC with the responsibility of paying the judgment.  For these and other reasons set forth below, the Proposed Judgment should not include the requested turnover provision.

## STATEMENT OF FACTS

### The Complaint

The Complaint requests, among other things, an injunction prohibiting defendants from violating Plaintiffs' trademark, various forms of monetary relief, and a pre-judgment asset restraint to secure the recovery of any damages award, but not for a judgment that directs third parties to turn over assets of the Defendants.[3]

### The Proposed Judgment

The Proposed Judgment seeks a damages award against Defendants, and also seeks relief against third party "Asset Holders," which the Proposed Judgment defines to include "any banks . . . who are in possession of Defendants' Assets."  See Proposed Judgment at 4.  Paragraph 7 of the Proposed Judgment would direct these "Asset Holders" to "liquidate the assets of [Defendants], that have been previously identified as frozen or otherwise restrained in compliance with the [Preliminary Injunction], and pay the value of such assets to Plaintiffs in partial satisfaction of the Damages Award.  This includes . . . any and all accounts with . . . Bank of China, including but not limited to Bank of China account numbers . . . that are associated with, utilized by and/or held by or on behalf of Defendants . . . ."[4]  In support of that relief, Gucci

---

[3]      Since, under Federal Rule of Civil Procedure 54(c), a default judgment "must not differ in kind from, . . . what is demanded in the pleadings," the Proposed Judgment should not include a direction for turnover.

[4]      Gucci also requests an order that "any person currently holding any other assets of [Defendants] and any persons who come in to possession of Defendants' Assets who receive notice … are permanently restrained and

cites "Rule 64 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), and the Court's inherent equitable power to issue remedies ancillary to its authority to provide final relief . . . ," none of which authorize the requested relief.

## ARGUMENT

Rule 69(a)(1) states that execution on a judgment "must accord with the procedure of the state where the court is located."  Article 52 of New York's C.P.L.R. contains the relevant state rules, and provides for the court, on notice to the judgment debtor and third party, to direct a third party to turn over property of the judgment debtor.  See N.Y. C.P.L.R. 5225.

Gucci seeks to include in the Proposed Judgment what are in effect post judgment turnover orders directed to third parties.  As set forth below however, nothing in New York law supports a direction to a nonparty foreign bank to turn over assets of a judgment debtor held in the non-U.S. branches of such a bank located abroad in contravention of foreign law.

## I.     ARTICLE 52 DOES NOT AUTHORIZE TURNOVER IN THIS ACTION

### A.     Under the Separate Entity Rule, the Reach of the Petition Should Be Limited to New York

Gucci's request is fundamentally at odds with the "separate entity" rule, long recognized in New York law and in banking law generally, and repeatedly recognized in the Southern District of New York.  See Fid. Partners, Inc. v. Philippine Export and Foreign Loan Guarantee Corp., 921 F.Supp. 1113, 1119 (S.D.N.Y. 1996) (separate entity rule recognized "by courts throughout the country"); Motorola Credit Corp. v. Uzan, 288 F.Supp.2d 558, 560 (S.D.N.Y. 2003); Lok Prakashan Ltd. v. India Abroad Publ'n, Inc., No. 00 Civ. 5862 (LAP), 2002 WL 1585820, at *1 (S.D.N.Y. July 16, 2002); Nat'l Union Fire Ins. Co. v. Advanced Emp't Concepts, Inc., 269 A.D.2d 101, 101-102, 703 N.Y.S.2d 3, 4 (1st Dep't 2000).  The separate

---

enjoined from transferring, disposing of, secreting, or otherwise paying or transferring . . . "  any asset of Defendants.  See Proposed Judgment ¶ 8.

entity rule provides that "each branch of a bank is a separate entity, in no way concerned with accounts maintained by depositors in other branches or at the home office." Cronan v. Schilling, 100 N.Y.S.2d 474, 476 (N.Y. Sup. Ct. 1950), aff'd, 282 A.D. 940, 126 N.Y.S.2d 192 (1st Dept. 1953); see Motorola, 288 F.Supp.2d at 560; Lok, 2002 WL 1585820, at *1. Under that rule, the situs of an account is at the branch where the account is carried. See Fid. Partners, 921 F.Supp. at 1119; Newtown Jackson Co. v. Animashuan, 148 N.Y.S.2d 66, 67 (N.Y. Sup. Ct. 1955). Consequently, the deposit can be seized only by process served on the branch that holds such funds for a judgment debtor. See Nat'l Union, 269 A.D.2d at 101, 703 N.Y.S.2d at 4.

The separate entity principle is also recognized in Article 4A of the New York U.C.C. in respect of funds transfers. Section 4A-105(a) states that "[a] branch or separate office of a bank is a separate bank for purposes of this Article." Section 4A-502(d) provides that "[c]reditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary." Thus, if the originator of a funds transfer requests its bank, Bank A, to transfer $1 million to the account of Mr. Smith (the beneficiary) maintained at the Shanghai office of his bank, Bank B, Bank A will wire the funds to the New York branch of Bank B. The New York branch of Bank B, in turn, will instruct the Shanghai branch to credit Mr. Smith's account on its books. Before, during, and after the payment order is received by the New York branch, any creditor process would be ineffective to stop and seize that payment. Under Article 4A creditor process must be served on the Shanghai branch. See also Scanscot Shipping Services v. Metales Tracomex LTDA, 617 F.3d 679 (2d Cir. 2010); Allied Maritime, Inc. v. Descatrade SA, 620 F.3d 70 (2d Cir. 2010). Notably, since "creditor process" is defined to include both pre and post

5

judgment remedies (see N.Y. U.C.C. § 4A-502(a)) this rule applies with equal force both before and after judgment.

Relying on the separate entity rule, courts in this district have repeatedly held that a judgment creditor cannot enforce its judgment against accounts of a judgment debtor in a bank head office or bank branch that is located outside of the U.S. by serving process on the New York branch of such bank.  In Lok, the plaintiff judgment creditor caused the U.S. Marshall to serve an execution on the New York Branch of Bank of Baroda, an Indian bank.  When the bank responded that the judgment debtor did not have an account with the New York Branch, plaintiff sought an order compelling that bank to transfer assets of the judgment debtor in the Bhadra (India) Branch of the Bank to the New York branch and freezing the account until permission was obtained from the Indian Central Bank to release the funds.  The district court, relying on the separate entity rule, held that although it had jurisdiction over the New York branch, the Bank of Baroda and its Indian branches were not considered present in New York and denied the relief requested, noting "[t]he Bank of Baroda is not a party to this action." 2002 WL 1585820 at *2.

To the same effect is Motorola, 288 F.Supp.2d at 560.  There, a judgment creditor sought to compel JPMorgan Chase and subsidiaries of HSBC to transfer funds into the court's registry from accounts located at foreign branches of those entities.  Judge Rakoff rejected that relief in reliance on the separate entity rule.  In doing so, the court expressly declined to expand a limited exception to the separate entity rule recognized when a New York head office of a bank was served with a restraint directed at accounts located at branches in New York.  Id. at 561; accord Nat'l Union, 269 A.D.2d at 101-102, 703 N.Y.S.2d at 4 (declining to expand exception absent express "pronouncement from the Court of Appeals or an act of the legislature").

And in <u>Fid. Partners</u>, 921 F.Supp. at 1119-20, the court held that a judgment creditor could not obtain access to assets located at the main office of the defendant, a loan guarantee agency, in the Philippines by moving against the New York branch of the defendant: "Philguarantee [the defendant] argues persuasively that the separate entity rule prohibits Fidelity's attempt to execute against assets held in PNB's Manila office by moving against the bank's local [New York] branch . . . ."[5]

Although the separate entity rule was historically justified in part by the impracticability of requiring constant transmission of reports on the status of accounts in one branch to all other branches (<u>see</u>, <u>e.g.</u>, <u>Cronan</u>, 100 N.Y.S.2d at 476),[6] the doctrine also has significant choice of law implications, particularly in the international context. As the United States explained in an amicus curiae brief submitted to the United States Supreme Court:

> In terms of international banking law, the separate entity doctrine thus gives recognition to the fact that any banking operation in a foreign country is necessarily subject to the foreign sovereign's own laws and regulations regarding such matters as the timing and amount of withdrawals; rates of interest; convertibility into foreign currency; local capital, reserve and insurance requirements; and the scope of permissible activities . . . . If a deposit made in one country could be converted into an obligation payable in another country, however, these laws and regulations could be readily evaded.

<u>Citibank, N.A.</u> v. <u>Wells Fargo Asia Ltd.</u>, Brief for the United States as Amicus Curiae Supporting Petitioner, No. 88-1260, 1989 WL 1126987, at *14 (U.S. 1989) (footnote omitted); <u>see also</u> RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 214, cmt. a.

---

[5]     New York state courts have also applied the separate entity rule in the judgment enforcement context. In <u>Intercont'l Credit Corp.</u> v. <u>Roth</u>, 578 N.Y.S.2d 955, 956 (N.Y. Sup. Ct. 1990), <u>vacated on other grounds</u>, 595 N.Y.S.2d 602 (N.Y. Sup. Ct. 1991), an action in which Intercontinental sought to enforce its New York judgment, Justice Greenfield rejected an argument that a restraining notice served on the New York agency of an Israeli bank operated to restrain assets in Israel. <u>Id.</u> at 958. "[E]nforcement of the instant judgment as against Roth's [judgment debtor's] assets held in Israel must be obtained through the Israeli courts." <u>Id.</u> at 956.

[6]     Given the fact that the New York branch of BOC does not have access to information about accounts at the head office and Chinese branches (<u>see</u> Beauchemin Dec. ¶ 2), the historic concerns underlying the separate entity rule are very real concerns for BOC. <u>See</u> Motorola, 288 F.Supp.2d at 560 (such concerns may have greater weight "when the requested transfers involve banks subject to foreign laws and practices"); <u>Lok</u>, 2002 WL 1585820 at *2 (New York branch of Bank of Baroda did not have information for accounts in Indian branch).

There are also significant economic reasons that favor use of branches rather than bank subsidiaries.  A depositor or a creditor of a U.S. branch of a non-U.S. bank has the worldwide capital of the bank behind that obligation, not merely that of a local subsidiary.  And because the lending limits of a U.S. branch of a non-U.S. bank are determined on the basis of the regulatory capital of the non-U.S. bank as a whole, 12 U.S.C. § 3102(b)(1); N.Y. BANKING LAW § 202-f, as opposed to the lending limits of a U.S. bank subsidiary, which are determined by the regulatory capital of the subsidiary alone, 12 U.S.C. § 84; N.Y. BANKING LAW § 103, a non-U.S. bank branch can make larger and more loans in the United States than it could through a subsidiary. "The ability of foreign banks to do business through branches and agencies is . . . important to New York and its economy."  See Report of the Superintendent's Advisory Committee on Transnational Banking Institutions, March 1, 1992, Healy Suppl. Decl. Ex. D, at 9 (availability of branch/agency form "is beneficial to the American economy as a whole").  The same principles govern the decision of U.S. banks to open branches outside the United States, as those branches take advantage of the worldwide capital of the banks.  Id. at 11.

The separate entity rule facilitates use of the branch form.  Abandonment or constriction of the rule would impose significant burdens on international banks operating in New York and could cause non-U.S. banks to use subsidiaries rather than branches in the United States.  This "would have a significant adverse impact on the international banking business done in the United States and could result in the withdrawal of capital from U.S. markets."  Id. at 11; see FRBNY Br. at 2 ("International banks are vital to New York's position as a global bank center").

Given the importance of the rule, New York courts have refused to alter the rule absent an explicit "pronouncement from the Court of Appeals or an act of the Legislature."  See Nat'l Union, 269 A.D.2d at 101, 763 N.Y.S.2d at 4.  No such pronouncement has been made.

**B.**     **The Koehler Decision Did Not Disturb the Separate Entity Rule**

Koehler does not abrogate the separate entity rule.  Koehler addressed a question certified by the Second Circuit, namely, "whether a court sitting in New York may order a bank over which it has personal jurisdiction to deliver stock certificates owned by a judgment debtor . . . to a judgment creditor, pursuant to C.P.L.R. article 52, when those stock certificates are located outside New York."  12 N.Y.3d at 536.  The decision in Koehler did not even mention the separate entity rule, and cannot be construed as the sort of express "pronouncement" necessary to abrogate the rule.  See Nat'l Union, 269 A.D.2d at 101, 763 N.Y.S.2d at 4; Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co., 58 A.D.2d 397, 401, 397 N.Y.S.2d 66, 69-70 (2d Dep't 1977) (finding that Court of Appeals' decisions did not overturn "basic and satisfactory principles of common-law" where Court of Appeals did not explicitly overturn common law principles in either decision (citation omitted)); Coleman v. New York State Dept. of Correctional Services, 19 Misc.3d 1104(A), 2008 WL 711730, at *3 (N.Y. Sup. Ct. 2008); see also Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 760 F.2d 1347, 1362 (2d Cir. 1985) ("Since, as appellants argue here, the result in *Carnation* appears on its face to conflict with the holding in *Keogh* . . . they deem this omission to imply that the Court intended to overrule *Keogh* but for some reason was unwilling to say so. We think it more plausible that, if the Court intended to overrule *Keogh* or even seriously to question that decision, it would have discussed or at least mentioned the fact."); Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50, 53 (2d Cir. 1965) (finding that federal courts "may not alter an established rule of New York law when there has been no indication by the New York lawmakers that they have changed their point of view"); Motorola, 288 F.Supp.2d at 560 ("[I]t is not for this Court to limit the separate entity doctrine beyond the limits already set by the courts of New York").

The <u>Koehler</u> judgment debtor had pledged as collateral share certificates in a company jointly owned by the judgment creditor and judgment debtor to Bank of Bermuda to secure a loan.  12 N.Y.3d at 536.  (Here, in contrast, the Defendants' accounts are not held as collateral of BOC).  Bank of Bermuda had a New York subsidiary (<u>see</u> <u>id.</u> at 536) (not a branch, as counsel for Gucci claimed at the January 5, 2011 oral argument).  The judgment creditor sought to have the bank compelled to bring the shares to New York to satisfy his judgment.

Although the Bank had initially raised a personal jurisdiction objection, it ultimately stipulated that the Bank itself (the head office that held the shares, not just the subsidiary) was subject to personal jurisdiction in New York.  <u>Id.</u>  In other words, in <u>Koehler</u>, the bank's head office, which held the share certificates, was itself before the court.  <u>Compare</u> <u>Lok</u>, 2002 WL 1585820, at *2 (applying separate entity rule, foreign head and branch office not present in New York for judgment enforcement purposes).  As a result, the ruling in <u>Koehler</u>, that the court could compel the Bank to bring the shares to New York, was applied where the very entity holding specifically identified property was before the court.  12 N.Y.3d at 536.

Thus, <u>Koehler</u> did not consider whether, let alone hold that, the New York branch of a foreign bank must turn over assets located outside of New York at the non-U.S. head office, or non-U.S. branches, of that foreign bank.  When the court concluded that the head office, which was holding the property at issue, could be directed to bring assets into New York, it was not disregarding the separate entity of a New York branch.[7]  The court did not need to, and did not, address the separate entity rule, and no cases relating to the rule were cited or discussed by the court.  Neither party – the judgment creditor, Koehler, nor the respondent, Bank of Bermuda –

---

[7]       The district court decision in the federal action that certified the question to the court of appeals expressly concluded that "the separate entity rule has no role to play in this case, since the rule involves circumstances where a party attempts to obtain the assets of an entity's foreign or auxiliary branch through service of its main branch." <u>Koehler</u> v. <u>Bank of Bermuda Ltd.</u>, No. M18-302, 2005 WL 551115, at *12 (S.D.N.Y. March 9, 2005).

10

mentioned the separate entity rule in their initial briefs to the Court of Appeals.[8]  See Koehler v. Bank of Bermuda Ltd., No. 2009-0082, 2008 WL 6191439 (N.Y. Dec. 12, 2008), 2009 WL 1615260 (N.Y. Feb. 4, 2009).  Koehler referred to the rule only in his reply to an amicus brief, and then stated that the rule is "inapplicable where, as here, the judgment creditor seeks to obtain funds of the debtor *held by the branch of the bank upon which service has been made*."  Id., No. 2009-0082, 2009 WL 1615263, at *29-30 (N.Y. Apr. 16, 2009) (emphasis added).[9]

The court in Koehler omitted mention of the separate entity rule not because it was somehow attempting to overturn the rule through silence, but because the separate entity rule simply was inapplicable in the proceeding (i.e., the court was not relying on the presence of a branch to reach the head office).  The separate entity is unaltered by Koehler.

Finally, the Koehler court's statement that "[w]hile prejudgment attachment is typically based on jurisdiction over property, postjudgment enforcement requires only jurisdiction over persons" (12 N.Y.2d at 537), does not support the conclusion that Koehler implicitly overturned the separate entity rule.  Regardless of whether there is a basis for jurisdiction, predicated on the presence in New York of a branch, under the separate entity rule, the branch is to be treated as a separate entity from the non-U.S. head office and branches for purposes of determining whether

---

[8]     The New York Law Journal article cited by Gucci for the proposition that Koehler abrogated the separate entity rule (see Pl. Opp. at 13), actually recognizes that the separate entity rule was not at issue in Koehler.  The authors of that article noted that Koehler did not address the separate entity rule "likely because in prior opinions, the district court determined that 'the separate entity rule has no role to play in this case, since the rule involves circumstances where a party attempts to obtain the assets of an entity's foreign or auxiliary branch through service of its main branch.'"  See Halter Decl. Ex. M.  In addition, the article indicates that the application of Koehler in post judgment enforcement is uncertain, and notes that the "impact of the Koehler decision has yet to be seen."  Id.

[9]     One court in this district has concluded that in light of Koehler, the separate entity rule may no longer apply in a judgment enforcement proceeding.  See Eitzen Bulk v. State Bank of India, Order Denying State Bank of India's Motion to Dismiss, No. 09 Civ. 10118 (AKH) (S.D.N.Y. August 3, 2010).  The court's analysis, which is contained in a single sentence, does not consider the factual context of Koehler or the fact (demonstrated above) that the parties in Koehler did not consider the separate entity rule to be at issue.  The court in Eitzen also, incorrectly, states that Koehler involved a branch, which it did not.  We also note that the Eitzen decision has been appealed to the Second Circuit, and that appeal is currently being briefed.  Nor does  John Wiley & Sons, Inc. v. Kirtsaeng, No. 08 Civ. 7834 (GEL) (DCP), 2009 WL 3003242 at *3 (S.D.N.Y. Sept. 15, 2009), support a conclusion that after Koehler the separate entity rule does not apply post judgment.  Wiley actually cites Motorola, 288 F.Supp.2d at 560-1, a judgment enforcement case, to support application of the separate entity rule.

creditor process (pre or post judgment) served on the New York branch reaches assets in the non-U.S. offices and branches.  Under the separate entity rule, the non-U.S. head offices and branches (and the assets they hold) are not viewed as "present" in New York for purposes of attachment and execution by reason of the presence of the branch.  See Lok, 2002 WL 1585820, at *1.  See generally Cronan, 100 N.Y.S.2d at 476; Motorola, 288 F. Supp. 2d at 560.[10]

Since Koehler did not disturb the separate entity rule, it provides no support for entering the Proposed Judgment in its present form.  Here, under the separate entity rule, the main office and the Chinese branches of BOC are not before the Court, Lok, 2002 WL 1585820 at *1, and, unlike Koehler, the main offices and the Chinese branches have not consented to appear.

### C.    In Light of Significant Policy Considerations, Koehler Should Not Be Given an Expansive Record

FRBNY has recently confirmed the significant policy considerations that weigh against reading Koehler expansively.  See FRBNY Br.  In Samsun, the petitioner, Samsun, sued to enforce a judgment, based on an arbitration award, against three Chinese entities.  It filed a petition requesting an order directed to six Chinese banks (including BOC) with branches or offices in New York, to turn over all property interests of judgment debtors located anywhere in

---

[10]    Nor, as Gucci has argued, did the Court of Appeals overturn the separate entity rule in prejudgment proceedings in Hotel 71 Mezz Lender LLC v. Falor et al., 14 N.Y.3d 303, 312 (2010) (Pl. Opp. at 14).  Hotel 71 says nothing about the separate entity rule, and simply found that the situs of the intangible property at issue in that case (i.e., uncertificated interests in business units) is determined by the situs of the garnishee of that property.  The court in Hotel 71 stated that the presence of the defendant in New York made the intangible property interests at issue attachable in New York:  "Just as a debt clings to the debtor when he enters a state other than the state where the debt was incurred, it follows that defendants' uncertificated ownership interests, which defendant Mitchell possesses or has custody over, travel with him, and were attachable in New York based on his presence in this state."  Hotel 71, 14 N.Y.3d at 315-6.  The attachment order in that case was served by the Sherriff on the defendant in New York (outside the courthouse) when defendant (and hence the property to be attached) was in New York.  The case does not suggest that pre-judgment attachment reaches property located outside the jurisdiction.  Nor does the New York State Law Digest article cited by Gucci (Pl. Opp. at 14) indicate that the separate entity rule has been overturned.  That article does not even discuss whether Hotel 71 or Koehler overturned the separate entity rule, and in fact incorrectly describes Koehler as a case involving a bank with a branch in New York.  See Halter Decl. Ex. N.  Notably the Second Circuit's decision in Allied Maritime, 2010 WL 3447882, at *3 confirms that post Koehler the separate entity rule continues to apply to attachments: "each branch of a bank [is] treated as a separate entity for attachment purposes".  There is nothing in that case that suggest the separate entity rule only applies (or applies differently) when it is being used for quasi in rem jurisdiction than for security purposes.

the world.  Petition, dated April 20, 2010, filed in Samsun Logix Corp. v. Bank of China, et al.,
Index No. 105262/2010, Healy Suppl. Decl. Ex. C ¶¶ 36, 37.

In its amicus brief, FRBNY states that Samsun's effort to restrain and cause delivery of
property held by the Chinese Banks "from outside the United States into New York . . . is based
on an impermissibly expansive reading of Koehler . . . ."  FRBNY Br. at 5.  FRBNY expressed
concern that should a New York court issue a judgment regarding assets located in a foreign
jurisdiction, e.g. China, a New York court and a Chinese court might issue contradictory rulings
regarding the assets' rightful ownership.  See id. at 6.  To avoid such a result, FRBNY argued
that courts should follow the "generally recognized principle" that "claims against a single asset
should be decided in a single forum, and that forum should be the court of the jurisdiction in
which the asset is located."  Id. (emphasis added).

FRBNY also expressed concern that if Koehler were read to apply to assets held abroad
at foreign banks, the other jurisdictions and countries might follow New York's example, and
might enter orders affecting assets located in the United States.  See id. at 7 ("Such turnover
orders could have unforeseeable and unintended consequences on U.S. banking, especially if
reciprocal laws are adopted by other jurisdictions").  Such a web of reciprocal banking laws, by
which courts around the world might begin entering orders affecting assets outside of their
jurisdictions, would, in FRBNY's words, "ultimately threaten[] the balance of international
banking law."  Id.  Thus, in order to avoid the results described by FRBNY, this Court should
limit its orders to assets located within its own jurisdiction.

**D.**      **The Separate Entity Rule Reflects the Reality that a Depositor at a Branch of
BOC in China Cannot Withdraw Its Deposit at the New York Branch**

The separate entity rule also reflects the historic rule that a depositor at one branch could
not withdraw its deposit at another branch.  See Hohenstein Shipping Co. v. Feliz Compania

Naviera S. A., 236 F.Supp. 216, 217 (E.D.N.Y. 1964) ("Under the law of the State of New York

'there is no obligation due at the main branch to a depositor in another branch'") (citing U.S. v.

First Nat'l City Bank, 321 F.2d 14, 20 (2d Cir. 1963)); D/S A/S Flint v. Sabre Shipping Corp.,

228 F.Supp. 384, 390 (E.D.N.Y. 1964); see also RESTATEMENT (SECOND) OF CONFLICT OF LAWS

§ 195, cmt. d.  That remains true with respect to deposits in China at BOC.  A customer with an

account at a branch of BOC in China cannot come to New York and simply withdraw funds from

his Chinese account.  See Beauchemin Decl. ¶ 5.

Because Plaintiffs as garnishors stand in the shoes of the Defendants, they should not be

able to exercise greater rights than the Defendants. See Karaha Bodas Co. v. Perusahaan

Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70 (2d Cir. 2002) (citing Bass v. Bass,

140 A.D.2d 251, 253, 528 N.Y.S.2d 558, 561 (1st Dep't 1988)) ("[A] party seeking to enforce a

judgment 'stand[s] in the shoes of the judgment debtor in relation to any debt owed him or a

property interest he may own.'"); see also First Nat'l, 321 F.2d at 20 ("[t]he nature of

garnishment proceedings is such that the garnishor obtains no greater right against the garnishee

than the garnishee's creditor had"), , rev'd on other grounds,  379 U.S. 378, 381 (1965) (noting

that the government's rights as creditor were limited to "whatever rights the debtor . . . may

have" against the garnishee bank).

## II.     THE COURT SHOULD DECLINE TO GRANT THE RELIEF GUCCI SEEKS, WHICH WOULD SUBJECT BANK OF CHINA TO SANCTIONS AND CIVIL LIABILITY IN CHINA

Even of Koehler could be read to abrogate the separate entity rule, it would not support

the relief Gucci seeks.  In contrast to the situation in Koehler, were Bermuda law evidently did

not prohibit the turnover sought by the plaintiff, here Chinese law prohibits the turnover of

deposits held in a bank account in China absent authorization from a Chinese authority.[11]  In

addition to sanctions and penalties, BOC would be liable to its customers for the amount of funds

turned over, and Chinese courts have awarded such relief to Chinese customers.  See Wu Decl.

¶¶ 19-26.  Indeed, BOC has been held liable for impermissibly permitting funds in a customer's

account to be withdrawn.  Id. ¶ 22. Gucci's expert, Donald Clarke, does not dispute this Chinese

law prohibition on asset turnover, nor does he deny that BOC would be at risk of double liability

should it comply with an order from this Court to turn over customer assets located in China.

See Clarke Dec. II ¶¶ 11, 12 (failing to address likelihood that BOC would be sued by customers

in China).[12]  Thus, the Proposed Judgment would subject BOC to double liability.

### A.   Because Granting Gucci the Relief Sought Would Subject BOC to Double Liability, It Would Violate Due Process

Subjecting BOC to double liability in these circumstances would violate the due process

clause.  See W. Union Tel. Co. v. Pennsylvania, 368 U.S. 71, 75 (1961) (concluding that when

party could be subject to double liability under the laws of several states it was threatened with a

violation of due process; a person "is deprived of due process of law if he is compelled to

relinquish it [property] without assurance that he will not be held liable again in another

jurisdiction or in a suit brought by a claimant who is not bound by [the] first judgment"); see also

First Nat'l, 379 U.S. at 384 (noting that no showing had been made that the respondent was

under any risk of double liability, and that the district court had reserved the power to enter a

protective order should such a showing be made); Mayor and City Council of Baltimore v.

---

[11]    Koehler does not support the proposition that a bank should be ordered to turnover property in contravention of foreign law.  Indeed, the Appellate Division in Gryphon Domestic VI, LLC v. APP International Finance Co., B.V., 41 A.D.3d 25, 37 (1st Dep't 2007), cited by Koehler (12 N.Y.3d at 540), stated expressly that a court may not "require a person to do an act in another state . . . that is prohibited by the law of that state . . . ."  In addition, in the Eitzen decision, there is no suggestion that foreign law barred the relief sought in that case.

[12]    The MyReplica case, on which Gucci and Mr. Clarke so heavily rely, does not disprove the argument that BOC would be penalized for violating Chinese law or subjected to liability to its customer for turning over deposits to Gucci in response to an order of this Court.  In that case, BOC released the funds to the customer after the customer threatened to sue it in China.  See Opposition to Cross Motion at 5.

Baltimore Football Club Inc., 624 F.Supp. 278, 284 (D. Md. 1985) ("In order to avoid conflicting judgments with respect to the same property, only one state may condemn a particular piece of property, whether tangible or intangible." (citation omitted)).  Because the Defendants will not be bound by any turnover order entered by this court in China, this Court cannot provide any "assurance that [Bank of China] will not be held liable again in another jurisdiction."  W. Union Tel. Co., 368 U.S. at 75.

The fact that the property at issue, should any exist, would be located in China, outside of this Court's jurisdiction, makes the due process concern particularly acute.  In Western Union, the Supreme Court explained that even where a court has in rem jurisdiction over property, exposure to double liability would contravene due process:

> [O]ur prior opinions have recognized that when a state court's jurisdiction purports to be based, as here, on the presence of property within the State, *the holder of such property is deprived of due process of law if he is compelled to relinquish it without assurance that he will not be held liable again in another jurisdiction or in a suit brought by a claimant who is not bound by the first judgment.*

368 U.S. at 75 (emphasis added) (citing Anderson Nat'l Bank v. Luckett, 321 U.S. 233, 242-43 (1944); Sec. Savings Bank v. California, 263 U.S. 282, 286-90 (1923)).  Due process then must surely be absent where the court does not even have jurisdiction over the property, and thus cannot protect the garnishee.

**B.    Under C.P.L.R. § 5240 the Court Should Deny the Relief Sought in the Circumstances Present Here or, at a Minimum, Require Gucci to Indemnify Bank of China for any Exposure It May Have**

Since Chinese law does not recognize a U.S. court order as a valid ground for BOC to turn over funds of the Defendants in China, and BOC will be liable to its customer for the amount of any funds turned over, the order Gucci seeks will, in effect, allow Gucci to collect its judgment from a third party – BOC – having nothing to do with the disputes that gave rise to the

16

default judgment that Gucci proposes.  This "would be 'an unconscionable result.'"  See JPMorgan Chase Bank, N.A. v. Motorola, Inc., 47 A.D.3d 293, 307, 846 N.Y.S.2d 171, 181 (1st Dep't 2007) (quoting Oppenheimer v. Dresdner Bank A.G., 50 A.D.2d 434, 441, 377 N.Y.S.2d 625, 632 (2d Dep't 1975)).  And it would be contrary to the clear policy embedded in New York law to insulate third party garnishees from double liability.  That policy is reflected in C.P.L.R. § 5209, which provides that once a garnishee bank turns over property of a judgment debtor subject to a court turnover order, the garnishee bank is discharged from its obligations to the judgment debtor.  See N.Y. C.P.L.R. § 5209.[13]  The C.P.L.R. § 5209 discharge would not protect BOC in China, and the only way to do so is through entry of a protective order.

Section 5240 of the New York Civil Practice Law and Rules expressly provides that a court "may at any time, on its own initiative or the motion of any interested person . . . make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure."  Section 5240 is designed to prevent unreasonable annoyance or prejudice to any person.  See Motorola, 47 A.D.3d at 307, 846 N.Y.S.2d at 181.  Section 5240 is worded "as broadly as possible" to provide courts with "extensive power to control and regulate the enforcement of a money judgment."  See 11 Weinstein-Korn-Miller, N.Y. Civ Prac ¶ 5240.00; see also Paz v. Long Island R.R., 241 A.D.2d 486, 487, 661 N.Y.S.2d 20, 22 (2d Dep't 1997) ("CPLR 5240 is an omnibus section empowering the court to exercise broad powers over the use of enforcement procedures").

Under Section 5240 the Court has authority to, and should, exercise its discretion to deny the turnover Gucci seeks.  Id. at 308-10.  At the very least, the Court should require Gucci to

---

[13]     Section 5209 provides: "A person who, pursuant to an execution or [turnover] order, pays or delivers, to the judgment creditor . . . money or other personal property in which a judgment debtor has or will have an interest, or so pays a debt he owes the judgment debtor, *is discharged from his obligation to the judgment debtor to the extent of the payment or delivery*." (emphasis added).

indemnify BOC for any exposure it has as a result of turning over property of the Defendants (should any exist) in China.

In <u>Motorola</u>, U.S. banks sought to enforce a judgment against an Indian corporate debtor by garnishing any obligation that third party Motorola was found to have to the Indian judgment debtor in a pending action in India between the judgment debtor and Motorola.  In light of evidence that the Indian court would not recognize the New York court judgment against the judgment debtor (and thereby reduce any amount owing from the garnishee to the judgment debtor), the First Department found that the garnishee faced a "substantial risk of double liability," and held that a protective order should issue dismissing the garnishment petition.  47 A.D.3d at 308, 846 N.Y.S.2d at 182.  The court recognized the possibility of conditioning the enforcement relief sought by JPMorgan on an indemnity but decided to deny the petition outright.  47 A.D.3d at 312, 846 N.Y.S.2d at 186-7.  The same relief is called for here.[14]

### C.     Under Principles of Comity the Court Should Deny the Relief Sought by Gucci

The principle of comity, the principle that determines the extent to which the law of a foreign nation shall be recognized and given effect by a court of this state, has long been recognized as part of federal and New York state common law.  <u>See</u>, <u>e.g.</u>, <u>Hilton</u> v. <u>Guyot</u>, 159 U.S. 113 (1895); <u>Petersen</u> v. <u>Chem. Bank</u>, 29 How. Pr. 240 (N.Y. 1865).  Among other things, comity informs a court's interpretation of statutes that might otherwise be applied extraterritorially.  <u>In re Maxwell Commc'n Corp.</u>, 93 F.3d 1036 (2d Cir. 1996); <u>In re Payment</u>

---

[14]     The court in <u>Motorola</u> distinguished earlier cases in which banks were subject to conflicting claims by depositors regarding deposits *located in New York* when one of the conflicting claimants could not be made a party.  In those cases, the bank was not a third party garnishee, but was itself the defendant in a suit by a depositor to recover an account located in New York.  <u>Motorola</u>, 47 A.D.3d at 311.  Distinguishing those cases, the court in <u>Motorola</u> stated: "Further, Chase, the party asking us to expose Motorola to the risk of double liability, seeks to garnish an asset to which Chase (unlike the plaintiffs in the *Petrogradsky* line of cases) asserts no claim in its own right, but only a derivative claim as judgment creditor of an absent third party."  <u>Id.</u>  Gucci, like the plaintiff in <u>Motorola</u>, seeks to use garnishment to obtain assets located *outside* of New York, in China, to which Gucci asserts no direct right – the very reasons the action subjects BOC to the risk of double liability.

Card Interchange Fee and Merch. Discount Antitrust Litig., No. 05-MD-1720 (JG)(JO), 2010 WL 3420517, at \*5 (E.D.N.Y. Aug. 27, 2010).  Under principles of comity, courts in this country have avoided extraterritorial application of U.S. laws where to do so would require a party or third party to take action in a foreign jurisdiction that would contravene the law of the foreign jurisdiction.  See, e.g., F. Hoffmann-LaRoche Ltd. v. Empagran S.A., 542 U.S. 155, 164 (2004); United States v. Ross, 302 F.2d 831, 834 (2d Cir. 1962).  This longstanding rule is set forth in RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 441(1), which provides "In general, a state may not require a person (a) to do an act in another state that is prohibited by the law of that state or by the law of the state of which he is a national . . . ."

In its previous memorandum to this Court, BOC noted that many courts have denied discovery of information located abroad based on the principles of comity where the party from whom discovery is sought shows that disclosure would violate foreign law.  See BOC Mem. at 6-12.  That principle should apply with greater force to the intrusive act of requiring BOC to turn over assets in China in violation of Chinese law.  See also Kosmond v. Kosmond, 830 N.E.2d 596, 602 (Ill. App. Ct. 2005).

## III.    NONE OF THE GROUNDS CITED IN THE PROPOSED JUDGMENT SUPPORT THE RELIEF REQUESTED

None of the other grounds listed by Gucci as support for its proposed turnover order support the relief it seeks.  See Proposed Judgment at ¶¶ 7, 8.  Rule 64 provides methods for obtaining provisional, pre-judgment remedies, not final remedies, and has no application at the judgment enforcement stage.  See EM Ltd. v. Republic of Argentina, No. 03 CIV. 2507 (TPG), 03 CIV. 8845 (TPG), 05 CIV. 2434 (TPG), 06 CIV. 6466 (TPG), 07 CIV. 1910 (TPG), 2009 WL 2568433, \*3 (S.D.N.Y. Aug 18, 2009).  The Proposed Judgment expressly states that Gucci is seeking turnover of property in order to obtain "satisfaction of the Damages Award."  Proposed

Judgment ¶ 7.  Although Gucci's request for turnover is built into its Proposed Judgment, it is still an enforcement remedy since it is requested to satisfy a damages award in the judgment.

Similarly, nothing in Section 1116, or the Lanham Act generally, provides for post judgment enforcement of any kind, let alone for a post-judgment turnover of assets.  Gucci has cited no cases that interpret Section 1116 to provide authority for such relief.  And even if Section 1116 did apply here, under Morrison v. Nat'l Austl. Bank, Ltd., 130 S.Ct. 2869, 2877 (U.S. 2010), the Court would not have the authority to issue an turnover order with an extraterritorial reach because the Lanham Act is silent as to any extraterritorial application.

Lastly, Gucci cites no authority that states that courts have such an inherent power to issue turnover orders in conjunction with providing final relief.  Rule 69 provides that the procedure for execution on a judgment "must" accord with state law procedures, unless a federal statute applies.  No such federal statute applies here.  As Judge Rakoff noted in Motorola, there is no Second Circuit case that has suggested that federal courts have an inherent power to provide remedies not already provided for by state law or federal statute.  Motorola, 288 F. Supp. 2d at 561.  Judge Rakoff did cite a First Circuit case finding that in "extraordinary circumstances" a court might have the power to depart from state law principles, but, as Judge Rakoff recognized, the fact that a plaintiff might face difficulty in enforcing its judgment is not such an extraordinary circumstance.  Id. at 561-2 ("[T]he difficulties in enforcing the judgment due to the location of the assets and the uncooperativeness of the judgment debtor are not the types of extraordinary circumstances which warrant departure from the general rule that money judgments are enforced by means of writs of execution . . ."). In order to even consider the issue of whether extraordinary circumstances justifying relief exist, a judgment creditor would have to at a minimum first seek "to enforce its judgment against the relevant bank accounts in the

countries in which the funds are actually located" and those efforts would have to "ha[ve] proven nugatory." Id. at 562.  Gucci has yet to take any action in China.[15]  Even if Rule 69 did allow the district court to fashion its own award of relief based on equitable principles, any order under Rule 69 could not have extraterritorial effect because the Federal Rules are silent as to extraterritorial application.  See Morrison, 130 S. Ct. at 2877.

## IV.   PETITIONER'S EFFORT TO REACH THE DEFENDANTS' PROPERTY AT BRANCHES OF BANK OF CHINA LOCATED OUTSIDE NEW YORK, WHICH RESTS ON STATE LAW, IS PREEMPTED BY FEDERAL LAW

Rule 69 provides for the use of state enforcement rules.  As set forth below, constitutional principles and federal law preempt those state rules insofar as they permit a judgment creditor to reach deposits held at a foreign branch or head office of a foreign bank based on the existence of a New York branch.

The supremacy clause of Article VI of the United States Constitution provides Congress with the power to preempt state laws where Congress comprehensively regulates a field of law, or where state law conflicts with federal law or policy interests.  See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-373 (2000) (finding that state statute was preempted because the imposition of any state law whatsoever would conflict with federal foreign policy interests); Louisiana Public Service Comm'n v. F.C.C., 476 U.S. 355, 368 (1986); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947), rev'd, 331 U.S. 247 (1947); Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  In both the areas of foreign relations and foreign commerce, federal interests are paramount and exclusive, and state activity that infringes on those interests is preempted, even if there is no federal legislation that expressly preempts state law.  If applied extraterritorially in the manner suggested by Gucci, Article 52 of the C.P.L.R. infringes on

---

[15]     Even if the Court finds that Section 1116 or a court's inherent powers are relevant here, the arguments made in BOC's December 22, 2010 memorandum show why neither Section 1116 nor the court's inherent powers support the relief Gucci seeks here.

federal interests in the realm of both foreign relations and foreign commerce.

In the area of foreign relations, state action is preempted simply were it has "more than [an] incidental effect" on the relationship between the United States and a foreign nation.  See American Ins. Ass'n v. Garamendi, 539 U.S. 396, 398 (2003) (finding that exercise of state power that touches on foreign relations must yield to federal government policy where there is concern for uniformity in the country's dealings with foreign nations); Zschernig v. Miller, 389 U.S. 429, 432 (1968) (reasoning that a state law prohibiting inheritance by a nonresident alien was an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress; In re Assicurazioni Generali S.p.a. Holocaust Ins. Litigation, 340 F.Supp.2d 494 (S.D.N.Y. 2004).  Here, an interpretation of C.P.L.R. Article 52 which allows for extraterritorial application of New York state discovery and garnishment laws will certainly have more than an "incidental effect" on the relationship between the United States and foreign nations affected by orders aimed at property abroad.

As for the area of foreign commerce, Congress has acted to regulate international banking and specifically has enacted legislation affecting multinational banks.  Federal laws and regulations recognize the local law constraint to which non-U.S. main offices and branches of foreign banks are subject.  For example, in licensing non-U.S. banks in the United States, federal regulators have addressed whether non-U.S. banks with branches in the U.S. must provide information from branches located abroad.  Specifically, federal regulators do not require non-U.S. banks to waive restrictions that may apply to other non-U.S. branches of that institution, and indeed, generally take note of potential restrictions and mandate only that the non-U.S. bank agree to cooperate with federal regulators to address such restrictions in the event the regulators require information or cooperation from abroad.  12 U.S.C. § 3105(d)(3)(C); 12 C.F.R. §

22

211.24(c)(2)(v)(A).  These regulations are part of a comprehensive federal regulatory scheme that applies to all non-US banks operating in the United States, whether licensed under federal or state law.  See, e.g., 12 U.S.C. § 3105(a); 12 U.S.C. § 3105(d)(3)(C); 12 C.F.R. § 211.24(c)(2)(v)(A).  Ordering BOC to turnover information and assets in China regardless of the fact that it would violate Chinese law *directly conflicts* with federal law, which only requires a multinational bank to "cooperate" with federal regulators.  12 U.S.C. § 3105(d)(3)(C); 12 C.F.R. § 211.24(c)(2)(v)(A).

Even if this Court finds that there is no direct conflict between federal law and state action here, the dormant foreign commerce clause provides that state action can be preempted even where it simply reaches into the area of foreign commerce.  Japan Line, Ltd. v. County of Los Angeles, 441 U.S. 434, 449 (1979) (finding that Foreign Commerce Clause protects the federal government's ability to speak "with one voice when regulating commercial relations with foreign governments"); see also Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 319 (1981) ("[S]tate efforts to regulate commerce must fall when they conflict with or interfere with federal authority over the same activity"); ABC Charters, Inc. v. Bronson, 591 F.Supp.2d 1272, 1304 -1307 (S.D. Fla. 2008) (where Congress enacted an extensive "web" of laws related to business with and travel to Cuba, state laws regarding travel to Cuba were preempted under foreign commerce clause); New York Lumber Trade Ass'n v. Lacey, 281 N.Y.S. 647 (2d Dep't 1935), aff'd, 199 N.E. 688 (N.Y. 1935) (finding Congress' authority to be paramount and preemptive in the field of interstate and foreign commerce).

As noted by the Supreme Court in Japan Line, the rationale behind preempting state laws that interfere with foreign commerce is to give effect to the Framers' "overriding concern" that the federal government is able to "speak with one voice" and present a unified federal policy

when "regulating commercial relations with foreign governments."  441 U.S. at 448-49.  Thus,

even where Congress is entirely silent on a particular issue that touches on foreign commerce, a

state law can violate the Commerce Clause where such state action harms "federal uniformity in

an area where federal uniformity is essential."  Nat'l Foreign Trade Council v. Natsios, 181 F.3d

38, 68 (1st Cir. 1999), aff'd, 530 U.S. 363 (2000) (citing Japan Line, 441 U.S. at 448-49).

Because federal uniformity in foreign commerce policy is essential, the Supreme Court

has reasoned that a "more extensive constitutional inquiry is required" in matters touching on the

foreign commerce power as opposed to the interstate commerce clause.  Japan Line, 441 U.S. at

446, 448-49; see also Bd. of Tr. v. United States, 289 U.S. 48, 56-7 (1933) ("The words of the

Constitution 'comprehend every species of commercial intercourse between the United States

and foreign nations.  No sort of trade can be carried on between this country and any other, to

which this power does not extend.'  It is an essential attribute of the power that it is exclusive and

plenary.  As an exclusive power, its exercise may not be limited, qualified, or impeded to any

extent by state action" (citation omitted)).   Thus, in Japan Line, the Court determined that

additional considerations come into play when a court inquires into a state law affecting foreign

commerce, as opposed to simply interstate commerce.  Where a state law is alleged to

impermissibly burden interstate commerce only, the court must consider whether the law is

applied to an activity with a "substantial nexus" to the state, is fairly apportioned, does not

discriminate against interstate commerce, and is fairly related to the service provided by the

State.  Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279 (1977).  Where *foreign*

commerce is involved, in addition to the Complete Auto factors, a court must also consider

whether the state law presents a risk of "multiple burdens" (Japan Line, 441 U.S. at 447), and

whether the state law impairs the federal government's ability to "speak with one voice."  Id. at

449.  Here, not only is there no substantial nexus to New York state, but there is a risk that BOC

will be subject to double liability (see Section II.A., supra) and, as discussed above, any

extraterritorial application of Article 52 would impede the federal government's ability to put

forth a uniform foreign banking policy.

Under Gucci's expansive reading of Koehler, Article 52 would contravene these

important federal policies and improperly impinge on the federal government's exclusive

authority over international commerce, rendering that statute unconstitutional as applied.  The

Court should avoid this result by rejecting Gucci's position.  See, e.g., Singer Sewing Mach. Co.

v. Brickell, 233 U.S. 304, 313 (1914); N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1,

30 (1937); People v. Bailey, 237 N.E.2d 205, 209 (N.Y. 1968) ("The policy of this court has

always been to construe statutes in such a manner as to uphold their constitutionality."); People

v. Lally, 224 N.E.2d 87 (N.Y. 1966) (reading a requirement for a hearing into a criminal statute

in order to preserve its constitutionality).

## CONCLUSION

For the foregoing reasons, Bank of China respectfully requests that the Court deny

Gucci's request for a turnover.

WHITE & CASE LLP

Dated: January 19, 2011

By: _/s/ Dwight A. Healy_____
    Dwight A. Healy
    Marika Maris (of counsel)
    1155 Avenue of the Americas
    New York, New York  10036
    Telephone:  (212) 819-8200
    Facsimile:   (212) 354-8113

    *Attorneys for Bank of China*

NEWYORK 7981400 v6 (2K)