163FGUCA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   GUCCI AMERICA, INC. et al,

4                  Plaintiffs,

5            v.                                 10 CV 4974 (RJS)

6   WEIXING LI, et al,

7                  Defendants.

8   ------------------------------x
                                               New York, N.Y.
9                                              June 3, 2011
                                               2:30 p.m.
10
    Before:
11
                      HON. RICHARD J. SULLIVAN,
12
                                               District Judge
13
                              APPEARANCES
14
    GIBSON DUNN
15       Attorneys for Plaintiffs
    NETRA SREEPRAKASH
16  ROBERT WEIGEL

17  ALLEN & OVERY
         Attorneys for Bank of China
18  ANDREW REYNARD
    LANIER SAPERSTEIN
19

20

21

22

23

24

25

163FGUCA

```
 1            (Case called)

 2            (In open court)

 3            THE COURT:  This is Gucci America v. Weixing Li,

 4    docket number 10 CV 4975.  Appearances, please?

 5            MR. WEIGEL:  Robert Weigel and Naptha Sreeprakash from

 6    Gibson Dunn & Crutcher for plaintiffs.

 7            THE COURT:  Mr. Weigel and Ms. Sreeprakash?  I don't

 8    see you on the docket sheet, but maybe I missed it.

 9            MS. SREEPRAKASH:  I haven't submitted a notice of

10    appearance in this particular action.

11            THE COURT:  Let's do that so we have everybody who is

12    working on this case on the docket.

13            MS. SREEPRAKASH:  I will do that.

14            MR. SAPERSTEIN:  Lanier Saperstein of Allen & Overy

15    for Bank of China today.  I'm joined here today by my colleague

16    Andrew Reynard who, too, will submit a notice of appearance.

17            THE COURT:  Mr. Saperstein and Mr. Reynard.  Good

18    afternoon.  I guess a lot of things are going on and have been

19    going on.  This is a case in which I previously issued a

20    preliminary injunction which was extended to third parties,

21    including Bank of China, and without going through all the

22    details, a motion was made by plaintiff to compel Bank of China

23    to produce confirmation and proof of the freezing of the

24    defendant's assets and accounts consistent with the injunction,

25    and then I got Bank of China's cross motion to modify the
```

163FGUCA

```
 1   preliminary injunction.  That was all when White & Case was

 2   managing the case for Bank of China, right?

 3            MR. SAPERSTEIN:  Yes, your Honor.

 4            THE COURT:  And then in the interim an amended

 5   complaint was filed naming additional defendants and an issue

 6   arose with respect to service, alternate service on those new

 7   defendants and, among other things, plaintiffs are seeking to

 8   have service effectuated through personal service on Bank of

 9   China's counsel and Bank of China's New York branch, though

10   also publication in a Beijing newspaper and service upon the

11   prior defendants with the direction that they forward the

12   complaint and summons to the new defendants.

13            Let's start, I think, with the injunction.  I've

14   gotten some letters and things from the parties since.  This is

15   the first time I've seen you, Mr. Saperstein?

16            MR. SAPERSTEIN:  Yes.

17            THE COURT:  You're still moving to modify the

18   preliminary injunction?

19            MR. SAPERSTEIN:  Yes.

20            THE COURT:  Mr. Weigel, you're still moving to get

21   them to show what they've done to comply with the injunction?

22            MR. WEIGEL:  Yes, your Honor.

23            THE COURT:  Seems we moved a little bit, but go ahead.

24            MR. WEIGEL:  We also asked that they be required to

25   produce the documents that were sought.
```

163FGUCA

 1                 THE COURT:  Under the injunction?

 2                 MR. WEIGEL:  And also pursuant to the subpoena we

 3       served on them.

 4                 THE COURT:  The parties have sent me as recently as a

 5       short time ago authority from New York State and others that

 6       relate to the separate entity doctrine.  Do you want to talk

 7       about that, first?

 8                 MR. WEIGEL:  Certainly.  Or if you'd like to talk

 9       about the service we might be able to reach some sort of

10       agreement on that.

11                 THE COURT:  Well, wait.  We might be able to reach an

12       agreement on what?

13                 MR. WEIGEL:  Well, what we've figured out, your Honor,

14       is that unlike in most of these cases where when we shut down

15       the website there's no longer an active e-mail address because

16       the e-mail address was sort of part of the website, the

17       administrator for these websites, according to Network

18       Solutions, which was the host, the contacts are two Yahoo

19       addresses.  So those e-mail addresses are live e-mail

20       addresses.  We've served things on them.  They've not bounced

21       back.

22                 So I've spoken to Mr. Saperstein, and they, leaving

23       aside the question whether they remain standing, they certainly

24       don't care how we serve these folks.

25                 THE COURT:  As long as it's not through them.

163FGUCA

1          MR. WEIGEL:  As long as it's not through them.  So if

2     your Honor found it acceptable, and I think it would be --

3          THE COURT:  So this is a new alternate service?

4          MR. WEIGEL:  It was part of serving the other

5     defendants.  What we didn't realize when we did that, we both

6     physically served the other defendants at that time and we

7     served this e-mail address and this e-mail is, as far as we

8     know, still a good e-mail address.  E-mails to it do not bounce

9     back.

10         THE COURT:  What is the basis for concluding that this

11    e-mail address is connected to the new defendants?

12         MR. WEIGEL:  The new defendants were all part of

13    this -- as alleged in the complaint -- are part of the same

14    scheme to sell fake Gucci purses through the internet.  These

15    folks all collectively I think received almost $500,000 into

16    their accounts at the Bank of China out of the proceeds of the

17    account that the proceeds, the counterfeit sales were dumped

18    into.  So what would happen would be, they would sell a purse

19    on the internet, they would process the credit card sale

20    through an operation called Frontline out of Montana.  They

21    would deposit the account in a Chase, the money in a Chase Bank

22    account and then the existing defendants would wire that money

23    to these folks in China.

24         So at this point I think that it would be a fair

25    assumption that these new defendants know that this lawsuit

163FGUCA

```
1    exists because, first off, they've stopped receiving the money
2    they were getting.  Their colleagues who were sending the money
3    certainly were served with the complaint, and --
4              THE COURT:  The other defendants you mean?
5              MR. WEIGEL:  The other defendants.  And, and perhaps
6    this is wishful thinking on my part, but the Bank of China
7    froze their accounts, in which case --
8              THE COURT:  Do you know that or you're hoping that
9    that's --
10             MR. WEIGEL:  I'm hoping that's in line with your
11   Honor's order, but whether they did or didn't, they certainly
12   stopped receiving funds for the counterfeits through this
13   website.
14             We know that this website address this, e-mail
15   address, this Yahoo address was used by the persons who set up
16   this website and since these people received the proceeds from
17   the sales from the websites, I think it's a fair inference and
18   a means calculated to give them notice to send the amended
19   complaint to these two Yahoo addresses.  And we could also
20   follow it up if your Honor thought appropriate with personal
21   service on the existing defendants.
22             THE COURT:  And then also you're talking about the
23   newspaper.
24             MR. WEIGEL:  And we could publish, too, if your
25   Honor -- the publication is a blunt tool, but it's a
```

163FGUCA

1   well-accepted tool.

2              THE COURT:  And when there's nothing else you can do,

3   that's sometimes the best can you do.  That's really the

4   inquiry, what's the best you can do that's reasonably designed

5   to give notice to the parties, to the defendant.

6              MR. WEIGEL:  And I believe that Mr. Saperstein does

7   not have any objection to any of that.

8              THE COURT:  You don't have a dog in that fight, is

9   that right?

10             MR. SAPERSTEIN:  That's right, your Honor.  I only

11  want to make sure that my client is not put in a position where

12  it has to violate Chinese law.  So if it doesn't involve Bank

13  of China, then, no, I don't have a dog in that fight.

14             THE COURT:  Let's play that out.  Mr. Weigel is deemed

15  to have served these other defendants, these other defendants

16  don't respond, don't show up, default judgment.  What's next,

17  then?

18             MR. WEIGEL:  Well, then what would happen, we would

19  move for -- and we may have to do it by a separate proceeding

20  or we'd move in this proceeding for a turnover order to the

21  Bank of China requiring them to turn over the proceeds of that

22  account to -- the various accounts to us.  So we're not going

23  to avoid our fight completely, but we're just going to avoid

24  our fight as to this service issue.

25             THE COURT:  That was an avoidable fight and that was

1    one of my questions to you.  Not based on the e-mail address,

2    but just on the first two methods of service, that would be one

3    way to avoid it.  I think it would be kind of a big deal,

4    certainly new ground I think being broken to allow service the

5    way you propose with respect to Bank of China.  I'm not saying

6    that's a reason not to do it, but the others would be less

7    controversial.

8              So what does that mean for the other motion you've got

9    kicking, which is the motion to compel Bank of China to confirm

10   that they've been complying with the injunction and to produce

11   the documents ordered by the injunction?

12             MR. WEIGEL:  That still stands, your Honor.

13             THE COURT:  So we fight that today or we fight that

14   another day after you get your turnover order?

15             MR. WEIGEL:  I'm happy to fight that today, your

16   Honor.  I'd like to get that resolved, because we'd like to get

17   the documents so that we could pursue these folks, because they

18   may have other bank accounts.

19             THE COURT:  So that's what I mean.  So we're not

20   avoiding that fight today.

21             MR. WEIGEL:  Not at all, your Honor, just the service

22   one.

23             THE COURT:  I was going to do service second, but we

24   can do it first.  Doesn't sound like we need to fight about

25   that.  The only thing I think I need is a tighter understanding

163FGUCA

1  with respect to the e-mail address and to why it's reasonable

2  to conclude that that e-mail address is going to lead to or

3  result in notice to the defendants.  Have you written that out

4  someplace?

5  MR. WEIGEL:  I'm not sure I have, your Honor.  I could

6  certainly speak to it.

7  THE COURT:  Does that sound familiar to you?  No.  I

8  was wondering if just a short affidavit would allow me to pass

9  on it in a more thorough way than we have?

10  MR. WEIGEL:  Certainly.  We'll submit that first thing

11  next week, your Honor.

12  THE COURT:  That's fine.  I'm inclined to grant the

13  motion for alternate means of service?  What are you going to

14  do otherwise.  It seems to me there's just no remedy

15  whatsoever.

16  MR. SAPERSTEIN:  Your Honor, I just want to be clear

17  that your granting of the motion is with respect to points one

18  and two.

19  THE COURT:  One and two, and now four.

20  MR. SAPERSTEIN:  Okay.

21  THE COURT:  I'm going to punt on three.  I could

22  resolve three if I need to, but I think until I've heard some

23  more argument, that would be an uphill climb for Mr. Weigel,

24  and maybe we want to avoid that one for now.

25  MR. WEIGEL:  Thank you, your Honor.

1      THE COURT:  Let's now go back to the motions that I

2  was going to talk to first, the motion relating to confirming

3  proof of freezing the assets and the production of documents

4  and Bank of China's cross motion to modify the preliminary

5  injunction to relieve them of those obligations.

6      There's a lot of talk about the May New York case,

7  Judge Solomon's case, Samsung Logics, right.

8      MR. WEIGEL:  Yes, your Honor.

9      THE COURT:  I've seen a lot of you guys writing about

10  it back and forth.  So your letter, which was June 1 --

11      MR. WEIGEL:  Yes, and a letter just today from

12  Mr. Saperstein.

13      THE COURT:  Yes, I have it.  You distinguish this case

14  because you're saying that case involved a Korean judgment

15  creditor seeking to enforce a British judgment, this is a

16  Chinese judgment debtor and a Chinese bank where there is no

17  New York connection, which may be true.  But does that matter

18  for purposes of what's going on here?  New York has probably a

19  policy of enforcing judgments in arbitrations, and so does it

20  really turn on just how much New York interests are implicated

21  by the arbitration and that's what distinguishes this Judge

22  Solomon case from this case, from the case before me?

23      MR. WEIGEL:  Honestly, your Honor, my personal feeling

24  is that Judge Solomon was -- her decision is wrong and it is in

25  conflict with other judgments such as the Commerce Bank

163FGUCA

1   decision.

2          THE COURT:  It's not entitled to tremendous weight.

3   That's not slapping at her or her reasoning, necessarily.

4   She's not the Court of Appeals, that's for sure.

5          MR. WEIGEL:  But in any event, what she said in that

6   case was that that case went beyond the -- she said that case

7   went beyond what the Bank of Bermuda case said, and our case

8   and the reason we distinguished them the way we did is that our

9   case is actually narrower and more New York focused than what

10  happened in the Koehler v. Bank of Bermuda case.

11          The dissent in the Koehler case complained and it

12  seemed to be what Judge Solomon picked up on, complained that

13  this could mean that New York would be the center of the

14  universe for people trying to collect judgments.  And that was

15  rejected by the Court of Appeals.

16          But in our case we're not going nearly so far.  In

17  Koehler it was a Maryland judgment against a defendant, neither

18  the plaintiff or defendant had anything to do with New York and

19  the Court of Appeals held because the Bank of Bermuda was here,

20  you could come to New York, domesticate your judgment from

21  Maryland and make Bank of Bermuda bring assets into New York.

22          Judge Solomon said that what the plaintiffs in her

23  case was trying to do was broader than even what the Court of

24  Appeals allowed.  In our case what we're trying to do is

25  narrower than what the Court has allowed, because here the

163FGUCA

1   plaintiff is in New York, the defendants are all subject to

2   personal jurisdiction in New York and the Bank of China is

3   here.  So there's no question of forum shopping.  None of the

4   concerns that were raised in the dissent to the Koehler case

5   apply here.

6          But all that being said, Judge Castel in the Commerce

7   Bank case allowed an Oklahoma judgment to be domesticated in

8   New York, serve upon Commerce Bank, and that that was

9   sufficient to restrain an account in Germany by Commerce Bank.

10  A similar result was reached in a Wachovia case in the Eastern

11  District by -- it was a magistrate judge, his name escapes me

12  right now -- but also held that serving Wachovia in New York

13  was sufficient to restrain an account in Florida.

14         So there really doesn't seem to be much argument that

15  this Court has the power.  The Koehler case was quite plain.

16         THE COURT:  Does it matter, though?  I don't know

17  about Florida, other states and their bank secrecy law, isn't

18  there a concern that China has a different bank secrecy law

19  than the U.S., typically, that puts folks like the Bank of

20  China between a rock and a hard place?  Isn't that a legitimate

21  concern?

22         MR. WEIGEL:  Well, it is one of the factors that is to

23  be considered, your Honor.

24         THE COURT:  But it wasn't a factor that really was at

25  play in the cases you've just cited, right?

163FGUCA

1          MR. WEIGEL:  No, but we're actually arguing, right

2     now, you and I, the case we're going to bring when we get

3     judgment.  What we're asking for right now is whether or not

4     this Court has the power to restrain the defendants from

5     accessing these accounts.  The answer I don't think anybody can

6     say is in dispute, it's the case, and the First Department in

7     the Abuhamda case restrained a bank account in Jordan.  They

8     said we're not doing an attachment here, we're just saying you

9     can't touch it, and they prevented the bank and the defendant

10    from releasing those funds.  That was the First Department.  It

11    was an injunction, it wasn't an attachment and it wasn't a

12    turnover order.  It was prejudgment and the First Department

13    said not a problem and we don't, frankly, understand why the

14    bank had a dog in the fight.

15         THE COURT:  But this is a little broader, this

16    injunction, right?

17         MR. WEIGEL:  What we're asking for --

18         THE COURT:  Freezing the assets is one thing.  You're

19    asking for freezing of the assets and the production of

20    documents, some of which might run afoul of China bank secrecy

21    laws, correct?

22         MR. WEIGEL:  They claim that that is the case, but we

23    have found, I believe, three different actions, the most recent

24    being in November in front of Judge McKenna who was affirming

25    Magistrate Judge Francis where the Bank of China was actually

163FGUCA

1    ordered to produce documents, and they have yet to produce any

2    evidence that they were in any way adversely impacted by having

3    done that.   And if you look at, it's the case of Milliken v.

4    Bank of China.   It rejected -- Judge Francis went through the

5    restatement factors and rejected China's argument, held that

6    they --

7         THE COURT:   But don't I have to do the same here, or

8    you're saying I don't have to do that?

9         MR. WEIGEL:   No, no.   I believe your Honor does have

10   to go through the restatement factors here.   But you asked

11   about the bank secrecy and I'm saying when you look at the fact

12   that they produced in that case, they produced in a case called

13   Non-Ferrous DM Corp. v. Daniel Karren (ph) in the Southern

14   District where they were ordered to produce documents, and the

15   DOC v. St. Paul Mercury Insurance, a 2004 case, in this court

16   where they were also compelled.

17        THE COURT:   Compelled to produce documents?

18        MR. WEIGEL:   And interrogatory responses.

19        THE COURT:   Pursuant to an injunction or that's a

20   subpoena?

21        MR. WEIGEL:   I think it's a subpoena, your Honor.   And

22   in all three of those cases they produced documents.   They also

23   produced documents in another case brought by Gucci and there's

24   a public filing on the record indicating they are going to

25   produce the documents and they have not produced anything other

163FGUCA

1   than generalized statements that they may possibly be harmed by

2   this.  They have done it multiple times and they have not been

3   subject to sanctions.

4           THE COURT:  What's the other Gucci case here in

5   Southern District?

6           MR. WEIGEL:  My Replica Handbags.  And what happened

7   in that case, a very similar case --

8           THE COURT:  Who was it before?

9           MR. WEIGEL:  It was Judge Koeltl, I believe.  What

10  happened -- there's no reported decision in that case.  What

11  happened is we got the same sort of injunction your Honor

12  issued here.  We served it on Bank of China.  They came into

13  Court, said we can't restrain these things, we put them on

14  administrative hold.

15          We then got a judgment.  The judgment directed them to

16  turn over the assets.  They then said, oh, we released the

17  account several months back.  We made a motion for contempt.

18  That was settled.  It had a provision in it that was

19  confidential, but allowed for us to disclose it in order to

20  enforce.

21          THE COURT:  Are you allowed to disclose it now?

22          MR. WEIGEL:  I am because it's on the public record,

23  your Honor.  What happened was we then made a second motion to

24  compel because they had not produced the documents that were

25  required to be produced.  At the end of the day they filed a

163FGUCA

1    status report on the record saying that they are producing the

2    documents, and the case settled after that.

3         So I'm bringing it up for the point that they've

4    produced documents --

5         THE COURT:  But nobody is going to jail in China

6    because of this.

7         MR. WEIGEL:  No one has gone so jail.  There's no

8    specific instance of anybody having any problem.

9         THE COURT:  Maybe it's good to hear from

10   Mr. Saperstein on this, then I'll hear from you again.  But

11   since we had a train of thought, you mentioned a bunch of cases

12   and have asserted that the bank secrecy laws in China are

13   really more of a red herring, certainly not something they can

14   specifically support the relief that's being sought by Bank of

15   China.  It may be significant for you to respond to it,

16   Mr. Saperstein.

17        MR. SAPERSTEIN:  Yes, your Honor.  I'm happy to

18   respond to it, then perhaps I can touch upon the separate

19   entity issue as well.

20        Your Honor, Bank of China alleges that the bank

21   secrecy laws are a paper tiger.

22        THE COURT:  I think that's exactly what you said.  You

23   allege.  Somebody used it in the letter.

24        MR. SAPERSTEIN:  I used that, your Honor, because

25   that's essentially what they're saying.  We have submitted two

163FGUCA

expert affidavits by Professor Wu, as well as Professor

Feinerman confirming that, one, Bank of China does have those

bank secrecy laws and plaintiff does not contest otherwise, and

second of all, there are examples and instances of banks,

including Bank of China, being subject to liability for

violating or allegedly violating those regulations.

THE COURT:  What about the ones that have been

mentioned now by Mr. Weigel?

MR. SAPERSTEIN:  Turning to the Milliken case.  I

think if anything the Milliken case is helpful to us.  If I

may, I'll give you a brief bit of background on the Milliken

case.  That, the Milliken served a turnover position -- by way

of background.  Milliken had a copyright infringement action

against certain defendants.  They brought an action in China

and obtained preliminary relief in China against the alleged

infringer.  Then they got a -- they bought a second suit in

Nevada and obtained a default judgment there.  Then they

brought an action for enforcement in Florida and were actively

litigating that matter against the judgment debtors.

Then Milliken brought another action three weeks after

Koehler in New York and served a turnover petition on the Bank

of China.  The Bank of China in that action filed an answer

asserting an affirmative defense.  Plaintiff said produce the

documents, and initially the bank said they refused.  Then the

Court said if you're going to rely on the affirmative defense

163FGUCA

1    you need to produce the documents.

2          That's not what we have here.  In fact, in the

3    decision that Magistrate Judge Francis issued, he says, which

4    is I think perfectly on point here, "it's one thing to require

5    a party bringing a claim to resort to the Hague evidence

6    convention procedures in order to obtain evidence from another

7    entity necessary to support that claim."

8          The Court goes on to say, "It's a different matter to

9    submit a party to decline to disclose information when they're

10   trying to rely on that for an affirmative defense."

11         So Magistrate Judge France opinion there specifically

12   says that when you're a non-party that is not asserting a

13   claim, as the Bank of China is here, that it is perfectly

14   reasonable to make the claimant resort to the Hague evidence

15   convention.

16         Second of all, with respect to the documents, after

17   the motion was decided, the Bank of China made documents

18   available, but they had customer consent and a very different

19   issue is that the judgment debtor was present and actively

20   litigating with the plaintiff Milliken.  They litigated in

21   China, they were actively litigating in Florida, and so there

22   the judgment debtors were present.  Very different from here.

23   So the judgment debtors were present and the bank got consent

24   from the customer to release the documents.

25         That's not -- we don't have that here, your Honor.  We

163FGUCA

1    don't have customer consent to release the documents.

2    Ultimately in Milliken what happened was, the petitioner,

3    Milliken, settled the action with the judgment debtors, so that

4    case was dismissed, the turnover petition against the bank was

5    dismissed ultimately because Milliken and the judgment debtor

6    had settled.

7           We don't have that here, your Honor.  We don't have

8    the alleged customers of the bank present and available to give

9    consent to release documents.

10          THE COURT:  But, I mean, that's true, I don't think

11   there's any dispute about that, but isn't it kind of perverse

12   that the folks who don't show up at all for whom there is

13   jurisdiction and a judgment has been entered against them, get

14   to, sort of get the benefit of all the bank secrecy laws and

15   all the protections that you're talking about?  Leaving the

16   plaintiff here basically without a wagon, right?  What are they

17   supposed to do?

18          MR. SAPERSTEIN:  Your Honor, I think there's a

19   solution.

20          THE COURT:  Tell me the solution.

21          MR. SAPERSTEIN:  The solution here is that plaintiffs

22   can submit -- should go through the Hague evidence convention.

23   I have offered --

24          THE COURT:  Does that ever work?

25          MR. SAPERSTEIN:  Your Honor, we have submitted

163FGUCA

1   evidence in two letters.  One on May 19 and one earlier today,

2   in which the Ministry of Justice confirms that they have and

3   will on a Hague Convention request for evidence located in

4   China.  Now, Mr. Weigel said when we were before you on

5   January 25 that going through the Hague Convention, Judge, is

6   futile.  Right?

7         THE COURT:  Right.

8         MR. SAPERSTEIN:  In the most recent submission on

9   June 1, you'll note that the tenor has changed.  It is no

10  longer futile, it's, well, it takes a long time.

11        THE COURT:  Taking a long time would not be futile if

12  in fact it turns out that Bank of China has frozen the assets,

13  right?  But if they haven't, futility seems assured.  And I

14  have to guess whether or not you've frozen the assets?

15        MR. SAPERSTEIN:  Your Honor, look, I mean, I don't

16  think the Bank of China has been perfectly clear here on what

17  the law is in China.  The law in China prohibits the freeing of

18  a customer's assets based on foreign process.  We've said that

19  to the Court many times and we submitted expert affidavits to

20  that effect.  That's what I can tell the Court.  But this is

21  about documents, and the question is, the question is, how do

22  they get the documents they purportedly need?

23        THE COURT:  Well, it's about documents and it's about

24  other things.  So maybe we should focus on the things where

25  maybe we can get someplace, because I don't think you're going

163FGUCA

1   to budge on documents.  What about confirming that the assets

2   have been seized?  Is that something the Bank of China can do?

3          MR. SAPERSTEIN:  If I could stick on documents for one

4   second?  I just want to close the loop here, if I can.

5          We are prepared to work with plaintiffs.  One, I

6   offered to draft the Hague evidence convention request for them

7   for their review and we have offered to work with them to file

8   it with your Honor and submit, if we could do so, a letter or

9   affidavit, or some submission to the Chinese authorities saying

10  we've agreed with this request.

11         THE COURT:  That might be a reasonable thing to do if

12  you know at the end of the day there are assets you're going to

13  get.  There still might be problems with it, but I guess why

14  not, what is restraining the Bank of China from confirming that

15  they have seized the assets or they have at least complied with

16  the preliminary injunction as far as the assets are concerned?

17         MR. SAPERSTEIN:  Your Honor, again, all I can say --

18  what I can say is I know the Bank of China has informed the

19  Court of the restrictions that apply under Chinese law.

20         THE COURT:  All right.  What you're suggesting is that

21  you'll help write the Hague Convention requests, you'll be

22  there side by side with Mr. Weigel and then at the end of the

23  day maybe there will be some assets there and maybe there won't

24  be, and if they aren't, then we'll know it was futile and two

25  years from now we'll know what to do next time?

163FGUCA

1         MR. SAPERSTEIN:  Your Honor --

2         THE COURT:  I don't know.  I'm being a little

3   facetious, but this makes sense only if you're prepared to wink

4   and nod in such a way to make it clear there's an advantage to

5   doing it this way.  Otherwise, I don't blame Mr. Weigel for

6   saying we need to do better than this.

7         MR. SAPERSTEIN:  Your Honor, presumably we would

8   encounter the same issue whether you order documents to go

9   through the Hague Convention or order the bank to release

10  documents in response to a Rule 45 subpoena.

11        THE COURT:  I think Mr. Weigel has two main goals

12  here.  One is to make sure at the end of the day he gets

13  assets.  The other is to give him access to information that

14  would allow him to pursue a trail while it's hot.  Hot at this

15  point being relative.  At this point it's a pretty cold corpse,

16  I imagine.  So I'm not sure what you propose satisfies the

17  second objective, but it might make sense for the first if the

18  Bank of China has frozen assets, but you're not in a position

19  to let us know whether that's true, so we just have to hope and

20  cross our fingers.

21        MR. SAPERSTEIN:  I think there are two responses to

22  that, your Honor.  First of all, the trail is, to use your

23  term, perhaps cold because we have been fighting with them

24  since July.

25        THE COURT:  I think Mr. Weigel wants to win this one

163FGUCA

 1 | now so the next time he has a warm body.

 2 |          MR. SAPERSTEIN:  I would say, your Honor, maybe the

 3 | thing to do, we've offered this many times to Mr. Weigel, it's

 4 | unclear to me why he won't go on parallel tracks; one, go

 5 | through the Hague Convention and pursue his motion.  I have

 6 | offered to go on parallel tracks and Mr. Weigel has not been

 7 | inclined to do that.  I'm unclear why.  I suspect, your Honor,

 8 | Mr. Weigel doesn't want the Hague Convention process to be

 9 | successful because that would mean he would have to go through

10 | it.  It's particularly unfair, given the fact the bank is put

11 | in a very unfair position where it has bank secrecy laws to

12 | comply with.  At one point Mr. Weigel said I don't see why Bank

13 | of China is raising an issue here.  The Bank of China is

14 | raising an issue here because it's caught in a difficult

15 | position.

16 |          THE COURT:  I understand the difficult position of

17 | Bank of China.  I think it's unclear as to how difficult a

18 | position, whether it's really between a rock and a hard place

19 | or it's as Mr. Weigel suggests, nobody is going to jail for

20 | this.  I understand your expert's report and I understand what

21 | you're saying on this.  Everyone would have to understand it's

22 | a difficult position for anyone to be in, that they have to

23 | comply with a Court order in New York or run the risk of

24 | violating a law in China.  Nobody wants to be in that

25 | situation.  And ideally you're right, this is what conventions

163FGUCA

1    and governments are for.  They are designed to sort of deal

2    with these problems, because ultimately they're international

3    problems involving governments.

4         But the law is such that Courts actually get to make

5    decisions on this kind of thing, so I don't have to wait for

6    the State Department to negotiate the next deal.  I can by

7    applying the framework that's been handed to me by the Court of

8    Appeals actually give Mr. Weigel what he wants, right?  Even if

9    it looks like you're going to be caught between a rock and a

10   hard place.  The issue is how hard is that hard place.

11        MR. SAPERSTEIN:  Your Honor, you're right, and I would

12   posit and support my evidence from the experts that it's a hard

13   place indeed.

14        The second reason why, you mentioned the futility

15   argument with respect to the documents.  You mentioned

16   Mr. Weigel is interested in following the money, I believe.

17        THE COURT:  I think he is.  I assume that's what

18   motivates him.  He looks like a materialistic person.  He

19   dresses better than I do, let's put it that way.  So do you,

20   Mr. Saperstein.

21        MR. SAPERSTEIN:  You're very kind, your Honor, thank

22   you.  That made my day.

23        THE COURT:  The bar is pretty low here.

24        MR. SAPERSTEIN:  I will still take it.

25        I think the documents will be useful also for

163FGUCA

 1  following the money.  If, for example, Mr. Weigel wants to

 2  follow the money from, let's say it went from Bank of China,

 3  assuming it did, to somewhere else, the documents could show

 4  that.  If that's what he's interested in, following the money,

 5  the documents could show that, and if he wants to go to the

 6  person who ultimately has the money or ultimately is

 7  responsible for the purported infringing the documents could

 8  help him do that in terms of a trail.  So I'm not sure seeking

 9  documents would be futile.

10          Now, I certainly do think that if we had done this a

11  while ago, gone through the Hague Convention, even at the same

12  time we pursued the motion, we would be a lot further along

13  than we are now.

14          THE COURT:  No question about that.  Mr. Weigel you

15  have a handle on this, though maybe the facts have changed

16  since you started.  Maybe China is warming up to these reviews

17  since it started to deal with this problem.  The State

18  Department seems to thinks so.

19          MR. WEIGEL:  The State Department took it out.  The

20  State Department has many issues with China and they didn't

21  give a clue, didn't say anything to suggest that the situation

22  had improved, they simply took it out.  We attached to one of

23  our letters an ADA study which said that the Peking court,

24  which processes approximately 1 per year, and even under their

25  analysis they say that 50 percent of them get declined over the

163FGUCA

1   course of six to twelve months.

2          So it really is not -- it is true, your Honor, that

3   when your Honor ordered that they produce the documents in ten

4   days that I didn't think almost a year later they wouldn't have

5   produced the documents.  But the Second Circuit has set forth a

6   number of criteria as to when you can judge how important the

7   government's interest is, and one of them is when it depends on

8   the consent of the depositor, then that's not a very strong

9   government interest because it's not a situation where, like

10  Switzerland, where you can't release the information under any

11  basis.  The Second Circuit has said that when the depositor or

12  when the customer can waive the privilege, it's not a very

13  strong concern of in this case the Chinese.

14          Second, the Chinese government has not come in here

15  and submitted anything.

16          THE COURT:  Hold on.  You're arguing the merits of the

17  motion, and I understand that.  But I don't think you're

18  responding to Mr. Saperstein's point, which is why not give the

19  Hague Convention a try?  And I think what you're saying is that

20  nothing really has changed since January, right?

21          MR. WEIGEL:  Nothing has really changed since January.

22  It's an added expense.  This is an action that was brought in

23  New York for sales in New York.  The Bank of China, while

24  between a rock and a hard place, has put themselves in that

25  place and in fact, and Mr. Saperstein and I go around and we do

163FGUCA

1   this on Monday we're in Judge Pitman's courtroom doing the same

2   thing because they are the recipient of the proceeds of a very

3   large amount of the counterfeits that are sold here and the

4   only way that the counterfeiter's model works where they kind

5   of hide behind the fog in China is if they have a conduit to

6   get the money, U.S. dollars.

7           THE COURT:  I get all that.  The other concern, and

8   this is what governments exist for, is to weigh what are the

9   costs of Bank of China just then getting out of New York,

10  because that could have a detrimental effect on other players

11  in a big economy, right?  So I understand what you're saying.

12  I think there's a lot to what you say there.  It's frustrating.

13          MR. WEIGEL:  U.S. banks produce Lord knows how many of

14  these Chase deals in a given week and why should the Bank of

15  China have some sort of competitive advantage that

16  counterfeiters can use their bank and shield their assets,

17  whereas if they had people doing banking with Chase, Chase

18  would turn it over?

19          THE COURT:  I think the reason is because China is a

20  sovereign country and China gets to enact its own laws with

21  respect to what's required of its banks in China.  This is not

22  a new problem.  This is kicking around for a while.  Congress

23  could fix it if they wanted to, right, by just saying we're not

24  going to allow this to happen, we recognize China is a safe

25  haven for fraudsters on a massive scale and we're not going to

163FGUCA

1  stand for their bank secrecy laws during which fraudsters

2  operate.

3      MR. WEIGEL:  The Second Circuit already decided this,

4  your Honor, in 1959 I think again in another First National

5  City case where again they said if a bank has problems

6  complying with two different sovereigns, that's the bank's

7  choice in having chosen to operate in two different companies

8  under two different sovereigns, and if they can't do both, then

9  they have to surrender to one or the other.

10     THE COURT:  We have a convention, right?  There is a

11 convention that is recognized, that the U.S. is on board with,

12 that this is acceptable.  This is an acceptable way for

13 multinational entities or entities with offices in different

14 countries to be able to function.  That's their general running

15 rule.

16     MR. WEIGEL:  There is clearly a convention and the

17 Supreme Court has said, I think it's the Aerospatiale case,

18 that it's not mandatory and in this circumstance where there's

19 only a 50 percent chance that in six to twelve months we might

20 gain information --

21     THE COURT:  Do you think it's that high?

22     MR. WEIGEL:  No, I don't.  But that's what their

23 statistics say.  That's what they say as it's gotten better.

24 Now you have half of a 50 percent chance that in six to twelve

25 months we might get something, that this is just not an

163FGUCA

1    effective remedy here.

2         THE COURT:  Look, I understand your arguments.  I've

3    been sympathetic to them and I don't think, I mean, this is

4    lost on me.  I wanted to give Mr. Saperstein an opportunity to

5    respond to you on some of the other cases that you mentioned.

6    So he's responded with respect to two; Judge Francis' decision

7    and the one Judge McKenna adopted.  What about the Judge Castel

8    case?

9         MR. SAPERSTEIN:  Your Honor, that goes to the separate

10   entity.  I wanted to finish up with the documents.  Your Honor

11   said things have changed since January, the answer is yes.  We

12   now have more information than we did in January.  First is the

13   State Department website on which the plaintiffs relied very

14   heavily on in their papers has been revised.  Previously the

15   State Department said it was very uncertain, difficult and

16   unlikely to go to the Hague Convention.  That language was

17   specifically struck from the web site.

18        THE COURT:  Any idea why?  You say it supports an

19   inference that it no longer is dire or discouraging as it once

20   was.  Conceivably it could be that the portion of the language

21   that said while it is possible to request compulsion, was

22   deemed to be overstating, because it's barely probable now.  So

23   I don't know, is there something else on the website or in

24   State Department literature that suggests that things really

25   are getting better?

163FGUCA

1      MR. SAPERSTEIN:  There's the evidence that we have for

2   the Chinese Ministry of Justice, but in answer to your question

3   do I know why they revised it, I called the State Department to

4   find out to speak to them about this.  They told me when I

5   asked them if I could quote them in an affidavit and they said

6   I couldn't unless I did it by way of Touhy requests.

7      THE COURT:  Got it.  That's even slower than Hague

8   Convention.

9      MR. SAPERSTEIN:  I feared I would not have it in time

10  for the hearing, your Honor.  What I was told -- and if the

11  Court wants me to submit Touhy requests to the State Department

12  so they could put their opinions in writing -- I was told it

13  was outdated.  That's the specific term I was told.  I was told

14  that the State Department encourages people to go through the

15  Hague Convention.  That's what I was told.

16      As to evidence, your Honor, we have two pieces of

17  evidence.  And it's not, as Mr. Weigel says, my evidence, it is

18  from Ministry of Justice.

19      THE COURT:  The ILCC thing.

20      MR. SAPERSTEIN:  Right, which channels Hague

21  Convention requests.  There are two pieces of information.

22  They have informed us that on average they have honored

23  50 percent of the requests for documents.

24      THE COURT:  Mr. Weigel was alluding to that a moment

25  ago.

163FGUCA

1          MR. SAPERSTEIN:  And it's executed within a

2     six-to-twelve-month period.  Now, I don't know about what

3     50 percent, the ones that were not honored or may still be

4     pending, I don't know if they were overly broad, I don't know

5     what those were, but certainly 50 percent is not futile.

6          Second of all, we would be prepared to work with

7     Mr. Weigel to assure that a Convention request, we would do our

8     best to make sure that it is honored, and third of all, your

9     Honor, the numbers are pretty consistent with other countries.

10    And that's what we submitted by way in our letter today.  Now,

11    Mr. Weigel may say he doesn't like the Hague Convention as a

12    matter of policy.  Okay, but it is a treaty that's in place and

13    parties do go through it and courts have required parties to go

14    through it.  For example, we appended as Exhibit D to our

15    letter of today that there's a summary of Hague Convention

16    requests by responding countries and the average time for

17    executing a letter request is about six months.  Of the 936

18    letters of request reported by responding nations to be served

19    in 2007, 216 were executed in the six-to-twelve-month period,

20    which is the single largest amount for any time period.  Not

21    the most artful sentence, but certainly that was the most for

22    any given time period.

23          So China is right in the thick of it.  China is not a

24    rogue country here.  It's not an outlier.  It's in the thick of

25    it in terms of honoring a Hague Convention request.  I give the

163FGUCA

1   numbers for the UK --

2           THE COURT:  This is all in Exhibit D?

3           MR. SAPERSTEIN:  Yes, your Honor, Exhibit D.

4           THE COURT:  As I said, I skimmed this.  I looked at

5   the letter, I didn't look at the attachment.

6           MR. SAPERSTEIN:  It's a mere 54 pages to the

7   attachment, your Honor.  I figured I should give you the whole

8   document rather than the table.

9           THE COURT:  Fine.  I'm just saying I haven't looked at

10  it.  But this is what you're referring to, data in Exhibit D,

11  which is the HCCH report.

12          MR. SAPERSTEIN:  Precisely, your Honor.  Then I also

13  recite the numbers for the UK.  And in 2007 the UK executed 36

14  letters, 15 of which were executed in the six-to-twelve-month

15  period, and so as to the rate of execution, the UK received 123

16  letter requests, 87 of which were returned unexecuted or were

17  still pending as of December.

18          THE COURT:  Well, they're a rogue country, too.  Isn't

19  that why you're here?

20          MR. SAPERSTEIN:  Indeed it is, your Honor.

21          So China -- it's not futile, and China is in the thick

22  of it in terms of honoring Hague Convention requests and we

23  will certainly work with the plaintiffs to submit a Hague

24  Convention request, your Honor.

25          THE COURT:  But just so we're all clear, this is a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

163FGUCA

```
 1   Hague -- what we're really talking about here and I think what
 2   Exhibit D refers to is requests for documents, right?
 3               MR. SAPERSTEIN:  Yes, your Honor.
 4               THE COURT:  You keep resisting -- I think I understand
 5   why.  You keep resisting a request for documents.  You keep
 6   making a distinction between a request for documents and -- let
 7   me rephrase.  You're making no distinction between a request
 8   for documents and a request for some sort of confirmation of
 9   compliance with the preliminary injunction as it applies to the
10   seizing of the assets.  Right now Mr. Weigel doesn't know
11   whether the assets have been seized and you're suggesting you
12   can't consistent with bank secrecy laws in China confirm or
13   deny that, correct?
14               MR. SAPERSTEIN:  The law is as we stated in our expert
15   declarations, your Honor, and that is what I'm able to say.
16               THE COURT:  Okay.
17               MR. SAPERSTEIN:  Your Honor, turning to the cases that
18   Mr. Weigel cited, he cited some in the separate entity context
19   and some in the document context and I'll just finish off in
20   the document context, if I may.  Mr. Weigel cited the Milliken
21   case, we discussed that.  He also mentioned the prior Gucci
22   case.
23               THE COURT:  Yes, the one before Judge Koeltl.
24               MR. SAPERSTEIN:  Yes, versus MyReplicaBag.com.
25   Perhaps the case is illustrative for why plaintiffs are here
```

163FGUCA

 1    again.  The upshot of that case was Bank of China ended up

 2    settling that case for $500,000, which went to Mr. Weigel's

 3    firm and to him.

 4            Now, what happened there was defendant had appeared in

 5    that litigation.  Defendant has entered into and approved a

 6    temporary restraining order.  Part of that temporary

 7    restraining order was consent to produce documents.  So Bank of

 8    China had a defendant who had appeared and had consented to the

 9    release of his documents.  We don't have that here.

10            Now, there is -- there was some issue of was the

11    consent sufficient for purposes of Bank of China.  I agree with

12    that.  There was to and fro.  What ultimately happened in that

13    case was the documents were made available at counsel's office,

14    and one of Mr. Weigel's colleagues came over and got to look at

15    them.  When Mr. Weigel started to press for more, the bank

16    ultimately sent them.  The bank had customer consent to send

17    the documents, but when Mr. Weigel started increasing his

18    pressure and increasing his demands, the bank ultimately

19    settled for $500,000.  Maybe that's why Mr. Weigel is here

20    again, I don't know.

21            But to say there's no harm to the bank when they paid

22    $500,000 to Mr. Weigel, I think is not true.  So I think if

23    anything, if anything, the Gucci case shows that the bank is in

24    potential jeopardy here.

25            THE COURT:  It's not clear to me why them paying

163FGUCA

1   $500,000, and I don't know whose money it was, theirs or their

2   account holders, but that doesn't speak to whether or not they

3   got in trouble in China for doing this.

4           MR. SAPERSTEIN:  They had customer consent, your

5   Honor.

6           THE COURT:  So they didn't get in trouble in China.

7           MR. SAPERSTEIN:  I don't know the answer to that

8   question.  I do not know the answer to that question.

9           THE COURT:  I think all these cases are factually

10  distinguishable and ultimately these determinations turn on the

11  facts.  I get that.  But it does seem as though there certainly

12  are enough instances in which the Bank of China is dealing and

13  is producing documents to suggest that people aren't routinely

14  going to jail when documents are getting produced.  Are you

15  suggesting that the only time the Bank of China has produced

16  documents in analogous cases is where there has been customer

17  consent?

18          MR. SAPERSTEIN:  Those are the only two examples I'm

19  aware of, your Honor.

20          THE COURT:  All right.

21          MR. SAPERSTEIN:  And then in those two instances the

22  bank had customer consent.  But it's an invidious position to

23  put the bank in, to say you know, you should produce documents

24  even though you don't have customer consent and you should hand

25  those documents over and you run the risk of the penalties, and

163FGUCA

1    the bank's position is, as we said, your Honor, patently

2    unfair.

3           Now, if I may turn to the separate entity argument,

4    because Mr. Weigel cited I believe one case which was the JW

5    Oilfield case that was decided by Judge Castel earlier this

6    year.  And that case is distinctive because there the parties,

7    the bank, didn't raise and did not brief the separate entity

8    rule.  It wasn't an issue.  It wasn't an argument that the bank

9    was making.

10          Second of all, I would say that JW Oilfield is in a

11   minority of the cases with respect to the separate entity rule.

12   I'll go through the cases that I think are the rule in a

13   second.  And third of all, even in JW Oilfield, even though the

14   bank didn't raise the separate entity rule, and even though I

15   think to the extent you could read it more broadly, the Court

16   there said in the prejudgment context the separate entity rule

17   is alive and well.  And so even if you accept that case as

18   binding on this Court, that it had been fully litigated, in the

19   prejudgement context the Court acknowledged that the separate

20   entity rule is still valid, something arguably so.  But I think

21   the rule is in this district that in the prejudgment and

22   post-judgment context the separate entity rule is still good

23   law.

24          Now, the Samsung decision I think is relevant to that,

25   your Honor.  Then, the Court said quite clearly that Koehler

163FGUCA

did not abrogate the separate entity rule for post-judgment
enforcement.  Now, Mr. Weigel says, well, the facts are
different, the debtor wasn't present, there were less contacts
with New York.  That for purposes of the separate entity rule,
that analysis is irrelevant.  The Court specifically held there
that the separate entity rule still applies.  In fact, in
Samsung, the petitioner there raised the same exact argument
plaintiffs are raising here, that the bank is present in New
York through its branch there and you could compel the branch
to produce assets on a worldwide basis.  The Court in Samsung
rejected that argument and held that under the separate entity
rule the branches of the bank are separate and the question is
does the entity that is before the Court have the property, yes
or no, or do they have control over the property and the Court
held that the Bank of China, New York branch, did not have the
property there and did not have control over the property
located abroad.

THE COURT:  Can I interrupt?  So is your analysis sort
of saying that the conclusion here would be different where
it's being sought in connection with a preliminary injunction
as opposed to in conjunction with a turnover order?

MR. SAPERSTEIN:  No, your Honor.  I think it's equally
strong whether it's a preliminary injunction or post-judgment
enforcement action.  The separate entity rule is good law.

And, your Honor, there are a number of cases in which

38

163FGUCA

1    courts in this district have affirmed the vitality of the

2    separate entity rule.  For example -- and we cite a number of

3    these in our brief -- the Motorola case, which was a

4    post-judgment case, held that you cannot force a branch to

5    bring in property, a branch of a bank to bring separate assets

6    in located abroad.  Fidelity Partners is another case,

7    Mr. Weigel argues that, he's probably familiar with that.

8         THE COURT:  The point Mr. Weigel makes is the

9    rationale for Koehler and the rationale for the separate entity

10   doctrine doesn't apply here, the parade of horribles that drove

11   the Court in that case doesn't really exist here because you've

12   got the individual defendants who came into New York and did

13   business, so there is jurisdiction over them vis-a-vis a

14   judgment against them.  So the concern that New York then is

15   going to become just the location of battles like this where

16   there's really no New York interest is not applicable here.

17        MR. SAPERSTEIN:  I certainly think there are some real

18   policy concerns there, your Honor, and for a bank here to be

19   required to turn over property abroad will have some

20   precedential value and profound policy implications.  Indeed,

21   the Federal Reserve Bank of New York branch, New York has

22   submitted a brief in the Samsung litigation.  The clearing

23   house has submitted briefs.

24        THE COURT:  Wait, a brief in connection with the

25   decision that was rendered by Judge Solomon or an appeal of

163FGUCA

     1   that?

     2          MR. SAPERSTEIN:   In the underlying case with Judge

     3   Solomon.

     4          But, your Honor, whether the debtors are present or

     5   not in New York is irrelevant for the separate entity property.

     6   It doesn't make a difference.   I can make other arguments

     7   whether the debtor is in New York or not, but for purposes of

     8   the separate entity doctrine doesn't matter if the debtor is

     9   here or elsewhere.   The separate entity doctrine says if you

    10   have a branch of a bank in the U.S. it is deemed to be a

    11   separate entity from branches elsewhere except in certain

    12   exceptions which don't apply here.

    13          So we can talk about whether the debtors are here, but

    14   that's not relevant to the separate entity analysis.   And there

    15   are a number of Courts that have held that in the prejudgment

    16   context and in the post-judgment context that you cannot force

    17   a bank to restrain and then turn over assets located abroad.

    18          Indeed, just recently, Judge, I believe Patterson,

    19   issued the Levin decision, which was decided in January 2011

    20   specifically reaffirming the validity of the separate entity.

    21   Judge Griesa in one of the Aurelius cases last year affirmed

    22   the vitality of the separate entity doctrine.   We also cite the

    23   Lotus case in our briefs that confirm the vitality of the

    24   separate entity doctrine.   The John Wiley case that we cite in

    25   our brief confirms that New York recognizes the separate entity

163FGUCA

1    doctrine.

2           Koehler did not address the separate entity doctrine.

3    It wasn't before the Court.  The Court didn't speak to it.  The

4    Court did not specifically say the separate entity doctrine is

5    bad law.  The separate entity doctrine has been New York case

6    law since I believe 1950 and it would be up to the Court of

7    Appeals to overturn a well-established doctrine of New York law

8    by silence and so the Court of Appeals simply did not consider,

9    simply did not consider and certainly didn't rule upon the

10   separate entity rule.

11          THE COURT:  Is there any attempt that you're aware of,

12   could you get the Court of Appeals to weigh in on this either

13   by referral by way of the Second Circuit or through the normal

14   appeals process within the state?

15          MR. SAPERSTEIN:  What I can tell you, your Honor, is

16   that certainly there are bank organizations including the IIB,

17   as well as the clearing house, that is very actively submitting

18   amicus briefs in this area.  I can tell you right now my

19   practice is busy with Koehler-related cases and we have,

20   frankly, in my view another winter storm on our hands where we

21   have a parade of Koehlerrelated litigation.  I think, yes, at

22   some point it's either going to go up to the circuit or the

23   Court of Appeals.

24          THE COURT:  But nothing now teed up for the circuit?

25          MR. SAPERSTEIN:  Interestingly the plaintiffs cite the

163FGUCA

1   Eitzen case.  It was before the Second Circuit and plaintiffs

2   cite it as an example of a Court, I believe it's Judge

3   Hellerstein's decision, where the Court said the separate

4   entity decision was overturned by Koehler.  That decision was

5   vacated just a couple of weeks ago by the U.S. Court of Appeals

6   because the case had been rendered moot.  So the Eitzen case is

7   no longer good law, certainly has no precedential value and

8   that case is not before the Second Circuit any more.

9           THE COURT:  Mr. Weigel, do you want to respond on that

10  point?

11          MR. WEIGEL:  Yes.  First off, your Honor, in this age

12  of computers, we apologize because we missed the fact that the

13  case was vacated.  It was two weeks ago, I believe.  It was an

14  unreported decision and the Second Circuit's decision didn't

15  somehow come up on Lexis or Nexis.

16          Why it was vacated is interesting.  Judge Hellerstein

17  ordered the Bank of India to comply with a restraining order

18  and subpoena served upon it.  The Bank of India objected below,

19  fought through the whole process and then in its opening brief

20  to the Second Circuit announced that it had searched all of its

21  worldwide records and come to the conclusion that the debtor in

22  that case did not have an account with them and so it was the

23  plaintiff who had prevailed below who moved to have an appeal

24  dismissed on grounds of mootness and it was dismissed.

25          THE COURT:  The main point that I was asking about was

163FGUCA

1   whether this is poised to be decided by the Second Circuit or

2   whether the Second Circuit is in a position to make a referral

3   to the New York State Court of Appeals.

4          MR. WEIGEL:  Well, they did, your Honor, and that's

5   the Koehler case.  My colleague says that it was not decided,

6   but in fact the very same banks submitted in the Koehler case

7   arguments that Koehler should not come out the way it came out

8   because of the separate entity doctrine.  They argued that the

9   separate entity doctrine prevented the Court in New York from

10   ordering the Bank of Bermuda in Bermuda to produce a stock

11   certificate.  There was a strong dissent in Koehler, but the

12   majority and the decision that's binding on all of us, held

13   that in fact when there is jurisdiction over the bank in New

14   York despite the separate entity doctrine, which was not

15   mentioned at all --

16          THE COURT:  It's not mentioned at all.

17          MR. WEIGEL:  There's no indication that they thought

18   that it was in any way an impediment to ordering, and it's not

19   a doctrine out of the Court of Appeals, but there is no

20   statement in Koehler that suggests that this Court should

21   somehow consider the separate entity doctrine in deciding

22   whether you can force a bank abroad to bring assets into the

23   United States and -- it's an interesting thing, because the

24   Bank of China has never come in here and said that it is not

25   subject to this Court's personal jurisdiction, like the Bank of

163FGUCA

Bermuda was subject to this Court's personal jurisdiction in
that case.  Whether you treat the New York branch as separate
or not, I suppose we can go into some big inquiry, some
metaphysical discussion --

THE COURT:  That's why I don't think this question
will be resolved by Koehler.  I disagree with you.  I think
there's got to be a way to tee it up for the Second Circuit to
say once and for all what it is to do in cases like this one,
but I don't think the circuit is poised to do it any time soon.

MR. WEIGEL:  If I could make a suggestion, your Honor.
The question of whether this Court has the right to issue the
injunction has been decided by the First Department, the
Abuhamda case quite plainly says this Court could enjoin, in
that case it was a bank in Jordan that had an office in New
York, from allowing the assets to be dissipated.  The U.S.
Supreme Court in First National City Bank overturned the Second
Circuit decision applying the separate entity doctrine.  The
Second Circuit applied the separate entity doctrine and said
the Court in New York couldn't order, it was a branch in -- I
want to say Uruguay.  I may have the country wrong, but it was
in South America.  The Second Circuit said this Court could not
enjoin Citibank from releasing funds in Uruguay, out of its
branch in Uruguay, and the Supreme Court overturned that and
said this Court has the power to restrain assets as long as you
have power over the bank, which it did.

163FGUCA

```
 1            THE COURT:  I get that.  That's why I keep going back
 2   to whether there's a distinction to be made between restraining
 3   the assets and confirming that fact and producing documents,
 4   which is a little different.  They are both the subject of the
 5   preliminary injunction, but they are certainly different
 6   injunctions, as it were.
 7            MR. WEIGEL:  Courts in this circuit, in this courtroom
 8   have routinely ordered banks to produce documents from abroad.
 9   It's not particularly unusual.  They've done it even when
10   parents own subs.  The easiest case is when it's the same
11   corporate entity.  There's the five-factor test that your Honor
12   knows.
13            THE COURT:  Look, I get all that.  I'm just, I think
14   we keep going back to the different interests that are at issue
15   here and I think the separate entity doctrine implicates some
16   of those as well, a different set of interests as well.
17            I think I'm going to have to wrap this up.  I'm going
18   to reserve on this, but I do want to resolve this quickly.
19            MR. SAPERSTEIN:  If I may, just a few points.
20            THE COURT:  Very, very quickly, because I have a full
21   house.
22            MR. SAPERSTEIN:  Your Honor, a couple of other points.
23   I just want to point out that Koehler is in apposite here.
24   There are several other points.  I'll be brief.  The first
25   point is Koehler involved a narrow set of facts and in that
```

163FGUCA

1    case the judgment debtor pledged the securities to the bank as

2    collateral.  The bank itself had appeared before the Court.

3    There was no separate entity issue and the bank clearly had

4    control over the assets at the time the restraining notice and

5    petition were served.

6              THE COURT:  No, I understand that.

7              MR. SAPERSTEIN:  Okay.  And the other point is, your

8    Honor, it's perhaps an obvious one, I apologize.  Koehler is

9    simply silent and did not address because it did not need to

10   address the conflict of the law issue that we have here.  There

11   was no conflict of law issue in Koehler and we have that issue

12   squarely in this case.

13             THE COURT:  Okay.  I do get it.  I appreciate the

14   parties' preparation, it was obvious.  It was interesting and I

15   really do enjoy having good lawyers who know their subject as

16   well as you both did and I want to thank those who didn't speak

17   but who obviously had a role in preparing, you and ultimately

18   me for today.  So thanks.  I will get back to you, I promise,

19   quickly on this.

20             MR. WEIGEL:  We will get that affidavit to you.

21             THE COURT:  What do you think; by Tuesday?

22             MR. WEIGEL:  If Tuesday is acceptable, we'll get it to

23   you by Tuesday.

24             THE COURT:  Thank you very much.

25             (Adjourned)