# EXHIBIT A

115QgucC.txt

115QgucC
1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  GUCCI AMERICA, INC. et al., ,
3
4                  Plaintiffs,
4
5            v.                        10 CV 4974 (RJS)
5
6  WEIXING LI, et al.,
6
7                  Defendants.
7
8  ------------------------------x
8                                     New York, N.Y.
9                                     January 5, 2011
9                                     12:05 p.m.
10
10  Before:
11
11               HON. RICHARD J. SULLIVAN,
12
12                                     District Judge
13
13                  APPEARANCES
14
14  GIBSON, DUNN & CRUTCHER, LLP
15       Attorneys for Plaintiffs
15  BY:  ROBERT L. WEIGEL
16       ANNE MAUREEN COYLE
16       JENNIFER COLGAN HALTER
17
17
18  WHITE & CASE, LLP
18       Attorneys for Defendants
19  BY:  DWIGHT A. HEALY
19       MARIKA MARIS
20
21
22
23
24
25
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

♀                                                          2

115QgucC
1            (In open court; case called)
2            THE DEPUTY CLERK:  For the plaintiffs?
3            MR. WEIGEL:  Robert Weigel, Anne Coyle and Jennifer
4  Halter from Gibson, Dunn & Crutcher for the plaintiff.
5            THE COURT:  In that order?
6            MR. WEIGEL:  Jennifer Halter and Anne Coyle.
7            THE COURT:  That's what I thought.  Good.  Good
8  afternoon to each of you.
9            For the defendant, it's for the Bank of China?
10            MR. HEALY:  Yes, your Honor.  Dwight Healy of White &
11  Case and Marika Maris.
12            THE COURT:  Mr. Healy and Ms. Maris, good afternoon.
13            I want to start with, I guess, we are here for two
                              Page 1

115QgucC.txt
```
14   matters really.  It's the same docket number.  One relates to
15   the default judgment by plaintiffs against the named defendants
16   in this case.  Why don't we start there.  I think that it could
17   have implications for where we go after that.
18           I'll make it clear.  The complaint in this action was
19   filed June 25 of 2010.  It named certain of the defendants.  On
20   June 25, I entered a temporary restraining order that directed
21   defendants to refrain from certain activities.  Thereafter,
22   there was service, I think, of the restraining order.  There
23   was also subsequently an amended complaint filed in October.
24   There was a preliminary injunction in the interim that I
25   ordered on July 12 roughly in line with what was in the
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              3
♀
     115QgucC
```
 1   temporary restraining order.  That too was served on the
 2   defendant, I believe.  After the amended complaint was filed
 3   which named a couple of additional defendants -- I think that's
 4   right.
 5           MR. WEIGEL:  Yes, your Honor.
 6           THE COURT:  -- those were filed.  The time in which to
 7   answer the complaint, those were served -- excuse me.  The time
 8   in which to answer the complaint came and went in July, I
 9   believe it was, and defendants didn't file a notice of
10   appearance, didn't answer, have never appeared in this action.
11           On November 8, I believe, plaintiffs sought
12   certification of default from the clerk of the court, and on
13   November 23, I issued an order to show cause directing the
14   defendants to appear -- to show cause why they should not have
15   a default judgment entered against them.  That order to show
16   cause was served on the defendants.  The order directed
17   defendants, I think, to make -- yes, they were to make
18   submissions by December 22nd, I believe.  No submissions have
19   been made.  I think the original hearing was the 29th of
20   December and it was put off until today.
21           Just so we're clear, is anybody present here today who
22   is representing the defendants or the defendant themselves?
23   No?  OK.
24           Mr. Weigel, have you had any communication with the
25   defendants?
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              4
♀
     115QgucC
```
 1           MR. WEIGEL:  Apart from Lijun Xu, your Honor, who was
 2   the one defendant to appear by counsel, and we reached a
 3   stipulated judgment with him, we have had no contact with
 4   anyone.
 5           THE COURT:  So I am prepared to enter a default
 6   judgment against the defendants.  And the plaintiffs have
 7   provided an order -- a proposed order that lays out the terms
 8   of the judgment.  I am OK with most of it.  I wanted to have a
 9   little conversation about the amount of the judgment, the
10   proposed amount of the judgment is $12 million, which would be
11   statutory damages for the multiple violations.  I think you
12   said was it $200,000 per identified violation?
13           MR. WEIGEL:  We set it at $200,000 per mark per
14   category of item, your Honor.
15           THE COURT:  Just talk to me about sort of why that
16   number.  I have a lot of discretion on this.  The cap is a
17   million dollars, but certainly the precedent is for generally
18   less than that where it is not blatantly willful or there is
```
                              Page 2

115QgucC.txt
```
19   not evidence of bad conduct.  Here we don't have much of a
20   record because the defendants never showed up.  So why 200,000?
21           MR. WEIGEL:  Well, the simple math, your Honor, is
22   that we historically had gotten $100,000 per mark, and the last
23   time we were in front of your Honor, your Honor gave us
24   $100,000 per mark per item.  I believe the total judgment was
25   somewhere in the magnitude of $13.5 million.  Since that time,
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

115QgucC
```
 1   Congress has chosen to double the statutory penalties from, I
 2   think, a maximum of a million to a maximum of 2 million.  So we
 3   have historically gotten a hundred thousand per mark.  When
 4   Congress doubled the amount, we thought it appropriate to
 5   double it.  We thought it was in the lower range of what was
 6   possible.
 7           THE COURT:  Well, certainly, it's, I guess, at the
 8   lower end of what is possible.  It is at the relatively high
 9   end of what is actually handed out in most cases.  I mean, I
10   have no sympathy for people who infringe.
11           MR. WEIGEL:  Your Honor, we know about these folks.
12   Some of what we don't know is what we're going to cover next
13   with the back table.  What we do know is that this operation
14   was large enough that they had a $400,000 reserve account,
15   which is typically a fraction of the sales.  In other words,
16   the credit card company keeps a certain percentage of each
17   transaction to protect itself from people who come back with a
18   chargeback.  So we know that this operation was large enough
19   that they had a $400,000 chargeback, which is obviously a
20   fraction of the total sales.  We know that Redtagparty had
21   operated another web site selling fake stuff.  They were shut
22   down by Chanel, and all they did was change their name and
23   operate again in this new manner.
24           We also know that these folks, unlike some of the
25   other folks, were actually selling these goods as genuine.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

115QgucC
```
 1   What we believe happened is that they had them shipped over
 2   from China to their address in San Diego, then they unwrapped
 3   them and took away the Chinese packaging and put them in a
 4   nicer box and sent them to people.  So these folks, we think,
 5   are more egregious than the other folks both because of the
 6   volume of the stuff that we've been able to locate, the fact
 7   that they've done this twice already that we know about, and
 8   the fact that they were not only violating the trademark laws,
 9   but they were really committing fraud by representing these
10   were genuine products when they clearly were not.
11           So, we thought that that was appropriate given the
12   magnitude of the operation and the egregiousness of the conduct
13   and, of, course they have not come in and appeared.
14           THE COURT:  They have not?
15           MR. WEIGEL:  Come in and appeared.
16           THE COURT:  But plaintiffs have this advantage to
17   establish facts.  All right.  I think that's reasonable.  I
18   think I have a fair amount of discretion, and I think in light
19   of what you just said, which is unrebutted at this point, and
20   in fact it's corroborated in part of the record, I'm going to
21   grant $12 million in damages.  That will be the damage award.
22           MR. WEIGEL:  Thank you, your Honor.
23           THE COURT:  I have a couple other questions about the
```
Page 3

115QgucC.txt
24    contours of the order, particularly in paragraphs 7, 8 and -- 7
25    and 8, which talks about the court's inherent equitable power
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    7
♀

115QgucC
 1    to issue remedies ancillary to its authority to provide final
 2    relief, and then there is a long paragraph, I won't read the
 3    sentence, but it extends to some other folks, right?  It covers
 4    the defendants, but it also covers those who have assets of the
 5    defendants and it also covers in that definition various banks
 6    and credit card companies, right?
 7              MR. WEIGEL:  Yes, your Honor.  I believe that these
 8    are the accounts that were frozen pursuant to the preliminary
 9    injunction.
10              THE COURT:  So, it's basically saying these are the
11    assets of the defendants and, therefore, should be subject to
12    this order as property that belongs to the defendants.
13              MR. WEIGEL:  Yes, your Honor.
14              THE COURT:  Right?
15              MR. WEIGEL:  I mean, your Honor has the equitable
16    power to order that the profits of the defendants be turned
17    over to us, and that is essentially what we are asking to
18    partially satisfy the judgment, or maybe even completely
19    satisfy the judgment, since we don't know what's in the Bank of
20    China account.
21              THE COURT:  I guess it's just "associated with" is the
22    one word that I'm not sure if it goes farther than I can or
23    should.  I'll come back to that.
24              Now, I want to move to the other issue which relates
25    to the motions before me to compel the Bank of China to freeze
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    8
♀

115QgucC
 1    assets and to produce certain documents and then the
 2    countermotion of the Bank of China to modify my preliminary
 3    injunction order to limit its application to the United States
 4    and to not extend to China, both with respect to assets and
 5    documents.
 6              I think there are different analyses for each, so I
 7    want to start with the freezing of assets.
 8              Mr. Weigel, the papers back and forth mention, at
 9    least, the concept of the separate entity rule, which is New
10    York Law and the Second Circuit has endorsed, and that's with
11    respect to prejudgment attachments which seems to be what the
12    preliminary injunction order is dealing with, right?
13              MR. WEIGEL:  Well, your Honor, it's slightly different
14    but they're certainly analogous concepts.  Your Honor's order
15    was issued under the authority given by the Lanham Act, which
16    authorizes you to issue any injunction necessary to protect the
17    rights of the trademark holder, and the whole idea of there
18    being some question, the extraterritoriality of the Lanham Act
19    is a complete red herring.
20              In 1954, the Supreme Court in the Bulova case applied
21    the very same presumption that the Morrison court did and ruled
22    that basically a fellow who was making Bulova watches in Mexico
23    couldn't get around the trademark laws that easily.  They
24    applied --
25              THE COURT:  Well, they couldn't get around them if
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    9
♀

                              Page 4

115QgucC.txt
115QgucC
1  he's -- well, maybe I'm not familiar with the case.  So the
2  articles never entered the stream of commerce of the United
3  States?
4         MR. WEIGEL:  No, the Supreme Court held that in fact
5  the Bulova watches that were coming across the border, that
6  legitimate jewelers were being forced to deal with repairs and
7  so forth, and they held it had an effect on U.S. commerce, and
8  that the Lanham Act extended to these activities that took
9  place in Mexico.  That was 1954.  Certainly, Congress thought
10 that that was not what it intended.  It has had many years
11 since then, my entire lifetime, to revise it, and they have not
12 done anything like that.
13        But this case actually does not really involve that
14 question very much.  This was a sale in New York.  This is a
15 web site that was operating in the United States.  Some of the
16 perpetrators were in San Diego, and they were shipping goods
17 from San Diego to New York and all across the United States.
18 So this is really -- this is an act in the United States.  This
19 is violating the trademark laws.
20        THE COURT:  Clearly, the defendants are liable in the
21 United States and in this district.  I've already entered a
22 judgment against them.  The issue is whether prejudgment the
23 property of those defendants; that is, in China or North
24 Carolina or Timbuktu, is subject to an order from this Court to
25 a branch of the bank that happens to be in New York where the
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              10
♀
115QgucC
1  property is outside of New York, right?  That's the issue.
2         MR. WEIGEL:  Well, both under federal law and under
3  New York State Law as incorporated by Rule 64 for prejudgment
4  attachments, both permit this and in fact authorize it.
5         Let me start with New York State law.  It had been the
6  law in New York for many years that you could only attach
7  property within the borders of New York State.  This year the
8  Court of Appeals in the Hotel 71 case ruled that where you have
9  personal jurisdiction over the defendant, that you're
10 entitled -- that attachment is not limited to assets within the
11 state, but can be to any property --
12        THE COURT:  The Hotel 71 case, is that in your brief?
13        MR. WEIGEL:  It is, your Honor.  I happen to know it
14 because I argued the case and won it.
15        THE COURT:  But what -- I'm looking at your --
16        MR. WEIGEL:  It is in our decision or in our brief.
17 It is on page 14.  Here is what the Court said.
18        THE COURT:  I'm looking to see where it is.  I don't
19 see it on page 14.  Hotel 71?
20        MR. WEIGEL:  It's about the middle of the page, your
21 Honor, about five lines down from the top.
22        THE COURT:  I'm looking at the wrong brief.  Sorry.
23 Your opposition brief?
24        MR. WEIGEL:  Yes, your Honor.  I can hand you up a
25 copy of the case if you want.
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              11
♀
115QgucC
1         THE COURT:  Sorry.  I was looking at the wrong brief.
2  Go ahead.
3         MR. WEIGEL:  What the Court of Appeals decided in that
4  case was that if you are using an attachment to get in rem or
                           Page 5

115QgucC.txt
```
 5   quasi in rem jurisdiction, then, yes, the property has to be
 6   within the state.  But if it is not, if you already have
 7   personal jurisdiction over the defendant, as we do here through
 8   Long-Arm Statute, that it held that a court with personal
 9   jurisdiction over non-domiciliary present in New York has
10   present jurisdiction over individuals --
11              THE COURT:  That's not a bank case though, right?
12              MR. WEIGEL:  Well, you have --
13              THE COURT:  The rule with respect to the separate
14   entity doctrine is a rule that is designed, I think in part, to
15   protect New York banks from becoming the subpoena recipients
16   for the world because every bank has a New York branch.  And if
17   you get to just stroll into New York to get property all over
18   the globe, that is problematic for New York banks, right?  So
19   Hotel 71 has nothing to do with that, does it?  It doesn't
20   address the separate entity rule, does it?
21              MR. WEIGEL:  It doesn't address the separate entity
22   rule, but it cites the Koehler case, which is the Bank of
23   Bermuda case, which is --
24              THE COURT:  Which is all about pre- and postjudgment
25   attachments, right?
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                            12
115QgucC
```
 1              MR. WEIGEL:  Well, the Koehler.
 2              THE COURT:  It makes a clear distinction between one
 3   and the other.
 4              MR. WEIGEL:  Yes, but Hotel 71 clarified that the
 5   distinction that Koehler made between pre- and postjudgment
 6   attachments only related to those situations where prejudgment
 7   attachments were used to obtain in rem jurisdiction.  And if
 8   you read that case --
 9              THE COURT:  I have read that case.
10              MR. WEIGEL:  It says very clearly, every time it says
11   you can only attach property within the borders of the New
12   York, it also says in order to attain personal jurisdiction or
13   in order to attain jurisdiction over the defendant.  That is
14   the distinction that the Court of Appeals made in the Hotel 71
15   case where they said CPLR 6202 says bluntly that any debt
16   or property which -- against which a money judgment may be
17   enforced and provided to 5201 is subject to attachment.
18              The Court of Appeals basically in that case said that
19   that statute 6202 means what it says, and that if you can
20   enforce it subject -- if you can enforce a judgment against it,
21   then you can attach it.  That is what the Court of Appeals
22   said.  And they said that the difference is that you can't get
23   jurisdiction over non-resident defendant by attaching something
24   out of state, but if you have personal jurisdiction over that
25   defendant, then 6202 should be read as it says, that anything
```
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                            13
115QgucC
```
 1   you can execute upon, you can attach in New York.
 2              So, read together, Koehler which held that service --
 3   well, there was service in that case on the Bank of Bermuda in
 4   New York at their New York branch.  It was a case involving a
 5   judgment --
 6              THE COURT:  I don't see how you can square that
 7   with -- I will take a look at the case to make sure I am not
 8   misreading it, but Koehler at page 538 expressly talks about
 9   what Article 62 attachment proceedings are about.  I don't
```
                              Page 6

115QgucC.txt
```
10   think it can be reconciled with what you just said.
11        MR. WEIGEL:  Your Honor, I would urge your Honor to
12   read Hotel 71 because this is exactly the argument my adversary
13   made in that case, and the Court of Appeals unanimously --
14        THE COURT:  But it's not a bank case.  Again, the
15   separate entity doctrine is a doctrine that is reserved for
16   banks, right?
17        MR. WEIGEL:  The separate entity doctrine is a
18   doctrine reserved for banks and it is nowhere mentioned in the
19   Koehler case.  What the Koehler case said is if you had
20   jurisdiction over the bank which was obtained in that case by
21   service on the branch in New York, that you could make a bank
22   in Bermuda bring shares into New York for the sole purpose of
23   satisfying a judgment that had been registered in New York and
24   had nothing to do with New York.
25        THE COURT:  So your view is then that Hotel 71
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                              14
⚥
115QgucC
```
 1   basically has overruled the separate entity doctrine, it seems
 2   to me, which the Second Circuit --
 3        MR. WEIGEL:  Well, the separate entity doctrine, I
 4   think -- I'm sorry, your Honor, please.
 5        THE COURT:  I was going to say the Second Circuit
 6   seems to have missed the memo on that, but all of this is
 7   fairly recent, so who knows.
 8        MR. WEIGEL:  The Second Circuit didn't miss the memo
 9   on that, your Honor, although I read that case last night and
10   when I first saw it cited in their brief, I was a little --
11        THE COURT:  Talking about the Judge Cabranes case or
12   something else?
13        MR. WEIGEL:  The 2010 case, the Allied Maritime case.
14   But if you read that case carefully, as I did very carefully
15   last night, believe me, your Honor, it says right up front
16   there is no personal jurisdiction over the defendant.  What the
17   case says is in cases where the district court has no personal
18   jurisdiction --
19        THE COURT:  What page are you at?
20        MR. WEIGEL:  It's page 4 of the Westlaw printout, your
21   Honor.  It's right under the heading jurisdiction after
22   discussion.
23        THE COURT:  "We agree," that one?
24        MR. WEIGEL:  Yes.  In cases where the district court
25   has no personal jurisdiction over a party, jurisdiction can be
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```
                                                              15
⚥
115QgucC
```
 1   established based on the court's power over property within its
 2   territory.  Then it goes on to say that that property in that
 3   case, which was a bank account in Paris, was not within the
 4   court's territory and therefore could not justify quasi in rem
 5   jurisdiction within New York.
 6        That is not what we have here.  This is not a
 7   quasi in rem case.  This is personal jurisdiction over the
 8   defendant.
 9        THE COURT:  It's different than these maritime cases,
10   I see that.  In light of the fact that I've just entered a
11   judgment here, in some ways does that moot this out, because
12   under Koehler, under 5225(b) of New York CPLR there now clearly
13   is a judgment and the property that belongs to the debtor, to
14   the defendants in this case, now is and can be ordered turned
```
                               Page 7

115QgucC.txt
```
15   over even if it is out of the jurisdiction.
16          So, yours is an interesting question going forward,
17   and a very relevant one, but for practical matters, as of
18   today, does the fact that I just entered a default judgment
19   against the defendants make this even easier?
20          MR. WEIGEL:  It does, your Honor.  It absolutely does.
21   There is one practical concern which I think is the question
22   of -- but, again, I think your Honor's decision resolves it.
23   There was an order that your Honor issued freezing the account.
24          THE COURT:  Right.
25          MR. WEIGEL:  The Bank of China did not come in and ask
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    16
115QgucC
```
 1   your Honor to alter that order.
 2          THE COURT:  They did last week.
 3          MR. WEIGEL:  Last week.  But up until that point, they
 4   did not.  There is no question that they are on Madison Avenue
 5   doing business in New York, and that the Bank of China that's
 6   here is the same Bank of China that's in China.  It's the same
 7   corporate entity.  There is no difference at all.  They were
 8   under an obligation to follow that order until it was modified.
 9          THE COURT:  The issue as I could see you're suggesting
10   is that they waived an argument now to challenge or modify?
11          MR. WEIGEL:  No, I'm suggesting, your Honor, that if
12   they did not in fact freeze the account, an order of your Honor
13   directing them to turn over the contents of that account today
14   may in fact, if your Honor were not to enforce the order that
15   was already served upon them, may subject me to some serious --
16          THE COURT:  Maybe.  We don't know.  I guess there's a
17   shoe that could drop.  Not clear if it will drop.
18          MR. WEIGEL:  Yes.
19          THE COURT:  If I ordered the Bank of China, in light
20   of today's default judgment, to produce or turn over the assets
21   that are the debtor's assets in China, pursuant to, among other
22   things, 5225(b) of the New York CPLR, then I guess they'll
23   either turn something over or they won't turn something over.
24   And then it may be relevant to know if they're not turning over
25   anything, why not, because the assets were dissipated or, you
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
```
                                                                    17
115QgucC
```
 1   know, took off sometime between after the preliminary
 2   injunction and today.  That might be a problem, and then we'd
 3   have to deal with the issue, right?
 4          MR. WEIGEL:  Exactly, your Honor.  We just don't know
 5   if they permitted the account to be drained or not.  If they
 6   held on to the money and then your Honor orders them to do it
 7   postjudgment, then all we need are the documents to confirm all
 8   that and we're fine.
 9          THE COURT:  All right.  Let me hear from Mr. Healy.
10          MR. HEALY:  Your Honor, would it be all right if I
11   spoke from the podium?
12          THE COURT:  Absolutely.
13          MR. HEALY:  I should say at the outset, your Honor,
14   that Mr. Weigel and I have a fundamentally different
15   understanding of the Koehler case and the Hotel Mezz case.
16          THE COURT:  Well, that may be.
17          MR. HEALY:  And the separate entity rule is, as your
18   Honor flags, critical here because, among other things, the
19   grounds that were cited to support the issuance of the assets
```
                            Page 8

115QgucC.txt
20   restrained in the Court's preliminary injunction order were
21   Article 62 of the New York CPLR.
22        THE COURT:  Right.
23        MR. HEALY:  As your Honor recognized, it is that
24   literally for scores of years the New York and Federal Courts
25   have concluded that in the context of a prejudgment attachment,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                            18

115QgucC
 1   a service on a New York branch does not reach accounts that are
 2   located in branches or the head office of a bank outside of the
 3   boundaries of New York.
 4        THE COURT:  Right.
 5        MR. HEALY:  Nothing in Koehler or Hotel Mezz alters
 6   that.  The district court case, the district court decision in
 7   Koehler in the federal court that ultimately certified the
 8   question to Koehler specifically said that the separate entity
 9   rule was not at issue there.  The parties did not brief the
10   separate entity rule.  Koehler in no way, shape or form, even
11   postjudgment, affects the separate entity rule.  It is not
12   mentioned.  We are separately litigating in New York Supreme
13   whether in fact Koehler has any impact on the separate entity
14   rule.
15        I would point out to your Honor that the New York
16   Federal Reserve Bank has submitted an amicus submission in that
17   case indicating that Koehler should not be read to permit an
18   enforcement order to call for a turnover of property that is in
19   the count outside of the jurisdiction of New York.
20        THE COURT:  Look, I think that's all interesting, and
21   we may need to get there, but I want to focus now on what might
22   be the shortcut, which is I just issued a judgment against the
23   defendants in this case.  So now there would be a proceeding
24   under Article 52, right?
25        MR. HEALY:  Yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                            19

115QgucC
 1        THE COURT:  And that's 5225(b).  And now it sounds
 2   like under Koehler and under the CPLR, I can order the
 3   defendants or anybody who's got the defendant's assets to turn
 4   them over.
 5        MR. HEALY:  Well, your Honor, that's really the point
 6   I was just speaking to, which is that Koehler does not say
 7   anything about the separate entity rule; and contrary to what
 8   Mr. Weigel said, Koehler did not involve service on a New York
 9   branch.  In Koehler, the parent entity had a subsidiary.  There
10   was a dispute for some period of time as to whether the bank,
11   the head office of the bank, was subject to jurisdiction here.
12   The bank eventually stipulated that it was subject to
13   jurisdiction here.  The Court --
14        THE COURT:  It's a bank case, right?  It's the Bank of
15   Bermuda.
16        MR. HEALY:  Yes, but it does not involve service on a
17   branch.  The separate entity rule is not implicated.  As I've
18   just said to your Honor, the issue --
19        THE COURT:  Well, here is the issue that is certified
20   for Koehler:  May a Court sitting in New York order a bank over
21   which it has personal jurisdiction to deliver stock
22   certificates owned by a judgment debtor to a judgment creditor
23   when those stock certificates are located outside New York.
24   That's pretty clear it's about a bank.  The separate entity
                         Page 9

```
                              115QgucC.txt
 25  rule would either apply or not apply.
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
     115QgucC
  1          MR. HEALY:  Your Honor, the separate entity rule says
  2  that service on a branch doesn't reach accounts at other
  3  branches.  The service there was not on a branch.  The head
  4  office of the Bank of Bermuda stipulated that it was subject to
  5  jurisdiction here.  There was no issue as to whether an order
  6  directed at a local branch could reach assets abroad.  There
  7  was no issue as to whether compliance with that order would
  8  violate the laws of the home jurisdiction.  There were also a
  9  number of other significant issues that were not addressed.
 10          And as I've said to your Honor, it is at the very
 11  least an open issue as to whether Koehler has any effect on the
 12  separate entity rule.  As I've said to you, it's currently
 13  being litigated in New York Supreme Court.  The New York
 14  Federal Reserve has weighed in on this issue citing very
 15  significant policy concerns about reading Koehler to do away
 16  with the separate entity rule and to permit a turnover of
 17  assets from a foreign branch based upon the presence of a New
 18  York branch.  The Clearing House Banking Association has
 19  weighed in on the issue.  The International Banking Association
 20  has weighed in on that issue.  That is an open issue.  If the
 21  Court wants to move to that issue, and we certainly ask for the
 22  opportunity for it to be briefed because we think it is a very
 23  significant issue, but --
 24          THE COURT:  Go ahead.
 25          MR. HEALY:  But I do think the question that we have
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
     115QgucC
  1  today, and it is still a very live question, is whether or not
  2  the asset restrained in a preliminary injunction could properly
  3  reach accounts that are outside of the United States.  Under
  4  the separate entity rule and a prejudgment attachment context,
  5  that is still live.
  6          Just to address Hotel Mezz, what Hotel Mezz says is
  7  the rule of Harris v. Balk applies.  It didn't say you could
  8  reach assets outside of the state.  What it said was that for
  9  the type of intangible assets that were issued there, which
 10  were uncertificated interests in business entities, the
 11  location under Harris were at the location of the owner of the
 12  interests.  The owner of the interests was a defendant.  That
 13  owner was served in New York with the order of attachment.  The
 14  Court said that based upon that, the assets were present in New
 15  York at the time of service, the order of attachment captured
 16  those assets because they were in New York.  Their situs was in
 17  New York where the owner was when he was served.
 18          There is no suggestion in that case that an order of
 19  attachment served on a New York branch of a foreign bank can
 20  reach accounts outside of the United States.  There is no
 21  suggestion that it affects the separate entity rule.  A
 22  separate entity rule was not involved in any way, shape or
 23  form.
 24          THE COURT:  But the separate entity rule is not
 25  designed to protect the defendants like those here who now have
                       SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

```
     115QgucC
```

115QgucC.txt
1  judgments against them, right?  So they've got judgments
2  against them.  I am ordering them to turn over the property to
3  satisfy the judgment.  To the extent that they don't do that,
4  and their property is in the custody of your client, a bank, or
5  your client, a shoemaker, why on earth wouldn't Article 52,
6  specifically 5225(b), apply?
7           MR. HEALY:  Because the separate entity rule stands as
8  a bar to granting that relief.
9           THE COURT:  For postjudgment relief?
10           MR. HEALY:  Absolutely.
11           THE COURT:  What is the authority for that?  All the
12  cases cited, at least the ones I focused on, were prejudgment
13  Article 62.  What are the ones that relate to postjudgment,
14  application of the separate entity doctrine on postjudgment
15  property?
16           MR. HEALY:  Judge Preska's decision in Lok, the
17  Motorola v. Uzan.
18           THE COURT:  Judge Preska's decision was -- all right.
19  Go ahead.
20           MR. HEALY:  The Fidelity Guaranty case, all of those
21  cases are postjudgment cases that apply the separate entity
22  rule.  So the question is whether Koehler overturns that line
23  of authority.  Then there are also state cases that have
24  applied the separate entity rule postjudgment.
25           THE COURT:  Fidelity Partners.  What were the other?
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    23
♀
   115QgucC
1  Ones.
2           MR. HEALY:  Motorola v. Uzan and Lok Prakashan.
3  They're all cited in our memorandum of law.
4           THE COURT:  I know they are there.  I really had
5  focused on, and, I think for the most part, you were focusing
6  on the prejudgment aspect of this.
7           MR. HEALY:  Sure.  But I think the point is, your
8  Honor, that the separate entity rule operates in the context of
9  a bank, pre- and postjudgment, and has been uniformly so
10  understood, and the question that is on the table now is
11  whether Koehler, which does not so much as mention the separate
12  entity rule, overturns.
13           THE COURT:  But the point about Koehler, of course, is
14  that Koehler said very explicitly that Article 52 has no
15  extraterritorial limitation, right?  Article 52 does not.  62
16  does.  Isn't that the holding in Koehler?
17           MR. HEALY:  What Koehler says is that enforcement is
18  in personam, but it does not address the separate entity rule,
19  and it does not speak to the issue of whether, as cases have
20  previously interpreted Article 52, Article 52, like Article 62,
21  is subject to the limits of the separate entity rule.
22           THE COURT:  Just so we're clear, the language of
23  Koehler is CPLR Article 52 contains no express territorial
24  limitation barring the entry of a turnover order that requires
25  a garnishee to transfer money or property into New York from
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
                                                                    24
♀
   115QgucC
1  another state or country.  So, your argument is that there's a
2  carveout for banks that this language would not apply.
3           MR. HEALY:  There was a carveout for banks that was
4  widely recognized before Koehler.  Koehler does not speak to
5  that carveout.  Parties with significant --
                          Page 11

115QgucC.txt
```
 6              THE COURT:  It doesn't speak to that carveout -- look,
 7     it's a case involving a bank, and it's a bank over which the
 8     Court has personal jurisdiction, right?
 9              MR. HEALY:  Not by reason of a branch.
10              THE COURT:  But who cares?  The point is that there
11     are various ways you could get personal jurisdiction over a
12     bank.  One of them, the easiest one, is that they happen to
13     have a branch right on Madison Avenue.  But there might be
14     others.  But I am not sure what difference that makes.  So why
15     do you think it matters whether the personal jurisdiction over
16     the bank was because they have a branch on Madison Avenue or
17     for some other reason?
18              MR. HEALY:  Because the separate entity rule has
19     historically stood for the proposition that in a branch bank
20     situation there are substantial policy considerations that
21     militate against using the presence of a New York branch here
22     as a basis for reaching assets that are outside of the United
23     States.  Koehler is an unusual situation because in Koehler we
24     don't have a New York branch versus a foreign branch situation.
25     What we have is a bank entity that appeared in New York,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
♀                                                                    25

115QgucC
```
 1     conceded that it was subject to jurisdiction, the parties and
 2     the Court in the federal case all agreed that the separate
 3     entity rule was not implicated by the facts pattern that was
 4     present in the Koehler case.
 5              As I said, your Honor, in amicus submissions the New
 6     York Fed and other disinterested parties have indicated that
 7     there are substantial reasons not to read Koehler to permit the
 8     turnover of assets outside of the United States on the basis of
 9     a New York branch.  Among those reasons, of course, is that it
10     is an invitation to foreign jurisdictions to do the same thing
11     to U.S. banks who operate with branches abroad.
12              In any event, we think there are substantial issues
13     about that.  If the Court wants us to address that, we would
14     ask for the opportunity to brief it because we do think there
15     are significant issues.  They're not frivolous issues, your
16     Honor.
17              THE COURT:  I'm not accusing anybody of making
18     frivolous issues.  They're interesting issues.  They are
19     certainly policy considerations that go both ways.  I get that.
20              MR. HEALY:  But we still are here in the context of a
21     request for an order that compels compliance with the
22     preliminary injunction that was granted prejudgment and rests
23     in significant part on Article 62.  And there is nothing in the
24     case law that has been cited that suggests that the Koehler
25     case or the Hotel Mezz case overruled the separate entity rule
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
```
♀                                                                    26

115QgucC
```
 1     for purposes of prejudgment attachment.
 2              I would add one other thing:  Plaintiffs actually
 3     cited Article 62 as a basis for the Court's preliminary
 4     injunction order, but they didn't ask for or get an order of
 5     attachment.  They got an injunction.  An injunction is a
 6     different form of provisional remedy.  So I am not sure how the
 7     availability of an attachment, if one had been sought,
 8     justifies the issuance of an injunction.  Certainly, under New
 9     York law preliminary injunction is a separate provisional
10     remedy.  There was no argument that such a remedy under New
                                Page 12
```

115QgucC.txt
```
11  York law was available.
12          THE COURT:  I get that.  But is this in response to
13  Mr. Weigel's suggestion that you guys have sat on your hands
14  for several months after I issued the injunction or I'm not
15  sure I'm following you.
16          MR. HEALY:  Well, I heard that, your Honor.  I haven't
17  seen any case law that says that there's no time limit for
18  seeking relief in a preliminary injunction.  It says it can be
19  brought on by short notice.  It does not say that it has to be
20  brought within a specified period of time.  We searched in
21  response to the argument that was set forth in Mr. Weigel's
22  brief.  We searched for case law that addressed the issue.  The
23  one case we found said that delay is not an impediment to
24  granting that relief to modify.  We don't see any reason why.
25  We had made our position absolutely plain in communications
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    27

115QgucC
```
 1  with Mr. Weigel's office from the outset.
 2          THE COURT:  Look, I don't think a jurisdictional
 3  deficiency can sort of be waived by time here, nor did I find
 4  any authority to suggest that you give up your right to move to
 5  modify or vacate a preliminary injunction by waiting a few
 6  months.  That's a different issue as to whether or not you can
 7  be held in contempt, I think, but the argument you are making
 8  is you can't be held in contempt of an order that the Court
 9  didn't have jurisdiction to issue in the first place.
10          MR. HEALY:  Certainly, your Honor.
11          THE COURT:  I get it.  I'm not sure I agree with it.
12  I'm not sure I agree that I didn't have jurisdiction in the
13  first place, but the argument makes sense to me.
14          MR. HEALY:  Can I turn to the other grounds?
15          THE COURT:  Sure.  Other grounds for?
16          MR. HEALY:  There were three grounds that were cited
17  as authority for issuing the asset freeze order.  We don't
18  think any of them supports the asset freeze order.
19          THE COURT:  Article 62.
20          MR. HEALY:  Article 62, separate entity rule precludes
21  that.  The second is Section 1116(a) of the Lanham Act.  When
22  you look in 1116(a) of the Lanham Act, I think you are
23  hard-pressed to find anything that would suggest that an asset
24  freeze is authorized.  What 1116(a) says is that the Court can
25  issue an injunction to prevent the violation of any right of
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    28

115QgucC
```
 1  the registrant of a mark.  No statement that an asset freeze is
 2  possible.  I think it's not possible to construe that language
 3  to authorize an asset freeze, and, interestingly, none of the
 4  cases, none, that have been cited to the Court to support an
 5  asset freeze in the Lanham Act context rely on the language of
 6  1116(a).  Indeed, the Motorola case which was cited in the
 7  opposition brief points out that 1116 by its terms does not
 8  appear to authorize an asset freeze.
 9          The cases actually go down on a different basis.  They
10  cite 1117, which provides for the recovery of profits.  Without
11  analysis, they say that that conclusion, that that is an
12  equitable claim, and that, therefore, they have inherent
13  equitable power to issue an asset restraint.  We don't think
14  that that stands up to scrutiny.
15          But before we get there, I'd like to talk first about
```
                                Page 13

115QgucC.txt
16    Grupo Mexicano and the statement in the complaint in this case.
17    Grupo Mexicano, of course, says that in an action to recover
18    damages, the Court does not have inherent equitable power to
19    issue a global asset restraint.
20          The complaint in this case asks for a preliminary
21    injunction asset freeze.  It says:  That plaintiffs are seeking
22    an asset freeze to secure their award of damages.  Damages.
23    That's what they say.
24          THE COURT:  Right.
25          MR. HEALY:  Specifically, they ask for an asset freeze
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    29
      115QgucC
1     so that the plaintiff's right to the damages set for in this
2     complaint is not later rendered meaningless.  That relief as
3     they've characterized it in their complaint is barred by Grupo
4     Mexicano.
5           Now, as I said, they now try to bring themselves
6     within the line of cases under the Lanham Act that have said
7     that a claim for profits is an equitable claim which entitles
8     the Court to exercise its equitable power to grant a
9     prejudgment asset restraint.  Those cases contain no analysis,
10    and there is no Second Circuit case that actually has granted
11    that relief.  The Second Circuit case that we cite which is
12    illuminating about what a claim for profits means is the George
13    Basch case.
14          George Basch says that there are three totally
15    distinct rationales for granting profits in a Lanham Act case:
16    One is unjust enrichment, one is as a proxy for damages, and
17    one is to serve the role of deterrence.  And the cases that
18    have actually analyzed Basch and have analyzed the claim have
19    said that at least where the claim for profits is being used as
20    a proxy for damages or deterrence, it is a legal, not an
21    equitable, claim.  OK?
22          THE COURT:  So what would be the difference here
23    between unjust enrichment and --
24          MR. HEALY:  Well, there is no claim for unjust
25    enrichment.  Indeed, the Second Circuit --
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    30
      115QgucC
1           THE COURT:  You mean they have to plead it in order
2     to --
3           MR. HEALY:  I think they'd have to plead it and prove
4     it, your Honor.  The Basch case says that if you can't offer
5     proof that sales were diverted, then you don't have an unjust
6     enrichment claim.
7           If you look at the way they shape their claim, they
8     include a request for profits in a single paragraph with a
9     request for damages.  When they ask for preliminary relief,
10    they say, we want the preliminary relief to secure an award of
11    damages.  That's what they said in their memorandum of law in
12    support of the application for a preliminary injunction.  And
13    explaining why they needed it, they said, well, our experience
14    has been that we'll recover more of our damages if you issue an
15    asset freeze in advance.
16          THE COURT:  But it's not about unjust enrichment
17    though.  You said that they would need to offer proof that
18    sales were diverted.
19          MR. HEALY:  Correct.
20          THE COURT:  Can't that be inferred from the facts
                              Page 14

115QgucC.txt
21    alleged in the complaint?  In other words, these are not bags
22    that were being sold as knockoffs, right?  They were being sold
23    as the authentic article.
24              MR. HEALY:  They may have been sold as the authentic
25    article, but there's no allegation of fact that there were
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    31
♀
      115QgucC
1     sales diversion.  I don't believe there's been any proof that's
2     been offered that suggests that.  There's no characterization
3     of this as unjust enrichment claim.  And, as far as I can tell,
4     there was a vast difference in price between these knockoff
5     articles and what a normal Gucci product or whatever product
6     sells for.  So query whether someone who was prepared to pay
7     $250 for a bag that from Gucci costs a thousand dollars, we are
8     actually diverting sales from Gucci.
9               THE COURT:  That's a compelling argument when it's $5
10    on Canal Street.  That's not a compelling argument when it's
11    hundreds on line with photographs of what could be genuine
12    articles.
13              MR. HEALY:  We don't have it pleaded.  We don't have
14    it proven.  What we really have here is a request for profits
15    that is serving as a proxy for damages.  The cases have said
16    that that is a legal claim.  It is a legal claim that does not
17    support any prejudgment in equitable relief.  The fact that a
18    request for an accounting is added to it does not alter that.
19    Indeed, the Supreme Court said as much in the Dairy Queen case
20    where the plaintiff sued for an award of trademark damages, and
21    the Court said that you need an accounting for those damages is
22    not a request for an equitable remedy and, therefore, it
23    remains a legal claim and a legal remedy, nor does the fact
24    that they may be entitled to an injunction to prevent
25    violations of the Lanham Act support a prejudgment asset
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    32
♀
      115QgucC
1     restraint.  That is made clear by Grupo Mexicano and the
2     DeBeers case cited in Grupo Mexicano with approval.  In that
3     case, the plaintiff sued to enjoin violations of the Sherman
4     Act.  And the lower court granted a prejudgment asset restraint
5     in order to assure compliance with the ultimate injunction.
6               The Supreme Court said, you can't do that because the
7     provisional remedy has to be of the same character as the
8     equitable claim that you're asserting, and a prejudgment asset
9     restraint is not the same character as an injunction to prevent
10    violations.
11              So, for all of those reasons, we don't think that
12    under any of the three grounds that were cited there is
13    authority to have issued the asset restraint.  Now, that is one
14    discrete argument about why the asset restraint should not have
15    issued.
16              A second is the extraterritorial aspect of this.
17    Steel v. Bulova addressed a very narrow circumstance.  Texas
18    resident buys supplies to manufacture knockoff products.  He
19    steps over the border into Mexico, sells the products, and they
20    dribble back across the border into the United States.  The
21    Court said, OK, in that circumstance we think the Lanham Act
22    applies to the defendant's conduct.  Query whether the Morrison
23    case decided this year doesn't overturn that because Morrison
24    said -- Morrison overturns a test applied to the securities
25    laws, the conducts and effects tests.  In effect, what Bulova
                              Page 15

115QgucC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

115QgucC
1  said was that there is an effect here and you can apply it.
2          But even if Morrison doesn't overturn Bulova, Bulova
3  is extremely limited.  There is nothing in the Lanham Act that
4  is a clear indication of an intent to apply that statute
5  extraterritorially.
6          I'd also add -- and, by the way, Morrison is limited
7  to securities law.  The Second Circuit made that clear a couple
8  months ago in the Norex case when it applied the same standard
9  to RICO.
10         THE COURT:  But, clearly, in this case the defendants
11 here are liable under the Lanham Act.  The defendants entered
12 into the stream of commerce of the U.S.  They were online
13 selling in the U.S., right?
14         MR. HEALY:  Your Honor, we take no position on that.
15 We are not arguing on the defendant's behalf that the Lanham
16 Act does not apply to them.  That is not our interest.  But
17 what is sought here is a restraint that is directed explicitly
18 at B of C, Bank of China in China, and I think I've said this
19 before, but if I didn't, there are no accounts at the New York
20 branch.  Any documents found at the New York branch that were
21 responsive to the subpoena have been produced.  So, what we are
22 dealing with here is a request to apply either the Lanham Act
23 or Rule 65 extraterritorially as to a third party, not someone
24 who is engaged in any trademark violations.
25         THE COURT:  Look, I think that an argument can be made
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

115QgucC
1  that post TRO and post injunction the bank is certainly on
2  notice of the infringement.  To the extent the bank is
3  providing continuing services to known infringers, that they
4  are contributorily infringing themselves under the Lanham Act.
5  That's not for today, I suppose, but I think an argument can be
6  made there.
7          MR. HEALY:  I'm sorry, I didn't mean to interrupt.
8          THE COURT:  Go ahead.
9          MR. HEALY:  The Bank of China is not named as a
10 defendant.
11         THE COURT:  I get that.
12         MR. HEALY:  But that is the context of which we are
13 dealing with.  The bank is a third party, and the relief that
14 is sought attempts to regulate the conduct of a third party
15 abroad.  There is nothing in the Lanham Act, there is nothing
16 in the Bulova Watch case, there is nothing in any other case
17 cited that supports that extension of either the Lanham Act on
18 one hand or Rule 65 on the other.
19         Just to take this a step further, the district court
20 case is dealing with extraterritorial application to parties
21 that are cited in plaintiff's opposition memorandum, apply a
22 three-part Second Circuit test:  Citizenship of the party,
23 whether the application of Lanham Act would conflict with
24 foreign law, and effect on the U.S.  Now I am going to come
25 back to this in a minute, but there is no question that a
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

115QgucC
1  freeze order conflicts with Chinese law.  The Bank of China is
Page 16

115QgucC.txt
```
 2   organized under and headquartered in China and is
 3   unquestionably subject to the laws of China.  It is not engaged
 4   in any activity with respect to this matter that has an effect
 5   in the U.S.
 6              THE COURT:  Why do you say that?
 7              MR. HEALY:  Everything that it has done is in China,
 8   so we have a situation here where we are dealing with
 9   extraterritorial application to conduct that takes place solely
10   in China.
11              I wanted to turn your Honor to the First National City
12   Bank case, which is the only case that I believe that is cited
13   where a territorial restraint was issued against a bank tying
14   up accounts abroad.  In First National City, of course, the
15   Court was applying the Internal Revenue code.  The bank in
16   question which was headquartered here is now City Bank, and it
17   was named as a defendant.  The plaintiff sought, that plaintiff
18   being the United States, sought to enforce a lien in assets
19   that were held by City Bank at a Uruguayan wane branch.  The
20   Court specifically found that the headquarters, the head
21   office, had the capacity to direct the manager of the branch to
22   freeze the assets.  It specifically noted that there was no
23   contention that doing so was contrary to the law of Uruguay or
24   would subject the bank to the risk of double liability, and it
25   expressly noted that the district court had said if there were
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    36
♀
115QgucC
```
 1   such a possibility, a protective order would be issued.
 2              Now, there are about six factors in the First National
 3   City Bank case that are different from what is present here.  The
 4   statutory authorization in City Bank was any injunction
 5   necessary or appropriate to enforce the tax laws of the United
 6   States.  We don't have anything in the Lanham Act that is
 7   remotely similar to that.
 8              Two, the Court was enforcing a lien, a traditionally
 9   equitable power in specific property.  We don't have that here.
10              Three, the bank was named as a defendant.
11              Four, in contrast to the head office of City Bank
12   here, which unquestionably had control over the branch, the New
13   York branch doesn't have control over the head office of Bank
14   of China here, and that distinction was recognized by the
15   Second Circuit in the Ings case in the context of discovery
16   where the Court specifically distinguished an earlier First
17   National City Bank case involving a subpoena, and said it's one
18   thing to say that the head office here can direct the branch to
19   do something.  It's quite another to say the local branch, the
20   local office of a foreign bank has the capacity to cause its
21   head office to do something here.
22              And, finally, it is unquestioned that Chinese law
23   prohibits the asset restraint.  There was some debate about
24   this earlier in the papers.  There was a suggestion in the
25   moving papers by the plaintiffs that their expert, Mr. Clark,
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                    37
♀
115QgucC
```
 1   had earlier opined that Chinese law did not actually prohibit
 2   this.
 3              THE COURT:  The freezing of assets.
 4              MR. HEALY:  The freezing of assets.  Mr. Clark has
 5   submitted a declaration.  And although I would say it is
 6   artfully framed, he admits now that Chinese law does prohibit
```
                                Page 17

115QgucC.txt
```
 7    both the disclosure and freezing that is sought here.  He
 8    agrees with Professor Wu whose declaration we submitted.  His
 9    arguments for why that should not apply are now that it's not a
10    strong interest of the Chinese government, and that there is no
11    meaningful risk of liability.
12              On the interest point, I think that Mr. Clark ignores
13    a few things.  First of all, Professor Wu, who was one of the
14    drafters of the Chinese commercial bank law, explains why the
15    comprehensive banking laws that China has adopted are
16    significant.  They are intended to bring Chinese banking law
17    and practice to develop a modern system that is consistent with
18    what is in developed nations; in other words, to help bring an
19    emerging economy, an emerging country in line with what is
20    thought of as first-line bank practice in developed countries.
21              And, two, the confidentiality considerations are
22    intended specifically to coax a historically Agrarian society
23    who had been skeptical of using banks to actually be confident
24    they can place their funds in banks and make use of them.
25    Strong policies.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

⚥                                                                    38

115QgucC
```
 1              Now, in addition to that, Chinese law provides
 2    sanction versus fines, civil liability and criminal penalties
 3    for violating the strictures that are contained there.  The
 4    case law, indeed, the case law that plaintiff's cite recognizes
 5    that the existence of a criminal law provision is a reflection
 6    of a strong governmental policy to assure confidentiality.  We
 7    have that here.
 8              Now, the second argument --
 9              THE COURT:  Are we talking about confidentiality now
10    or are we talking about assets?
11              MR. HEALY:  I think it's -- if you look at the laws,
12    your Honor--
13              THE COURT:  But I have been focused on assets.
14              MR. HEALY:  You're quite right.  The laws are
15    intertwined, your Honor.
16              THE COURT:  I want to get the other in a minute.  Less
17    than a minute perhaps.
18              MR. WEIGEL:  Would your Honor like me to address the
19    asset point?
20              THE COURT:  No.  I'm going to go back and look at some
21    of these things, so I'm going to reserve with respect to the
22    assets today.  But I want to get to the documents very quickly.
23              MR. HEALY:  Your Honor, I apologize for being wordy,
24    but I --
25              THE COURT:  You don't have to apologize.  It's just
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

⚥                                                                    39

115QgucC
```
 1    that today is a jam-packed day for me.
 2              MR. HEALY:  Let me move on to one other point on the
 3    asset freeze, or two other points.
 4              A lot of reliance is placed on the myreplicahandbag
 5    case and the argument that the Bank of China behaved in that
 6    case in some way that is inconsistent --
 7              THE COURT:  It's a Judge Koeltl case?  Yes, your
 8    Honor.  First of all, there is an argument that is made by
 9    Mr. Clark that there was no consent.  There is no question that
10    there was a consent.  Indeed, Gucci repeatedly said in
11    correspondence to the Bank of China and in statements to the
```
Page 18

115QgucC.txt
12    Court that the customer had consent.  The question was really
13    whether that consent was in an appropriate form that the bank
14    could rely on.  In other words, whether it satisfied Chinese
15    law for an appropriate customer consent.  But there was a
16    consent.  There was no consent of any form whatsoever here.
17              Two, the fact that the bank wasn't prosecuted for
18    freezing assets is a point that is very weak under the
19    circumstances because the bank did not impose a permanent
20    freeze.  It froze initially as an internal matter, and as set
21    forth in the memorandum that the plaintiffs put in in
22    opposition, the bank eventually released those funds because of
23    concerns about whether it could do so lawfully.  So we don't
24    have a situation where the bank in a prior action imposed an
25    unlimited restraint and suffered no consequence.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                40
      115QgucC
1               I guess there is one other point that I would like to
2     make because I think it is telling here.  There is no case that
3     is cited, none, by the plaintiffs where a Court has sustained
4     an asset freeze directed at a third party that requires that
5     third party to act in contravention of the law of its home
6     jurisdiction in its home jurisdiction.  Not one case.  The
7     relief that is sought is extraordinary relief.  There are no
8     grounds that have been cited that would support it
9               THE COURT:  Ever?  You mean -- you're talking in the
10    asset-freeze situation.
11              MR. HEALY:  An asset freeze.  I admit, your Honor,
12    that there is a body of law in the discovery area where the
13    courts have gone both ways; but as to the asset restraint,
14    there is nothing.  And you know the basic rule of the Courts as
15    cited in the restatement is that as a general matter, the Court
16    does not require a party to take action in a foreign
17    jurisdiction, particularly its home jurisdiction, that
18    contravenes the law of its home jurisdiction, and that policy
19    should be applied here on the asset restraint issue.
20              THE COURT:  I'm going to reserve on the asset freeze.
21    I want to talk about the documents.
22              MR. WEIGEL:  Your Honor, may I have just two minutes
23    on the asset freeze?
24              THE COURT:  One minute on the asset freeze.
25              MR. WEIGEL:  One minute.  First off, your Honor, the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                41
      115QgucC
1     Koehler case was service on a branch.  The Bank of Bermuda in
2     that case did concede that it had personal jurisdiction.  The
3     Bank of China does not come in here and argue that it's not
4     subject to this Court's personal jurisdiction.  Indeed, it is
5     not only doing business here, but it has filed actions in this
6     court.
7               THE COURT:  They noticed me about that.
8               MR. WEIGEL:  The Grupo Mexicano case does not apply
9     here because it dealt with a situation where it was a loan and
10    it was trying to get unrelated assets.  1116 of the Lanham Act
11    is very similar to the statute that the Supreme Court found in
12    the First National City case authorized the issuance of an
13    injunction under federal law to restrain a bank account in
14    Uruguay and, indeed, what 1116 of the Lanham Act says is the
15    court has the broad authority to grant injunctions according to
16    the principles of equity and upon such terms as the Court may
                            Page 19

115QgucC.txt
17  deem reasonable to prevent the violation of any right of the
18  registrant of the mark.  Of those rights is the right to
19  profits that the infringer earned by selling goods with our
20  marks on them.  It's an equitable right.  We pled it.
21  Mr. Healy selectively chose from our complaint, but we have
22  pled an equitable right to profits.  We are restraining here.
23  Mr. Healy would gut the trademark laws.  There are numerous
24  cases.  Judge Swain just did it in a case cited in our brief,
25  the Balenciaga case where court after court after court has
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            42
♀
     115QgucC
1   held that the equitable powers of this court N1116 of the
2   Lanham Act authorized restraint, a prejudgment restraint of
3   assets.  In fact, the Ninth Circuit went so far in the Reebok
4   case to hold it was an abuse of discretion not to do that.
5           We are not trying to freeze random accounts that these
6   people might have, your Honor.  We are trying to freeze -- we
7   gave them specific account numbers that the proceeds of the
8   counterfeit sales took place in the United States were gotten
9   to, and if you've adopted their view, which was rejected by the
10  Supreme Court in the Bulova case, that the trademark laws
11  somehow stop at our borders and if you ship the goods from
12  China and get your money back to China, then the U.S. has no
13  power over you, that is just simply not true.
14          THE COURT:  OK.
15          MR. WEIGEL:  The bank is here.
16          THE COURT:  I get that.
17          MR. WEIGEL:  And Mr. Healy did not even come in and
18  argue that the bank is not subject to the Court's personal
19  jurisdiction.  So the Koehler case just dealt with that
20  completely, your Honor.
21          THE COURT:  Well, under Article 52.  I don't think
22  it's a good case for you under Article -- for prejudgment
23  attachment.
24          MR. WEIGEL:  I would ask the Court if you had a minute
25  to read professor --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            43
♀
     115QgucC
1           THE COURT:  I'm going to, look, believe me.  I read
2   all the stuff.  I hadn't focused on the Hotel 71 case because
3   it's not a bank case.  Koehler sure as hell is a bank case, and
4   the language with respect to Article 62 I think is pretty
5   explicit.  So if you're suggesting to me that a non-bank case
6   overrules Koehler with respect to Article 62 --
7           MR. WEIGEL:  No, it doesn't, your Honor.
8           THE COURT:  I think -- I will read it, but I'd be
9   surprised.
10          MR. WEIGEL:  I would just ask your Honor, what Koehler
11  says about Article 62 is focused on prejudgment attachments for
12  purposes of obtaining jurisdiction over the defendant.  That's
13  the distinction that Hotel 71 said.
14          THE COURT:  I disagree with that characterization.
15  Anyway, let's move on.  I want to talk about the request to
16  produce documents, which is distinct from the asset freeze.
17  Here there is a more developed body of case law that basically
18  has the Court apply a five-part test from the restatement and
19  then a couple of additional factors that the Circuit has
20  blessed.
21          I don't think there is really much dispute about those
                        Page 20

115QgucC.txt
22  factors.  I will list them, and you can tell me if you
23  disagree.
24          They are the importance of the documents or
25  information requested to litigation; the degree of specificity
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                44
♀

115QgucC
1   of the request; whether the information originated in the
2   United States; the availability of alternative means of
3   retrieving the information; the extent to which noncompliance
4   with the request would undermine important interests of the
5   United States or compliance with the request would undermine
6   interest of the state where the information is located.
7           Then the additional factors are:  The hardship of
8   compliance on the party or witness from whom discovery is
9   sought, and then the good faith of the party resisting
10  discovery.
11          Everybody agrees that's the line-up of factors?
12          MR. WEIGEL:  Yes, your Honor.
13          THE COURT:  Mr. Healy, do you agree, do you agree that
14  those are the factors I am to be weighing?
15          MR. HEALY:  Yes, your Honor.
16          THE COURT:  And there's authority, Second Circuit
17  authority, and obviously district courts that have come out one
18  way or the other in similar cases like this one based on their
19  assessment of these factors and applying those to the facts of
20  the case, right?
21          MR. WEIGEL:  Yes, your Honor.
22          THE COURT:  So, I just want to go through these.  It
23  seems to me the importance of the documents or information
24  requested to the litigation here is obvious, and it's very
25  important.  I mean, certainly pretty tough to enforce Lanham
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                45
♀

115QgucC
1   Act and to bring culpable defendants, not just civilly
2   culpable, criminally culpable defendants, to justice when you
3   can't get access to the information that is proof of their
4   infringement and enables you to locate the assets that were
5   derived from the infringement.  So that favors the plaintiff.
6           MR. HEALY:  Your Honor, I don't mean to interrupt you
7   or Mr. Weigel.  Do you want comments at the end or --
8           THE COURT:  At the end.  Let me run through them
9   quickly.  I will tell you where I basically come out on these,
10  and you could tell me where I've missed something.
11          The degree of specificity of the request.  I think
12  it's a pretty straightforward request.  Not surprising to me
13  and doesn't seem to be very difficult to comply with.  It's not
14  a fishing expedition.  It's not terribly onerous in terms of
15  massive amounts of electronic discovery.  I think that favors
16  the plaintiffs as well.
17          The next factor, whether the information originated in
18  the United States.  It clearly did not.  I don't think there is
19  any dispute about that, is there, Mr. Weigel?  Or only in the
20  most tangential sense, but this is a foreign defendant doing
21  business with a Chinese bank, documents that presumably reflect
22  information about those defendants that was provided in China
23  or someplace from outside the United States, right?
24          MR. WEIGEL:  That is certainly some of what we're
25  requesting, but we are also requesting the records of the wire
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           Page 21

115QgucC.txt
(212) 805-0300

46

♀

115QgucC
1  transfers that originated in the United States.  This is money
2  in the most basic sense.  Money was wired both according to
3  Mr. Lijun Xu, whose counsel said in a letter that these are the
4  account they wired the money into, and the Chase Bank accounts,
5  money was wired into those accounts from the U.S. and we want
6  those records.
7         THE COURT:  I think this one, even with that caveat,
8  clearly favors the defendants.
9         The availability of alternative means of retrieving
10  the information.  I'm not aware really of any alternative means
11  other than the Hague Convention, which I want to talk about
12  because there is some dispute as to whether the Hague
13  Convention is merely slow, cumbersome and frustrating, or
14  whether it is utterly futile and, therefore, not even worth the
15  price of admission.  So I want to come back to that.
16         The fifth factor, the extent to which noncompliance
17  with the request to undermine important interests of the United
18  States.  I think clearly noncompliance does undermine important
19  interest of the United States.  The United States has a long
20  and, I think, proud history of respecting and protecting the
21  intellectual property rights of the parties, and that is what
22  has led to people to create a lot of great things that
23  ultimately enhance the quality of life of this society and also
24  ultimately lead to much greater value being brought to a
25  society.  So I think there's considerable U.S. interests here .
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

47

♀

115QgucC
1         The flip side, of course, is whether compliance with
2  the requests would undermine the important interests of the
3  state or where the information is located.  Mr. Healy
4  referenced a couple of those in his prior statements,
5  particularly, the fact that confidentiality is an important
6  tool to, I guess, bring the Chinese banking system into the
7  21st Century from what was a more Agrarian society, and that if
8  people doing business in Chinese banks feel like their
9  confidentiality won't be maintained, maybe they'll, I don't
10  know, put it under their mattress or something.  I think there
11  are other interests as well Mr. Healy hasn't talked about.  Not
12  everybody in the world wants to usher in US-style discovery.  I
13  can't say that that's irrational, frankly, and so I think that
14  we generally respect other countries' rights to set up their
15  own rules of discovery and their own rules of making
16  information available to parties in litigation.
17         So I think that is probably a wash.  Maybe it tips
18  slightly in favor of plaintiffs here because I think the U.S.
19  interests of intellectual property is very considerable and,
20  frankly, is under assault from a lot of different quarters
21  these days.
22         The next factor hardship of compliance on the party or
23  witness from whom discovery is sought.  There have certainly
24  been allegations that would be a violation of Chinese law and
25  that Chinese law would be enforced.  There are other
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

48

♀

115QgucC
1  allegations that perhaps Chinese law would not be enforced
2  against the bank that is, in essence, an arm of the state and
                        Page 22

115QgucC.txt
```
 3  therefore if they have to do it, then nobody is going to get
 4  too worked up over it.  That's hard to assess, frankly, at this
 5  point.  I don't think there is a lot of data from which to draw
 6  firm conclusions.  I think that's a factor that weighs in favor
 7  of the defendants.
 8           The last one is the good faith of the party resisting
 9  discovery.  I don't think there is any allegation that the Bank
10  of China is acting in bad faith; that they are complicit in the
11  infringements in a way that could be arguably a basis for
12  charging them or naming them as a contributory infringer.  I
13  can imagine scenarios where that might be the case but at least
14  at this point I don't think that's been alleged.  So I think
15  that factor weighs in favor of the defendants.
16           That is my initial assessment.  Anybody think I've
17  missed something or want to elaborate on any of those points,
18  mindful of the time and the guy in the back of the room who I'm
19  supposed to have lunch with.
20           MR. WEIGEL:  Yes, your Honor.  I'll try to be quick.
21  On the competing interest point, courts have found that when it
22  is a privilege to be waived by the -- in this case the
23  defendant, the judgment debtor at this point, but when the bank
24  secrecy is a privilege that can be waived by the individual,
25  that it is not as important as, for example, in Switzerland
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                                49
115QgucC
```
 1  where it's not waivable, so that that weighs -- that changes
 2  the characterization because this is a privilege that the Bank
 3  of China clearly has acknowledged can be waived.
 4           THE COURT:  That goes to the fifth and sixth factors,
 5  I guess.
 6           MR. WEIGEL:  Yes.  And also, your Honor, we have a
 7  situation here where the -- let me go to availability of
 8  alternative means which is the other point your Honor was
 9  making.
10           THE COURT:  The Hague Convention.
11           MR. WEIGEL:  Yes.
12           THE COURT:  It may be something else too, but I really
13  think it is the Hague Convention.
14           MR. WEIGEL:  It really is the Hague Convention, your
15  Honor.
16           THE COURT:  What's your beef with the Hague
17  Convention; that it's slow or that it's going to -- we could
18  wait six months or a year for the Hague Convention, and we will
19  be no different than we are now because China is not going to
20  make its banks give up the information?
21           MR. WEIGEL:  Exactly right, your Honor.  This bank is
22  doing business in New York.  It's chosen to do business in New
23  York.
24           THE COURT:  There's no dispute about that.
25           MR. WEIGEL:  Right.  And we didn't have an opportunity
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                                50
115QgucC
```
 1  to choose who would counterfeit with us, or who would
 2  counterfeit our products.  But they did have an opportunity not
 3  to do business with somebody who was counterfeiting.  Between
 4  the two of us, which one of us needs to suffer the hardship,
 5  they should suffer it.  They have the client relationship with
 6  this individual.
 7           THE COURT:  Let me stop you.  You are not suggesting
```
                           Page 23

115QgucC.txt
```
 8    that there are documents in New York or there are documents
 9    accessible from a work station in New York that the defendants
10    are refusing to turn over, are you?
11              MR. WEIGEL:  Your Honor, all I know is that they've
12    made this argument in the past and they came into this
13    courtroom and they did turn over documents.  They told Judge
14    Koeltl they were going to turn them over, and they did turn
15    them over.  So, the folks in New York do have some control over
16    it because it is the same bank.
17              THE COURT:  I'm presuming word went to the folks in
18    China, and they decided to give up information in China.  If
19    there are documents in New York, there is no basis to withhold
20    those, right, just because the Bank of China has its main
21    office in China.
22              MR. WEIGEL:  No, absolutely not, your Honor.  We are
23    not arguing that.
24              THE COURT:  Fine.  So the next step is if there are
25    bank documents, because clearly it is just documents that are
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    51
115QgucC
```
 1    housed on servers someplace, but those servers are accessible
 2    to people in New York, it would seem to me that those are
 3    subject to discovery in New York pursuant to a subpoena in New
 4    York.
 5              MR. WEIGEL:  Right.
 6              THE COURT:  You would agree with that.
 7              Mr. Healy, you would agree with that too?
 8              MR. HEALY:  No, I wouldn't, your Honor.
 9              THE COURT:  You wouldn't.
10              MR. HEALY:  No, I wouldn't.
11              THE COURT:  So, let me ask you a factual question.
12    Are there documents responsive to this subpoena that have not
13    been produced that are readily accessible from work stations
14    here in New York?
15              MR. HEALY:  Your Honor, I can answer it this way:
16    Whatever we found at the Bank of New York was produced, we
17    submitted an affidavit, or declaration, pardon me, from the
18    gentleman who was responsible for internal control at the
19    branch indicating that they do not have access to records,
20    they're not plugged in to the computer systems in China, they
21    don't have access to the information.  So the answer is there
22    is nothing, as far as I'm aware that is available here in New
23    York, directly or indirectly, that has not been produced that
24    is responsive to the subpoena.
25              THE COURT:  OK.  So that's good.  So you may have a
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
                                                                    52
115QgucC
```
 1    legal quibble with what I just said, but we don't need to
 2    resolve that because there are no documents in New York or
 3    accessible to New York that haven't been produced based on the
 4    representation made to you?
 5              MR. HEALY:  That is my understanding, your Honor.
 6              THE COURT:  OK.  Mr. Weigel, you had another point?
 7              MR. WEIGEL:  The state department has said, your
 8    Honor, that while it is possible to do this, such requests have
 9    not been particularly successful in the past.  Requests may
10    take more than a year to execute, and it is not unusual for no
11    reply to be received.
12              That is the state department, which is fairly
```
                              Page 24

115QgucC.txt
13    diplomatic.  Professor Clark in his affidavit says it a little
14    more clearly, but --
15                THE COURT:  All right.  I just want to make sure I was
16    understanding your argument, and I think I do.
17           OK.  I want to hear from Mr. Healy now with respect to
18    any of these.  Real quick, Mr. Healy.
19                MR. HEALY:  I can work in reverse order.  Mr. Clark
20    cites a blog for the proposition that the Hague Convention is
21    not readily accessible.  The only thing the blog cites is the
22    state department circular that Mr. Weigel has referred to.
23                THE COURT:  Let me ask you a question.  If I make
24    Mr. Weigel go through the hoops of the Hague Convention, are
25    you telling me that China, a court in China will ultimately
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    53

115QgucC
 1    issue an order to the Bank of China, and the Bank of China will
 2    turn over the responsive documents, and they will be produced?
 3                MR. HEALY:  Your Honor, I am not -- I don't speak on
 4    behalf of the Chinese courts or the Chinese government, and I'm
 5    not in a position --
 6                THE COURT:  Is your expert suggesting that that is the
 7    way it works and that is the practice?
 8                MR. HEALY:  That is why we submitted an expert
 9    declaration, your Honor, because I am not a representative of
10    the Chinese government.
11                THE COURT:  I understand that, but I didn't think he
12    went so far as to say that.  It seems to me there was very
13    little track record from which to make a determination -- for
14    me to make a determination as to whether the Hague Convention
15    is an inconvenience but it is a treaty, and it is a convention
16    that the parties -- that countries involved have signed on to,
17    and if it's cumbersome, that is kind of life, or whether it's
18    just utterly futile, and, therefore, there is no point in
19    making somebody jump through the hoops.
20                MR. HEALY:  Your Honor, the answer is that I don't
21    have any reason to believe it is futile.  We quoted or
22    Professor Wu quoted in his declaration the relevant provisions
23    that implement the Hague Convention -- that call for
24    implementation of the Hague Convention.  The state department
25    circular, I would point out, is totally out of date.  The last
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                    54

115QgucC
 1    information -- it says that in 1998, China signed on to the
 2    Hague Convention, and the state department was going to get --
 3                THE COURT:  I've seen that, so I don't think I need to
 4    hear more about it, and certainly there are cases where
 5    parities have been ordered to produce documents notwithstanding
 6    the fact that a country has signed on to the Hague Convention.
 7                MR. HEALY:  That's true, but in the First American
 8    case, which is the lead Second Circuit case that the plaintiff
 9    cited, in that case which involved England, a letter request
10    had previously been submitted and rejected by the English
11    authorities, and it was on that basis that the Court concluded
12    that another attempt under the Hague Convention was not
13    warranted.  We don't have that here.
14           Just briefly, your Honor, two points.  On the
15    necessity, we believe the only necessity that has been
16    articulated by the plaintiffs really goes to the question of
17    judgment enforcement, and we've cited cases for the proposition
                              Page 25

115QgucC.txt
```
18   which I think is well-established that prejudgment you don't
19   get discovery that relates to judgment enforcement; that your
20   interest --
21            THE COURT:  Why is it judgment enforcement?  It's also
22   about establishing liability.  Now there is a judgment entered,
23   so I guess liability is sort of moot at this point, but at the
24   time, I mean, the plaintiffs were seeking to get documents and
25   information that would enable them to support the case they
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                              55
```
     115QgucC
 1   brought against these infringing defendants.
 2            MR. HEALY:  I don't think there has been any
 3   articulation as to why the information as to what is in the
 4   account, if there is a --
 5            THE COURT:  The amount of money that's flowing into
 6   their account is not relevant to establishing liability under
 7   the Lanham Act?  That's a stretch.
 8            MR. HEALY:  Well, plaintiff obtained information here
 9   which is attached to their papers which shows money flowing
10   into the account.
11            THE COURT:  Well, the amount of money is relevant
12   though, right?
13            MR. HEALY:  I don't think so, with the -- they've
14   sought statutory --
15            THE COURT:  OK.  Next point.
16            MR. HEALY:  I guess the final point I would make, your
17   Honor, is that -- it is twofold.  First of all, there's a
18   reliance on myreplicahandbag.  I don't want to make too big a
19   deal about this, but there is a disclosure in their papers
20   which is in violation of a confidential settlement agreement.
21   I have a redacted version of the side letter that is referenced
22   that I brought with me.  I've asked for permission to hand it
23   up.
24            It states explicitly that the terms of the side letter
25   can only be disclosed to enforce the rights in the earlier
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```
                                                              56
```
     115QgucC
 1   action.  It is totally inappropriate for there to be any
 2   reference to that in these papers.  We ask that the Court
 3   disregard any such reference.
 4            Secondly, what they're talking about is evidence of a
 5   settlement, they're offering it basically as an admission
 6   against interest here.  The Playboy v. Chuckleberry case from
 7   the Second Circuit that we cited precludes that use.  One other
 8   point, your Honor.
 9            THE COURT:  My favorite name for a case.
10            MR. HEALY:  Rule 45 says if you're going to enter an
11   order compelling compliance with a subpoena, that the Court
12   must make provision to avoid significant expense of the party.
13            We would request that -- and both on the asset
14   restraint side and on the discovery side -- that if the Court
15   decides to enter an order compelling compliance, that the Court
16   provision that on an indemnity obligation from the plaintiffs
17   that if the bank is subjected to expense or liability in China,
18   that they are responsible for that expense.  We think that is
19   required by Rule 45.  We think it is consistent with the
20   relevant rules that would apply in the context of an asset
21   freeze.
22            THE COURT:  Nobody has, I think, briefed that, or did
                          Page 26
```

115QgucC.txt
```
23    I miss it?
24              MR. HEALY:  We asked for it in our --
25              THE COURT:  You asked for it, but --
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                              57
♀
115QgucC
```
 1              MR. HEALY:  We cited Rule 45.  We asked for the
 2    relief, and it hasn't been disputed.
 3              THE COURT:  All right.  I'm going to reserve on the
 4    assets -- I guess I'm reserving on everything, but I think I am
 5    likely to grant the request to produce documents.  I think in
 6    balance of factors here weigh in favor of the plaintiffs.  I
 7    guess I want to consider the last point you made about Rule 45.
 8              Then if the parties want to make some additional
 9    briefing with respect to Koehler, Hotel 71, and the application
10    of the separate entity doctrine over Article 52 postjudgment
11    proceedings, I'll allow it.  I'm not requiring it, but you had
12    suggested you wanted an opportunity to do that, Mr. Healy,
13    right?
14              MR. HEALY:  Well, your Honor, in the New York State
15    practice, that issue would be teed up by an application for a
16    turnover order that would be on notice to us, and we would have
17    an opportunity to answer and contravene.  I haven't seen the
18    judgment that your Honor is about to sign, but it sounds like
19    that short-circuits the whole process, and we are going to be
20    served with a judgment that directs us to turn over without
21    having had any opportunity to contest that, and it seems --
22              THE COURT:  Well, the judgment is likely to contain a
23    provision that references Article 52 as a basis for awarding
24    the judgment in favor of the plaintiffs and sort of setting out
25    a way that they can get the judgment honored.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                              58
♀
115QgucC
```
 1              MR. HEALY:  Well, if they are going to bring a motion
 2    for a turnover order, we will brief that in the context of
 3    request for a turnover order.  If the Court -- I'm not quite --
 4    I haven't seen the proposed judgment, so I'm a little at sea
 5    here, but --
 6              THE COURT:  Take a look -- Mr. Weigel can show you a
 7    copy of it.  I may tweak it a bit, but not before your taking a
 8    look at it and letting me know whether you are suggesting that
 9    the granting of that order would negate you or your client's
10    ability to challenge under Article 52.
11              MR. HEALY:  I think the Article 52 is quite clear that
12    once the judgment has been entered, a further step is required
13    to enforce it, and in this particular context, it's an
14    application for a turnover order.
15              THE COURT:  It might be consistent with -- well, it
16    might be just a matter of adding some language that references
17    Article 52.
18              MR. HEALY:  In any event, we would normally be given
19    notice and opportunity as a third party to oppose that.
20              THE COURT:  Right, but I'm giving you notice now.  You
21    know what I am planning to do, so you're arguing that Article
22    52 or Koehler as it pertains to Article 52, is irrelevant
23    because it is separate doctrine -- a separate entity doctrine
24    that renders it applicable only to non-banks.
25              MR. HEALY:  Can we set up a briefing schedule to
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                           Page 27
```

115QgucC.txt
                                                                    59
115QgucC
 1   address those issues?
 2           THE COURT:  Yes, let's do that.  How much time do you
 3   think you need?
 4           MR. HEALY:  Yes, I'm not sure what order would you
 5   like us to go in, your Honor.  We would certainly be in a
 6   position to put in a brief in two weeks.
 7           THE COURT:  OK.  Let's do that.  Two weeks.  I think
 8   -- you have heard where I am going on this, so I think you
 9   should go first probably.  Mr. Weigel, if you want to add
10   something, you can do it two weeks later.
11           MR. WEIGEL:  Perfect, your Honor.
12           THE COURT:  I'm not requiring it.  I'm just saying it
13   might be helpful, and if you want to do it, I'll allow you to
14   do it.
15           MR. WEIGEL:  Thank you.  The only concern I have, your
16   Honor, is that having issued the judgment, and I'm not entirely
17   sure -- I would like to make sure that the status quo doesn't
18   change while we're briefing this.
19           THE COURT:  Status quo?
20           MR. WEIGEL:  In other words, that the account is not
21   drained because having issued a judgment, your Honor, I'm not
22   sure the preliminary injunction remains in force, and the
23   judgment requires them to turn over the assets.  If we're
24   briefing this whole issue, you know, can Mr. Healy represent
25   that his client --
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    60
115QgucC
 1           THE COURT:  Well, until I issue the default judgment,
 2   the preliminary injunction is still in effect, right?
 3           MR. WEIGEL:  Yes, your Honor.
 4           THE COURT:  So, does that satisfy your concern?
 5           MR. WEIGEL:  Yes, your Honor, it does.
 6           And if I just may say just half a second on the
 7   agreement that I had, the settlement.  The settlement does
 8   provide that it could be disclosed for purposes of enforcing
 9   the settlement.  Unfortunately, we were forced to enforce it.
10   The settlement is actually filed on the public record in that
11   case, and counsel for the Bank of China in that case had made
12   no effort and, indeed, had no right to somehow seal that
13   record.  It's a public document at this point because they
14   failed to honor it and forced us to make the motion.
15           But we are not introducing it for purposes of saying
16   that -- of establishing their negligence or something like
17   that.  We are doing it for the point of saying that they
18   produced the documents, and they've never come in here and
19   claimed that they in any way suffered any injury.
20           THE COURT:  I understand why you're doing it.  Whether
21   it's in violation of or consistent with a confidentiality
22   provision, I don't know.  So I will look at that.
23           MR. WEIGEL:  Thank you.
24           THE COURT:  All right.  Thanks.
25           MR. HEALY:  Would you like us to hand up the redacted
                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                    61
115QgucC
 1   side letter so you have the provision in front of you?
 2           THE COURT:  You can send it to me with your papers in
 3   two weeks.  I will issue a short order that just memorializes
                                 Page 28

115QgucC.txt

```
 4   the schedule I set forth.  Let me thank you for the effort that
 5   went into this.  It's a very fascinating question, and I
 6   appreciate the lawyering that went into it by each of you and
 7   by those who work with you.
 8               MR. HEALY:  May I ask one question, are you going to
 9   withhold entering the judgment until we brief this issue?
10               THE COURT:  I will either withhold entering the
11   judgment because I don't know if it's going to make a
12   difference.  Mr. Weigel, is it going to make a difference at
13   this point?  The bank in China is the only game in town at this
14   point, right?
15               MR. WEIGEL:  The Bank of China is the only source we
16   know of right now of any funds.
17               THE COURT:  So I could wait or I could tweak the
18   language in such a way that it doesn't foreclose the relief you
19   think you are entitled to under Rule 52 so that it sort of
20   leaves that as an open issue, something like "consistent with
21   the rights of garnishees under Article 52 of New York CPLR."  I
22   think that might solve the problem and still allow me to issue
23   the judgment.
24               MR. WEIGEL:  My only concern, which I think Mr. Healy
25   can fix, is that there be some change in status of the account.
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    62

115QgucC
```
 1   And I certainly don't expect him to turn over the money to me
 2   until your Honor rules, but I don't want him to let the money
 3   go either.
 4               THE COURT:  Right.  But you think that that
 5   possibility is enhanced by the issuance of the default judgment
 6   or you're just generally concerned about this change in status
 7   quo?
 8               MR. WEIGEL:  I am generally concerned about the status
 9   quo, and if your Honor is going to tinker with the default
10   judgment to be careful that it doesn't in some way -- because I
11   believe it was designed to require them to turn the money over
12   now that the case was over.
13               THE COURT:  Well, I mean, it would do that.  If the
14   new language had said "consistent with Article 52" and it
15   allowed for them to make a motion as a garnishee is entitled to
16   under Article 52, right, to say -- really, it's an issue as to
17   who is the real owner.  Isn't that the whole point of Article
18   52?
19               MR. HEALY:  I think Article 52 serves two purposes.
20   It certainly gives the third party the opportunity to object
21   either on the grounds that it is the actual owner of the
22   property or on other grounds, and certainly we have other
23   grounds to object here, which is it violates Chinese law and it
24   subjects us to liability --
25               THE COURT:  The question is while we're talking about
                   SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

                                                                    63

115QgucC
```
 1   that and briefing that, if the defendants are to stroll in and
 2   say "I'd like to make a withdrawal," is your client going to
 3   say, "You bet"?
 4               MR. HEALY:  Your Honor, I have no instruction on that
 5   point.  We obviously take the position that the preliminary
 6   injunction lacked authority.
 7               THE COURT:  So, whether there is a preliminary
 8   injunction in place or not in place, your advice would not be
```
                               Page 29

115QgucC.txt
```
 9    any different to your client?
10             MR. HEALY:  To be honest, I don't think it's
11    appropriate --
12             THE COURT:  It's a risky move, but that's your
13    position.
14             MR. HEALY:  I don't think it's appropriate for me to
15    talk about what advice I will or will not give the client.
16             THE COURT:  That's true.
17             MR. HEALY:  All I am saying is that I don't have an
18    instruction from my client that addresses the question that you
19    just posed.
20             THE COURT:  Mr. Weigel, if you want me to wait because
21    you feel more comfortable having the preliminary injunction in
22    place, I'm happy to do that.  If there is some downside to
23    waiting because you think you can do something with the
24    judgment now, and waiting two weeks or four weeks is going to
25    be an impediment, then it makes sense to figure out whether
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    64
♀
115QgucC
```
 1    there is language that can be crafted for inclusion in the
 2    judgment that will provide the same protection that you think
 3    you have under the preliminary injunction.  I think I can order
 4    contempt under either, can't I?
 5             MR. HEALY:  I think you can do under either, and I
 6    think I would be comfortable with your Honor crafting language
 7    that required them to turn it over.
 8             THE COURT:  What I may do then is craft some language
 9    and send it to the parties and give you an opportunity just to
10    opine before I pull the trigger.
11             MR. HEALY:  My request, your Honor, would be that we
12    brief the issue and that the judgment not be signed until we've
13    done that because I think that would be consistent with the New
14    York practice.
15             THE COURT:  I get that, but I will send something
16    before I issue an order, in any event.  Great.  Thanks a lot.
17    Thank the court reporter too.
18             (Adjourned)
19
20
21
22
23
24
25
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

♀