Robert L. Weigel
Howard S. Hogan
Anne M. Coyle
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                  :

GUCCI AMERICA, INC., BALENCIAGA      :
AMERICA INC., BALENCIAGA S.A., BOTTEGA  :
VENETA INTERNATIONAL S.A.R.L.,     :
BOTTEGA VENETA INC., LUXURY GOODS   :
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT  :
LAURENT AMERICA, INC.        :
                                  :

                     Plaintiffs,    :

-against-                     :

                                  :   2010 Civ. 4974 (RJS)

WEIXING LI a/k/a XIN LI, LIJUN XU a/k/a JACK  :
LONDON and TING XU a/k/a JACK LONDON   :   **THIRD DECLARATION**
a/k/a XU TING a/k/a REBECCA XU, WENYING  :   **OF DONALD CLARKE**
GUO, XIAOCHAO SHANG, LEI XU, FENGYUAN  :
ZHAO, LIQUN ZHAO, MING ZHAO, and   :
PEIYUAN ZHAO, all doing business as    :
REDTAGPARTY, MYLUXURYBAGS.COM,   :
KUELALA.COM, XPRESSDESIGNERS.COM,   :
XPRESSDESIGNER.NET, and DESIGNER    :
HANDBAGS; ABC COMPANIES;     :
and JOHN DOES,               :
                                  :

                    Defendants.   :

-------------------------------------------------------------------- X

I, DONALD CLARKE, declare as follows:

1. I was asked to provide a response to the Declaration of Yuqing Zhang submitted by the Bank of China ("BOC") in the above-captioned action.

2. My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, my personal experience and familiarity with the Chinese legal system and courts, and the documents cited herein. In addition to the documents described in my Declaration dated December 1, 2014, I have reviewed the Declaration of Yuqing Zhang (the "Zhang Declaration") and exhibits thereto, as well as the Civil Judgment of the People's Court of Chaoyang District, Beijing Municipality, (2014) Chao Min Chu Zi No. 25377 ("Chaoyang Judgment"), a copy of which was provided by counsel for BOC and attached hereto, together with a certified translation, as Exhibits 1-2.

3. Where appropriate, I have also conducted independent research and have cited the relevant sources in the text of my declaration.

4. The conclusions set forth in my prior declarations remain the same: (1) I continue to believe that there is no state policy affording a high degree of protection to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information; and (2) I maintain the position that BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case.

**BOC'S FAILURE TO SHOW ANY MEANINGFUL RISK OF SANCTIONS**

5. The Zhang Declaration cites a number of Chinese court decisions he contends show that "Chinese courts do impose liability on banks for breaches of their duty to keep customers' account information confidential and to refrain from freezing customer accounts." Zhang Declaration ¶¶ 25-29. None of the cases cited show a Chinese bank or its executives suffering

criminal sanctions for doing what is being asked of BOC in this case. While I agree with the Zhang Declaration's statement that not all relevant cases may be published due to unsystematic reporting of cases in China, the fact is that BOC, with every incentive and years of time to find a case imposing criminal liability on a bank or its executives under similar circumstances, has failed to do so. No criminal liability has been imposed on BOC even though BOC froze certain defendants' accounts and produced partial banking records to Plaintiffs in this action.

6.   There is no assertion that the Chinese government has imposed any penalties on BOC—criminal or civil—in connection with its production of the defendants' bank account records. Indeed, although the Zhang Declaration states that the 2011 letter from the Chinese banking regulators "indicates that PBOC and CBRC will not hesitate to impose liability on a Chinese bank simply because that bank is partially owned by another governmental entity," (Zhang Declaration ¶ 39), the letter indicated only that BOC had received a warning and stated that the two authorities were in the process of evaluating the matter and determining sanctions (it made no mention of ownership issues). Today, *more than three years later*, the BOC has not asserted that any sanctions have been imposed.

**CHINESE GOVERNMENTAL CONTROL OF BOC**

7.   Although the Zhang Declaration contends that BOC operates "independently" from the Chinese government and that ownership of BOC's majority shareholder Central Huijin Investment Company ("Huijin") by the Chinese government therefore does not alleviate risk to the Bank for any alleged violation of Chinese laws, I believe this assertion to be contradicted by all available evidence. As set forth in detail in my January 2010 Declaration, governmental control of BOC is extensive. *See* Declaration of Donald Clarke dated January 3, 2010 (ECF 41) ¶ 19(a)-(k). BOC's own IPO prospectus states that Huijin's role as shareholder is "to represent

3

the PRC government in exercising its investor rights and obligations" and to "implement and execute PRC government policy arrangements in relation to the reform of state-owned financial institutions." *See id.* ¶ 19(i).

## THE BEIJING COURT JUDGMENT DOES NOT ALTER THE ANALYSIS

8.   As set forth in my Declaration of December 1, 2014, I cannot find in the Beijing High Court Judgment grounds for believing there is a strong state policy in favor of bank secrecy. It is a simple contract case. The court found nothing unlawful about the contract, which gave BOC very broad rights over its customers' information in certain circumstances. The case turned simply on matters of evidence; it would have been decided in BOC's favor had the court found BOC's evidence of breach adequate.

9.   The Zhang Declaration purports to address the argument that "the inclusion in the Beijing Judgment of information concerning the plaintiffs' bank accounts shows that China does not have a strong policy against the disclosure of bank client information." Zhang Declaration ¶ 32. The purported refutation, however, is simply the bare opinion that the conclusion does not follow from the premise, without any reasoning offered in support. It may well be that the inclusion of such information in the opinion does not relieve BOC of its confidentiality obligations (Zhang Declaration ¶ 32); the Plaintiffs have not argued to the contrary. The point is that the inclusion of such information in the opinion contradicts the general claim that the Chinese government takes bank confidentiality extremely seriously.

10.   The Zhang Declaration fails to provide any legal explanation for the inclusion of such supposedly confidential information in a public judgment or to explain why, if a Chinese customer's account information is meant to be closely guarded, such records would not be sealed or redacted as is typical of materials that contain highly confidential information in U.S. courts.

4

11. An important issue in this case is how to understand and interpret the concept of "suspected of (*shexian*) [involvement in illegal activity]" as that term is used in the banking services agreement between BOC and the defendants. The Zhang Declaration states that "under Chinese law, the concept of an individual being suspected of involvement in illegal activity is very narrow, and requires the issuance of criminal process against the accountholder." Zhang Declaration ¶ 33. Unfortunately, the Zhang Declaration cites no legal, academic, or other authority for this statement. The statement seems to be inconsistent with the plain language of the agreement, which provides that "[i]f the Applicant violates any provision of this Agreement . . . or is suspected of engaging in money laundering, financing of terrorism or other illegal or criminal activities, *based on any reason or factor (including risk control) as deemed justifiable by the Bank . . . .*" Beijing High Court Judgment at 4 (Zhang Declaration Exhibit 11) (emphasis added). The Beijing High Court did not state that the arrest or conviction of the Chinese Plaintiffs would have been required to support BOC's suspension of their bank accounts; it stated only that that BOC failed to produce sufficient evidence of the Chinese Plaintiffs engaging in criminal activities. The lower court whose judgment the Beijing High Court affirmed did note the lack of any judgment against the Chinese Plaintiffs, but again did not state that this was a *sine qua non* of being "suspected of" illegal activities under the agreement.

12.  I note also that the Zhang Declaration's statement is contradicted by the position of the Bank itself as set forth in the December 30, 2014 Chaoyang Judgment dismissing BOC's lawsuit against the counterfeiters. The Chaoyang Judgment includes the court's presentation of the relevant part of BOC's argument, almost certainly verbatim. *See* p. 2, paragraph 5 of the English translation. If one looks at the Chinese original of the Chaoyang Judgment, the language used by BOC in its argument to the court was "in our opinion, the Defendants *were suspected of*

illegal acts . . ." (The English translation with which I was provided is misleading in that section as it does not signal the use of the critical term *shexian*, "to be suspected of.") The term for "were suspected of," *shexian*, is exactly the term used in the banking services agreement between the defendants and BOC, and exactly the term that the Zhang Declaration opines can mean only "were subject to an official criminal proceeding by reason of." Zhang Declaration ¶ 33.

**CHINA'S INADEQUATE ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS**

13.  The Zhang Declaration opines on the "robustness of the remedies available for trademark infringement under Chinese law." Zhang Declaration ¶ 55.

14.  In 2014, the U.S. Trade Representative included China on its "Priority Watch List" in its "Special 301 Report" reviewing the global state of intellectual property rights protection and enforcement and reported that the United States will continue to monitor China under Section 306 of the Trade Act of 1974.[1] The Report noted that "a wide range of U.S. stakeholders in China continues to report serious obstacles to effective protection of IPR in all forms, including . . . trademarks"[2] and that "foreign rights holders in China continue to face a complex and challenging IPR environment."[3] Notably, although trademark enforcement activities in China have increased, albeit mostly on behalf of local brands, "enforcement efforts have yet to slow the sale of counterfeit products online" and measures to address the online sale of counterfeit goods "have not significantly deterred repeat and large-scale offenders who, after postings are removed, quickly place new postings offering the same infringing goods."[4]

15. The US-China Business Council ("USCBC"), a private, nonpartisan, nonprofit organization comprising approximately 220 U.S. companies that do business in China, surveyed

---

[1] U.S. Trade Representative, 2014 Special 301 Report, attached hereto as Exhibit 3, at 30.
[2] *Id.*
[3] *Id.* at 31.
[4] *Id.* at 34.

its members in 2014 on the Chinese business environment and found that intellectual property rights enforcement ranked as the second biggest challenge.[5] It reported that "almost 50 percent of companies hold back on investment and research and development (R&D) in China because of IP concerns"[6] and that U.S. companies give all of China's enforcement channels, including its civil and criminal courts and administrative agencies, mixed reviews.[7]

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 5, 2015 in Washington, D.C.

_____
DONALD CLARKE

---

[5] The US-China Business Council, USCBC 2014 China Business Environment Survey Results: Growth Continues Amidst Rising Competition, Policy Uncertainty, attached hereto as Exhibit 4, at 11.
[6] *Id.* at 12.
[7] *Id.*