# EXHIBIT 3

# 2014 Special 301 Report



Ambassador Michael B.G. Froman
Office of the United States Trade Representative

**SECTION II. COUNTRY REPORTS**

**Determination in Section 301 Investigation of Ukraine**

Ukraine was designated a Priority Foreign Country in the 2013 Special Report due to the particular IPR acts, policies, and practices identified in the 2013 Special 301 Report. (*See* 2013 Special 301 Report; Identification of Ukraine as a Priority Foreign Country and Initiation of Section 301 Investigation, 78 FR 33886 (June 5, 2013)). Those acts, policies, and practices involved: (1) the administration of Ukraine's system for collecting societies, which are responsible for collecting and distributing copyright royalties to U.S. and other rights holders; (2) use of infringing software by Ukrainian government agencies; and (3) online infringement of copyright and related rights. On May 30, 2013, the United States Trade Representative initiated a Section 301 investigation of the acts, policies, and practices identified in the Special 301 Report.

Based on the information obtained during the investigation, on February 28, 2014, the U.S. Trade Representative determined that these acts, policies, and practices are unreasonable and burden or restrict United States commerce, but, due to the current political situation in Ukraine, no action would be taken at that time. (*See* Notice of Determination in Section 301 Investigation of Ukraine, 79 FR 14326 (March 13, 2014)).

USTR remains committed to addressing the problems that served as the basis for the designation of Ukraine as a PFC, and appreciates Ukraine's recent outreach and ongoing engagement in exploring how to ameliorate these problems and improve its overall IP regime. The United States looks forward to working with Ukraine on these three issues.

**PRIORITY WATCH LIST**

**China**

China remains on the Priority Watch List and subject to Section 306 monitoring.

China's leadership has acknowledged the critical role that intellectual property plays in spurring innovation and the need to improve China's protection and enforcement of IP rights, including at the Third Plenum of the 18th Central Committee of the Chinese Communist Party. Consistent with China's policy objectives, its judicial, legislative, administrative, and enforcement authorities are in the midst of wide-ranging legal reform efforts relating to the protection and enforcement of IPR in China. Certain rights holders report positive experiences, including in some cases a greater ability to obtain redress against infringers in civil court actions. The United States also notes increased cooperation between U.S. and Chinese law enforcement agencies in an effort to stem cross-border flows of infringing products. The United States looks forward to strengthened cooperation, building on the increasing and positive cooperation between U.S. customs and investigative agencies and their Chinese counterparts, including the General Administration of Customs and Ministry of Public Security.

At the same time, a wide range of U.S. stakeholders in China continues to report serious obstacles to effective protection of IPR in all forms, including patents, copyrights, trademarks,

30

trade secrets as well as protection against unfair commercial use or unauthorized disclosure of test and other data generated to obtain marketing approval for pharmaceutical products.  As a result, sales of IPR-intensive goods and services in China remain disproportionately low when compared to sales in similar, or even less developed, markets that provide a stronger environment for IPR protection and market access.  Despite laudable policy objectives and a welcome ongoing reform effort, foreign rights holders in China continue to face a complex and challenging IPR environment. Given the size of China's consumer marketplace and its global importance as a producer of a broad range of products, China's protection and enforcement of IPR will continue to be a focus of U.S. trade policy.

In particular, the theft of trade secrets remains a significant concern. Such thefts are occurring not only inside but also outside China for the competitive advantage of Chinese state-owned and private companies. Conditions are likely to deteriorate as long as those committing such thefts, and those benefitting, continue to operate with relative impunity, often taking advantage of the theft in order to enter into unfair competition or disadvantageous business relationships with their victims. The United States strongly urges the Chinese government to take serious steps to put an end to these activities and to deter further activity by rigorously investigating and prosecuting trade secret thefts conducted by both cyber and conventional means.

Of longstanding concern are Chinese central, provincial, and local government measures and actions that appear to require or pressure rights holders to transfer IPR from foreign to domestic entities. Sometimes guided by government measures or policy statements intended to promote indigenous innovation and the development of strategic industries, government authorities may deny or delay market access or otherwise condition government procurement, permissions, subsidies, tax treatment, and other actions on IPR being owned or developed in China, or licensed to a Chinese entity.  The U.S. Government is also concerned by the increased number of stakeholders reporting that Chinese government entities are using regulatory pressure to compel the licensing of important technologies or to dissuade stakeholders from pursuing available legal avenues to enforce their IPR.  China has made certain commitments to the United States on some of these matters; the United States will continue pressing China to follow through on those commitments.

### *Legal Reform*

The United States welcomes China's ongoing legal reform efforts despite serious reservations regarding certain measures.  Since 2012, China has undertaken revisions to and invited comment on draft revisions to its existing laws on patents, copyrights, trademarks, drug administration, and scientific and technological achievements. Effective January 1, 2013, China's amended Civil Procedure Law includes provisions that may help U.S. rights holders to secure preliminary measures and otherwise enforce their rights in civil court actions.  Currently before China's State Council Legislative Affairs Office (SCLAO) are draft amendments to the Copyright Law and Patent Law.  In mid-2014, a revised Trademark Law and implementing regulations will go into effect.  Amendment of the Anti-Unfair Competition Law (AUCL), unrevised since first entering into force in 1993, is proceeding at a slower pace.  While applauding China's consideration of U.S. government and private sector perspectives and experiences as it amends its laws, the United States notes the need to move forward expeditiously with remaining revisions to its IP-related laws, and underscores the urgent need to update and amend the AUCL and related trade

secret laws, regulations, and judicial interpretations, including provisions regarding the protection and enforcement of trade secrets.

China also invited comment on draft rules and guidelines on proposed regulations for the remuneration of "service inventions" (i.e., inventions created by an employee as part of his or her employment), rules for anti-monopoly enforcement in the field of intellectual property rights, and patent examination guidelines for utility model and design patents. Several proposed measures raise serious concerns, while others represent a marked improvement over prior drafts. The United States applauds China's openness to receiving comments and looks forward to continuing engagement as future drafts are developed and evaluated, and as the drafts move through the SCLAO and the National People's Congress.

Additional legal reforms require action, including amending the Criminal Law and other relevant measures to address continuing deficiencies in China's criminal IPR enforcement.

### *National Leading Group*

Following the completion of China's 2010-11 Special IPR Campaign, the State Council established a permanent office of the national leading group on combating IPR infringement (Leading Group) to better coordinate and improve China's efforts to combat IPR infringement and the manufacture and sale of counterfeit and sub-standard goods. In 2013, the Leading Group continued to coordinate enforcement actions and undertake special campaigns, including concerning online markets and cross-border infringement cases. The United States encourages China to continue to work with foreign governments and rights holders to share information and demonstrate the constructive role the Leading Group can play to improve the protection and enforcement of IPR.

### *Trade Secrets*

As noted above, trade secret theft is a serious and growing problem in China. Thefts may arise in a variety of circumstances, including those involving departing employees, failed joint ventures, and cyber intrusion and hacking. In addition, thefts arising from the misuse of information submitted to government entities for purposes of complying with regulatory obligations are particularly troubling. The misappropriation of trade secrets and their use by a competing enterprise can have a devastating impact on a company's business, making recourse to adequate and effective legal remedies particularly important.

Under Chinese law, however, available remedies are difficult to obtain, given that civil, administrative, and criminal enforcement against trade secrets theft remains severely constrained. Enforcement obstacles include various deficiencies in China's AUCL; constraints on gathering evidence for use in litigation; difficulties in meeting the criteria for establishing that information constitutes a trade secret; and criminal penalties that do not provide adequate deterrents. Unlike other Chinese IP laws, the AUCL does not expressly authorize judges to issue certain provisional orders that are often critical to the successful pursuit of a civil enforcement action. While China's new Civil Procedure Law may address, or partially address, that problem, there has been insufficient time to ascertain whether this new law is facilitating access to civil remedies in practice. Additionally, the AUCL appears to apply primarily to "commercial undertakings" and not to impose liability on individual actors; the AUCL also requires that a trade secret have "practical applicability," which may limit the scope of protection for early stage research.

There are other important weaknesses in China's civil enforcement system that relate to mechanisms for gathering evidence; procedures for obtaining preliminary injunctions; and the relative weight afforded certain kinds of evidence, as reflected in the overreliance on original documentary evidence over oral testimony. Without changes to address these weaknesses, some of which are not specific to intellectual property but relate to China's civil process generally, effective enforcement against misappropriation of trade secrets in China will remain challenging.

The United States is encouraged by China's December 2013 Joint Commission on Commerce and Trade (JCCT) commitment to undertake an Action Program that will include concrete actions to address enforcement, enhance public awareness, and require strict legal compliance with respect to trade secrets.  The United States will continue to engage with China as it develops this Action Program, and as it advances legal and regulatory reforms to better protect trade secrets.

### *Copyright and Piracy*

#### *Software legalization*

The United States will continue to urge that all levels of the Chinese government, as well as state-owned enterprises (SOEs), use only legitimate, licensed copies of software.  In May 2011, China's government reported that software legalization in central government offices was complete. At the provincial level, China's government reported that a similar effort was completed as of June 30, 2012.  In January, 2014, the Chinese government reported that all local government agencies at the city and county level had completed software legalization by the end of 2013.  However, even with the significant work to legalize this number and range of government agencies, U.S. software companies have seen only a modest increase in sales to government agencies, and specific information about the procedures and tools used to ascertain budget or audit information remains unavailable.

Software legalization efforts more recently have extended to China's SOE sector. Losses by software companies due to piracy at SOEs and other enterprises remain very high. To the degree that Chinese firms do not pay for the software that runs many of their operations, they reap a cost advantage relative to competitors who pay for legally acquired software. The United States remains committed to working with China to continue to address these challenges.

#### *Online piracy*

Despite bilateral commitments to increase IPR enforcement, online piracy in China persists on a large scale. As of 2013, China had the largest Internet user base in the world, estimated at over 600 million users, including nearly 500 million mobile web users. Despite national campaigns and the leadership of the Leading Group, widespread piracy affects industries involved in the distribution of legitimate music, motion pictures, books and journals, video games, and software. For example, industry reports that in 2013 the revenues from digital music sales in China were $65.4 million, compared to $108.3 million in South Korea, and $32.0 million in Thailand – a country with less than five percent of China's population and a roughly equivalent per capita GDP. Similarly, over 90 percent of the revenue generated by U.S. films in China comes in the form of box office revenues, compared to 25-30 percent in the United States. This difference is partly due to widespread piracy of motion pictures over the Internet and on optical discs. Online piracy extends to scientific, technical, and medical publications as well.

33

Parties in China are also facilitating online infringement, in China and third countries, through media box piracy. Manufactured in China and exported abroad, media boxes can be preloaded with infringing content and plugged directly into televisions. They enable the user to stream and download infringing online audio and visual content. The vast majority of the infringing websites to which media box users connect are reportedly located in China. The United States urges China to continue efforts to improve IPR protection and enforcement in this area.

### Counterfeit Goods

Despite increased enforcement efforts, problems with counterfeiting in China remain widespread. A partial list of commonly counterfeited goods includes food and beverages; apparel, footwear, and accessories; consumer electronics, computers and networking equipment; entertainment and business software; batteries; chemicals; appliances; pharmaceuticals; and auto parts. Impacts are not limited to lost sales volumes and damage to the reputation of the trademark owner. For example, higher defect and failure rates among counterfeit semiconductors may cause malfunctions in the equipment in which they are incorporated, which may include medical devices, vehicle safety and braking systems, and other critical applications. As one measure of the scale of the problem, products from China (including Hong Kong) accounted for 93 percent of the value of the IPR infringing products seized by U.S. Customs and Border Protection in fiscal year 2013.

Although rights holders report increased enforcement activities, mostly but not exclusively on behalf of local brands, enforcement efforts have yet to slow the sale of counterfeit products online.  This is particularly concerning in light of the rapid growth of e-commerce both within China and between China and overseas markets. Rights holders report that local Administrations for Industry and Commerce (AICs) typically confine their efforts to physical markets. While both the State Administration for Industry and Commerce and local AICs have called on online trading websites to improve procedures to address online sales of counterfeit merchandise, these measures have not significantly deterred repeat and large-scale offenders who, after postings are removed, quickly place new postings offering the same infringing goods. It is reported that the Supreme People's Court may issue a judicial interpretation to address these concerns.

### IPR and Technology Transfer Requirements

The United States is concerned about Chinese measures, policies and practices at the national, provincial, and local levels that allegedly are intended to hasten China's development into an innovative economy, but that may disadvantage foreign rights holders.  Industry reports that many of China's innovation-related policies and other industrial policies, such as strategic emerging industry policies, may have a negative impact on U.S. exports or U.S. investors and their investments or IP rights.  Such Chinese measures frequently call for technology transfer and, in certain cases, appear to include criteria that could require IP rights to be developed in China, or to be owned by or licensed to a Chinese party.  Such government-imposed conditions or incentives may distort licensing and other private business arrangements, resulting in commercial outcomes that are not optimal for the firms involved or for promoting innovation. Such government intervention in the commercial decisions that enterprises make regarding the ownership, development, registration, or licensing of IP is not consistent with international practice, and may raise concerns relative to China's implementation of its WTO commitments.