UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 10 Civ. 4974 (RJS)

---

GUCCI AMERICA, INC., *et al.*,

Plaintiffs,

VERSUS

WEIXING LI, *et al.*,

Defendants.

---

OPINION AND ORDER
September 29, 2015

---

RICHARD J. SULLIVAN, District Judge:

On June 25, 2010, Plaintiffs Gucci America, Inc., and certain of its affiliates ("Gucci") commenced this trademark infringement action against the owners and operators of a Chinese website dedicated to the sale of imitation handbags and other counterfeit items bearing Gucci's trademarks. (Doc. No. 1.) Now before the Court is Gucci's motion to compel nonparty Bank of China ("BOC") to comply with subpoenas requesting the production of account documents relating to all Defendants. (Doc. No. 135.) For the reasons set forth below, the motion is granted.

I. BACKGROUND

The Court presumes the parties' familiarity with the facts underlying this case, which were thoroughly discussed in the Court's August 23, 2011 Memorandum and Order (Doc. No. 75 ("August 23 Order")) and May 18, 2012 Memorandum and Order (Doc. No. 98 ("May 18 Order")). However, to provide context, the Court briefly recites the facts and procedural history below.

Gucci is a distributor of luxury handbags, clothing, jewelry, fragrances, and home products. In or around June 2010, Gucci discovered that Defendants and their affiliates were offering for sale on the internet counterfeit versions of Gucci's products. On June 25, 2010, Gucci initiated this action against certain Defendants pursuant to the Lanham Act, 15 U.S.C. § 1051, *et seq.*, and related state-law causes of action. Gucci amended its complaint to add additional

Defendants on October 4, 2010 (Doc. No. 18) and on March 10, 2011 (Doc. No. 55).

On July 12, 2010, the Court issued a preliminary injunction (the "Injunction"), which froze Defendants' assets and enjoined Defendants from manufacturing, distributing, marketing, or selling counterfeit goods. (Doc. No. 12.) Because Gucci had obtained evidence that certain Defendants had wired the proceeds of the counterfeit sales to accounts at the Chinese headquarters of BOC (the "Head Office"), the Injunction also provided that "any banks . . . who receive actual notice of this order . . . are, without prior approval of the Court, restrained and enjoined from transferring, disposing of, or secreting any money, stocks, bonds, real or personal property, or other assets of Defendants." (*Id.* at 6.) The Injunction also provided that "any third party receiving a subpoena pursuant to this Order shall produce documents responsive to such requests within ten (10) days of service of such subpoena." (*Id.* at 9.)

Pursuant to the Injunction, Gucci served a subpoena on BOC on July 16, 2010 (the "2010 Subpoena") in accordance with Rule 45 of the Federal Rules of Civil Procedure, requesting documents pertaining to any BOC accounts maintained by Defendants and defining "ACCOUNTS" to include "all . . . accounts at [BOC] held by Defendants; including, but not limited to" two specifically named BOC accounts. (Doc. No. 28-5 at 4.) The 2010 Subpoena also requested "documents associated with any open or closed checking, savings, money market accounts, and certificates of deposit held in the name of any of the Defendants, including but not limited to" the two named BOC accounts. (*Id.* at 6.) Shortly before filing the Second Amended Complaint, Gucci served BOC with a second subpoena on February 23, 2011 (the "2011 Subpoena"), making some new requests for information but largely repeating the same requests contained in the 2010 Subpoena.

(Doc. No. 109-4.) Although again seeking documents pertaining to "any" BOC accounts maintained by any of the Defendants, the 2011 Subpoena specifically identified the same two accounts identified in the 2010 Subpoena, along with six additional accounts. (*Id.*) In a supplemental submission, Gucci identified one other account, bringing the total number of BOC accounts connected to Defendants to nine. (Doc. No. 58-9.)

On August 23, 2011, the Court granted Gucci's motion to compel BOC to comply with the 2010 Subpoena and the asset freeze provisions of the Injunction, and denied BOC's cross-motion to modify the Injunction so as to exclude assets held by BOC in any of its locations in China. (August 23 Order at 1.) On September 12, 2011, the Court denied BOC's motion for leave to appeal, as well as BOC's request for an additional twenty-one days to comply with the August 23 Order. (Doc. No. 79.) In response to the Court's September 12 Order, BOC produced documents relating to only the two accounts identified in the 2010 Subpoena, and refused to produce information regarding other accounts held by Defendants. (Doc. No. 116 at 3.) According to Gucci, BOC's production was also incomplete as to even those two accounts, since it did not include "documents reflecting deposits and withdrawals into the account[s], such as monthly account statement[s], even though these were among the documents [that] Gucci specifically requested." (Doc. No. 111 at 9.)

On November 30, 2011, BOC filed a motion for reconsideration of the Court's August 23 Order, based principally on a November 3, 2011 letter that BOC received from the People's Bank of China ("PBOC") and the China Banking Regulatory Commission ("CBRC"). In the letter, PBOC and CBRC set forth their views as to the application of Chinese bank secrecy laws to disclosures of customer information outside of

2

China, China's commitment to using Hague Convention procedures for document requests, and the likelihood of sanctions being imposed on BOC in China as a result of its compliance with the August 23 Order. (Doc. No. 91-9.) On May 18, 2012, the Court issued its Memorandum and Order denying the motion for reconsideration. (May 18 Order at 1.) BOC thereafter appealed the Court's August 23 and May 18 Orders to the Second Circuit. (Doc. Nos. 80 & 99.)

On September 17, 2014, the Second Circuit affirmed the Court's Injunction but vacated its August 23 and May 18 Orders in light of the Supreme Court's opinion on general personal jurisdiction in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), which post-dated the Court's August 23 and May 18 Orders. *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014) ("*Gucci II*"). The Second Circuit remanded the case to this Court to consider in the first instance whether the Court has specific personal jurisdiction over BOC, and, if so, whether exercising such jurisdiction is consistent with principles of comity in light of recent Chinese court decisions. *Id.* at 145.

On December 1, 2014, Gucci filed its motion to compel BOC's compliance with the 2010 and 2011 Subpoenas (Doc. No. 135) and an accompanying memorandum of law (Doc. No. 136 ("Mem.")). BOC filed its memorandum of law in opposition to the motion to compel on January 23, 2015 (Doc. No. 141 ("Opp.")), and Gucci filed its reply memorandum of law on February 6, 2015 (Doc. No. 146 ("Rep.")). After the matter was fully submitted, the parties submitted additional letters relating to recent cases they argue are relevant to the motion before the Court. (Doc. Nos. 152, 154, 155, 156 & 157.) The matter was thus fully briefed as of September 10, 2015.

## II. DISCUSSION

As noted above, the Second Circuit has directed the Court on remand to consider (1) whether it has specific personal jurisdiction over BOC justifying an order to compel it to produce the documents called for in the 2010 and 2011 Subpoenas, and, if so, (2) whether recent decisions from Chinese courts alter the Court's previous comity analysis pursuant to § 442 of the Restatement (Third) of Foreign Relations Law. For the reasons set forth below, the Court concludes that it has specific personal jurisdiction over BOC and that the § 442 factors still strongly support ordering BOC to comply with the 2010 and 2011 Subpoenas.

### A. Specific Personal Jurisdiction

A district court must have personal jurisdiction over a nonparty to compel it to comply with a Rule 45 subpoena. *See, e.g.*, *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998); *In re Sealed Case*, 141 F.3d 337, 341 (D.C. Cir. 1998); *In re Application to Enforce Admin. Subpoenas Duces Tecum of the S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996). Federal courts must satisfy three primary requirements to lawfully exercise personal jurisdiction over an entity: (1) the entity must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012) ("*Licci II*"). Here it is undisputed that BOC was properly served at its New York branch. (August 23 Order at 5.) Accordingly, the Court will address the second and third "primary requirements" under *Licci II* – namely, whether the Court has a statutory basis for exercising jurisdiction, and whether doing so comports with constitutional due process.

3

1. Statutory Basis for Personal Jurisdiction

A federal statute or the law of the state in which the court is located can provide the statutory basis for personal jurisdiction. *See Licci II*, 673 F.3d at 60. New York's long-arm statute provides that a court "may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state" so long as the plaintiff's "cause of action aris[es] from" that "transact[ion]." N.Y. C.P.L.R. § 302(a)(1); *see also Licci II*, 673 F.3d at 60. Accordingly, before exercising personal jurisdiction over an entity, "a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction." *Licci II*, 673 F.3d at 60 (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)) (internal quotation marks omitted).

The New York Court of Appeals has noted that, in the banking context, the first prong of the § 302(a)(1) inquiry "may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (2012) ("*Licci III*"). Notwithstanding this potential complication, the New York Court of Appeals has held that "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client" are sufficient to "show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339.

With respect to the second prong of the § 302(a)(1) jurisdictional analysis, the New York Court of Appeals requires that "in light of all the circumstances, there must be an *articulable nexus* or *substantial relationship* between the business transaction and the claim asserted." *Id.* (citations and internal quotation marks omitted) (emphasis added). Notably, New York does not require a *causal relationship* between the business transaction and the claim asserted; it is enough that "the latter is not completely unmoored from the former." *Id.* Considering this analysis in the subpoena context, the Second Circuit in this action endorsed a focus on "the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci II*, 768 F.3d at 141-42 (citing *Knowles*, 87 F.3d at 418).

In answering a certified question from the Second Circuit, the New York Court of Appeals in *Licci III* applied its § 302(a)(1) analysis to a foreign bank in a strikingly similar situation to that of BOC here. There, the foreign bank "did not operate branches or offices, or maintain employees, in the United States," *Licci III*, 20 N.Y.3d at 332, but it nevertheless executed dozens of U.S. dollar-denominated wire transfers through a correspondent account it maintained with a domestic bank in New York, *id.* at 340. In so doing, the plaintiffs alleged, the foreign bank provided financial support for a terrorist group. *Id.* The New York Court of Appeals held that "the fact that [the foreign bank] used a New York account 'dozens' of times indicates desirability and a lack of coincidence," which demonstrates a transaction of business in New York. *Id.* The court also held that the plaintiffs had shown "an articulable nexus or substantial relationship between the transaction and the alleged breaches" because the foreign bank "did not route a transfer for a terrorist group once or twice by mistake," but rather "deliberately used a New York account again

4

and again to effect its support of [the terrorist group]." *Id.*

Here, BOC's New York conduct is, if anything, even more substantial, deliberate, and recurring than that of the foreign bank in the *Licci* cases (collectively "*Licci*"). As a result, the Court has no trouble concluding that Gucci satisfies the first prong of § 302(a)(1). Unlike the bank in *Licci*, BOC owns multiple real properties in New York and maintains two branches that are staffed with employees. (Doc. No. 138, Declaration of Robert L. Weigel, dated Dec. 1, 2014 ("Weigel Decl."), Exs. 14-15.) Moreover, BOC's Head Office opened a correspondent account at JPMorgan Chase Bank ("Chase") in New York to facilitate transfers directly from Chase customers to BOC customers. (Weigel Decl., Exs. 2-8, 17.) This relationship enables BOC to boast that its New York branches are the "principal U.S. dollar clearing channel of [BOC] worldwide," and that BOC is "the first choice of U.S. dollar wire transfers to and from China." (Weigel Decl., Ex. 17.) Such marketing apparently captivated Defendants, who used BOC nearly a dozen times to transfer what Gucci alleges are ill-gotten gains denominated in U.S. dollars from the United States to China. (Weigel Decl, Exs. 2-12.)

Furthermore, with respect to the second prong of the § 302(a)(1) analysis, there is a strong relationship between BOC's New York conduct and Gucci's subpoena requests. Specifically, Gucci alleges that Defendants' use of BOC's correspondent account at Chase and BOC's relationship with Chase in New York to effectuate wire transfers between the United States and China were crucial components of their counterfeiting operation. Gucci's 2010 and 2011 Subpoenas seek information about those very transfers, as well as Defendants' relationship with BOC. Clearly, there is more than "an articulable nexus" between BOC's New York business activity and Gucci's discovery requests.

BOC's efforts to distinguish *Licci* are unpersuasive. BOC asserts that "there is a vast difference between a bank's purposeful *use* of a correspondent account in the United States to *make* illegal payments for a client, as in *Licci*, and BOC's passive receipt of transfers that [D]efendants and Chase Bank initiated and routed to BOC." (Opp. at 14 (emphasis in original).) But BOC mischaracterizes *Licci*. The Second Circuit and New York Court of Appeals emphasized that frequent and deliberate *use* of a domestic correspondent account to execute international wire transfers was enough to constitute transacting business in New York; neither court said anything about the *Licci* foreign bank knowingly making illegal payments, much less that such knowing complicity was required to establish jurisdiction pursuant to § 302(a)(1). *See Licci III*, 20 N.Y.3d at 338-39; *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci IV*"). Here, there can be no real dispute that BOC frequently and deliberately *used* its New York correspondent account with Chase to effectuate wire transfers for its U.S. clients, including, critically, Defendants in this action. BOC did not simply "maintain" a correspondent account with Chase in New York that was used "once or twice by mistake" or "coincidental[ly]" by Defendants. To the contrary, BOC encouraged its clients to rely on its relationships with Chase so that they could effectuate frequent wire transfers from the United States to China, which is exactly what Defendants did here. *Licci III*, 20 N.Y.3d at 340.

Moreover, the cases that BOC relies on to support its argument that "receiving a transfer of funds, whether via a U.S. correspondent account or through wire services, does not subject the recipient to personal jurisdiction" (Opp. at 15), are equally inapplicable to the

5

instant facts. None of those cases involved a foreign bank deliberately thrusting itself into the New York financial market by establishing a New York office and a correspondent account with a New York bank to repeatedly facilitate the transfer of money from its clients' bank accounts in the United States to their accounts abroad. Rather, the cases either involved banks with no New York operations that passively received money via a New York correspondent account, *see e.g.*, *Rushaid v. Pictet & Cie*, 9 N.Y.S.3d 16, 17 (App. Div. 2015) and *Leema Enterprises, Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983), or, even less applicable, concerned non-banks that received wire transfers from an account that happened to be associated with a New York or U.S. bank, *see e.g.*, *Ballard v. Walker*, No. 11-cv-5874 (LLS), 2013 WL 6501234, *3 (S.D.N.Y. Dec. 11, 2013), *Gargano v. Cayman National Corp.*, 2010 WL 2245034, at *6 (D. Mass. June 2, 2010), and *Canadian Group Underwriters Insurance Co. v. M/V "Arctic Trader"*, No. 96-cv-9242 (DAB), 1998 WL 730334, at *3-4 (S.D.N.Y. Oct. 19, 1998).

Here, BOC is a bank that is in the business of providing banking services to individuals in China and the United States. (Weigel Decl., Ex. 13.) Critical to serving those clients is the existence of a correspondent account at a reputable New York bank to conduct secure, efficient, and quick wire transfers. BOC cannot credibly compare itself to a passive recipient of a few one-off wire transfers that by pure happenstance were routed through a domestic correspondent bank account.

Finally, BOC asserts that Gucci cannot demonstrate the requisite nexus between BOC's New York-based conduct and the Subpoenas, since the information sought by Gucci is in fact located in China and the active task of crediting Defendants' Chinese bank accounts took place in China. (Opp. at 10-11, 14.) However, the Second Circuit in *Licci* directly addressed and rejected the argument that the effects of the entity's in-forum conduct must also take place in New York for jurisdiction to be proper. In fact, the Second Circuit concluded that "[s]o long as [the entity's] in-forum activity sufficiently reflects the [entity's] 'purposeful availment' of the privilege of carrying on its activities here, minimum contacts are established, even if the effects of the [entity's] entire course of conduct are felt elsewhere." *Licci IV*, 732 F.3d at 173. Thus, the fact that BOC's deliberate conduct in New York produced effects in China – such as causing China-based BOC employees to make book entries to Defendants' Chinese bank accounts to reflect wire transfers – does nothing to undermine the nexus between BOC's New York-based conduct and the 2010 and 2011 Subpoenas.

BOC's argument that the information that Gucci seeks is physically located in China, not New York, is equally unavailing. BOC seems to be invoking a species of the "separate entity rule," which "provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes." *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 158 (2014). However, "where the remedy sought is . . . a subpoena, the separate entity rule has not barred enforcement;" rather, "only personal jurisdiction over the legal entity, the bank and its branches, is necessary." *CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*, No. 12-cv-8087 (SN), 2013 WL 2661037, at *17 (S.D.N.Y. June 12, 2013) (citing *United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965)); *see also Eitzen Bulk A/S v. Bank of India*, 827 F. Supp. 2d 234, 239-41 (S.D.N.Y. 2011). Therefore, it is clear that the Court has a

6

statutory basis to exercise personal jurisdiction over BOC.[1]

2. Constitutional Due Process

When assessing whether the exercise of specific personal jurisdiction over an entity is constitutionally proper, courts must apply a two-step test: first, they must determine whether the entity has sufficient "minimum contacts" with the forum, and second, they must find that the exercise of jurisdiction under the circumstances was "reasonable." *Licci IV,* 732 F.3d at 170; *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). Determining whether an entity has sufficient "minimum contacts" with a forum turns on whether the entity "'purposefully directed' [its] activities at . . . the forum and [whether] the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted). Once the threshold showing of "minimum contacts" is met, the party objecting to jurisdiction must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (Sotomayor, J.) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 568). Reduced to its essence, the "reasonableness" of exercising jurisdiction depends on whether doing so would comport with "fair play and substantial justice." *Burger King Corp.*, 471 U.S. at 476.

As an initial matter, the Second Circuit noted in *Licci IV* that it would be "rare" and "unusual" for a court to find that an entity's conduct satisfied § 302(a)(1), "yet, in connection with the same transaction of business," that the entity did not have sufficient minimum contacts with New York or that the exercise of personal jurisdiction would be otherwise unreasonable. *Licci IV*, 732 F.3d at 170. The court further observed that it was aware of no such decisions in the Second Circuit. *Id.* Therefore, in light of the Court's prior finding that it has statutory personal jurisdiction over BOC for the enforcement of the Subpoenas pursuant to § 302(a)(1), it would be "unusual," and in fact unprecedented in this Circuit, if the Court's exercise of personal jurisdiction over BOC did not comport with due process. Nevertheless, the Court will specifically assess whether BOC has sufficient "minimum contacts" with New York and whether the exercise of jurisdiction in this action is otherwise "reasonable."

a. Minimum Contacts

Court often analyze the "minimum contacts" inquiry as two separate prongs: (1) the "purposeful availment" prong, whereby the court determines whether the entity deliberately directed its conduct at the forum, and (2) the "relatedness" prong, whereby the court determines whether the controversy at issue arose out of or related to the entity's in-forum conduct. *See, e.g.*, *Chew v. Dietrich*, 143 F.3d 24, 27-29 (2d Cir. 1998); *Nowak v. Tak How Inv., Ltd.*, 94 F.3d 708, 713 (1st Cir. 1996).

As the Court has already noted, BOC's in-forum conduct is deliberate and recurring, not "random, isolated, or fortuitous." *Licci IV*, 732 F.3d at 171 (quoting *Keeton v. Hustler*

---

[1] Citing the amended Rule 45, which provides that "[a] subpoena may be served at any place within the United States," Fed. R. Civ. P. 45(b)(2), the Second Circuit suggested that the Court may consider BOC's contacts nationwide in evaluating personal jurisdiction. *See Gucci II*, 768 F.3d at 142 n.21. However, because the Court finds that it has personal jurisdiction over BOC under New York's long-arm statute, the Court need not determine whether BOC's nationwide contacts with the United States are relevant to the personal jurisdiction analysis.

7

*Magazine, Inc.*, 465 U.S. 770, 774 (1984)). BOC's Head Office opened a correspondent account at Chase in New York to facilitate transfers directly from Chase customers to BOC customers, thereby enabling BOC to assert that its New York branches are the "principal U.S. dollar clearing channel of [BOC] worldwide" and that it is "the first choice of U.S. dollar wire transfers to and from China." (Weigel Decl., Ex. 17.) There is also no dispute that BOC's New York branches are "mainly funded by deposits from various third parties in China as well as in the United States," are "designated as the U.S. dollar funding pool within [BOC]'s global operations," provide "U.S. dollar funding . . . to other [BOC] foreign branches and affiliates," and "manage[] the liquidity for other U.S. branches." (Weigel Decl., Ex. 13.) As noted above, BOC owns multiple real properties in New York (Weigel Decl., Exs. 14-15), and it has initiated multiple lawsuits in the Southern District of New York (*see, e.g.*, Mem. at 10 n.5). Accordingly, as the Court observed in its August 23 Order, it is clear that BOC "has purposely chosen to do business in New York and has availed itself of the myriad benefits that come with establishing a presence in the United States' premier financial center." (August 23 Order at 11.)

Once again, the *Licci* decisions demonstrate that BOC had the requisite "minimum contacts" with New York. In *Licci IV*, the Second Circuit concluded that "the selection and repeated use of New York's banking system . . . constitutes 'purposeful availment of the privilege of doing business in New York.'" *Licci IV*, 732 F.3d at 171 (quoting *Bank Brussels Lambert*, 305 F.3d at 127) (alterations omitted). Like the foreign bank in *Licci*, BOC selected Chase in New York to be its correspondent bank to give it access to "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci III*, 20 N.Y.3d at 339. Clearly, BOC could have chosen to process Defendants' U.S. dollar-denominated wire transfers through correspondent accounts elsewhere, or chosen to have its Head Office establish a correspondent account elsewhere, but it did not. *See Licci IV*, 732 F.3d at 171. Thus, BOC's arguments that it did not purposefully avail itself of the privilege of conducting business in New York are as unpersuasive here as they were when considered in connection with the § 302(a)(1) analysis above.

Relatedness, the second prong of the minimum contacts inquiry, is a sliding-scale test: when an entity has only limited contacts with a forum, relatedness requires that "the plaintiff's injury was proximately caused by those contacts," but when an entity's contacts with the forum "are more substantial," it is not unreasonable to exercise personal jurisdiction "even though the acts within the state are not the proximate cause of the plaintiff's injury." *Chew*, 143 F.3d at 29; *see also S.E.C. v. Straub*, 921 F. Supp. 2d 244, 254 n.6 (S.D.N.Y. 2013) (recognizing that *Chew* established a sliding-scale analysis for assessing relatedness). For an entity's contacts to fall on the "more substantial" end of the sliding scale test, the contacts need not rise to the level that would establish general jurisdiction. *See Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07-cv-2360 (KMK), 2008 WL 169358, at *10 (S.D.N.Y. Jan. 16, 2008) (concluding that a defendant's contacts with New York placed it on the "more substantial" end of the spectrum because it repeatedly sent its principals on business trips to New York and it purchased a large portion of its products from New York suppliers). And when an entity's contacts with the forum are "more substantial," courts have determined that it is sufficient that those contacts be a "but for" cause of the plaintiff's injury, rather than the "proximate cause" of

8

the injury. *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11-mdl-2262 (NRB), 2015 WL 4634541, at *23 (S.D.N.Y. Aug. 4, 2015). Finally, the Second Circuit in this action endorsed the Tenth Circuit's approach to applying the relatedness inquiry in the context of a subpoena, which focused on "the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci II*, 768 F.3d at 141-42 (citing *Knowles*, 87 F.3d at 418).

Under the *Chew* sliding scale, BOC's contacts with New York are sufficiently "substantial" that they need only be a "but for" cause of Gucci's 2010 and 2011 Subpoenas. As noted previously, BOC has significant operations, employees, and physical locations in New York, actively solicits business and customers in New York, and has deliberate and recurring contacts with New York. Furthermore, BOC provides extensive services to its clients in New York, including a correspondent account at Chase that its Head Office established to facilitate U.S. dollar-denominated transfers. Therefore, contrary to BOC's assertions, BOC bears little resemblance to the defendants in *SPV OSUS Ltd. v. UBS AG* – which were "foreign banks alleged to have provided services to foreign investment funds, acting entirely abroad and with only sporadic or indirect contacts with the United States," with no physical presence or employees in New York, and which did not "directly or purposefully solicit, market, or otherwise seek out business from potential customers located in the United States." No. 15-cv-619 (JSR), 2015 WL 4394955, at *5-6 (S.D.N.Y. July 20, 2015).

On the record before it, the Court has little difficulty concluding that BOC's New York contacts are a "but for" cause of Gucci's document requests. Gucci's Subpoenas are premised on the fact that Defendants' proceeds from the sale of counterfeit goods were transferred through BOC's correspondent account in New York. As such, there is a substantial nexus between (1) the motion to compel BOC to comply with Gucci's Subpoenas, which focus on Defendants who allegedly sold counterfeit goods on the internet in violation of the Lanham Act and utilized New York banks as part of that scheme, and (2) BOC's contacts with New York.

Accordingly, the Court finds that BOC purposefully availed itself of this forum and that its conduct was sufficiently related to the subpoena enforcement action that is the subject of this dispute. The Court thus concludes that BOC has sufficient minimum contacts with New York for the Court to have personal jurisdiction over Gucci's motion to compel.

### b. Reasonableness

In determining whether the exercise of personal jurisdiction would comport with "traditional notions of fair play and substantial justice," courts consider five factors: (1) "the burden that the exercise of jurisdiction will impose on the [entity]," (2) "the interests of the forum state in adjudicating the case," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of the controversy," and (5) "the shared interest of the states in furthering substantive social policies." *Bank Brussels Lambert*, 305 F.3d at 129 (citations omitted). When the entity that may be subject to personal jurisdiction is a foreign one, courts consider the *international* judicial system's interest in efficiency and the shared interests of the *nations* in advancing substantive policies. *See Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987). Here, it is clear that BOC, as the party objecting to jurisdiction, has not carried its burden of making "a compelling case" that jurisdiction is

9

unreasonable. *Bank Brussels Lambert*, 305 F.3d at 129.

The burden on BOC of submitting to jurisdiction in New York is minimal. BOC has been litigating this action in New York since June 2010. Moreover, BOC has initiated multiple lawsuits in the Southern District of New York and maintains physical operations here. In addition, "the conveniences of modern communication and transportation ease" any burden BOC might experience from further contesting the 2010 and 2011 Subpoenas. *Licci IV*, 732 F.3d at 174 (quoting *Metro. Life Ins.*, 84 F.3d at 574). Indeed, the fact that the controversy at issue involves subpoena compliance, and not BOC's own liability, gives BOC even less "cause to complain of an outrage to fair play." *First Am. Corp.*, 154 F.3d at 20. Although BOC asks the Court to consider the fact that granting Gucci's motion would force BOC to violate Chinese law (Doc. No. 141 at 16), BOC cites to no other courts that have considered such arguments in the context of assessing the reasonableness of an exercise of personal jurisdiction, as opposed to a separate and subsequent comity analysis, and the Court declines to be the first. In fact, in a case that BOC cites to support its contention, the court specifically *declined* to consider any potential "clash between the forum law and the substantive policies of another state" as part of the personal jurisdiction analysis. *Ballard v. Savage*, 65 F.3d 1495, 1501 (9th Cir. 1995); *see also United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609, 623 (S.D.N.Y. 1996) (considering the conflict of two nations' laws only in the comity analysis, not the personal jurisdiction due process analysis). With respect to the burden factor, courts tend to focus their inquiry on the logistical difficulties facing a foreign entity forced to litigate in a given forum, such as the distance the entity would have to travel and the entity's unfamiliarity with the forum. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir. 2000). Here, it is clear that such burdens are minimal or non-existent, since BOC is physically present in the forum, no stranger to litigation in it, and already represented by able New York counsel.

With respect to the forum's interest in adjudicating the dispute, courts do not "compare the interests of the sovereigns" but rather "determine whether the forum state *has* an interest." *Nowak*, 94 F.3d at 718 (emphasis in original). Here, New York as the forum state has a "manifest interest in providing effective means of redress for its residents." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010) (quoting *Burger King*, 471 U.S. at 483). Several Plaintiffs, including Gucci and Yves Saint Laurent America, Inc., are incorporated in New York and have their principal place of business here. (Doc. No. 55 ¶¶ 6 & 9.) Furthermore, the U.S. dollar-denominated transfers of allegedly ill-gotten gains were routed through New York. Finally, New York has a strong interest in litigants' compliance with their discovery obligations, such as subpoenas, to ensure an efficient and effective judicial process, *see, e.g.*, *Hickman v. Taylor*, 329 U.S. 495, 501 (1947), and it is clear that New York and the United States "ha[ve] a powerful interest in enforcing the acts of Congress, especially those, such as the Lanham Act, that are designed to protect intellectual property rights and prevent customer confusion," (August 23 Order at 11).

As for "the plaintiff's interest in obtaining convenient and effective relief," *Bank Brussels Lambert*, 305 F.3d at 129, there can be no doubt that Gucci has a strong interest in BOC complying with the 2010 and 2011 Subpoenas because, as the Court already found, "the documents sought by the Subpoena[s] are likely to provide the most fruitful avenue for discovering the identity of additional infringers" and "the most effective measure of the revenues generated by

10

Defendants." (August 23 Order at 6.) Because "there exists substantial doubt that [Gucci] could adequately resolve the dispute" by other means, *Nowak*, 94 F.3d at 718, Gucci's interests in obtaining its desired relief in its desired forum are even greater. (*See* August 23 Order at 10 (casting doubt on the viability of a Hague Convention request yielding Gucci the information it seeks).)

With respect to the international judicial system's interest in obtaining the most efficient resolution to the controversy, the Court's retention of jurisdiction over this action would undoubtedly provide the fastest and most practical means of resolving this dispute. The Court is already intimately familiar with the parties, facts, and legal issues, *see Ballard*, 65 F.3d at 1502, and BOC has already partially complied with Gucci's document requests. Forcing Gucci to initiate this process in China would be significantly less efficient, extremely time consuming, and potentially fruitless. (August 23 Order at 10.)

Finally, a balancing of the substantive social policies at issue further supports exercising personal jurisdiction. As the Court already concluded in its original § 442 comity analysis under the "balance of national interests" factor, Gucci's interest in compelling BOC to comply with the 2010 and 2011 Subpoenas and the United States' interest in enforcing the Lanham Act clearly outweigh BOC's interest in resisting compliance and China's interest in its bank secrecy laws. (August 23 Order at 11; *see also infra* Section II.B.) BOC has failed to identify any compelling substantive social policies not raised in its earlier comity briefing that would alter the Court's conclusion on this factor.

Accordingly, having carefully considered each of the factors discussed above, the Court concludes that the exercise of personal jurisdiction over BOC to compel it to comply with the 2010 and 2011 Subpoenas is consistent with "fair play and substantial justice," *Burger King*, 471 U.S. at 476, and comports with due process.

### B. Comity

In its August 23 Order, the Court conducted a detailed comity analysis and concluded that a balancing of the § 442 factors strongly supported ordering BOC to comply with Gucci's document requests. (August 23 Order at 13.) The Second Circuit upheld this conclusion, holding that there was "no abuse of discretion in this analysis" and that "BOC's arguments to the contrary are without merit." *Gucci II*, 768 F.3d at 141. However, the Second Circuit also directed the Court to "consider the question of comity again" in light of recent Chinese court cases involving BOC. *Id.* at 142.

The Court's initial comity analysis considered seven factors. Five of those factors came from § 442(1)(c): (i) "the importance to the investigation or litigation of the documents or other information requested;" (ii) "the degree of specificity of the request;" (iii) "whether the information originated in the United States;" (iv) "the availability of alternative means of securing the information;" and (v) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Two additional factors that the Court considered included "the hardship of compliance on the party or witness from whom discovery is sought" and "the good faith of the party resisting discovery." (August 23 Order at 6 (quoting *Minpeco S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 523 (S.D.N.Y. 1987).) After carefully considering the various factors and interests, the Court concluded that a balancing of the factors

11

"strongly weighs in favor" of granting Gucci's motion to compel. The Court noted that this result was particularly necessary in light of (1) "[BOC's] failure to demonstrate an actual likelihood that compliance with the Subpoena would result in criminal or civil liability in China," (2) "[BOC's] failure to put forward credible, non-speculative evidence that requests made through the Hague Convention represent a viable alternative method of obtaining discovery," (3) "the clear and obvious harm caused by counterfeiters to mark holders such as [Gucci]," and (4) "the fact that such counterfeiters have deliberately utilized institutions such as [BOC] to thwart Congress and the reach of the Lanham Act." (August 23 Order at 13.)

The Second Circuit directed the Court to "consider the question of comity again in light of the newly available December 4, 2013 Judgment of the Second Intermediate People's Court of Beijing Municipality, and any subsequent judgments it finds relevant." (Doc. No. 127 at 44.) After the Second Intermediate People's Court of Beijing Municipality issued the December 4, 2013 Civil Judgment (Doc. No. 142, Declaration of Yuqing Zhang, dated Jan. 22, 2015 ("Zhang Decl."), Ex. 10 ("Beijing Intermediate Court Judgment")), BOC appealed the Beijing Intermediate Court Judgment to the Higher People's Court of Beijing Municipality. On June 20, 2014, the Higher People's Court issued a Civil Judgment, upholding the Beijing Intermediate Court Judgment. (Zhang Decl., Ex. 11 ("Beijing High Court Judgment").) Accordingly, the Court will consider how both the Beijing Intermediate Court Judgment and Beijing High Court Judgment (the "Beijing judgments") affect the § 442 comity analysis.

The controversy underlying the Beijing judgments is a private civil suit between BOC and some of the Defendants in this action. Specifically, the plaintiffs in that action – who are Defendants here – alleged that BOC unlawfully froze their bank accounts as a result of the litigation before this Court, and argued that the terms and conditions of their account opening documents did not permit BOC to suspend their banking services. (Beijing Intermediate Court Judgment at 2-3.) Consequently, the account holders sought an order directing BOC to lift the account freezes and to pay all litigation costs associated with the case. (*Id.* at 2.)

The Beijing Intermediate Court held that BOC "failed to produce evidence to prove that [the plaintiffs] actually made any operation with malicious intent, or defamed or damaged the reputation of the bank, or maliciously attacked the electronic banking system of the bank," which the Beijing Intermediate Court found was the necessary prerequisite for BOC to freeze the plaintiffs' bank accounts. (*Id.* at 6-7.) The Beijing Intermediate Court further noted that the action before this Court "is still on-going and pending," "no judgment has taken effect in China," and BOC "failed to produce evidence sufficient to prove that it has justifiable reason . . . to cease to provide services" to the account holders. (*Id.* at 7.) The Beijing Intermediate Court therefore concluded that BOC had no contractual or legal basis for suspending the plaintiffs' accounts and ordered BOC to resume providing banking services to the account holders. (*Id.*)

On appeal, the Beijing High Court noted that under Chinese commercial banking law, "the lawful business operation of a commercial bank [should be] free from interference of any entity or individual," "a commercial bank shall protect the lawful interest of depositors from being damaged by any entity or individual," and "personal savings deposit business with commercial banks shall be based on the principles of voluntary deposit, free withdraw[al], deposit bearing interest, and the confidentiality for the

12

depositor." (Beijing High Court Judgment at 8.) After *de novo* review of the Beijing Intermediate Court Judgment (Doc. 137, Declaration of Donald Clarke, dated Dec. 1, 2014 ("Clarke Decl.") ¶ 13), the Beijing High Court held that BOC "failed to produce evidence to prove that [the account holders] violated any contractually agreed terms, [that BOC] unilaterally terminated services for their bank accounts, [and] thus there is no contractual or legal basis for BOC to unilaterally stop financial service and suspend usage of the accounts." (*Id.*) The Beijing High Court Judgment directed BOC to pay 140 renminbi in court fees (approximately $22.00 at current exchange rates) and upheld the Beijing Intermediate Court's injunction. (*Id.*)

As an initial matter, it is important to note that the Beijing judgments impact only a few of the seven factors the Court considered. Nothing in the Beijing judgments changes the Court's conclusion that: (i) "the documents requested in the Subpoena[s] are important to the instant litigation," (ii) "the Subpoena[s] [are] sufficiently specific," and (iv) "Hague Convention requests in circumstances similar to those presented here are not a viable alternative method of securing the information [Gucci] seek[s]." (August 23 Order at 6-10.) The only factors that the Beijing judgments could affect are (v) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located," and "the hardship of compliance on the party or witness from whom discovery is sought." The Court will consider each in turn.[2]

With respect to the balancing of national interests, the Court noted that while China has bank secrecy laws that prevent disclosure of an individual's account information without consent, such protection can be waived by several different public bodies. (August 23 Order at 10 (discussing declaration of BOC's Chinese bank law expert).) Accordingly, the Court concluded that "China's bank secrecy laws merely confer an individual privilege on customers rather than reflect a national policy entitled to substantial deference." (*Id.* at 11.) Weighing against China's interests, the Court concluded that the United States "has a powerful interest in enforcing the acts of Congress, especially those, such as the Lanham Act, that are designed to protect intellectual property rights and prevent consumer confusion." (*Id.*) Overall, the Court determined that this factor "clearly weighs in favor of" Gucci. (*Id.*)

The Beijing judgments, if anything, shift the balance of national interests more firmly toward the United States because they acknowledge that BOC had broad contractual rights over its customers' account information, such as the power to suspend or terminate service in certain circumstances. (Clarke Decl. ¶¶ 16-18.) That BOC did not sufficiently prove the existence of those circumstances does not change the fact that the Beijing judgments recognized BOC as lawfully having that authority. The Beijing judgments do not provide any support for BOC's assertion that China's bank secrecy laws are rigidly enforced or a matter of strong state policy that trump the United States' interest in enforcing the Lanham Act.

---

[2] Because the Second Circuit explicitly cabined the Court's reconsideration of its comity analysis to the Beijing Intermediate Court Judgment and "any subsequent judgments it finds relevant," such as the Beijing High Court Judgment, the Court does not consider the numerous arguments the parties raise with respect to the Court's comity analysis that have nothing to do with the Beijing judgments. (*See* Mem. at 23-24; Opp. at 23-24; Rep. at 8-9.) In any event, most of the parties' arguments are simply rehashes of ones previously made in connection with the Court's initial comity analysis.

13

Accordingly, the Court concludes that this factor "clearly weighs in favor of" Gucci.

As for the hardship of compliance, the Court initially found that this factor weighed in favor of Gucci because it concluded that BOC's representations that it would face significant criminal and civil liability from complying with the 2010 Subpoena were unduly speculative. Specifically, the Court determined that the Chinese cases that purportedly demonstrated that Chinese courts take customer bank account secrecy seriously did not in fact support BOC's assertion that compliance with the 2010 Subpoena would subject BOC or its employees to heavy fines or incarceration. (August 23 Order at 11-12.) In fact, the Court concluded that BOC could point to no case where a Chinese bank was subjected to liability for disclosing the type of bank account information sought by Gucci. (*Id.* at 12.) In light of the speculative nature of BOC's professed hardship, the Court determined that the factor supported granting the motion to compel.

Once again, the Beijing judgments only provide further support for Gucci's case. The controversy underlying the Beijing judgments was a simple, private contract case. The Beijing Intermediate Court and Beijing High Court merely concluded that BOC had not sufficiently proven grounds upon which it could lawfully freeze the plaintiffs' bank accounts. Nothing in the Beijing judgments suggests that China has an ironclad requirement of bank secrecy or that disclosure of the information requested by the 2010 and 2011 Subpoenas would expose BOC and its employees to serious criminal or civil liability in China. Even BOC's own Chinese bank law expert does not opine that the Beijing judgments demonstrate that China has a strong national policy against disclosure of bank client information (*see* Zhang Decl. ¶¶ 30-35), whereas Gucci's Chinese bank law expert expressly states that the Beijing judgments do not change his opinion that "there is no strong state policy affording a high degree of protection to clients of Chinese banks" and that "BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case" (Clarke 2014 Decl. ¶¶ 14-15). Put simply, the Beijing judgments, which resulted in BOC paying the equivalent of $22.00 in court fees, do nothing to change the Court's prior conclusion that BOC's contention that compliance with the 2010 and 2011 Subpoenas would subject it to serious criminal and civil liability is unduly speculative.

Because the Court previously found that a balancing of the § 442 factors "strongly weighs in favor of" granting Gucci's motion to compel, and the Beijing judgments actually strengthen that determination, the Court reaffirms its comity analysis and concludes that ordering BOC to comply with the 2010 and 2011 Subpoenas is consistent with § 442 of the Restatement (Third) of Foreign Relations Law.

### III. CONCLUSION

For the reasons set forth above, the Court concludes that it has specific personal jurisdiction over BOC with respect to the 2010 and 2011 Subpoenas and that exercising such jurisdiction comports with due process and principles of comity. Accordingly, Plaintiffs' motion to compel is granted. IT IS HEREBY ORDERED THAT BOC shall produce all documents requested in the 2010 and 2011 Subpoenas as they pertain to all Defendants, including but not limited to (1) all documents and communications regarding Defendants or their accounts, (2) all documents associated with any accounts or deposits held in any Defendants' name, and (3) all documents relating to any checks, money orders, or other negotiable instruments purchased by Defendant. For clarification, "all Defendants" covers all Defendants who have been named

in this action, including those in the Second Amended Complaint: Wenying Guo, Xiaochao Shang, Lei Xu, Fengyuan Zhao, Liqun Zhao, Ming Zhao, and Peiyuan Zhao. IT IS FUTHER ORDERED THAT Plaintiffs shall submit a letter to the Court by October 15, 2015 apprising the Court of BOC's compliance with the 2010 and 2011 Subpoenas. The Clerk of Court is respectfully directed to terminate the motion located at docket number 135.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 29, 2015
       New York, New York

\*   \*   \*

Plaintiffs are represented by Robert L. Weigel, Esq., Howard Sean Hogan, Esq., and Anne Maureen Coyle, Esq. of Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, NY 10166.

Bank of China is represented by Andrew Rhys Davies, Esq., Justin L. Orman, Esq., and Brian T. Fitzpatrick, Esq. of Allen & Overy, LLP, 1221 Avenue of the Americas, New York, NY 10020.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09-29-15