UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                   :

GUCCI AMERICA, INC., BALENCIAGA
AMERICA INC., BALENCIAGA S.A., BOTTEGA
VENETA INTERNATIONAL S.A.R.L.,
BOTTEGA VENETA INC., LUXURY GOODS
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT
LAURENT AMERICA, INC.

                Plaintiffs,

        -against-

WEIXING LI a/k/a XIN LI, LIJUN XU a/k/a JACK
LONDON and TING XU a/k/a JACK LONDON
a/k/a XU TING a/k/a REBECCA XU, WENYING
GUO, XIAOCHAO SHANG, LEI XU, FENGYUAN
ZHAO, LIQUN ZHAO, MING ZHAO, and
PEIYUAN ZHAO, all doing business as
REDTAGPARTY, MYLUXURYBAGS.COM,
KUELALA.COM, XPRESSDESIGNERS.COM,
XPRESSDESIGNER.NET, and DESIGNER
HANDBAGS; ABC COMPANIES;
and JOHN DOES,

              Defendants.
---------------------------------------------------------------X

               2010 Civ. 4974 (RJS)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO SANCTION
AND HOLD BANK OF CHINA IN CIVIL CONTEMPT FOR REFUSING TO COMPLY
WITH THE COURT'S SEPTEMBER 29 AND OCTOBER 16, 2015 ORDERS**

Robert L. Weigel
Howard S. Hogan
Anne M. Coyle
Casey K. Lee
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Counsel for Plaintiffs*

New York, New York
November 9, 2015

## TABLE OF CONTENTS

<div align="right"><u>Page(s)</u></div>

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 6

    A.   The Documents Requested in the Subpoenas Are Indispensable to Plaintiffs'
Claims Against Defendants........................................................................................ 6

    B.   The Second Circuit Found No Abuse of Discretion in this Court's Comity
Analysis, and this Court Followed the Circuit's Instructions on Remand..................... 9

ARGUMENT ................................................................................................................... 11

I.    BOC SHOULD BE HELD IN CONTEMPT FOR FAILURE TO PRODUCE THE
SUBPOENAED DOCUMENTS AS ORDERED BY THE COURT ................................. 11

    A.   The Court's Orders Unambiguously Require BOC to Produce All Documents
Requested in the Subpoenas...................................................................................... 12

    B.   BOC's Noncompliance Is Clear, Convincing, and Outright Admitted........................ 13

    C.   BOC Made No Reasonable Attempt to Comply with this Court's Orders ................... 14

II.   SEVERE SANCTIONS ARE WARRANTED IN THIS CASE........................................... 15

    A.   Plaintiffs Are Entitled to Compensatory Damages for the Damage Caused by
BOC's Refusal to Obey the Orders ........................................................................... 17

    B.   This Court May Impose a Daily Coercive Sanction to Secure BOC's
Compliance with the Orders ..................................................................................... 22

    C.   This Court Should Award Plaintiffs Their Costs and Attorney's Fees........................ 24

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Badgley v. Santacroce*,
   800 F.2d 33 (2d Cir. 1986) .................................................................................. 11

*Chem. Bank v. Affiliated FM Ins. Co.*,
   154 F.R.D. 91 (S.D.N.Y 1994) ............................................................................ 16

*Chevron Corp. v. Donziger*,
   296 F.R.D. 168 (S.D.N.Y. 2013) ........................................................................ 21

*Compania Pelineon de Navegacion, S.A. v. Tex. Petrol. Co.*,
   540 F.2d 53 (2d Cir. 1976) ............................................................................ 17, 19

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*,
   No. 07 Civ. 3635(DC), 2008 WL 3852046 (S.D.N.Y. Aug. 13, 2008) .................. 25

*Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*,
   246 F.3d 142 (2d Cir. 2001) .............................................................................. 16

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014) .......................................................................................... 2

*Drywall Tapers & Pointers of Greater N.Y., Local 1974 of I.B.P.A.T. AFL-CIO v.*
   *Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*,
   889 F.2d 389, 395 (2d Cir. 1989) .................................................................. 12, 13

*First Nat'l City Bank of New York v. IRS*,
   271 F.2d 616 (2d Cir. 1959) .............................................................................. 22

*Gucci Am., Inc. v. Bank of China*,
   768 F.3d 122 (2d Cir. 2014) ...................................................................... 2, 9, 11, 22

*Gucci Am., Inc. v. Curveal Fashion*,
   No. 09 Civ. 8458 (S.D.N.Y. May 27. 2010) ........................................................ 15

*In re Grand Jury Subpoena*,
   218 F. Supp. 2d 544 (S.D.N.Y. 2002) ................................................................ 15

*Int'l Bus. Machs. Corp. v. United States*,
   493 F.2d 112 (2d Cir. 1973) .............................................................................. 24

*Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*,
   389 U.S. 64 (1967) ............................................................................................ 12

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Jones v. Niagara Frontier Transp. Auth.*,
   836 F.2d 731 (2d Cir. 1987) ................................................................. 16

*Juan F. ex rel. Lynch v. Weicker*,
   37 F.3d 874 (2d Cir. 1994) ................................................................... 13

*Koehler v. Bank of Bermuda Ltd.*,
   12 N.Y.3d 533 (2009) .................................................................... 19, 20

*Latino Officers Ass'n City of N.Y. v. City of New York*,
   519 F. Supp. 2d 438 (S.D.N.Y. 2007) .................................................. 13

*Levin v. Tiber Holding Corp.*,
   277 F.3d 243 (2d Cir. 2002) ................................................................. 13

*Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*,
   885 F.2d 1 (2d Cir. 1989) .............................................................. 16, 24

*Milburn v. Coughlin*,
   83 F. App'x 378 (2d Cir. 2003) ............................................................ 17

*Motorola Credit Corp. v. Standard Chartered Bank*,
   24 N.Y.3d 149 (2014) ........................................................................... 19

*NIKE Inc. v. Wu*,
   13 Civ. 802 (SAS) (S.D.N.Y. Aug. 20, 2015) ......................................... 8

*N.Y. State Nat'l Org. for Women v. Terry*,
   886 F.2d 1339 (2d Cir. 1989) ............................................................... 16

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
   369 F.3d 645 (2d Cir. 2004) ................................................................. 11

*Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*,
   673 F.2d 53 (2d Cir. 1982) ....................................................... 16, 23, 24

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F.3d 99 (2d Cir. 2002) ............................................................. 20, 21

*Shamis v. Ambassador Factors Corp.*,
   34 F. Supp. 2d 879 (S.D.N.Y. 1999) .................................................... 20

*Shepherd v. Am. Broad. Cos.*,
   62 F.3d 1469 (D.C. Cir. 1995) .............................................................. 16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Spallone v. United States,*
   493 U.S. 265 (1990) ................................................................................................ 11

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
   282 U.S. 555 (1931) ................................................................................................ 17

*Summit Bank v. Taylor,*
   No. 96 CIV. 7229 (BSJ), 1997 WL 811526 (S.D.N.Y. Nov. 12, 1997) ............................ 16, 24

*Tiffany (NJ) LLC v. Forbse,*
   2012 WL 3686289 (S.D.N.Y. Aug. 23, 2012) ........................................................ 21

*Tiffany (NJ) LLC v. Forbse,*
   11 Civ. 4976 (NRB) (S.D.N.Y. Sept. 22, 2015) ...................................................... 8

*Turner v. Hudson Transit Lines, Inc.,*
   No. 89 Civ. 4252 (PKL), 1992 WL 51570 (S.D.N.Y. Mar. 9, 1992) ........................ 20

*United States v. Chase Manhattan Bank, N.A.,*
   590 F. Supp. 1160 (S.D.N.Y. 1984) ...................................................................... 14

*United States v. Rylander,*
   460 U.S. 752 (1983) ................................................................................................ 14

*Upjohn Co. v. Medtron Labs., Inc.,*
   2005 WL 3078232 (S.D.N.Y. Nov. 16, 2005) ...................................................... 11

*Vuitton et Fils S.A.,*
   592 F.2d at 130 ........................................................................ 17, 19, 22, 24, 25

*Wultz v. Bank of China Ltd.,*
   942 F. Supp. 2d 452 (S.D.N.Y. 2013) .................................................................. 21

*Zino Davidoff SA v. CVS Corp.,*
   2008 WL 1775410 (S.D.N.Y. Apr. 17, 2008) ................................................ 13, 14

*Zubulake v. UBS Warburg LLC,*
   229 F.R.D. 422 (S.D.N.Y. 2004) .......................................................................... 16

**Other Authorities**

Restatement (Third) of Foreign Relations Law § 442 cmt. h. ...................................... 15

U.S. Dep't of Labor Bureau of Labor Statistics, CPI Inflation Calculator, http://www.bls.gov
   /data/inflation_calculator.htm ................................................................................ 24

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Rules**

Fed. R. Civ. P. 45(g) ................................................................................................ 11

Plaintiffs Gucci America, Inc., Balenciaga America Inc., Balenciaga S.A., Bottega Veneta International S.a.r.l., Bottega Veneta Inc., Luxury Goods International (L.G.I.) S.A., and Yves Saint Laurent America, Inc. (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for an order sanctioning and holding nonparty Bank of China ("BOC") in contempt for willfully refusing to obey this Court's September 29 and October 16, 2015 orders ("Orders"). *See* ECF 158, 161. Those Orders require BOC to "produce all documents requested" in Plaintiffs' July 16, 2010 and February 23, 2011 subpoenas ("Subpoenas") "as they pertain to all Defendants," which "covers all Defendants who have been named in this action, including those in the Second Amended Complaint" (ECF 158 at 14) by October 23, 2015, *see* ECF 161. BOC has clearly stated that it will not comply.

## PRELIMINARY STATEMENT

Defendants in this action operated an extensive counterfeiting network over a period of many years and sold millions of dollars of products that openly displayed counterfeit versions of Plaintiffs' world renowned trademarks. Defendants wired their ill-gotten profits—in U.S. dollars, using correspondent accounts and other banking systems in New York—to accounts in China at BOC, where Defendants maintained more than thirty accounts, according to the decision of the Beijing Intermediate Court filed by BOC in this action. 2d Cir. Dkt. 291-2 at 18.

On August 23, 2011, this Court ordered BOC to produce the Defendants' account records to Plaintiffs, finding the documents "important" to the litigation, "likely to provide the most fruitful avenue for discovering the identity of additional infringers" and "likely to provide the most effective measure of the revenues generated by Defendants." ECF 75 at 6-7. After repeatedly rejecting BOC's excuse that Chinese bank secrecy law prevented it from complying, this Court ultimately held BOC in contempt for disobeying its order to produce the documents.

ECF 116.  On appeal, the Second Circuit found that the Court weighed the appropriate comity factors under Section 442 of the Restatement (Third) and did not abuse its discretion in ordering the bank to turn over documents, notwithstanding BOC's asserted conflict with Chinese bank secrecy law.  The Second Circuit remanded, asking this Court (1) to evaluate the question of personal jurisdiction in the first instance in light of the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), and (2) to clarify the scope of the production order.  *See Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 134-35, 142-44 (2d Cir. 2014).  The Second Circuit's decision made clear that this Court could find BOC in contempt if (a) the Court found it had jurisdiction to enforce Plaintiffs' Subpoenas;  (b) the Court ordered BOC to produce the documents; and (c) BOC failed to comply.  *Id.* at 133, 142-43.  These circumstances have all now come to pass.

As an initial matter, BOC's course of conduct undermines its entire argument that it resisted this Court's August 23, 2011 Order because it was ambiguous.  *See, e.g.*, 2d Cir. Dkt. 186 at 52.  BOC has now confirmed it will disobey even crystal clear Orders to produce all of the documents called for in the Subpoenas.  BOC does not contend that the Orders are in any way ambiguous, but rather asserts that it disagrees with this Court's finding of jurisdiction and that BOC cannot comply "consistent with its obligations under Chinese law."  Declaration of Robert L. Weigel, Nov. 7, 2015 ("Weigel Decl.") Ex. 1 (BOC Oct. 23, 2015 Letter).  BOC's unjustifiable noncompliance is civil contempt, plain and simple.  BOC has made clear that it will not comply, and its noncompliance forecloses Plaintiffs' ability to identify all of the additional infringers and to recover the Defendants' profits, to which Plaintiffs are entitled under the Lanham Act.

This Court has already determined the importance of the requested documents to the

Plaintiffs' attempt to recover for the damages caused by the counterfeiters' intentional violations of the Lanham Act. BOC was certainly aware of this Court's findings as to the importance of the documents to this litigation and this Court's finding that "there exists substantial doubt that [Plaintiffs] could adequately resolve the dispute by other means." ECF 158 at 11 (quotations omitted). In the face of this clear guidance, BOC deliberately chose to violate this Court's Orders.

BOC was also aware of this Court's findings as to "the clear and obvious harm caused by counterfeiters to mark holders such as Plaintiffs, and . . . the fact that such counterfeiters have deliberately utilized institutions such as [BOC] to thwart Congress and the reach of the Lanham Act" (ECF 75 at 13) when it chose to go into contempt of this Court. BOC's contempt has blocked Plaintiffs' efforts to identify all of the counterfeiters, to determine the amount of revenue that the Defendants earned by violating the Lanham Act, and to locate where these revenues ultimately ended up. Moreover, because BOC has refused to produce "communications concerning Defendants or Defendants' accounts," (ECF 28-5 at 3), BOC's contempt has also made it impossible to verify if BOC acted in concert with the Defendants to allow them to drain their bank accounts in violation of this Court's order.

The evidence is clear that these Defendants were engaged in a massive counterfeiting operation that went on for years. The Defendants operated multiple websites, dating back to as early as 2005, including Myluxurybags.com, kuelala.com, Xpressdesigners.com, Xpressdesigner.net, eluxurybags.net kueluxury.com, WalletFashion.com, RedTagParty.com, SurisBoutique.com, YBags.com, UbestBags.com, and DesignersFusion.com. *See* ECF 9-11; Weigel Decl. Exs. 2-5. Plaintiffs have identified millions of dollars in sales through a single payment processor for a period of just 2 years.

But Defendants operations go back at least a decade.  Indeed, Defendants' counterfeiting enterprise pre-dates the filing of this Complaint.  Beginning as early as 2005, Defendants offered merchandise bearing counterfeits of Plaintiffs' trademarks for sale through several websites:

- "WalletFashion.com" sold counterfeit "Gucci" products as early as August 2005. Weigel Decl. Ex. 2.

- "RedTagParty.com" offered for sale dozens of "Gucci" shoulder bags, wallets, and belts as early as December 2006.  Weigel Decl. Ex. 3.

- "YBags.com", which as of September 2007 offered over 177 "Gucci" items—three of which were the site's most "popular products."  Weigel Decl. Ex. 4.

- "UbestBags.com", which in September 2007 offered dozens of "Gucci" bags including counterfeit versions of Gucci's 2005 and 2006 lines.  Weigel Decl. Ex. 5.

BOC's contempt has made it impossible to know how many millions more the counterfeiters took in.  The records of these sales were all clearly covered by the Subpoenas with which BOC has refused to comply.  ECF 28-5 at 3-4 (requesting "[a]ll documents associated with any open or closed checking, savings, money market accounts . . . held in the name of any of the Defendants" including "Wire transfer records" and "documentation . . . that relates to the deposit, withdrawal, or transfer of funds into, out of, or between any of Defendants' accounts").  In fact, although BOC refused to produce the relevant documents, the Chinese court revealed in its decisions that certain of the Defendants maintained at least 30 different accounts.  2d Cir. Dkt. 291-2 at 18.  By refusing to produce the counterfeiters' bank records as ordered, BOC has made it impossible for Plaintiffs to determine how much money went into the 30 accounts, how many more accounts exist in the names of Defendants, where the money that went into the accounts was sent, and the identity of the other participants in the counterfeiting scheme.  Put simply, BOC's contempt has damaged Plaintiffs by preventing them from recovering for "the clear and obvious harm" caused by the counterfeiters.

Accordingly, Plaintiffs respectfully request that BOC be required to compensate Plaintiffs for the harm caused by the Defendants—damages that cannot be recovered from the Defendants because of BOC's contemptuous refusal to turn over the counterfeiters' bank records. A daily coercive fine is also available, but by itself would not compensate Plaintiffs for the damage caused by BOC's contempt.

Utilizing the statutory damages expressly authorized by Congress to deal with precisely the situation where a counterfeiter's actual revenue cannot be determined, Plaintiffs have previously requested the sum of $12 million based on a statutory award of $200,000 per mark infringed per type of good offered for sale. This Court previously indicated that it would grant Plaintiffs' request for $12 million in damages. *See* Weigel Decl. Ex. 6 at 3 (Jan. 5, 2011 Hr'g Transcript). BOC was aware, when it chose to violate this Court's Orders, of the magnitude of the harm that would be caused by its refusal to produce the Defendants' bank records. Basic evidentiary principles, this Court's inherent power and common sense enable this Court to find that the documents BOC refused to produce would be damaging to BOC's position if they were in fact revealed. And to the extent BOC may argue that Plaintiffs cannot establish the harm to Plaintiffs caused by BOC's contempt with mathematical certainty, any imprecision is due to BOC's conscious refusal to turn over the records showing how many accounts were maintained by the Defendants and how much money was wired into them.

Accordingly, Plaintiffs respectfully request that this Court issue an order requiring BOC to compensate Plaintiffs for the damages caused by its contempt, in the amount of $12 million. An award in this amount is appropriate given the extensive record of BOC's contempt and the clear harm caused by BOC's decision to hide evidence of counterfeiting from this Court. Furthermore, a monetary award is particularly appropriate on the unique record in this case

where BOC has attempted to justify its non-compliance based on Chinese banking laws.   BOC

has never contended that such laws prevent it from honoring a U.S. monetary award.  Finally, a

monetary award is also appropriate because BOC—which knows where the counterfeiters'

money is located—can pursue its contractual right to indemnification against the counterfeiters,

as explained in the decision of the Chinese Court, upon its payment to Plaintiffs.

## FACTUAL BACKGROUND

### A.      The Documents Requested in the Subpoenas Are Indispensable to Plaintiffs' Claims Against Defendants

Plaintiffs brought this suit to obtain relief against Defendants, serial counterfeiters who,

despite numerous prior court orders enjoining their conduct, sold millions of dollars of

counterfeit goods in the United States that exploited Plaintiffs' valuable intellectual property.

Defendants reaped millions in illicit proceeds, with approximately $2.2 million in counterfeit

sales transacted through just one U.S. credit card payment processor, Frontline Processing.

Weigel Decl. Ex. 7 (Frontline Processing History).   The actual value of Defendants' sales is

likely far greater.  Defendants operated at least twelve websites over a period of at least five

years.  These websites sold hundreds of different types of counterfeit goods from 2005 to 2010.

According to records produced by Frontline Processing, Defendants' websites accepted

payments totaling $2.2 million from December 2007 through January 2010 made using Visa,

MasterCard, and Discover.  Weigel Decl. Ex. 7.  Frontline Processing processed the payments

made by Visa, MasterCard and Discover under an account for "Designer Handbags" registered

by defendant Lijun Xu. *Id.* The Defendants' websites also accepted American Express, which

unlike the other credit card associations does not rely on outside payment processors.

Documents produced by American Express reveal that during the period between 2008-2010

Defendants held two accounts with American Express, which processed over $250,000 in sales

for Defendants' website Myluxury.com. Weigel Decl. Ex. 8 (Amex Records). To get an idea of the magnitude of Defendants' known counterfeiting operation, just two of Defendants' 12 websites—eluxurybags.net and kueluxury.com—generated sales of more than $450,000 in the 6 months between February 2010 and July 2010.[1] Weigel Decl. Ex. 9 (Ezot Records). These sales are on top of—and not included in—the sales reflected in the transaction processing history produced by Frontline Processing. The Defendants also maintained multiple accounts with PayPal. Weigel Decl. Ex. 10 (PayPal Records). Defendants must have also used other credit card processors to effectuate their illegal sales on their websites that were in operation prior to opening their Frontline account in December 2007, and the proceeds of such sales likely also made their way to accounts in China. *See* ECF 9-2 ¶ 57. BOC's failure to comply with this Court's order to produce, *inter alia*, wire transfer records showing the number and source of the U.S. dollar wires into Defendants' 30 or more bank accounts at BOC makes it impossible to determine exactly how many different credit card processors Defendants utilized to process their sales of counterfeit goods or how much money was wired into Defendants' accounts. *See* ECF 75 at 6-7 (holding that the account records are "likely to provide the most effective measure of the revenues generated by Defendants.").

Defendants' website myluxurybags.com sold literally hundreds of products, with 9 pages devoted to "Gucci handbags" alone, and sold products at prices of up to $850 per piece. Weigel Decl. Ex. 11; ECF 9-2 at 25. The Defendants' other websites also offered a wide selection of counterfeit products using counterfeits of Plaintiffs' trademarks. After reviewing Plaintiffs'

---

[1] On February 23, 2008, Defendants—under the alias "Kewei Zhao"—registered the domain names eluxurybags.net and Kueluxury.com using the same California address as "Ting Xu" and "Lijun Xu." Weigel Decl. Ex. 12. On July 3, 2009, in response to a series of DMCA take-down notices, Defendant "Jack London" transferred all content from Myluxurybags.com to Kueluxury.com. Weigel Decl. Ex. 13.

motion for a default judgment—currently held in abeyance, pending receipt of the information this Court directed BOC to produce back in 2011—this Court indicated that an award to Plaintiffs of $12 million would be appropriate based on Defendants' willful infringement of at least 20 of Plaintiffs' registered trademarks. Weigel Decl. Ex. 6 at 3 ("I'm going to grant $12 million in damages.").[2]

Defendants transferred the revenues from their sales of counterfeits to consumers in the U.S. to their BOC accounts in China. Based on just the records of the U.S. accounts that Plaintiffs have so far uncovered, Plaintiffs can establish that Defendants wired at least $530,000 from their U.S.-based accounts to their accounts at BOC. ECF 136 at 3-4. Given the millions in counterfeit sales Defendants generated in the U.S., and the fact that Defendants maintained at least 30 accounts at BOC, the actual total is undoubtedly much greater—but due to BOC's failure to turn over the records, the actual amount of the counterfeiters' revenue cannot be determined. As disclosed in the Chinese judgment BOC submitted to the Second Circuit, the approximate value of these accounts was over $450,000 at the time BOC froze the accounts—nearly a year after service of the asset freeze order on BOC. 2d Cir. Dkt. 291-2 at 18. Due to BOC's refusal to produce documents pursuant to this Court's Orders, Plaintiffs will never know

---

[2]  Plaintiffs submitted documented proof to the Court that Defendants have sold, attempted to sell, or distributed at least 6 different types of goods bearing counterfeits of at least 13 Gucci Marks. *See* Second Amended Complaint ¶¶ 51-51(a), ECF 55; ECF 9 at 9-14; (Falsone Decl.). Similarly, Defendants infringed 1 Balenciaga Mark, selling at least 3 types of goods bearing counterfeits of Balenciaga Marks. ECF 55 ¶ 52; ECF 9 at 14-17. In addition, Defendants infringed 2 Bottega Veneta Marks on at least 1 type of good bearing counterfeits of Bottega Veneta Marks. ECF 55 ¶ 53; ECF 9 at 17-18. Finally, Defendants infringed 4 YSL Marks on at least 1 type of good bearing counterfeits of YSL Marks. ECF 55 ¶ 54; ECF 9 at 18; ECF 9-2 at 1. Courts in this district frequently award a multiplier of more than $200,000. *See, e.g., Order, Tiffany (NJ) LLC v. Forbse*, 11 Civ. 4976 (NRB) (S.D.N.Y. Sept. 22, 2015) (awarding $1 million per mark per category of good infringed); *Order*, NIKE Inc. v. Wu, 13 Civ. 802 (SAS) (S.D.N.Y. Aug. 20, 2015) (awarding $1 million per mark per category of good infringed).

how much money went through Defendants' accounts or even the true amount that was in the accounts when this Court ordered Defendants' assets frozen back in July 2010.

Under the remedies provided by the Lanham Act, Defendants' counterfeiting proceeds in equity rightly belong to Plaintiffs. But as this Court recognized, since "every remaining Defendant has failed to appear in this action," the only real issue in dispute in this case "is the amount of Plaintiffs' damages." ECF 75 at 6. As a result, practically speaking, "information related to Defendants' bank accounts is likely to provide the most effective measure of the revenues generated by Defendants in contravention of United States trademark laws." *Id.* BOC's failure to provide this information has brought Plaintiffs' investigation to a halt, effectively destroying Plaintiffs' ability to recover the Defendants' profits.

**B.      The Second Circuit Found No Abuse of Discretion in this Court's Comity Analysis, and this Court Followed the Circuit's Instructions on Remand**

This Court rejected BOC's argument that Chinese bank secrecy law shields the bank from complying with the same discovery obligations owed by any bank in New York. This Court found, among other things, that the United States' "powerful interest" in protecting intellectual property outweighed China's demonstrably limited interest in bank secrecy and that BOC's purported exposure to liability for producing the requested information was "unduly speculative." ECF 75 at 11-12. On appeal, the Second Circuit affirmed this Court's approach, holding that its comity analysis under Section 442 of the Restatement (Third) of Foreign Relations Law was proper. *See Gucci Am.*, 768 F.3d at 141. The U.S. Government, as invited *amicus curiae*, agreed that "there was no reversible error in the *Gucci* court's order compelling BOC to comply with Gucci's document subpoena." 2d Cir. Dkt. 319 at 22.

This Court followed the Second Circuit's directive on remand, finding specific jurisdiction over BOC based on its numerous "substantial, deliberate, and recurring" contacts in

New York and the fact that "BOC frequently and deliberately used its New York correspondent account with Chase to effectuate wire transfers for its U.S. clients, including, critically, Defendants in this action." ECF 158 at 5 (emphasis omitted). The Court also "consider[ed] the question of comity again in light of the newly available December 4, 2013 Judgment of the Second Intermediate People's Court of Beijing Municipality," as directed by the Second Circuit, and the judgment of the Higher People's Court of Beijing Municipality subsequently submitted to this Court. *Id.* at 12 (quotations omitted). The Court recognized that the Beijing judgments "shift the balance of national interests more firmly towards the United States because they acknowledge that BOC had broad contractual rights over its customers' account information," and "do not provide any support for BOC's assertion that China's bank secrecy laws are rigidly enforced or a matter of strong state policy that trump the United States' interest in enforcing the Lanham Act." *Id.* at 13. The Court further recognized that "[n]othing in the Beijing judgments suggests that . . . disclosure of the information requested by the 2010 and 2011 Subpoenas would expose BOC and its employees to serious criminal or civil liability in China." *Id.* at 14. Indeed, those judgments merely "resulted in BOC paying the equivalent of $22.00 in court fees." *Id.*

Following the Court's September 29 Order directing BOC to comply fully with the subpoenas, BOC informed this Court that it sought to confer "with its domestic regulators" to "evaluate how it should respond to its *conflicting obligations*," and that it "is awaiting the instructions of its domestic regulators." ECF 160 at 1 (emphasis added). And on October 23, 2015, the deadline for compliance set by this Court, *see* ECF 161, BOC informed Plaintiffs that despite this Court's rulings, "BOC maintains . . . that it is not subject to the jurisdiction of the Court," and that "BOC cannot comply with the September Order consistent with its obligations

under Chinese law," and that this "requires BOC not to comply with the September Order." Weigel Decl. Ex. 1.  Plaintiffs promptly filed this motion.

## ARGUMENT

**I.     BOC SHOULD BE HELD IN CONTEMPT FOR FAILURE TO PRODUCE THE SUBPOENAED DOCUMENTS AS ORDERED BY THE COURT**

The law leaves no doubt that this Court has the "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quotations omitted); *see also* Fed. R. Civ. P. 45(g) ("The court for the district where compliance is required . . . may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.").  "The purpose of civil contempt . . . is to compel a reluctant party to do what a court requires . . . ." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986).  And that power applies equally to recalcitrant nonparties like BOC that abjectly refuse to comply with a court order.  *See, e.g.*, *Upjohn Co. v. Medtron Labs., Inc.*, 2005 WL 3078232, at *1 (S.D.N.Y. Nov. 16, 2005) (non-parties held in contempt for failure to comply with a court order and subpoenas).

The Court may thus hold a non-party in civil contempt where "(1) the order the contemnor failed to comply with is clear and unambiguous; (2) the proof of non-compliance is clear and convincing; and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quotations omitted).  The Second Circuit expressly authorized this Court to hold BOC in contempt in precisely these circumstances. *See Gucci Am.*, 768 F.3d at 142.

A.   **The Court's Orders Unambiguously Require BOC to Produce All Documents Requested in the Subpoenas**

Contrary to the position it took in the Second Circuit, BOC cannot plausibly deny that this Court's Orders dated September 29 and October 16 are clear and unambiguous.  the Orders required BOC to "produce *all* documents requested in the 2010 and 2011 Subpoenas as they pertain to *all* Defendants" (ECF 158 at 14 (emphasis added)) by October 23, 2015.  The "clear and unambiguous" requirement is met where it leaves "no doubt in the minds of those to whom it was addressed," and the enjoined nonparty can "ascertain from the four corners of the order precisely what acts are forbidden." *Drywall Tapers & Pointers of Greater N.Y., Local 1974 of I.B.P.A.T. AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir. 1989).  This Court is merely required to "frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).  This requirement has unquestionably been fulfilled in this case.

The Orders state in no uncertain terms that BOC "shall produce all documents requested in the 2010 and 2011 Subpoenas as they pertain to all Defendants" (ECF 158 at 14) by October 23, 2015.  The Court further explains that this directive "includ[es], but [is] not limited to (1) all documents and communications regarding Defendants or their accounts, (2) all documents associated with any accounts or deposits held in any Defendants' name, and (3) all documents relating to any checks, money orders, or other negotiable instruments purchased by Defendant[s]." *Id.*  And the Court did not stop there:  In light of BOC's grievance that the Court's prior order compelling production (ECF 75) was insufficiently clear as to the scope of the term "Defendants," *see* ECF 108 at 10-15—the Orders expressly dictate that, "[f]or *clarification*, 'all Defendants' covers all Defendants who have been named in this action,

including those in the Second Amended Complaint:  Wenying Guo, Xiaochao Shang, Lei Xu,

Fengyuan Zhao, Liqun Zhao, Ming Zhao, and Peiyuan Zhao."  ECF 158 at 14-15 (emphasis

added).  And "[t]he lack of ambiguity is also evidenced by the fact that" BOC "sent a letter to the

court complaining that the [order] would cause [it] great hardship." *Drywall Tapers*, 889 F.2d at

395; *see also* ECF 160.  In sum, the Orders leave no room for doubt over what they require and

forbid, and decisively extinguish any concern over ambiguity.

  **B.**  **BOC's Noncompliance Is Clear, Convincing, and Outright Admitted**

   BOC's noncompliance with the Court's Orders is undisputed—indeed, BOC flatly admits

its failure and refusal to comply. Weigel Decl. Ex. 1.  This is more than enough to meet the

"clear and convincing evidence" of noncompliance requirement.  "In the context of civil

contempt," the "clear and convincing" element "requires a quantum of proof adequate to

demonstrate a reasonable certainty that a violation occurred." *Levin v. Tiber Holding Corp.*, 277

F.3d 243, 250 (2d Cir. 2002) (quotations omitted); *see also Zino Davidoff SA v. CVS Corp.*, 2008

WL 1775410, at *13 (S.D.N.Y. Apr. 17, 2008) (same).  The Second Circuit has suggested that

this element triggers the "substantial compliance" standard in evaluating noncompliance. *See*

*Latino Officers Ass'n City of N.Y. v. City of New York*, 519 F. Supp. 2d 438, 446 & n.43

(S.D.N.Y. 2007) (citing *Juan F. ex rel. Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994)).

BOC's conduct comes nowhere near meeting the "substantial compliance" threshold.  Despite

the Court's unambiguous directives to produce all documents responsive to the Subpoenas—and

its clarification of precisely what that entails—BOC has refused to do so on the basis of its belief

"that it is not subject to the jurisdiction of the Court" and "cannot comply with the September

Order consistent with its obligations under Chinese law." Weigel Decl. Ex. 1.  BOC has

produced nothing more since its incomplete production of documents related to only two of

Defendants' BOC accounts back in 2011, withholding highly relevant information regarding

deposits into and withdrawals from even those accounts. *See* ECF 108 at 9; ECF 111 at 9.

BOC's noncompliance is clearly and convincingly established—indeed, it is beyond debate.

### C.   BOC Made No Reasonable Attempt to Comply with this Court's Orders

BOC cannot seriously contend that it has exercised any (let alone reasonable) diligence.

"Reasonable diligence, at the very least, requires [BOC] to develop reasonably effective methods

of compliance." *Zino Davidoff*, 2008 WL 1775410, at *8. BOC has done nothing of the sort.

BOC instead continues to assert both that this Court lacks specific jurisdiction to compel it to

comply with a validly issued subpoena, and that compliance with the Orders presents an

intractable conflict between Chinese and U.S. law. *See* ECF 160; Weigel Decl. Ex. 1. This

Court has rejected this argument on four separate occasions, *see* ECF 75, 98, 116, 158, and the

Second Circuit expressly upheld this Court's application of the appropriate standard. This Court

has already rejected BOC's improper attempts to relitigate the validity of a court order as an

excuse to contempt sanctions. *See* ECF 116 at 6-7. "Once a court has issued an order, the

validity of that order may not be relitigated" on a contempt motion. *United States v. Chase

Manhattan Bank, N.A.*, 590 F. Supp. 1160, 1162 (S.D.N.Y. 1984). The law is unmistakably clear

that "a contempt proceeding does not open to reconsideration the legal or factual basis of the

order alleged to have been disobeyed and thus become a retrial of the original controversy."

*United States v. Rylander*, 460 U.S. 752, 756 (1983) (quotations omitted).

Nor does BOC's reflexive reliance on Chinese law constitute a reasonable attempt to

comply. As this Court has already recognized, "seeking authorization from foreign regulators in

the face of a clear order to produce responsive documents" is not sufficient diligence to avoid

civil contempt. ECF 116 at 7. Indeed, "[w]hile disclosure with consent of the Chinese

government would serve to alleviate BOC's concerns about its obligations under Chinese law,

the Court must only consider BOC's good faith efforts to comply with the [Orders], not Chinese law because the Order[s] did not purport to direct disclosure contingent upon strict compliance with Chinese law. *Id.* (quoting *Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458, at 13 (S.D.N.Y. May 27. 2010), *adopted*, (S.D.N.Y. May 27, 2010) (quotations and brackets omitted)). Such good faith efforts are altogether lacking here.

To the contrary, BOC's repeated efforts to obtain the Chinese government's pronouncements against compliance with the Orders demonstrate a complete *lack* of reasonable diligence. A contemnor who "court[s] legal impediments" and seeks "advice from [a foreign government] intended to elicit support for resisting anticipated subpoenas," including "suggest[ing] bases for non-compliance," "does not ... genuinely attempt[] to comply" with a subpoena. *In re Grand Jury Subpoena*, 218 F. Supp. 2d 544, 563-64 (S.D.N.Y. 2002) (quotations omitted). "Evidence that parties or targets have actively sought a prohibition against disclosure ... may be regarded as evidence of bad faith and justification for sanctions ...." Restatement (Third) of Foreign Relations Law § 442 cmt. h. As this Court observed, BOC's gambit throughout this case has been to wait until the Court "make[s] a ruling," "then the Chinese regulators or the banks ... take[] steps that will whittle away at [its] ruling," "then [BOC] ... asks [the Court] to reconsider," "then additional facts and additional time passes[,] and there is again more attempts to ... whittle away" at the Court's orders until "there is this great new fact that you get to argue ... because the decision was made to delay" compliance, ECF 121 at 28:18-24. This is precisely the type of misconduct that warrants holding BOC in civil contempt.

## II.    SEVERE SANCTIONS ARE WARRANTED IN THIS CASE

BOC's willful defiance need not be countenanced by this Court. "[I]n this day of burgeoning, costly and protracted litigation courts should not shrink from imposing harsh

sanctions where they are clearly warranted." *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987) (ellipsis omitted). Severe sanctions for BOC's contempt are particularly appropriate here. Civil contempt sanctions may either "coerce the contemnor into future compliance with the court's order" or "compensate the complainant for losses resulting from the contemnor's past noncompliance." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989). "When the purpose is compensatory, the order should be fashioned so as to reimburse the injured party for his actual damages." *Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc.*, 673 F.2d 53, 57 (2d Cir. 1982). By contrast, when "the purpose is coercive, the district court has broad discretion to design a remedy that will bring about compliance." *Id.*

This Court has the inherent power to draw an adverse inference against BOC for failure to produce relevant evidence pursuant to the Orders—either "in aid of proper fact-finding on the merits," *Chem. Bank v. Affiliated FM Ins. Co.*, 154 F.R.D. 91, 95 (S.D.N.Y 1994), or as a sanction for improper litigation conduct, *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430, n.60 (S.D.N.Y. 2004) (citing *Shepherd v. ABC*, 62 F.3d 1469, 1474-75 (D.C. Cir. 1995)).

Further, this Court may exercise its equitable discretion to award costs and attorney's fees caused by BOC's contempt. *See Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 147 (2d Cir. 2001). This Court may "award the reasonable costs of prosecuting the contempt, including attorney's fees … where violation of a court order is found to have been willful." *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 8 (2d Cir. 1989) (quotations omitted). This standard applies equally to nonparties such as BOC. *See, e.g.*, *Summit Bank v. Taylor*, No. 96 CIV. 7229 (BSJ), 1997 WL 811526, at *4 (S.D.N.Y. Nov. 12, 1997).

A.    **Plaintiffs Are Entitled to Compensatory Damages for the Damage
Caused by BOC's Refusal to Obey the Orders**

BOC should be held to account for the damages it has inflicted on Plaintiffs through its bold defiance of this Court's authority.  Compensatory sanctions "make reparation to the injured party and restore [it] to the position [it] would have held had the [order] been obeyed." *Vuitton et Fils S.A.*, 592 F.2d at 130.  "The district court is not free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established. *Id.* "[O]nce the [complainant] has proved that he has suffered harm because of a violation of the terms of an [order], compensatory damages are appropriate." *Id.*

Further, "the fact that compensatory damages may be difficult to ascertain does not relieve the district court of its duty to award compensatory damages if actual injuries are suffered." *Milburn v. Coughlin*, 83 F. App'x 378, 380 (2d Cir. 2003) (summary order) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). "It is not required that damages be proved with mathematical exactness provided that there is reasonable data from which the amount of damages can be ascertained with reasonable certainty." *Compania Pelineon de Navegacion, S.A. v. Tex. Petrol. Co.*, 540 F.2d 53, 56 (2d Cir. 1976).  In sum, BOC "may not insist on theoretical perfection." *Id.*

Plaintiffs' injuries from BOC's contempt are quite literally the inability to recoup the Defendants' profits to which they are entitled or to identify additional infringers, such as the owners of the factories who manufactured (likely still manufacture) the counterfeit goods sold by Defendants in the United States.   In addition to shielding Defendants from any legal consequences for their flagrant theft of Plaintiffs' intellectual property, BOC's conduct has brought Plaintiffs' litigation against Defendants to a screeching halt.   Plaintiffs need the information sought in the Subpoenas to investigate Defendants' illegal counterfeiting activities

17

and hold Defendants accountable for the illegal profits they transferred from the United States to China using the services of BOC.

This Court has acknowledged that the information BOC has been ordered to produce "is likely to provide the most effective measure of the revenues generated by Defendants in contravention of United States trademark laws" and "likely to provide the most fruitful avenue to discovering the identity of additional infringers." ECF 75 at 6. The massive scope of the counterfeiters' operation is established by proving the number of different websites, the enormous number and variety of counterfeiting products offered by the Defendants and the length of time the counterfeiters operated. As set forth above, Defendants operated at least 12 websites during at least a five-year period, offering for sale hundreds of counterfeit items, offered dozens of different styles of handbags and wallets, and infringed at least 20 separate trademarks on 10 categories of goods. *See* Weigel Decl. Exs. 2-5; ECF 9, 9-2. But because BOC has refused to produce Defendants' account records, Plaintiffs have had at best a pinhole view of where the proceeds of the Defendants' operations ended up. Even that brief look has indicated that Defendants' counterfeiting scheme is massive, with at least $2.9 million sales in a two and a half year period ($2,240,449 through Frontline Processing between December 2007 and January 2010; $250,000 through American Express from 2008-2010, and $466,000 in sales from February 2010-July 2010) that Plaintiffs have been able to discover, and over $500,000 in counterfeiting proceeds transferred to BOC from eleven transactions made in 2009 and 2010. Weigel Decl. Exs.  ECF 138.2-138.12. As a direct result of BOC's contemptuous conduct, Plaintiffs do not know the amount of U.S. dollars that were transferred to Defendants' accounts at BOC prior to 2009—or after 2010. Plaintiffs cannot determine if there were other accounts being utilized during those 2 years. Based on the Chinese judgments, it is clear that the

Defendants continue to maintain and use at least 30 accounts at BOC, and in light of the Defendants' serial counterfeiting activities, it is quite likely that additional ill-gotten gains are continuing to flow into the Defendants' accounts every day.  BOC has an ongoing obligation to produce these records pursuant to the Subpoenas and this Court's Orders.  ECF 28-5 at 3 ("This is a continuing request.").

Under principles of equity, those illegal profits belong to Plaintiffs.  But as a direct result of BOC's stonewalling Plaintiffs' requests for information regarding Defendants' accounts, Plaintiffs cannot recover the proceeds of the counterfeiting to which they are clearly entitled.  And BOC's misconduct likely permitted Defendants to obscure and further secret their illicit gains, making it even more difficult for Plaintiffs to recover them.  Had the Orders been obeyed, Plaintiffs would have learned how much Defendants earned in illegal profits and would be able to collect them through further legal proceedings.[3]

Consequently, in light of the purpose of compensatory sanctions—to "restore [Plaintiffs] to the position they would have held had the [order] been obeyed" (*Vuitton et Fils S.A.*, 592 F.2d at 130)—Plaintiffs respectfully request that the Court award compensatory damages of $12 million, an amount that this Court already indicated was a fair approximation of Plaintiffs' damages.  *See Compania Pelineon de Navegacion*, 540 F.2d at 56 (mathematical exactitude not required in calculating compensatory damages).

---

[3] Although BOC has contended throughout this litigation that Plaintiffs could never obtain a turnover order directing the bank to transfer the funds in the Defendants' China-based accounts to Plaintiffs following entry of judgment, this Court's finding of jurisdiction over BOC's head office renders the separate entity rule irrelevant. *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149 (2014) held that service of a restraining notice on a bank branch in New York is insufficient to obtain jurisdiction over a foreign branch of the bank.  Where personal jurisdiction over a foreign bank is obtained, however, a court may order a foreign garnishee bank branch to turn over a judgment debtor's assets.  *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 536 (2009).

As BOC's refusal to produce documents has made it impossible for Plaintiffs to prove up the exact amount taken in by the counterfeiters and exactly where the money went, BOC has forfeited its right to dispute that (1) it has in its possession (or had, and allowed to be withdrawn in violation of this Court's order) money belonging to all of the known and unknown counterfeiters participating in Defendants' counterfeiting ring, in excess of $12 million; and (2) BOC's records would establish a sufficient basis for this Court to order that such monies be turned over to Plaintiffs pursuant to the New York Court of Appeals' decision in *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009), due to BOC's deliberate use of correspondent accounts in New York to transfer the money into the counterfeiters' accounts.

BOC, moreover, should not be able to use its willful refusal to comply to date to support an argument that there is no evidence as to the actual amount in the Defendants' thirty-plus accounts. This Court can infer from BOC's willful and deliberate refusal to produce the documents requested in the Subpoenas that these documents contain information that is unfavorable to BOC. "[T]his Court possesses an inherent power to sanction litigants for abusive litigation practices that are taken in bad faith," including drawing "an adverse inference" against BOC. *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 888-90 (S.D.N.Y. 1999); *see also Turner v. Hudson Transit Lines, Inc.*, No. 89 Civ. 4252 (PKL), 1992 WL 51570, at *2 (S.D.N.Y. Mar. 9, 1992) (same). An adverse inference is proper where (1) the contemnor had "control over the evidence" and "an obligation to timely produce it"; (2) the contemnor had "a culpable state of mind"; and (3) the missing evidence is relevant to the complainant's claim "such that a reasonable trier of fact could find that it would support that claim . . . ." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

All three requirements are met.

20

- *First*, BOC does not deny that it has control over the documents sought in the Subpoenas; its constant refrain has simply been that Chinese law prohibits BOC from producing them. Nor can BOC deny that it has a clear obligation under the Orders to produce those documents. *See* Section I.A, *supra.*

- *Second*, BOC's culpable state of mind is beyond dispute. "Where, as here, a [contemnor] actively seeks legal impediments to justify its non-production, selectively determines when it will produce documents and when it will not, and continues to assert objections to discovery that long have been rejected, that party has willfully and culpably failed to produce evidence and an adverse inference … is warranted." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013). BOC has done exactly that. *See* Sections I.B, I.C, *supra; see also* Section II.C, *infra.*[4] Such "evidence of [a contemnor's] state of mind . . . will frequently be sufficient to permit . . . [the] conclu[sion] that the missing evidence is favorable to [Plaintiffs]." *Residential Funding*, 306 F.3d at 109.

- *Third*, the documents requested in the Subpoenas have already been found by this Court to be highly relevant to Plaintiffs' claims, since they are "likely to provide the most effective measure of the revenues generated by Defendants in contravention of United States trademark laws," ECF 75 at 6, and to identify the other participants in Defendants' counterfeiting ring.

Accordingly, Plaintiffs respectfully request that this Court draw adverse inferences against BOC's failure to comply with the Orders and find that BOC had or has in its possession money belonging to all of the counterfeiters participating in Defendants' counterfeiting ring in excess of $12 million, and that BOC's records would establish a sufficient basis for this Court to order that such monies be turned over to Plaintiffs under New York law.

Payment of $12 million as a sanction would not be a hardship to BOC, which had profits of $27.8 billion in 2014. Weigel Decl. Ex. 14 (BOC 2014 Annual Report). Indeed, as discussed below, the Second Circuit has upheld a sanction of as much as five percent of a corporation's

---

[4] As Judges Buchwald and Scheindlin have also recognized, "BOC has shown bad faith toward its discovery obligations" by making "'a conscious decision to selectively disclose information … only as it suits BOC's litigation interests.'" *Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 468 (S.D.N.Y. 2013) (quoting *Tiffany (NJ) LLC v. Forbse*, 2012 WL 3686289, at *2 (S.D.N.Y. Aug. 23, 2012)). "On more than one occasion, BOC has failed to comply with an order, said nothing to the Court, waited for plaintiffs to bring BOC's noncompliance to the Court's attention, and then, when confronted with its noncompliance, claimed to believe that the Court intended something other than what the Court clearly said." *Id.* at 469.

profits, which would be roughly $3.8 million per day in BOC's case.   And payment of compensatory damages, in addition to making Plaintiffs' whole, will allow BOC to skirt any potential hardship of compliance with this Court's Orders.  As this Court has already held, BOC has chosen to avail itself of the benefits of doing business in New York.  BOC voluntarily chose to do business with the counterfeiters, voluntarily chose to use correspondent accounts in New York to facilitate its massive business of wiring U.S. dollars to China both in general and in this specific instance for these specific counterfeiters, and voluntarily chose not to obey this Court's Orders.  As the Second Circuit has stated, "If the Bank cannot, as it were, serve two masters and comply with the lawful requirements both of the United States and [a foreign country], perhaps it should surrender to one sovereign or the other the privileges received therefrom." *First Nat'l City Bank of New York v. IRS*, 271 F.2d 616, 620 (2d Cir. 1959).  Here, having to pay for the $12 million in damages that BOC's contempt has caused is a much lower price to pay than the alternative suggested by the Second Circuit.

**B.   This Court May Impose a Daily Coercive Sanction to Secure BOC's Compliance with the Orders**

This Court may also sanction BOC's contempt through a daily coercive fine, giving BOC clear warning that "any more fooling around in this case is going to bring down the wrath from on high." *Vuitton et Fils S.A.*, 592 F.2d at 130 (quotations and ellipsis omitted).  Notably, the Second Circuit raised no qualms with this Court's prior coercive fine of $10,000 per day when BOC did not comply with this Court's prior order. *See Gucci Am.*, 768 F.3d at 144.  The Court can and should impose a sanction well above that amount.

"[T]he district judge, sitting in equity, is vested with wide discretion in fashioning" a coercive sanction to secure BOC's future compliance. *Vuitton et Fils S.A.*, 592 F.2d at 130. "Several factors should be considered in the exercise of this discretion," including (1) "the

22

character and magnitude of the harm threatened by continued contumacy," (2) "the probable effectiveness of any suggested sanction in bringing about compliance," and (3) "the amount of the contemnor's financial resources and the consequent seriousness of the burden to him." *Perfect Fit Indus.*, 673 F.2d at 57 (quotations and brackets omitted).

BOC cannot plausibly dispute the need for and propriety of a stiff coercive fine here. As a direct result of BOC's non-compliance, Plaintiffs are unable to pursue Defendants for grave violations of U.S. law. BOC has not only buttressed the operations of international counterfeiting schemes designed to defraud Americans, but also openly permitted, encouraged, and aided Defendants (and very likely other counterfeiters) in flouting the Lanham Act, unashamedly stealing Plaintiffs' valuable intellectual property, and shielding themselves from any legal consequences for their flagrant theft. And every passing day of BOC's noncompliance offers Defendants further opportunities to obscure and relocate their illicit proceeds.

As this Court rightly acknowledged, "BOC has exhibited very little interest in complying with the Court's orders." ECF 116 at 9. But when, in a case akin to this one, Plaintiffs moved for formal contempt proceedings against BOC to obtain discovery indistinguishable from that sought here, *see* ECF 112-9, BOC finally relented and produced the requested documents, *see* ECF 28-16—without a whisper of retribution from the Chinese government. Nor was the bank sanctioned by the Chinese government after making its inadequate production following this Court's August 23, 2100 Order. A firm coercive sanction offers the best likelihood that BOC will finally comply.

Finally, BOC's prodigious coffers permit it to disregard any insubstantial coercive sanction. Those financial resources have provided the very means by which BOC has waged its vexatious litigation tactics. "[A]ny fine [must] be substantial enough to make it more

economical for [BOC] to comply than not to comply." *Perfect Fit Indus.*, 673 F.2d at 57.  A "contingent fine," such as the daily fine proposed here, is especially appropriate "given [BOC's] deliberate, willful, and indeed brazen contumacy." *Id.* (quotations and brackets omitted).  BOC's audacious and willful contempt is well-established.  In 2014, BOC's profits were approximately $27.8 billion, or on average just under $76 million per *day*.  Weigel Decl. Ex. 14.  The Second Circuit has previously approved a daily coercive fine of $150,000 (over *$800,000* today when adjusted for inflation),[5] where it constituted only five percent of the contemnor's average daily earnings, as "a classic case of using the court's power to afford full remedial relief, so as to enforce the right ... to discover certain documents."  *Int'l Bus. Machs. Corp. v. United States*, 493 F.2d 112, 116 (2d Cir. 1973) (civil contempt).  Likewise, this Court would act well within its discretion to impose a daily coercive fine of about five percent of BOC's average daily profits, or roughly $3.8 million per day.

BOC has no basis to claim that such a fine would be unduly burdensome, since it would give BOC "the power to avoid the fine entirely or to end its accrual" by complying with the Orders. *Perfect Fit Indus.*, 673 F.2d at 58.

### C.     This Court Should Award Plaintiffs Their Costs and Attorney's Fees

Finally, this Court can exercise its equitable powers to award Plaintiffs the costs and attorney's fees they incurred to prosecute BOC's contempt.  A willful violation of a court order is a sufficient ground for awarding attorney's fees.  *See Manhattan Indus.*, 885 F.2d at 5; *Vuitton et Fils S.A.*, 592 F.2d at 130; *Summit Bank*, 1997 WL 811526, at *4. The award of attorney's fees

---

[5]   U.S. Dep't of Labor Bureau of Labor Statistics, CPI Inflation Calculator, http://www.bls.gov /data/inflation_calculator.htm.

is an important component of ensuring that a plaintiff is made whole for the harm resulting from the contemnor's misconduct. *See Vuitton et Fils S.A.*, 592 F.2d at 130.[6]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (i) hold BOC in contempt of court for failure to comply with the September 29, 2015 and October 16, 2015 orders; (ii) impose effective and appropriate sanctions for its gross misconduct, including compensatory damages, coercive fines, an adverse inference against BOC, and costs and attorneys' fees; and (iii) grant such other relief as this Court may deem just and proper.

Dated:  New York, New York
November 9, 2015

<div style="margin-left:40%">

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____
Robert L. Weigel
Howard S. Hogan
Anne M. Coyle
Casey K. Lee
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Counsel for Plaintiffs*

</div>

---

[6] As before, *see* ECF 111 at 24 n.16, Plaintiffs stand ready to submit an affidavit setting forth its actual costs and fees incurred in its efforts to compel BOC's compliance with the Orders. *See Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, No. 07 Civ. 3635(DC), 2008 WL 3852046, at *2 (S.D.N.Y. Aug. 13, 2008) (directing complaining party to submit proposed order setting forth "actual costs").