Fbodgucm

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   GUCCI AMERICA, INC., et al.,

4                    Plaintiffs,              New York, N.Y.

5            v.                               10 Civ. 4974(RJS)

6   WEIXING LI, et al.,

7                    Defendants.

8   ------------------------------x

9                                            November 24, 2015
                                             11:30 a.m.
10
    Before:
11
                        HON. RICHARD J. SULLIVAN,
12
                                             District Judge
13
                          APPEARANCES
14
    GIBSON, DUNN & CRUTCHER, LLP
15       Attorneys for Plaintiffs
    BY:  ROBERT L. WEIGEL
16       HOWARD S. HOGAN
         ANNE M. COYLE
17       KIMBERLY LINDSAY FRIEDMAN

18  ALLEN & OVERY LLP
         Attorneys for non-party
19       Bank of China
    BY:  LAURA R. HALL
20       JUSTIN L. ORMAND
         ANDREW RHYS DAVIES
21
              – also present
22
    Yifei Cheng, Bank of China representative
23

24

25

Fbodgucm

```
 1              (Case called)

 2              THE COURT:  Have a seat.  Thank you.

 3              All right.  Let's take appearances.  I will begin with

 4    the plaintiffs.

 5              MR. WEIGEL:  Good morning, your Honor.  Robert Weigel,

 6    Gibson Dunn & Crutcher, for the plaintiffs.

 7              THE COURT:  Yes, Mr. Weigel.

 8              MR. WEIGEL:  Anne Coyle, Howard Hogan and --

 9              THE COURT:  Come on, you can do it.

10              MR. WEIGEL:  Kim Lindsay Friedman.

11              THE COURT:  Friedman.  All right.  OK.  Good morning

12    to each of you.

13              And for the third-party Bank of China?

14              MS. HALL:  Good morning, your Honor.  Laura Hall,

15    Allen & Overy.  With me are Justin Ormand, Andrew Rhys Davies.

16              THE COURT:  All right.  I think I only have Mr. Rhys

17    Davies on the docket sheet.

18              MS. HALL:  Yes.  In light of the jurisdictional issues

19    in the case, your Honor, at the time that I joined it, we

20    thought a notice of appearance would be a complication.  We

21    wouldn't want to seem to waive our jurisdictional objection.

22              THE COURT:  I've got five lawyers from your firm who

23    filed a notice of appearance.

24              MS. HALL:  Yes.  Prior to the Supreme Court decision

25    in Daimler, I believe.
```

Fbodgucm

```
 1            THE COURT:  All right.  So you are not on the docket

 2       sheet.  So I guess, Mr. Rhys Davies, you're carrying the ball

 3       for this since you are on the docket sheet.

 4            MS. HALL:  Your Honor, I had submitted the brief --

 5            THE COURT:  I know you did.  OK.

 6            In any event, who else is here from your bank -- from

 7       the bank?

 8            MS. HALL:  If I may, your Honor?

 9            THE COURT:  .No, I'll hear from Mr. Rhys Davies.

10            MR. DAVIES:  Your Honor, Ms. Hall had prepared to

11       argue this.

12            THE COURT:  Just answer my question.  Who else is here

13       from the bank?  Who is here?  I asked for a corporate

14       representative from the bank to be here.

15            MR. DAVIES:  This is the gentleman in the back, your

16       Honor.

17            THE COURT:  What is the gentleman's name.

18            MS. HALL:  Mr. Yifei Cheng.

19            MR. DAVIES:  Mr. Yifei Cheng, your Honor.

20            THE COURT:  Could you spell that for the court

21       reporter?

22            MR. DAVIES:  Yes.  Last name Cheng, C-h-e-n-g; first

23       name is Yifei, Y-i-f-e-i.

24            THE COURT:  All right.  OK.  Good morning to you.

25            All right.  The long history here I think everybody
```

Fbodgucm

1    knows.  We're here on plaintiffs' motion for sanctions.  And so

2    I guess where we ought to start is with whether or not there

3    has been conduct that merits sanctions, whether I should hold

4    Bank of China in contempt.  I think the standard is pretty

5    clear.  I don't think the parties disagree as to what the

6    standard is.

7         So I'll hear from the plaintiffs.  First I'll ask them

8    to address that issue first and then get to what amount of

9    sanctions and what type of sanctions are appropriate.

10   Plaintiffs are seeking compensatory sanctions and/or coercive

11   sanctions.  Each of them require a different analysis, and so I

12   will ask you to address that as well.

13        Mr. Weigel, you are carrying the ball for the

14   plaintiffs?

15        MR. WEIGEL:  I am, your Honor.

16        THE COURT:  OK.  So just keep your voice up nice and

17   loud.  We have a lot of people here so I want to make sure they

18   can hear what's going on.  It's a beautiful courtroom but the

19   acoustics are sometimes challenging.

20        MR. WEIGEL:  I have a cold, your Honor, so if my voice

21   drops, please let me know and I will keep it up.

22        As your Honor said, the standard is clear.  Your Honor

23   issued an unambiguous order in September.  You asked us to

24   respond by letter mid-October as to whether that order had been

25   complied with.  We made an order to show cause -- or we wrote

Fbodgucm

your Honor and told you no.  Your Honor issued an order

requiring them to produce the documents by October 23rd.

Instead, we got a letter saying that they were not going to

comply.  So the standard has been met.

          We served two subpoenas back in 2010 and in 2011.  In

the annals of my career, this is a dubious distinction.  I have

never had a party been able to resist a subpoena for five

years.  Your Honor ordered them to be produced back in August

of 2011.

          Now, we never -- we didn't voluntary choose to do

business with the Bank of China or these counterfeiters.  We

are the victim of a crime that was foisted upon us.  And your

Honor has ruled unequivocally that these documents are crucial

to our case and that they are important and they must be

produced.  Your Honor considered all of the arguments that they

have raised about Chinese law and came to the conclusion that

they did not suffer real risk under Chinese law.

          Your Honor applied the correct standards.  We know

that because the Second Circuit has indicated that you applied

the correct standards, and the U.S. government as invited amici

came in and said you applied the right standards.  So there

really is no question.

          They don't dispute at this point that the order is

clear and ambiguous.  I read the transcript of the last

hearing --

Fbodgucm

1          THE COURT:  Clear and unambiguous.

2          MR. WEIGEL:  Clear and unambiguous.  I'm sorry, your

3    Honor.

4          I read the transcript of the last hearing at which

5    point Mr. Rhys Davies stood up and argued, again and again,

6    that your order was ambiguous, that he didn't know which of the

7    subpoenas his client was supposed to respond to.  Your Honor

8    has made that abundantly clear.  They still haven't responded,

9    which can only lead to the conclusion that that was really a

10   pretextual argument, that they never intended to comply with

11   both subpoenas, that they were just simply raising an argument

12   to delay, and they did effectively delay.

13         The proof of the noncompliance is clear and

14   convincing.  There is no dispute among anybody that they

15   haven't produced the documents.  And the contemptor has not

16   diligently attempted to comply in a reasonable manner.  They

17   have not done so, your Honor.  They don't even -- this is not a

18   situation where they have or could possibly say we still need

19   more time to gather these documents.  Presumably, these

20   documents were gathered back in 2010.

21         This is a deliberate position on their part.  They're

22   trying to take this up to appeal to argue that there's no

23   jurisdiction.  But your Honor's order is clear; contempt is not

24   a time to reargue it, but your opinion is well reasoned and

25   there is no reason to look at it again anyway.  So we would

Fbodgucm

1    submit that there is no question that they are in contempt of

2    this Court at this point, your Honor.

3              THE COURT:  All right.  So let's keep going, please.

4    I don't want to go back and forth.  So then let's talk about

5    what is the appropriate sanction.  So your view is that clearly

6    the standards of the Second Circuit with respect to holding

7    them in contempt have been met and in fact that they have been

8    willful, and so you urge compensatory damages in the amount of

9    $12 million, right?

10             MR. WEIGEL:  Yes, your Honor.

11             The Second Circuit, in this very case, made it clear

12   that we are -- that the contempt sanction may only be

13   compensatory or coercive.  We are asking for -- but they didn't

14   say that there is some exception here that we couldn't get

15   compensatory damages here.  And in fact the Second Circuit, in

16   the Vuitton case that we cite in our papers, goes so far as to

17   say that the Court actually lacks discretion not to award

18   compensatory damages if in fact they are proved.  In that case,

19   compensatory damages in a counterfeiting case were not awarded,

20   and the Court sent it back saying you're actually obliged to do

21   it if in fact they are proved.

22             And we've already proved to your Honor that these

23   documents are necessary to this case.  Your Honor has already

24   found that they are the best way to find out the revenue and

25   who else is involved.

Fbodgucm

1          This is an enormous counterfeiting ring.  They have

2     been in business since 2005.  They have 12 websites that we

3     have uncovered.  For a short window of time we found

4     $2.9 million worth of revenue, $500,000 of wires went to nine

5     bank accounts in China at the Bank of China.  What we now know,

6     because the Bank of China, when it chooses to, discloses

7     information that it thinks might be helpful to its case, it

8     produced an order of a Chinese court that indicated that just

9     three of the nine defendants maintained 30 different bank

10     accounts.  We went back and looked at the wires that we had.

11     Those wires indicate that there are six accounts that are not

12     held by the three defendants that are referenced in the Chinese

13     court order.  So there is at least 36 different accounts out

14     there.  We don't know who manufactured this material but we

15     would if we got these accounts because they would show money

16     going to the people who were supplying the fake goods that had

17     been sold.

18          THE COURT:  Right.  But that is an argument for a

19     coercive sanction, really, right?  So what you really want is

20     to hold the counterfeiters accountable, you want to be able to

21     figure out who they are, bring them to justice both perhaps

22     criminally and civilly, and to get compensation for your

23     clients based on the infringement that took place, right?

24          MR. WEIGEL:  Yes, your Honor.

25          THE COURT:  So why isn't that really an argument for

Fbodgucm

1    coercive sanctions that basically get the Bank of China to open

2    up, provide the information you are seeking that will allow you

3    then to proceed against the infringing defendants?

4              MR. WEIGEL:  Well, it an argument for coercive

5    sanctions, your Honor, but this has also dragged on an awful

6    long period of time.  And they indicated in the past that

7    they -- the $10,000 a day is not enough.  They went and got the

8    Second Circuit to stay it.  We are entitled to compensatory

9    damages.  This has -- you know, I want to keep it focused, your

10   Honor, on --

11             THE COURT:  I want to stay focused on compensatory.

12   So why is 12 million --

13             MR. WEIGEL:  Your Honor issued an order in September,

14   and the Court was clear that you could issue damages -- or

15   sanctions relating to violations of the new order but not the

16   prior order.

17             THE COURT:  Mm-hmm.

18             MR. WEIGEL:  But, your Honor, they have demonstrated

19   unwillingness to do this.  These counterfeiters continue to

20   operate --

21             THE COURT:  But why is 12 million the right amount?

22   Why is that the compensatory number and why is it appropriate

23   to impose sanctions for that rather than attempt coercive

24   sanctions, which, you know, really haven't been attempted at

25   this point?  I issued an order but it got stayed and it

Fbodgucm

1    ultimately didn't go into effect.

2          So now I have a clear path.  I can use coercive

3    sanctions to hopefully get the result you want, which is the

4    information from the Bank of China about the counterfeiters.

5          MR. WEIGEL:  Well, your Honor, if coercive sanctions

6    work, that would be terrific, but they have already delayed

7    this process an enormous amount of time.  I think we will

8    probably be back here if we get the coercive sanctions.

9          Your Honor is entitled to draw an inference both as a

10   matter of evidence, circumstantial evidence, and as part of the

11   Court's inherent power to say that when a party has documents

12   in its possession, they act in -- and with a culpable state of

13   mind -- which can be negligence, actually, the Second Circuit

14   ruled, but here we have willful, that your Honor can draw an

15   inference that these documents, if they were produced, would be

16   harmful to their case.  We have sought --

17         THE COURT:  To their case?  I mean, it is not really

18   their case at this point, right?  They are a third party.  So

19   when you say "harmful to their case," what do you mean?

20         MR. WEIGEL:  To their position, your Honor.  They

21   stand here subject to sanction.  I don't think there is any

22   question that they are entitled to some sanction.  We've asked

23   for $12 million.  If those records would help them, if those

24   records would show, for example, that these counterfeiters

25   didn't do $12 million worth of business, then they could

Fbodgucm

1   produce them.  They have chosen not to.  Your Honor has the

2   power both inherently and just as matter of common sense and

3   evidence to say that when a party -- like an adverse inference

4   instruction that you give to a jury --

5         THE COURT:  I understand what you are saying.  I'm

6   just not sure why given what your goal is, I think, which is to

7   bring to justice the actual defendants against whom you already

8   have a judgment --

9         MR. WEIGEL:  We actually don't have the judgment yet,

10  your Honor.  We asked for the judgment and it was stayed

11  because we didn't know who the parties are that are the

12  recipient of this money.

13        THE COURT:  Well, I mean, you've got a number of

14  defendants --

15        MR. WEIGEL:  Yes, your Honor.

16        THE COURT:  -- who have defaulted.

17        MR. WEIGEL:  Right.

18        THE COURT:  So I assume your goal is to bring those

19  folks to justice, right?

20        MR. WEIGEL:  Yes, your Honor.

21        THE COURT:  And so I guess it is not clear to me why

22  coercive sanctions shouldn't be attempted in order to get you

23  that information.

24        Are you saying that that information at this point is

25  just worthless because it has been so long coming that it is

Fbodgucm

1    not likely to provide you any assistance, that the trail is now

2    cold, or are you saying something else?

3         MR. WEIGEL:  Your Honor, I think common sense would

4    tell us that we would have been much better off and much better

5    able to chase these counterfeiters if we had gotten these

6    documents back in 2011, when you first ordered them.  So, yes,

7    the trail has undoubtedly gotten cold.  Until we see the

8    documents, we don't know how cold it has gotten.

9         But they had ample opportunity to produce these

10   documents and they've chosen not to, and it has cost my client

11   an incredible amount of money to get this.  They have a

12   contractual right, according to what they submitted, to go

13   after the counterfeiters themselves in China for

14   indemnification.  So I think there is a certain justice in

15   saying you pay the judgment.  We can infer that the records

16   they have, if anything, would indicate that the operation is

17   bigger than we have gotten our hands on.  The $12 million is

18   based on what Congress -- a fairly conservative estimate of

19   what Congress has allowed this court to enter in terms of

20   statutory damages when documents are not available -- $200,000

21   per mark per type of good.  I believe the Court could go up

22   to $2 million per mark.  So it's a fairly conservative number

23   that we ask for.

24        And you are right that we want to hold them, you know,

25   and hold the counterfeiters accountable, but we also are

Fbodgucm

```
 1    entitled to our damages.  I mean, we have been damaged by this
 2    in an amount that Congress has decided, and we also want to
 3    recover our damages.  And given the Bank of China's position, I
 4    think it is only fair that they be -- I think it's pretty clear
 5    that their conduct has caused us not to be able to recover from
 6    these people, the counterfeiters themselves.  We have been
 7    damaged, and the law is crystal clear that your Honor could
 8    award compensatory sanctions.
 9            THE COURT:  All right.  Do you want to talk about
10    coercive sanctions in the alternative?
11            MR. WEIGEL:  Your Honor has -- it is odd but the case
12    law is that while there is no discussion not to award
13    compensatory if they are proven, there is discretion and, your
14    Honor, fairly wide discretion as to how large a coercive
15    sanction you choose to impose in order to cause them to comply
16    with your Honor's order.
17            Courts have imposed as much as 5 percent of a
18    company's profits per annum as a sanction, which here I think,
19    doing the math, came out to $3-and-a-half million a day.  This
20    is a huge bank.  They have an obligation.  They have come to
21    the United States.  They do business here.  They use our
22    courts.  They lend money.  They file mortgages.  They advertise
23    as being the, you know, the place to go to wire money from the
24    U.S. to China.  It's going to have to be a large number to
25    cause them to comply.  You know, whether it is a million
```

Fbodgucm

 1    dollars a day or $100,000 a day, I think that's up to your

 2    Honor's discretion, but I think it has to be a big number just

 3    by virtue of the size of the bank.  You are entitled to

 4    consider that.  It has to be something that would make it less

 5    desirable for them to incur the sanction than to comply with

 6    the order.

 7          Thank you.

 8          THE COURT:  All right.

 9          Mr. Rhys Davies.

10          MR. DAVIES:  Your Honor, I really ask that you allow

11    Ms. Hall to enter a limited appearance today just for the

12    purposes --

13          THE COURT:  This is a game.  Your firm has filed a

14    notice of appearance, right?  I've got five people from your

15    firm who have filed notices of appearance and then two others

16    who just decide that by not filing a notice of appearance, that

17    that somehow preserves your ability to make argument?  Your

18    firm is counsel of record here, right?

19          MR. DAVIES:  Well, that's right, Judge.  I think

20    technically what's happened -- I'm not sure I ever filed a

21    notice of appearance technically.  I think I am on the docket

22    sheet --

23          THE COURT:  You are on the docket sheet.

24          MR. DAVIES:  It is because of the nature of the

25    involvement of our client.  I don't think we filed a notice of

Fbodgucm

1    appearance because we weren't appearing for a party.  I'm

2    certainly reflected on the docket as counsel, that's true.

3         THE COURT:  Right.  What you're telling me is you are

4    not prepared to do this?

5         MR. DAVIES:  Your Honor, I will do it if that's what

6    you require, but I would really ask that you allow Ms. Hall to

7    do this subject to the bank's jurisdiction argument.

8         THE COURT:  All right.  Fine.  Go ahead, Ms. Hall.

9         MR. DAVIES:  Thank you, Judge.

10        MS. HALL:  Thank you very much, your Honor.

11        If I may, your Honor, I just want to address the

12   reasons that we are reraising our personal jurisdiction

13   objections and reraising issues of compliance with Chinese law.

14        The Court's prior order in September is not

15   independently appealable and, therefore, as a nonfinal order we

16   must reraise those issues to preserve them for appeal.  So I

17   will not belabor the personal jurisdiction issue, and I refer

18   the Court to our prior brief, but we are required to.  Unlike

19   the cases cited by Gucci, those cases consider contempts in the

20   context of prior appealable orders, and, therefore, reopening

21   those issues on a contempt was inappropriate.  Here, your

22   Honor, we are required to.

23        With respect to the contempt issue, your Honor, there

24   is one quibble I would have to say with respect to the standard

25   as it applies here.  We don't believe that the third prong of

Fbodgucm

1   the standard, the lack of diligence in compliance, is met here.

2              THE COURT:  All right.  So you are not disputing that

3   the order issued by the Court is clear and unambiguous?

4              MS. HALL:  That is correct, your Honor.

5              THE COURT:  OK.  And you're not disputing that you

6   haven't complied and you don't suggest that you did comply,

7   right?

8              MS. HALL:  That is correct, your Honor.  Those facts

9   are undisputed.  We only disagree with the --

10             THE COURT:  So the issue then is whether or not you

11  have diligently attempted to comply, and by that you mean that

12  because you have a legal argument, you think that that's enough

13  to cure the third prong?

14             MS. HALL:  No, your Honor.  Specifically, our

15  noncompliance is a prerequisite to appellate jurisdiction.

16             THE COURT:  So you're telling -- so what are you

17  saying?  I thought that you were suggesting that you were

18  quibbling with whether or not one of the elements, the

19  requirements for contempt have been met.

20             MS. HALL:  We believe, your Honor, that the diligence

21  aspect here is simply inapplicable and therefore is not met,

22  because our noncompliance is required for our appellate

23  jurisdiction and also because, again, compliance would violate

24  Chinese law --

25             THE COURT:  Well, that doesn't mean it hasn't been

Fbodgucm

```
 1    met.  That means you've got another argument to make later, but

 2    for purposes of this proceeding you certainly haven't attempted

 3    to comply; have you?

 4              MS. HALL:  That is correct, your Honor.

 5              I would just note that in First American and in

 6    Societe Internationale, the Second Circuit and the United

 7    States Supreme Court both held that the effect of foreign law

 8    should be considered a second time at the contempt stage even

 9    if the court previously found that not to be justification for

10    not granting a motion to compel, and so, therefore, we

11    respectfully ask the Court not hold Bank of China in contempt.

12              THE COURT:  If that were the case, then I could never

13    hold anybody in contempt, right?  As long as they cited

14    conflicting law, they will be judgment-proof for purposes of a

15    contempt order?

16              MS. HALL:  No, your Honor.  It is open to the Court to

17    consider the issue --

18              THE COURT:  What would be the basis for reconsidering

19    my prior conclusion?  These are new facts, new law that I have

20    missed?  You guys have a tendency to sort of dribble in new

21    facts and new law sort of as we go in the hopes that you get to

22    sort of reopen the whole argument again.  Are we doing that

23    again?  I'm ready for it.  But tell me, is that where we are

24    going?

25              MS. HALL:  No, your Honor.  We simply think that, as
```

Fbodgucm

```
 1   the United States submitted in its amicus brief, that China's
 2   interest in developing its banking system to providing
 3   protections of their accounts and information about them will
 4   only be disclosed in accordance with Chinese procedures
 5   warrants considering whether it is appropriate to hold the bank
 6   in contempt here.
 7           THE COURT:  I've covered all of these points before
 8   and all these arguments before and all this authority before,
 9   right?
10           MS. HALL:  I understand, your Honor --
11           THE COURT:  That is a question.  Just a "yes" or "no."
12           MS. HALL:  Yes.
13           THE COURT:  Yes, OK.  So you are asking me to
14   reconsider again but you are not citing new authority or new
15   facts, right?
16           MS. HALL:  No, your Honor.  The authority I am citing
17   is just that to hold the parties in contempt is qualitatively
18   different than to order a party to compel.
19           THE COURT:  To order a party to compel without the
20   power to hold them in contempt is sort of a silly exercise,
21   wouldn't you say?  I am going to order you to compel and then
22   you are going to just basically thumb your nose at me or use
23   some other finger to figuratively tell me what you think of the
24   ruling and of the court system and of U.S. law and then we are
25   all just going to go on our way?
```

Fbodgucm

1          MS. HALL:  No, your Honor.  I am just pointing to the

2     fact that the United States Supreme Court and the Second

3     Circuit have directed that that analysis be done.

4          THE COURT:  OK.  I have seen nothing to suggest that a

5     different outcome is warranted, that I've already explained my

6     reasoning for my judgment on the law.  There is no new facts or

7     authority offered, so I'll reject that.

8          So then I guess we get to sanctions.

9          MS. HALL:  Yes, your Honor.

10          THE COURT:  OK.

11          MS. HALL:  With respect to compensatory sanctions, we

12     simply think it's -- well, as far as we know, it is

13     unprecedented.  No federal court has ever required someone to

14     pay someone else's default judgment as a discovery sanction,

15     let alone a judgment, as referred to from Mr. Weigel, they

16     haven't had entered.  We think the reason that they haven't had

17     any satisfaction of that judgment is it hasn't been entered.

18     It's been --

19          THE COURT:  I gather they were hoping to sort of

20     figure out who the real counterfeiters were and to be able to

21     sort of build a case and to figure out what exactly the damages

22     were and to figure out how they can hold those folks

23     accountable both under civil law and criminal law, if

24     necessary.

25          MS. HALL:  Well, that may be a tactical decision that

Fbodgucm

```
1    they have made, but that certainly hasn't caused them not to

2    get paid on the 12 million, which would be their tactical

3    decision not to accept your Honor's offer of the default

4    judgment in January 2011.

5              THE COURT:  All right.  So that's the argument with

6    respect to compensatory, that having not sought the judgment,

7    that that basically closes the door to that one; is that the

8    point?

9              MS. HALL:  Yes.  That is one basis, your Honor.  We

10   also think that they have failed to show that they could have

11   recovered $12 million on that judgment if entered and that it

12   is only Bank of China's lack of --

13             THE COURT:  How could they prove that?  So you think

14   it is their burden to show that they could have recovered if

15   you had bothered to comply with court orders?

16             MS. HALL:  Yes.

17             THE COURT:  So how are they supposed to prove that?

18             MS. HALL:  Well, here, your Honor, it has already been

19   proven by the Court of Appeals in -- the New York Court of

20   Appeals in Motorola.  They couldn't, to the extent they get any

21   information on any of these bank accounts in China, use the

22   turnover order they previously told the Court they planned on

23   asking for.  And so as a matter of law nothing they found out

24   about accounts at Bank of China in China would allow them to

25   recover we think terminates any sort of causation irregardless
```

Fbodgucm

1    of what else they might be able to have shown under different

2    circumstances.

3             THE COURT:  All right.  So let's then move to coercive

4    sanctions, which is where I'm more focused anyway, because it

5    doesn't seem that they have really been tried at this point.  I

6    mean, we started down that road but didn't get very far.  So

7    now we get to start again.

8             And I have an order that's being not complied with,

9    defied, if you will, and so I've got to figure out a way that

10   will coerce the Bank of China to comply with my order.  So what

11   will do that?  I'll ask you.  You tell me.  What would it take

12   to get them to comply?  Because I think what you're really

13   telling me is nothing, right?

14            MS. HALL:  I disagree, your Honor.

15            THE COURT:  OK.

16            MS. HALL:  What the bank is seeking here is just an

17   opportunity to have its objection to the Court's ruling on

18   jurisdiction heard by the Second Circuit.  And so,

19   respectfully, your Honor, we are going to ask you if you do

20   enter sanctions, to stay them so that we can seek that appeal

21   from the Circuit.

22            But, ultimately, you know, at the end of this process

23   the bank is subject to jurisdiction, and we'll have to evaluate

24   that.  Right now we are really just in this proceeding as a

25   necessary procedural step to vindicate our appellate rights.

Fbodgucm

```
1         THE COURT:  All right.  So, basically, what you are
2  telling me is there is no amount of money I can order as a
3  coercive sanction that is going to result in compliance; that,
4  you know, I can pick a number and I'll have to justify that
5  number, but you're not going to comply with this order.  You
6  are going to either ask me or the Court of Appeals to stay the
7  order, and then if they don't and I don't, then I guess maybe
8  we'll see.  But you're not going to give me a clue as to what
9  the number ought to be that would --
10        MS. HALL:  I don't think that that would be
11 appropriate for me to say, your Honor.
12        THE COURT:  I don't know or not.  But you can't then
13 complain too much that the number I came up with was
14 unwarranted or unjustified, it seems to me, can you?
15        MS. HALL:  I do think 380 times what the Court
16 previously found was sufficiently coercive and the Second
17 Circuit considered sufficiently coercive to stay so we could
18 take up our appeal without being put to the test of either
19 paying that amount of money every single day for the 22 months
20 it took to get through that appellate process or getting our
21 appeal filed and producing --
22        THE COURT:  That's always going to be true in any case
23 in which there are sanctions.  Anybody who wants to appeal the
24 sanction can seek a stay.
25        MS. HALL:  That is right.
```

Fbodgucm

1           THE COURT:  But, you know, that is the gamble that you

2      run is that the stay will be denied and then you are going to

3      have to pony up the money.  So that is the nature of the

4      process.

5           MS. HALL:  I agree, your Honor.  I do think that

6      millions of dollars per day and hundreds of thousands of

7      dollars per day just don't bear relation to what the Second

8      Circuit says we need to consider, which is --

9           THE COURT:  But what -- I mean, it just seems to me

10     this is a bank that has billions in assets, and so it is not

11     clear to me that $10,000 a day is going to make much of an

12     impact.  Clearly, a hundred thousand dollars a day wouldn't

13     make much of an impact.  Why do you think it would?

14          MS. HALL:  It was big enough so they could have time

15     for the bank to seek a stay the last time.  If the bank was

16     completely indifferent to $10,000 a day, it certainly wouldn't

17     have had us run off to the Second Circuit and get a stay of it.

18          THE COURT:  Really?  I mean, it doesn't cost a whole

19     lot to get a stay, right?  You are telling me that -- so there

20     is a number that I could pick that might result in you not

21     seeking a stay?

22          MS. HALL:  No, your Honor.  I am simply saying the

23     importance of that number, the significance of that number to

24     the bank is evident by the fact the bank tried to have it

25     stayed in --

Fbodgucm

| | |
|---|---|
| 1 | THE COURT:  But the point of a coercive sanction is to |
| 2 | impose pain, right?  That is the point of it, right? |
| 3 | MS. HALL:  I appreciate that. |
| 4 | THE COURT:  Not to kill the patient, not to be |
| 5 | compensatory but to be coercive.  So I'm trying to figure out |
| 6 | what is the right number, and the standard I think is pretty |
| 7 | clear.  I don't think there is much dispute about what the |
| 8 | standard is and what factors I am required to consider. |
| 9 | Mr. Weigel hasn't gotten into it too much because I think he is |
| 10 | really hoping that I am going to impose compensatory damages. |
| 11 | You are not getting into it because you really don't want to |
| 12 | engage in that discussion. |
| 13 | MS. HALL:  No, your Honor.  I would like to address |
| 14 | the standard. |
| 15 | THE COURT:  OK.  Let's talk about the standard then. |
| 16 | Character and magnitude of the harm threatened by the |
| 17 | continued -- |
| 18 | MS. HALL:  That's exactly where I was going, your |
| 19 | Honor.  Here, the nature of the conduct -- I'm sorry.  The |
| 20 | character and magnitude of the harm is the noncompliance, the |
| 21 | failure to produce documents. |
| 22 | THE COURT:  Right. |
| 23 | MS. HALL:  In terms of some of the other cases cited |
| 24 | by Gucci where people failed to comply with consent judgments, |
| 25 | in one case they say someone failed to provide medical |

Fbodgucm

1    treatment --

2             THE COURT:  But this is effectively -- not producing

3    documents, that has the effect of harboring a fugitive, in

4    essence, right?  That is really what it is, and that's what

5    makes it so bad.  You are basically preventing the plaintiffs

6    and the Court from being able to exercise jurisdiction over and

7    to bring justice to people who have violated the law, violated

8    U.S. law, which should be pretty important.  I would think it

9    is pretty important to everybody.

10            MS. HALL:  Absolutely, your Honor, and I completely

11   disagree with your characterization of the effects here.  They

12   have already identified the defendants.  As you'll see from the

13   Beijing court judgments attached to my declaration, the bank

14   repeatedly seized -- it has asked them to come to this court.

15   It has asked them for permission to disclose these documents.

16   They are fleeing from justice, but the court is trapped between

17   two legal systems here.  So our noncompliance is necessary to

18   vindicate our appellate rights, but it's certainly not changing

19   the nature of defendants' conduct.  They are not going to come

20   here whether we give documents or not.

21            THE COURT:  No, but the point is that if you give

22   documents that allow the plaintiffs to follow the assets of

23   these folks so they might be able then to collect on the

24   judgment that they have or will have, and so they might also,

25   frankly, be able to seek law enforcement authorities to bring

Fbodgucm

criminal prosecution against these folks, but it's kind of hard

to do if they don't have access to the information that I've

already said they are entitled to, right?

          MS. HALL:  Yes, you have, your Honor.

          I would just note with respect to the judgment you

reference, the $12 million figure, the 3.8 million that

Mr. Weigel is seeking here would be greater than a $12 million

default judgment in just four days.  So they are completely out

of proportion here.  Even if you accepted that $12 million was

the measure of the harm here, which we don't, because they

can't collect on bank accounts in China and they know that, and

they've acknowledged that's the only avenue here.  Frankly, we

don't know whether those other U.S. bank accounts that they

have revealed information about in their most recent

submissions might have assets in them or a source of recovery.

We're not a party.  They refuse to tell us anything about

those.  We just know that they can't recover from Chinese bank

accounts and so we don't --

          THE COURT:  Just so I'm clear, then your view of this

element or this factor in assessing coercive sanctions is that

I can't impose sanctions on a daily basis that will in time

exceed the value of the underlying claim; that's your point?

          MS. HALL:  I think if it is some greatly prolonged

period of time, perhaps that would be fine.  I can't say it as

a legal principle, but I think if you exceed their alleged

Fbodgucm

1    damages in less than four days, I think that would be

2    completely out of -- that would be inconsistent with the

3    character and magnitude of the harm relative here.

4           THE COURT:  All right.  So how many days would be the

5    outside period that would be appropriate?

6           MS. HALL:  I definitely opened myself up to that one.

7    I certainly couldn't say that, your Honor, with any

8    specificity.

9           I just want to reemphasize that we're here because we

10   want to take up an appeal.

11          THE COURT:  I mean, there is a case, right, that they

12   have cited that I don't know if you have referenced it.  It the

13   <u>IBM</u> case, which is an old case in which it was $150,000 a day,

14   which I haven't done the math but Mr. Weigel assures me that in

15   today's money that is $800,000 a day.

16          MS. HALL:  Yes.  That case is quite an outlier for a

17   number of reasons --

18          THE COURT:  It may be an outlier but it certainly was

19   approved by the Second Circuit.

20          MS. HALL:  I disagree, your Honor.

21          THE COURT:  It was not approved by Second Circuit?

22          MS. HALL:  The Second Circuit did not have

23   jurisdiction to consider whether that was appropriate because

24   they concluded that that was a civil contempt, and as a party

25   IBM did not have the right to review a civil contempt judgment

Fbodgucm

1   pending a final judgment.  Here as a nonparty we have the right

2   to appeal from a civil contempt judgment.  IBM did not.

3          THE COURT:  But in terms of the amount, you're

4   suggesting the Second Circuit said that amount was sort of

5   beyond the pale?

6          MS. HALL:  No.  The Second Circuit said it couldn't

7   consider the issue at all.  It lacked appellate jurisdiction

8   because it was a civil contempt order, not a criminal contempt

9   order.  A civil contempt order brought against a party is not

10  appealable until the final judgment --

11         THE COURT:  I get all of that.  That is a procedural

12  point.  But I guess I'm asking about the magnitude of the

13  sanction that was imposed and whether or not that sort of is

14  beyond the pale, whether or not that is inappropriate just by

15  virtue of the fact of its size.

16         MS. HALL:  Well, certainly the dissenting judge of the

17  panel of the Second Circuit thought that the size moved it into

18  the criminal contempt sanction.  But because it was found not

19  to be a criminal contempt sanction, the Second Circuit because

20  it lacked jurisdiction couldn't have endorsed that amount.

21  That was solely one judge, and, frankly, that judge, your

22  Honor, was later removed from that case on.  So I think it

23  calls into question relying on that.

24         THE COURT:  Let's then talk about the other factors.

25         Next we have the probable effectiveness of any

Fbodgucm

1    suggested sanction in bringing about compliance.  This is a

2    bank that has assets in the billions.  So it seems to me that

3    10,000 a day or $100,000 a day is sort of chump change and that

4    it's going to need to be a really big number to make them sort

5    of stand and think twice about violating a court order.

6         MS. HALL:  I disagree, your Honor.  The bank takes

7    very seriously the fact that even that it has had to come here

8    now and violate the court order and we're only doing it because

9    of the issues created by Chinese law and U.S. law and the

10   appellate procedure, I mean, we don't think you have to award

11   some enormous amount.  The bank has already taken it very

12   seriously.

13        THE COURT:  Well, I mean, it seems to me that that

14   factor is almost riding it out.  If somebody wants to make an

15   appeal, you are basically saying that this factor doesn't get

16   considered.  It seems to me you're almost arguing -- almost

17   arguing -- that you're entitled to a stay of any sanction here

18   because, well, you have an appeal you want to take, and I don't

19   think it really works that way.  I have to independently find

20   what is the proper sanction and then we talk about a stay

21   later.  You can certainly talk about a stay to the Court of

22   Appeals.  But that's not really the analysis for purposes of

23   these factors or these prongs.  It's what it's going to take to

24   get compliance.

25        Imagine there is no more Second Circuit.  Imagine the

Fbodgucm

```
1    Second Circuit says tell them you've got it right; like a

2    broken clock, you've got it right,  And so what's it going to

3    take I guess is really the question, then.  At that point are

4    you guys going to say we're still not doing it?  Then we're

5    going to the Supreme Court.  And then we're not going to do it

6    then.  And then what?

7            I'm imagining that this is the end of the line, and so

8    what is the proper sanction that will induce compliance for a

9    $27 billion bank, according to what's been represented to me?

10           MS. HALL:  I think, your Honor, the $10,000 a day fine

11   that you entered several years ago when the bank was not one

12   380th of the size it is today was certainly sufficient to cause

13   the Court -- to cause the bank to need to seek a stay because

14   that was important to the bank because that was taken very

15   seriously by the bank and --

16           THE COURT:  What is the evidence that it was taken

17   very seriously by the bank because I haven't seen any

18   indication of that?

19           MS. HALL:  Your Honor, we sought a stay of it.  We

20   certainly did not --

21           THE COURT:  So seeking a stay is recognition of the

22   seriousness of the sanctions order and the effect it had on the

23   bank?

24           MS. HALL:  Absolutely, your Honor.  Since one of the

25   aspects -- one of the elements of the stay is the harm to the
```

Fbodgucm

1    party or, rather, in this case the nonparty that it would be

2    otherwise subject --

3          THE COURT:  So what is the harm occasioned to a

4    multi-billion-dollar bank by $10,000 a day?

5          MS. HALL:  That's $10,000 a day payable in engagement

6    of the laws of our country but on behalf of people who we have

7    tried to get in here who are the real defendants.  So the bank

8    is not even a party to this case.  $10,000 a day to continue to

9    hold out on this case is absolutely a serious impact.

10          I just want to make one other point, your Honor, with

11   respect to the amount.  You referred earlier to it is important

12   that coercive sanctions inflect pain.  I disagree.

13          THE COURT:  Oh, really?  What is the point -- I mean,

14   explain to me, what do you mean?

15          MS. HALL:  They are certainly supposed to create

16   economic incentive such that it is preferable to comply versus

17   not comply.

18          THE COURT:  Right.  That is certainly what I meant by

19   "pain."  What did you think I meant?

20          MS. HALL:  Punitive sanctions, of course, your Honor,

21   are criminal.

22          THE COURT:  I'm not talking about punitive sanctions.

23   I'm talking about create the proper incentive to create enough

24   pain to induce release.  I think that is what it is.  It is not

25   pain for the sake of pain.  It is pain that makes that gripping

Fbodgucm

1    little hand let go of the damn thing that they've been ordered

2    to give up, and that requires a certain amount of pain.

3              Do you agree?

4              MS. HALL:  I disagree, your Honor.

5              THE COURT:  Oh, so what does it need to coerce?

6              MS. HALL:  Well, I agree that that is the general

7    concept of the coercive sanctions.  I disagree that the Court

8    needs to enter them here because that in some way has a bearing

9    on the reason for the bank's noncompliance at this time.  The

10   bank's noncompliance -- I am beginning to sound like a broken

11   record -- is because it believes it has a stronger economic

12   basis not to be held liable to produce these documents.

13             THE COURT:  Well, I do think we are --

14             MS. HALL:  The bank at this point just wants to

15   vindicate our due process rights and take an appeal.

16             THE COURT:  So I agree with you on one point, which is

17   that we are kind of going around in circles now.

18             MS. HALL:  If I could just make two other points, your

19   Honor?

20             THE COURT:  OK.

21             MS. HALL:  With respect to the request for attorneys'

22   fees.

23             THE COURT:  Yes.  I do want to get to that.

24             MS. HALL:  I'm sorry?

25             THE COURT:  I did want to get to that so you've

Fbodgucm

1   anticipated where I was going to go.

2              MS. HALL:  I would just with respect to the

3   requirement, as you noted in the Zino Davidoff case, that

4   typically in this Circuit attorneys' fees are not awarded

5   except in cases of willful infringement -- or, rather, willful

6   contempt.

7              THE COURT:  Yes.

8              MS. HALL:  I just wanted to draw your Honor's

9   attention to a couple of cases that discuss what it means to be

10  willful.  In Converse, for example, Judge Leisure referred to a

11  willful contempt is one where the contemnor had actual notice

12  of the court's order, was able to provide, did not seek to have

13  it modified, and did not make a good faith effort to comply.

14             THE COURT:  Well, did not seek to have it modified

15  doesn't mean that we want to appeal the whole darn thing,

16  right?  Did not seek to have it modified means that, listen, we

17  can't come up with that kind of money or we can't produce the

18  documents on that kind of a timetable, can you give us more

19  time.

20             MS. HALL:  Well, here your Honor --

21             THE COURT:  You are construing seeking to have it

22  modified as saying, hey, we think you got it wrong on the law,

23  right?

24             MS. HALL:  Right, your Honor.  I think we -- you know,

25  what I think Judge Leisure is distinguishing here is people --

Fbodgucm

1    and we cite many cases where this happened, and I think your

2    Honor's earlier default hearing was like this.  You know,

3    people get notice and then they get an order to show cause and

4    they still don't show up until they actually receive the order

5    issuing the sanctions and only then do they come running in.

6        The bank has been here and the bank has been making

7    its position known.  So it's not like a willful contemnor, just

8    completely off in Never-never Land in ignorance of this whole

9    thing.  We are here --

10       THE COURT:  Clearly they are not in ignorance of it,

11   but that's kind of what makes it so willful, right?  From the

12   plaintiffs' perspective, I think this makes no difference at

13   all and it is unclear that it makes any difference to me.

14       MS. HALL:  If I could just cite again <u>Societe</u>

15   <u>Internationale</u>.  There the Supreme Court held that

16   noncompliance with a discovery obligation due to prohibition by

17   foreign law was due to inability and not to willfulness, bad

18   faith, or any fault of the petitioner.  Again, I note our issue

19   here is again caused by the Chinese laws restricting the

20   production of this information.  And so, again, I respectfully

21   submit, your Honor, we're bound by conflicting systems of law

22   here and we're not willfully in noncompliance.

23       THE COURT:  Right.  I've already addressed that point,

24   right?  You get $22 worth of court costs in China.

25       MS. HALL:  We lost that case and we have an injunction

Fbodgucm

1    directing us to unfreeze their plaintiffs, here defendants.

2              THE COURT:  Right.  No, I understand that, but it's

3    not -- there have been no sanctions, right?

4              MS. HALL:  None that I am aware of.

5              THE COURT:  Look, as I said before, there are no

6    additional facts that you are proffering at this point.  So as

7    of the last time I wrote an opinion on this, there was no

8    indication that the bank paid anything more than $22 -- well,

9    the equivalent of $22 in court costs.  So I think that says

10   something.

11             MS. HALL:  Well, again, your Honor, I would hope that

12   our desire to comply with foreign law is --

13             THE COURT:  But what desire is there to comply with

14   U.S. law, I keep wondering, because it doesn't seem to be

15   terribly deep, right?

16             MS. HALL:  Your Honor, we are exactly trying to comply

17   with U.S. law.  That's why we are here.  We are taking this

18   contempt because the Second Circuit requires us to do it as a

19   condition for taking the appeal.

20             THE COURT:  No, but -- look, yes, for taking the

21   appeal, but it is not clear to me that once you finally lose on

22   appeal that you are going to be producing anything.  I mean, it

23   seems to me that this has been sort of a long "game" might be

24   too strong a word, but it has been a long, you know, exercise

25   in delay.  And, I mean, you know, you told me you needed more

Fbodgucm

1    time to talk to your client to tell me whether or not you are

2    going to comply with my order.  Come on, that was ridiculous.

3    You guys weren't taking instruction on that.  There was no

4    intention of complying with this order; I think that was pretty

5    clear.  Are you suggesting otherwise?

6              MS. HALL:  No, your Honor.

7              THE COURT:  That there was a real plan to comply with

8    my order back in October that prompted you to seek more time?

9              MS. HALL:  Are you referring to our request for more

10   time to brief the order to show cause?

11             THE COURT:  Yes.

12             MS. HALL:  Your Honor, they had for the first time

13   requested $12 million in compensatory sanctions.  We had never

14   seen that request before.  We needed more time to consult with

15   our client on how to respond to that and to other new issues

16   raised in their papers.

17             THE COURT:  All right.

18             MS. HALL:  And, finally, your Honor, if I may?  With

19   respect to the stay issues, we cited the Court to Judge

20   Rakoff's decision in First City, where he analyzes the stay

21   issues specifically in a case like this, where the public

22   interest ordered the stay because of the common interest of not

23   just the bank but other people involved in the New York

24   correspondent bank accounts to have a judgment on what the

25   specific jurisdiction test is with respect to that.  We view

Fbodgucm

```
 1    that as a bit of a part of the jurisdictional issue here.

 2            THE COURT:  It sounds then like what we are really

 3    saying is that mark holders, like plaintiffs, are basically

 4    just going to have to bear the cost of all of this in the

 5    interim; that is really what you are saying, right?

 6            MS. HALL:  Well, I --

 7            THE COURT:  Because your interests and the interests

 8    of the other correspondent bank are just too important to be

 9    trifled with and so it is OK that Mr. Weigel's clients can just

10    sort of suck it up for years at a time when they're trying

11    desperately to protect their marks and to prevent

12    counterfeiting.  If it takes a little longer, hey, Mr. Weigel,

13    buck up because that is just the way it goes because you guys

14    are just mark holders in a system that is supposed to protect

15    those marks but just not that important in the grand scheme of

16    things.

17            MS. HALL:  I disagree, your Honor.  They have chosen

18    to pursue this issue here against the Chinese bank that

19    absolutely refuses --

20            THE COURT:  What else could they do?  What else would

21    you suggest they should have done?

22            MS. HALL:  They could have taken a Hague Convention

23    request.  The nine months that that took on the other cases has

24    long since elapsed in this case, and we would proceed on

25    whatever information is available --
```

Fbodgucm

```
 1                THE COURT:  "Whatever information" I think is well
 2       put.
 3                MS. HALL:  In other cases they received sufficient
 4       information to identify additional defendants to file lawsuits
 5       against them and to get default judgments against them.
 6                THE COURT:  But what good are default judgments if you
 7       have no prospect of getting assets from these people?
 8                MS. HALL:  Well, then they can go to China where these
 9       people are located and where they can obtain freezing orders
10       and use the Chinese government's intellectual property laws to
11       prosecute people acting in China.
12                THE COURT:  All right.
13                MS. HALL:  This is, again, a clash of legal regimes
14       here than both we and --
15                THE COURT:  Which I guess in your view the Chinese
16       legal regime wins even in U.S. courts.
17                I've ruled on this so let's --
18                MS. HALL:  May I just make one more point, your Honor?
19                THE COURT:  Yes, you can.
20                MS. HALL:  We have consulted with the Second Circuit
21       and they are closed tomorrow.  They are closed on Friday.  They
22       will not hear a stay application on Thursday or Friday.  So if
23       we are -- if your Honor is to rule --
24                THE COURT:  I'm open tomorrow.  What?  Don't they work
25       for a living up there?
```

Fbodgucm

1        MS. HALL:  I believe we need to get them a brief

2   tomorrow morning at 9 a.m. so that Gucci would have time to

3   respond to it.  In the interest of saving the Second Circuit's

4   Thanksgiving, we ask that you please stay any sanctions for a

5   week so we can proceed as early as possible, or, if not, if you

6   enter a judgment today, we can --

7        THE COURT:  All right.  Thank you.

8        MR. WEIGEL:  May I be heard, your Honor?

9        THE COURT:  Yes, Mr. Weigel.  It is your motion so I

10   will let you rebut.

11        MR. WEIGEL:  The Second Circuit asked Mr. Rhys Davies,

12   while he was up there arguing that your Honor's order was

13   ambiguous, if it was not ambiguous would they comply, and

14   Mr. Rhys Davies, to his credit, did not say yes of course we

15   would.  I just heard now counsel said that, well, if your Honor

16   rules -- imposes a sanction, we go up to the Second Circuit and

17   they uphold your Honor, that we're going to have to evaluate

18   what we're going to do.  They're not saying they're going to

19   comply with this order.

20        We didn't seek judgment four years ago.  The reason

21   this case is still ongoing is because they have not produced

22   the documents in the subpoenas that were served in 2010 and in

23   early 2011, and if they had this case would be off this Court's

24   docket.

25        The factors for a coercive sanction, they would read

Fbodgucm

out two and three.  They would say, well, as long as the amount

you're seeking in a judgment is not that great -- and $12

million they seem to be saying is a piddling amount -- you

can't impose a sanction that would be disproportionate to the

$12 million.  Well, that means that for a bank the size of Bank

of China, they could continue to I think your Honor used the

word take the air out of the ball and just delay.

        I mean, you have heard this is the strategy, right?

We've delayed this so long that they could have gotten a Hague

Convention request in the time it took to decide our motion for

reconsideration, the motion for contempt, the appeal, and

whatever.

        So there are three factors that your Honor is supposed

to consider.  And your Honor is right, I mean, I am hoping that

your Honor will grant us the compensatory damages for the

damage that they have caused us.  But in terms of coercive

sanctions, it is the character and magnitude of the harm

caused, which is not only to my client but to U.S. consumers.

These are people who were selling fake products as real.  They

were charging $700 for these things.

        My client has an interest in enforcing the Lanham Act,

but as your Honor has noted repeatedly, it is also a criminal

act.  It's there for the protection of the public.  So there is

harm besides the harm to my client.

        The probable effect in this is the second factor, and

Fbodgucm

I think your Honor has addressed that.  It has got to be a big

number because they are a huge bank, and they could pay $10,000

a day for a year and not think twice about it.

        And third is explicit; the amount of the contemnor's

financial resources and consequent seriousness of the burden to

him.  Your Honor has analyzed it right.  It's not punitive.

It's not to punish.  It is to coerce.  And the question is how

big does the fine have to be to cause them to pay?

        And they come here and they basically ask for a stay,

but they never -- not in their papers and not today in argument

do they address any of the factors for a stay:

        Likelihood of success.  I think given that your Honor

has already been upheld by the Second Circuit in terms of

this -- in terms of the balancing test that you are supposed to

apply.

        Irreparable harm.  A million dollars a day, $3 million

a day, that's not going to irreparably harm the bank.  It's

money, first off, and they have a lot of it.

        Public interest.  The public interest is in enforcing

the Lanham Act and making sure that these counterfeiters -- for

all we know, they are still operating.  They have a history of

ignoring court judgments before.

        So, your Honor, they have cost my client an enormous

amount of money.  They have allowed the trail to run cold.

They have not given an indication that if the Second Circuit

Fbodgucm

1    affirms that they are going to produce the documents.

2           We have been damaged here.  And they try and argue the

3    separate entity rule, the Motorola case in the New York Court

4    of Appeals, but they have just got the law wrong.  The Court of

5    Appeals decided a case called Bank of Bermuda, Koehler v. Bank

6    of Bermuda.  And in Koehler the Court of Appeals, on reference

7    from the Second Circuit, ruled that if you had jurisdiction

8    over the Bank of Bermuda in Bermuda, you could order the Bank

9    of Bermuda to bring stock certificates from Bermuda here.

10          What Motorola decided was that the separate entity

11   rule which says if you serve a restraining notice on a bank

12   branch in New York, that doesn't restrain assets everywhere in

13   the world.  And they made that rule a policy rule.  But they

14   expressly did not overturn Koehler.  And your Honor has ruled

15   that there is jurisdiction over the Bank of China in China

16   here, because it's the Bank of China that's using these

17   correspondent accounts in New York to effectuate these wire

18   transfers.  That's an important part of their business.

19          So we haven't -- your Honor did it in terms of

20   responding to a subpoena, not in terms of a turnover order.

21   But I would submit (a) that the standards are not that

22   different.  And if they were to produce the documents that they

23   are withholding, I submit that they would show even more

24   contacts with New York, but, of course, they're not producing

25   them.  So what they're saying is, Judge, without it being in

Fbodgucm

1    front of you, without having all the information, you should

2    make a determination that we could never get them to produce

3    and turn over those counterfeiters' money that came from New

4    York, that was wired through accounts in New York, and then,

5    frankly, based upon some equitable tracing rules could really

6    be argued that they are still in that Chase account, they don't

7    get that because they have kept to themselves the records that

8    we would need to establish or to assist us in establishing that

9    the Bank of China itself is subject to jurisdiction here and

10   there could be a turnover order.

11         So, your Honor, I would respectfully request that (a)

12   we be afforded compensatory damages, and (b) that in

13   determining the amount of sanctions, I think any amount up

14   to $3 million a day would be appropriate.

15         THE COURT:  All right.  I don't think you have

16   addressed attorneys' fees.

17         MR. WEIGEL:  Your Honor awarded attorneys' fees the

18   last time this came up.

19         THE COURT:  So you haven't submitted a declaration.  I

20   think what you said is you would do that, but you are asking me

21   to basically award attorneys' fees and then to work out the

22   numbers later; that's what you are saying?

23         MR. WEIGEL:  Yes, your Honor.  That I think is the way

24   that makes the most sense given the timing and so forth.

25         THE COURT:  All right.  OK.

Fbodgucm

1          MR. WEIGEL:  Thank you, your Honor.

2          THE COURT:  OK.  Ms. Hall, anything else?

3          MS. HALL:  No, your Honor.  I don't believe there is a

4    separate entity rule, and I disagree, of course, with Mr.

5    Weigel.

6          THE COURT:  OK.  I think I understand the legal issues

7    and so I'm prepared to hold the bank in contempt.  I think the

8    standards have been met.  I think the order that I issued was

9    crystal clear and unambiguous, and there is no dispute about

10   that.

11         The noncompliance is obvious, clear, and convincing,

12   certainly not even disputed.

13         And with respect to the third prong, or element, which

14   is whether the contemnor has diligently attempted to comply in

15   a reasonable manner, I find that they have not.  They have made

16   no attempt to comply at all.  The fact that they have a legal

17   argument to make if and when they appeal is all well and good,

18   but I don't think that's enough to overcome the third element,

19   and so I find that certainly contempt is appropriate.

20         I'm not going to stay my order, so I want to forestall

21   that now.  So any attempt to stay here -- I mean, I don't think

22   the requirements for a stay have been met.  You can certainly

23   go to the Circuit if you want to.

24         But I want to consider -- I am going to reserve on the

25   amount.  I want to think about some of the arguments made here

Fbodgucm

1    today both with respect to compensatory and with respect to the

2    size of coercive sanctions.  Candidly, I'm inclined to go with

3    coercive sanctions rather than compensatory but I want to

4    noodle over that a bit.  And then the size of the coercive

5    sanctions, if that's the way I go, is something I also want to

6    think about in light of what's been argued here today.  So I

7    will not issue an order probably until Monday.

8            MS. HALL:  Thank you, your Honor.

9            THE COURT:  A couple of days is not going to kill

10   anybody.  And in any event, I think there may be a motion for a

11   stay in the Court of Appeals.  I don't know if you will have

12   any more success there than you would here with respect to a

13   motion to stay, but I'm not moved and I do not find that the

14   requirements for a motion to stay would be met here.

15           So that would be my ruling on the points that I have

16   covered.  I will get back to you on the amounts.  OK.

17           Anything else we should cover today?

18           MR. WEIGEL:  No, your Honor.  Thank you.

19           THE COURT:  No.  All right.

20           Well, Ms. Hall, I will say I'm glad I let you talk.

21   There is no way Rhys Davies could have done nearly as good a

22   job

23           MS. HALL:  Thank you, your Honor.

24           THE COURT:  And that's true of Mr. Weigel as well.  So

25   the lawyers obviously did a very fine job and this is not

Fbodgucm

1    personal against lawyers.  This is an important case and I have

2    articulated that before in writing; I don't think I need to say

3    it again.  So I get that, at least, but I appreciate the effort

4    that went into it from the attorneys.

5              So you all should have a nice lunch.  OK?  Have a nice

6    Thanksgiving.

7              MR. WEIGEL:  Thank you, your Honor.

8              THE COURT:  Let me thank the court reporter, of

9    course, who didn't get a break at all, so I thank him for his

10   times and his talent.  If anyone needs a copy of the

11   transcript, take that up with him either now or later through

12   the website.  OK?

13             ALL COUNSEL:  Thank you, Judge.

14             THE COURT:  OK.  Thanks.

15

16                              -   -   -

17

18

19

20

21

22

23

24

25