# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Robert Weigel
Direct: +1 212.351.3845
Fax: +1 212.351.5236
RWeigel@gibsondunn.com

March 2, 2016

ECF AND E-MAIL

Honorable Richard J. Sullivan
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2104
New York, New York 10007
E-mail: SullivanNYSDChambers@nysd.uscourts.gov

Re:   Gucci America, Inc., et al. v. Weixing Li, et al., No. 2010 Civ. 4974 (RJS)

Dear Judge Sullivan:

Plaintiffs and nonparty Bank of China ("BOC") respectfully submit this joint letter in response to this Court's order dated February 16, 2016 directing the parties to provide the Court an update on the status of BOC's document production and a proposal for next steps. Plaintiffs have posed specific follow up questions about certain of the spreadsheets and documents that the Bank has produced, but the Bank has committed to provide answers to the extent possible, and both Plaintiffs and BOC have agreed that there is no need to bring these issues to the Court's attention at this time. With respect to issues on which Plaintiffs and BOC have not been able to reach agreement, each side has set forth its own statement of position below.

Finally, the parties have agreed that in any future motion practice, the non-moving party will have 30 days to oppose.

**Plaintiffs' Position**

*BOC's Production*

As set forth in the parties' letter to the Court dated February 11, 2016, when BOC represented to this Court on January 20, 2016 that it was in substantial compliance with this Court's orders, BOC had withheld numerous account statements and internal spreadsheets pertaining to the Defendants' accounts, among other responsive documents. ECF 204. Indeed, since January 20, 2016, BOC produced an additional 109 critical account documents, including Excel statements for 202 accounts. Plaintiffs were forced to invest a significant amount of time and effort to sort through a production set that the Bank admitted contained duplicative versions of documents, in order to determine definitively what had and had not

**GIBSON DUNN**

Honorable Richard J. Sullivan
March 2, 2016
Page 2

been produced and to repeatedly follow up with BOC to obtain documents that the Bank should have produced long ago.

In spite of the Court's clear requirement that the Bank produce all responsive documents, the Bank's representation that all documents were produced on January 20, and Plaintiffs' continuing meet-and-confer efforts, BOC continues to stall its production and force Plaintiffs to make repeated requests for additional information. As of this date, BOC's production still is not complete for at least the following reasons:

*First*, the Bank has refused to provide its internal communications related to the Defendants, and has failed to produce or log a single email concerning the Defendants. There is no question that the Court ordered BOC to produce its internal communications concerning the Defendants and their accounts. The subpoenas called for "[a]ll internal or external communications concerning the Bank of China accounts" ( 2010 Subpoena, Request No. 1 (ECF 109-1); 2011 Subpoena, Request No. 1 (ECF 109-4)), and the Court ordered the Bank to produce "all documents requested in the 2010 and 2011 Subpoenas as they pertain to all Defendants, including but not limited to (1) all documents and communications regarding Defendants or their accounts, (2) all documents associated with any accounts or deposits held in any Defendants' name, and (3) all documents relating to any checks, money orders, or other negotiable instruments purchased by Defendant." ECF 158.[1]

BOC now asserts that its internal communications about the Defendants are privileged, even though there is no attorney-client privilege or work product privilege under Chinese law, and BOC's privilege claims have previously been rejected by Judge Scheindlin. *See Wultz v. Bank of China*, 979 F. Supp. 2d 479, 493 (S.D.N.Y. 2013) ("Because Chinese law does not recognize the attorney-client privilege or the work-product doctrine, BOC must produce those items listed on its privilege log which are governed by Chinese privilege law").[2] And even if Chinese law did recognize such a privilege, the Bank has waived it by failing to assert

---

[1] *See also* ECF 161 ("The Bank of China must produce all documents required by the Court's September 29, 2015 order . . . ."); ECF 190 (repeating need to comply with September 29 Order); ECF 193 ("BOC has had ample time to prepare for the production of these documents").; *Bice v. Robb*, 511 F. App'x 108 (2d Cir. 2013) (summary order) ("The district court did not abuse its discretion in ordering the [plaintiffs] to produce … emails between the [plaintiffs] concerning their potential claims….").

[2] *See also* Xu Xi, *A Comparative Study of Lawyers' Ethics in the US and PRC: Attorney-Client Privilege and Duty of Confidentiality*, 146 Tsinghua China L. Rev. 46 (2009); Carla Walworth, *Privilege Law, its Global Application, and the Impact of New Technologies*, ABA Midyear Conference (Feb 3., 2012) ("In the People's Republic of China, there is no doctrine of legal privilege."), *available at* https://www.americanbar.org/content/dam/aba/publications/young_lawyer/attorneyclientprivlege.authcheckdam.pdf .

**GIBSON DUNN**

Honorable Richard J. Sullivan
March 2, 2016
Page 3

the privilege in a timely manner. *See, e.g., Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, 2008 WL 4452134, at *11 (S.D.N.Y. Oct. 2, 2008) ("Where a party fails to provide an index of withheld documents in a timely manner, any potentially applicable privilege is ordinarily waived."); *In re Chevron*, 749 F. Supp. 2d 170, 182 (S.D.N.Y. 2010) (where, as here, a party objects to discovery through motion practice but does not raise privilege issues, that privilege is waived "so that discovery does not become a game").[3]

After repeated inquiries from Plaintiffs about these internal communications,[4] BOC represented by letter dated February 26, 2016 that it "has investigated whether there are any non-privileged internal communications relating to defendants or their accounts and has located none." BOC has not provided any detail about the scope or nature of its search for internal documents, or what custodians' records were searched, what search terms may have been used to search email systems, or what criteria were used to determine responsiveness. As a result, it is impossible for Plaintiffs to evaluate whether the search for responsive documents was reasonable.

Furthermore, BOC's February 26 letter also represented that it "has withheld internal privileged communications involving [BOC] in-house counsel about defendants and/or their accounts." Although BOC also provided a privilege log for the first time on February 26, it identified only two documents. As a result, even assuming we accept the Bank's representation that *all* its internal discussions about the Defendants could conceivably fall under an applicable privilege that has not been waived, BOC's log does not preserve or assert any privilege properly, because the log still does not describe *any* of the internal communications the Bank has withheld. *See* Local Civil Rule 26.2(a)(2)(A) (requiring privilege log to include "(i) the type of document, *e.g.* letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) the author of the document, the addressees of the document, and any other recipients, and where not apparent, the relationship of the author, addressees, and recipients to each other"); *Wultz*, 979 F. Supp. 2d at 497 ("BOC's privilege logs are not sufficient to allow either plaintiffs or this Court to evaluate what, if any, claims of privilege BOC may have."). Just hours ago, BOC's counsel informed us that the Bank finally agreed to provide a document-by-document privilege log describing internal communications pursuant to the Local Rule, and has committed to do so by March 11, 2016. This belated log is insufficient to establish BOC's privilege claims for the reasons set forth above, and is just one more example of BOC's stalling tactics.

---

[3] *See also See* Fed. R. Civ. P. 45(e)(2)(A); S.D.N.Y. Local Civ. R. 26.2(b); ECF 204 at 4 n.1 (putting Bank of China on notice of its failure to comply with these rules).

[4] *E.g.*, letters from counsel for Plaintiffs to counsel for BOC dated February 3, February 9, February 25, 2016; ECF 204 (joint letter to the court, dated February 11, 2016).

GIBSON DUNN

Honorable Richard J. Sullivan
March 2, 2016
Page 4

BOC, moreover, cannot establish any privilege over the two documents that are described on its log, even if the Court were to overlook BOC's waiver. The first document, described as "Notes of October 31, 2011 Meeting between BOC Representatives and Counsel for Peiyuan Zhao, Ting Xu and Lei Xu," relates specifically to the Bank's Chinese litigation, not this U.S. litigation, and does not involve the work product or communications of U.S. counsel. Plaintiffs are entitled to information concerning the full extent of Defendants' accounts and other relations with the Bank, the Defendants' intentions concerning this Court's orders, and any agreements reached between Defendants and the Bank. In addition, the Bank has put this litigation at issue. Accordingly, this document should be produced immediately.[5]

*Second*, Plaintiffs specifically requested "[a]ny and all documents containing contact information associated with each of the Defendants' accounts" (2010 Subpoena, Request No. 2 (ECF 109-1); 2011 Subpoena, Request No. 2 (ECF 109-4)), and this information will be necessary for Plaintiffs' judgment enforcement efforts. The Bank produced the Defendants' account opening documents, which include the Defendants' addresses at the time the accounts were opened. Plaintiffs repeatedly asked the Bank to identify the most up-to-date contact information that the Bank maintains for these Defendants,[6] but the Bank repeatedly refused to search its own computer systems and simply produce the customer contact information for the Defendants that it currently relies on. Earlier this afternoon, the Bank produced a chart that appears to contain contact information for each of these Defendants and has represented that it believes this is the most current contact information. As Plaintiffs have not yet had time to analyze this information for completeness, Plaintiffs reserve their rights on this issue.

*Third*, the BOC has failed to produce Suspicious Activity Reports (SARs) for any of the Defendants in the Bank's possession, custody, or control. Plaintiffs specifically requested all SARs for the Defendants in the original 2010 subpoena (*see* 2010 Subpoena, Request No. 8 (ECF 109-1)), and Plaintiffs have repeatedly followed up on this issue with the Bank during the meet and confer process.[7] The Bank acknowledges that it never specifically objected to the production of SARs at any time in its June 26, 2010 objections to the 2010 subpoena, in its opposition to Plaintiffs' December 6, 2010 motion to compel, in the Bank's own

---

[5] BOC had already produced the other logged document, "Appendix 3: Details of Incoming Wire Transfers from Overseas" but then sought to claw back the document, claiming inadvertent production. Plaintiffs subsequently received the same information contained in that document in a different form.

[6] *E.g.*, letters from counsel for Plaintiffs to counsel for BOC dated February 3, February 9, February 25, 2016; ECF 204 (joint letter to the court, dated February 11, 2016).

[7] *E.g.*, letters from counsel for Plaintiffs to counsel for BOC dated February 9, February 25, 2016; ECF 204 (joint letter to the court, dated February 11, 2016).

**GIBSON DUNN**

Honorable Richard J. Sullivan
March 2, 2016
Page 5

December 22, 2010 cross motion, in its November 30, 2011 motion for reconsideration, in its response to the Court's September 27, 2012 order to show cause why the Bank should not be held in contempt, in any of the Bank's 2012 through 2014 appellate filings, in the parties' October 17, 2014 joint letter to the Court identifying the remaining issues to be resolved, in the Bank's opposition to Plaintiffs' December 1, 2014 motion to compel, *or* in its November 16, 2015 response to the Court's order to show cause why the Bank should not be held in contempt. Now, however, the Bank seeks to assert new bases to withhold these reports for the first time, claiming there are legal prohibitions on producing these documents, and refuses to confirm or deny the existence of SARs in its possession. Counsel for BOC suggested for the first time yesterday that they would explore the possibility of providing Plaintiffs related information that is not prohibited by law. If BOC has any information relevant to the request for the SARs that can be produced, it should have produced it long ago. The Bank's pattern of delaying and lodging new objections to producing whole categories of documents—after this Court has twice held the Bank in contempt and unambiguously ordered it to produce all documents—is further reason to order the Bank to produce all its internal communications and award Plaintiffs' attorneys' fees incurred in this process.

Plaintiffs respectfully submit that additional sanctions are necessary and appropriate at this point. BOC's ongoing refusal to produce this information violates this Court's unambiguous orders to produce all responsive documents, and is likely intended to obscure the Bank's assistance of Defendants' violation of the Court's asset freeze injunction.

Accordingly, Plaintiffs respectfully request that this Court enter an order: (1) compelling BOC to search its electronic other record depositories and produce immediately, on pain of resumption of the $50,000 daily coercive fine, all internal communications concerning Defendants, including emails; and (2) compelling BOC to produce from its computer system the records that it relies on as the most up-to-date contact information for all Defendants. In addition, as Plaintiffs requested in the joint letter dated February 11, sanctions against BOC should include an award of the attorneys' fees Plaintiffs have been forced to incur as a result of time spent negotiating with BOC and updating this Court concerning BOC's production deficiencies. *See Fendi Adele S.R.L. v. Filene's Basement, Inc.*, No. 06 Civ. 244 (RMB) (MHD), 2009 LW 855955, at *8 (S.D.N.Y. Mar. 24, 2009).

With the Court's permission, Plaintiffs will file an affidavit describing their attorneys' fees attributable to BOC's misconduct by whatever date the Court deems by March 9, 2016 or whatever later date the Court my deem to be appropriate.

Honorable Richard J. Sullivan
March 2, 2016
Page 6

*BOC's Violation of the Asset Freeze Injunction*

Plaintiffs also respectfully request permission from this Court to move for sanctions against BOC for violating the Court's asset freeze injunction. The documents that BOC finally produced to Plaintiffs confirm that BOC knowingly permitted the Defendants to empty their accounts in direct violation of that injunction. Based on our analysis of the Defendants' account statements, BOC permitted the Defendants to withdraw or transfer a total of approximately 13,673,318.27 CNY—approximately $2,097,134.69 at the current exchange rate. These transfers occurred after February 23, 2011, when the Bank undisputedly had notice of the identity of *all* Defendants. 3,376,657.70 CNY was withdrawn on June 11, 2015, *after* the Second Circuit unequivocally found that this Court had both personal jurisdiction and equitable authority to freeze the Defendants' assets, and made clear that BOC could become liable for assisting in the violation of the injunction. *See Gucci Am. Inc. v. Bank of China*, 768 F.3d 122, 129, 130, 132 (2d Cir. 2014). The Bank allowed Defendants to drain and close their accounts without informing the Court of its intent or requesting any relief, even though the Preliminary Injunction expressly provides "that upon two (2) days written notice to the Court and Plaintiffs' counsel, any third party . . . may appear and move for the dissolution or modification of any provisions of this Order that impact upon it." ECF 12, at 9.

The Second Circuit set forth two bases upon which this Court could find specific personal jurisdiction over BOC with respect to the asset freeze injunction: 1) BOC's "presence and activity in the forum" related to this dispute, and 2) BOC's knowing and "intentional[] aid[ing]" in the violation of the injunction. *Id.* at 136-38. Both grounds give rise to specific jurisdiction here.

*First*, this Court already found specific personal jurisdiction over BOC on the first ground in compelling BOC to produce documents in response to Plaintiffs' subpoenas (ECF 158 at 3-11) because, *inter alia*, BOC "deliberately thrust[ed] itself into the New York financial market by establishing a New York office and a correspondent account with a New York bank to repeatedly facilitate the transfer of money from its clients' bank accounts in the United States to their accounts abroad" and, specifically, "Defendants' proceeds from the sale of counterfeit goods were transferred through BOC's correspondent account in New York." ECF 158 at 3-11. These facts also lead to the conclusion that the Court has specific personal jurisdiction of the Bank with respect to its violation of the asset freeze order: The Bank used a New York correspondent account to transfer profits from the sale of counterfeits to Defendants' accounts, and then allowed the Defendants to drain these accounts in violation of this Court's injunction.

*Second*, as the Second Circuit observed, other courts have reasoned "that intentionally violating an asset freeze injunction is conduct designed to have purpose and effect in the forum and that the authority to force compliance is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process." *Gucci Am., Inc.*, 768 F.3d at 137 (citing cases from Fifth, Seventh, and Tenth Circuits). *See generally Calder v. Jones*, 465 U.S. 783, 788-89 (1984). Here there can be no dispute that BOC was on notice of the injunction and aware of the effects that its violation would have on Plaintiffs.

Furthermore, a comity analysis, as prescribed by the Court of Appeals, also compels the conclusion that it is appropriate to sanction the Bank for its violations of the asset freeze order. As the Court is well aware, this analysis requires the Court to give "due regard to the various interests at stake," including the Chinese Government's banking laws and interests therein, BOC's legitimate expectations given "its choice to conduct business here," and "the United States' interest in enforcing the Lanham Act and providing robust remedies for its violation." *See generally Gucci Am., Inc.*, 768 F.3d at 138, 140. This Court already considered very similar issues with respect to BOC's compliance with the subpoenas, including the "balancing of national interests" of the United States and China and the "hardship of compliance" for BOC. ECF 158 at 13-14. The Court rejected "BOC's assertion that China's bank secrecy laws are rigidly enforced or a matter of strong state policy that trump the United States' interest in enforcing the Lanham Act." *Id.* at 13. Similarly, with respect to the disclosure of account information, the Court reaffirmed that "BOC's contention that compliance with the 2010 and 2011 Subpoenas would subject it to serious criminal and civil liability is unduly speculative." *Id.* at 14. Importantly, this Court rejected the Bank's argument that the Beijing High Court Judgment weighed in BOC's favor because "[t]he Beijing judgments, if anything, shift the balance of national interests more firmly toward the United States because they acknowledge that BOC had broad contractual rights over its customers' account information, such as the power to suspend or terminate service in certain circumstances." *Id.* at 13. Similarly, in the context of the asset freeze, the United States' interest in enforcing the Lanham Act outweighs the asserted Chinese interest in enforcing Chinese banking laws, particularly where the Bank's relationship with its customers is governed by a contract. Moreover, BOC could not reasonably have expected to violate this Court's asset freeze injunction with impunity. BOC sought neither approval from this Court to release the funds, nor any other form of relief from the asset freeze order in light of the Beijing High Court Judgment. Under these circumstances, an award of sanctions is appropriate.

With the Court's permission, Plaintiffs would like to file their motion by March 30, 2016, in order to allow the Bank additional time to produce the remaining categories of information addressed in the parties' meet-and-confer efforts and in this letter.

**GIBSON DUNN**

Honorable Richard J. Sullivan
March 2, 2016
Page 8

*Further Amendment of the Complaint*

Finally, Plaintiffs' respectfully request the right to amend the complaint in this action, if necessary, to add additional defendants based on its review of the documents that have been or will be produced by the Bank. At a minimum, this request would reach additional "John Doe" and "ABC Company" defendants whose complicity is made apparent by the documents being produced or yet to be produced by the Bank. Plaintiffs respectfully request that the Court allow such an amendment to be filed at a reasonable time *after* the Bank produces the remaining documents due under the terms of the September 29 Order.

**BOC's Position**

BOC affirms that it substantially complied with Plaintiffs' 2010 and 2011 subpoenas on January 20, 2016, when it produced over 7,000 pages of records relating to Defendants' accounts. Since that time, BOC has made two small supplemental productions,[8] and has continued to work with Gucci's counsel constructively to answer Gucci's questions about the scope of BOC's production and to explain the account information. BOC will continue to cooperate with Plaintiffs and will do its utmost to help Plaintiffs understand the Chinese-language account documentation that has been produced.

On February 26, 2016, although BOC does not believe it had any legal obligation to do so, BOC manually collected and organized information from the over 7,000 pages of documents produced, and provided to Gucci (i) a spreadsheet linking Defendants' old account numbers to new account numbers that were assigned to the accounts in October 2010 as a result of updates to the Bank's IT systems; and (ii) a spreadsheet summarizing records relating to incoming and outgoing international and domestic wire transfers. On that same date, BOC also served a privilege log. The spreadsheets were created by BOC on a non-waiver basis in order to help Gucci understand the information contained in the account spreadsheets, which is largely in Chinese, and which shows Defendants' historical transactions.

In addition, BOC has, by letters dated February 19, 2016 and February 26, 2016, provided to Gucci's counsel updates and responses with respect to all of the outstanding matters

---

[8] On February 4, 2016, BOC produced an additional 64 Excel spreadsheets that were generated by BOC earlier the same week, and 15 PDFs of account detail printouts. On February 9, 2016, BOC produced an additional 30 documents, most of which consisted of documents located following a hand-search of archives conducted by BOC.

**GIBSON DUNN**

Honorable Richard J. Sullivan
March 2, 2016
Page 9

described in the parties' joint letter dated February 11, 2016.  Specifically, BOC has done the following:

- BOC confirmed that there are no non-privileged internal communications about Defendants or their accounts;

- BOC confirmed that no transactions have occurred in any of the Defendants' accounts since October 2015 except the crediting of interest for open accounts;

- BOC investigated questions posed by Gucci's counsel about BOC's production of Chinese litigation documents and has provided responses;

- BOC provided detailed answers to over 20 detailed questions about the account documents (e.g., questions relating to the meaning of numerical coding that appears on account documentation), which were received via email dated February 10, 2016;

- BOC confirmed that it has produced all of the contact information pertaining to Defendants that it has in its possession;

- BOC confirmed that it has produced all responsive documents from its pre-2002 hard copy archives; and

- After BOC informed Gucci that it had located no responsive accounts in the name of Lijun Xu, BOC, at Gucci's request, conducted additional searches for accounts in the name of Lijun Xu using the Chinese version of Lijun Xu's name and has confirmed, per Gucci's request, that none of the addresses associated with the over 7,000 accounts resulting from this search matched the addresses on file for Ting Xu, Peiyuan Zhao or Lei Xu.

We received additional questions about the documents produced from Gucci's counsel by letter dated February 25, 2016, and BOC provided answers to those questions earlier today. BOC will continue to provide information that will help Gucci understand the Chinese-language account documentation that has been produced.[9]

During a meet and confer held yesterday, Gucci suggested that it may seek additional orders from this Court in relation to Defendants' contact information.  BOC has confirmed several

---

[9] The parties continue to negotiate a protective order, and Gucci has agreed to hold the documents produced by BOC confidential pending agreement on and entry of the order.

GIBSON DUNN

Honorable Richard J. Sullivan
March 2, 2016
Page 10

times that it has provided all of the contact information for Defendants that it has in its possession. BOC is not obligated to provide the same information in multiple formats. Fed. R. Civ. P. 45(e)(1)(C). Nevertheless, BOC has provided a table of contact information for Defendants contained within the production that it believes to be the most up-to-date contact information in its possession.

Gucci has contended that BOC has waived the right to object to production on the basis of privilege. Gucci has also contended that BOC has waived the right to invoke the protection against disclosure of Suspicious Activity Reports ("SARs") or their Chinese equivalent, Suspicious Transaction Reports ("STRs"), to the extent any exist.[10] For the record, BOC disagrees with these contentions. BOC's New York Branch, on which the subpoenas were served, objected to the extent the subpoenas call for privileged information and/or sensitive financial information, and objected to any requests that would require providing information in violation of the banking, commercial or criminal laws of the People's Republic of China.

Further, with respect to Suspicious Activity Reports (or their Chinese equivalent), under Article 15 of the Anti-Money Laundering Regulations, promulgated by the People's Bank of China ("PBOC") in 2006, and Article 6 of the Administrative Measures for the Financial Institutions' Report of Large-sum Transactions and Suspected Transactions, also promulgated by the PBOC in 2006, BOC is legally forbidden from disclosing SARs, which is an obligation that cannot be waived. *See also Wultz v. Bank of China*, No. 11 Civ. 1266(SAS), 2013 WL 132664, at *1 (S.D.N.Y. Jan. 10, 2013) (agreeing that "just as [BOC] would not be required under U.S. law automatically to produce a Suspicious Activity Report ('SAR') in civil litigation, so it should not be required to violate the analogous Chinese laws . . . by producing analogous documents submitted to Chinese regulators, such as Suspicious Transaction Reports"). U.S. law similarly provides that banks cannot waive the protection against disclosure of Suspicious Activity Reports, which belongs to the U.S. government. 31 C.F.R. § 1020.320(e). *See also Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("a financial institution cannot reveal what disclosures it made in an SAR, or even whether it filed an SAR at all"); *Weil v. Long Island Sav. Bank*, 195 F. Supp. 2d 383, 389 (E.D.N.Y. 2001) (the prohibition on disclosure of SARs "is not subject to waiver by the financial institution"). For these reasons, we have informed Gucci's counsel that we cannot confirm whether or not any responsive SARs or STRs exist, and even if such documents do exist, BOC would be prohibited by law from producing them.

---

[10] Suspicious Activity Reports were requested in Gucci's 2010 subpoena, but were not requested in its 2011 subpoena.

**GIBSON DUNN**

Honorable Richard J. Sullivan
March 2, 2016
Page 11

With respect to privilege, based on the parties' meet and confers, BOC's understanding is that Gucci's counsel does not require a document-by-document privilege log covering BOC's communications with outside counsel. With respect to internal BOC communications that have been withheld on privilege grounds, which are referenced categorically in BOC's February 26, 2016 privilege log, following a meet and confer held yesterday, BOC has agreed to provide a document-by-document privilege log by March 11, 2016.

To the extent Gucci seeks an order compelling BOC to produce withheld documents and/or additional sanctions, including attorney's fees, BOC requests that the Court afford the parties an opportunity for full briefing so that these matters can be addressed on a fully-developed record.

Finally, BOC notes Gucci's stated intention to file a motion seeking to hold BOC liable for aiding and abetting Defendants' alleged violations of the asset freeze order in place in this matter as a result their withdrawal of more than $2 million (as calculated by Gucci) in June 2015. Actually, the amount of money that was withdrawn from Defendants' accounts was much lower, and the withdrawals occurred after final, non-appealable orders were issued in the Chinese litigations between BOC and certain of the Defendants. On February 24, 2016, BOC was served with a new complaint brought in China by these same Defendants, who now claim that BOC must pay money damages as a result of its unlawful suspension of access to their accounts.[11] BOC expects that the parties will be able to negotiate an agreed schedule for briefing the issue so that BOC has a full opportunity to show the lack of any legal or factual basis on which BOC could be held liable for Defendants' alleged violations of the asset freeze order.

Respectfully submitted,

*/s/Robert L. Weigel*

Robert L. Weigel, counsel to Plaintiffs


*/s/ Laura R. Hall*

Laura R. Hall, counsel to nonparty Bank of China

---

[11] BOC produced the complaint it received last week to Gucci today.